```
 1                     UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF NEW YORK
 2

 3    --------------------------------X
                                      :
 4    UNITED STATES OF AMERICA,       :
                                      :  11-CR-00030
 5                                    :
                                      :
 6           v.                       :
                                      :  225 Cadman Plaza East
 7    REYNOLD MARAGNI,                :  Brooklyn, New York
         also known as "Ren" also     :
 8       known as "Reynolds"          :  February 4, 2011
                                      :
 9                 Defendant.         :
      --------------------------------X
10
           TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
11                BEFORE THE HONORABLE LOIS BLOOM
                  UNITED STATES MAGISTRATE JUDGE
12

13    APPEARANCES:

14    For the Government:        ELIZABETH GEDDES, ESQ.
                                 ALLON LIFSHITZ, ESQ.
15                               United States Attorney's Office
                                 271 Cadman Plaza East
16                               Brooklyn, New York 11201

17    For Defendant:            JAMES R. FROCCARO, ESQ.
                                 20 Vanderventer Avenue
18                               Suite 103W
                                 Port Washington, New York  11050
19

20
      Court Transcriber:         RUTH ANN HAGER
21                               TypeWrite Word Processing Service
                                 211 N. Milton Road
22                               Saratoga Springs, New York 12866

23

24

25


      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service
```

2

1   (Proceedings began at 12:55 p.m.)

2          COURT CLERK:  -- Case number 11-CR-00030, <u>United</u>

3   <u>States v. Reynold Maragni</u>.

4          Counsel, please state your names for the record.

5          MS. GEDDES:  Elizabeth Geddes for the Government.

6   Good afternoon, Your Honor, and Allon Lifshitz as well.

7          THE COURT:  Good afternoon.

8          MR. FROCCARO:  Good afternoon, Your Honor.  James

9   Froccaro for Mr. Maragni.

10          THE COURT:  Good afternoon and good afternoon, Mr.

11   Maragni.  This is on for your bail application.  I have

12   received submissions from both the Government and your

13   attorney but this is your application, Mr. Froccaro.

14          MR. FROCCARO:  Judge, I know you've read the papers

15   so I'll be brief.  The bond that I've offered is a very

16   substantial bond.  It's also a very restricted bond.  It's a

17   two million-dollar appearance bond secured by over a million

18   dollars in equity in the real property of his loved ones.

19   Judge, in terms of the restricted terms I'd ask that he be

20   released on house arrest with electronic monitoring.

21          In terms of the Government's case, Your Honor, I

22   know I've put it in my letter, but briefly Mr. Maragni is not

23   alleged to have engaged in any act of physical violence nor is

24   he alleged to have -- any person at his behest to have engaged

25   in physical violence and I think that separates him from a lot

3

1    of the others in the detention memo.  For those reasons, Your

2    Honor, I respectfully submit that he should be released on the

3    conditions that I proposed.

4              THE COURT:  And Ms. Geddes?

5              MS. GEDDES:  The Government opposes the defendant's

6    release on any bond in this case.  The defendant is a captain

7    in the Colombo crime family and in light of his position in

8    the family, a violent criminal enterprise, he's not required

9    to personally engage in any violence.  He has individuals to

10   do that on his behalf.

11             He was captured on numerous consensual recordings

12   meeting with cooperating witnesses discussing acts of

13   violence.  On one occasion he approved a soldier in the

14   DeCavalcante family who requested a cooperating witness to

15   assist him in collecting a debt in a different state.  On a

16   more recent occasion this past December the defendant was

17   captured on a recording that provided a brief transcript to

18   defense counsel and I mentioned this in the detention

19   memorandum and I have another transcript of a more recent

20   conversation as well that I can provide to Your Honor on this

21   particular recording which was captured December 1st.

22             I should note that the defendant resides in Florida

23   but travels approximately every three to four weeks up to New

24   York and maintains Colombo family business in both New York

25   and in Florida.  On one recent trip to New York in December

4

1    the defendant was captured asking the cooperating witness to

2    go and grab the boyfriend of a relative of the Colombo family

3    under "Boss."  He -- the defendant directed the cooperator

4    that he didn't want him to hurt him, this individual who he

5    was requesting that the cooperator grab, but he wanted him to

6    scare him and then indicates that he wants him to tell him

7    that if this individual ever laid his hands on this relative

8    again he was going to come back and "We're going to cripple

9    you.  We're not going to kill you because we're going to make

10   you live through it."  He then later says, "We're going to

11   roll him out like a paraplegic" and I've omitted his colorful

12   language in that.

13           In that same conversation he brought up another

14   incident in which he had previously asked the cooperating

15   witness to collect -- to assist him in collecting a debt owed

16   by a surveyor or a landscaper, an individual he described as a

17   surveyor or a landscaper.  Excuse me.  In that particular

18   recording he provided some information about where that

19   individual would be.  This is a completely separate incident

20   during the same conversation where they discussed this but it

21   was a separate individual that he was referring to.  In that

22   incident he advised the cooperating witness where this

23   particular individual, this landscaper or surveyor who owed

24   him money would be located and tells him, "When you see this

25   kid I want you to take him off the streets.  Take him off the

5

1   streets.  Tell him if you're ever late for one of his payments
2   again -- threaten him essentially if you're ever late for one
3   of his payments again."  And then Maragni says, "I want him
4   stabbed.  Take him off with a couple of kicks to his belly.  A
5   little wake-up call" and he later says, "I want you to horrify
6   him.  Horrify him.  Next time you're going in the trunk.
7   Don't ever be late with these payments again."  These are
8   instructions that the defendant is providing to a cooperating
9   witness to go and convey to another individual.
10              This recording was as recent as December.  This was,
11  I believe, the second to last trip that the defendant has made
12  to New York and it's just one example of violence advocated by
13  the defendant in his capacity as a captain of a crime family.
14  He maintains extensive operations in both Florida and, as I
15  stated, New York.  He has been captured on recordings meeting
16  with other captains in the Colombo family as well as attending
17  captain's meetings with the hierarchy in the Colombo family
18  administration up here in New York.
19              In light of that, the defendant's -- in addition to
20  that, the defendant has ties to Canada.  He's engaged in a
21  scheme to import marijuana from Canada and I raise this simply
22  because the defendant has ties to Canada and other countries,
23  also traveled recently with members of his crew to Aruba out
24  of the country.  By "his crew" I'm referring to the Colombo
25  family crew that he has.  He also on another recording was

6

1   captured discussing business that he has in other states in

2   the United States which he vocalized would be "good" for the

3   Colombo family.  He mentioned that he had meetings scheduled

4   in New Orleans as well as Chicago and also had plans to engage

5   in activities in Detroit and Milwaukee and I believe there's

6   another city as well.

7           I raise this only to state that the defendant's

8   criminal activity is widespread over the United States.  It's

9   most specifically or most prominently in Florida and New York,

10  but he has numerous activities going on.  And in light of his

11  position in the Colombo family, the direction that he's

12  provided to cooperating witnesses, his access to other Colombo

13  family associates and La Costa Nostra associates and the

14  members, the defendant poses a significant danger to the

15  community.

16          MR. FROCCARO:  Judge, can I just briefly respond?

17          THE COURT:  Of course you can.

18          MR. FROCCARO:  Regarding --

19          THE COURT:  And I just -- but I also want to say

20  thank you for not trying to interrupt and I know that it's

21  difficult to listen when there are things being said and that

22  your client may have wanted you to interrupt, but he is doing

23  his job by letting her speak and I will now, of course, let

24  you speak.

25          MR. FROCCARO:  Thank you, Judge.  Just briefly.  I'm

7

1    seeing this excerpt for the first time, a complete excerpt,

2    but it's exactly as I represented to Your Honor that he has no

3    alleged to have engaged in any act of physical violence and no

4    person is alleged to have engaged in any act of physical

5    violence.  Also have -- this doesn't change that.

6              In reviewing it, Judge, she didn't read the whole

7    statement that they alleged Mr. Maragni made.  Obviously I

8    don't have access to the tapes to make my own independent

9    interpretation.  These transcripts are sometimes wrong, but it

10   says, "I don't want you to hurt.  I don't want you to do

11   nothing to him but I want to scare him," which is exactly what

12   I told Your Honor.  No acts of physical violence.

13             With respect to the flight risk, Your Honor, he has

14   a passport.  It's being sent up by his estranged wife to my

15   office.  I'll surrender it.  The package that I proposed to

16   Your Honor I know you know is substantial.  He's not about to

17   leave the country or flee based on the substantial package

18   offered.  All his loved ones are [unintelligible] homes.  I

19   respectfully submit, Judge, to comply with each and every term

20   of the bond that Your Honor imposes if you're inclined to do

21   so.

22             THE COURT:  His children aren't signing on the bond?

23             THE DEFENDANT:  No, my children aren't signing the

24   bond.

25             THE COURT:  Why not?

8

1          THE DEFENDANT:  Well, my daughter owns a home that's

2     being sold, but if you need their personal signatures I'm sure

3     they will sign.

4          THE COURT:  Well, this is my problem --

5          THE DEFENDANT:  But I've got lots --

6          THE COURT:  Let me tell you what my problem is.  My

7     problem is you know that Florida is one of those states that

8     is a difficult issue for property because of the homestead

9     provision and so it's not as good even though he's got --

10         MR. FROCCARO:  Well, we put a mortgage, Judge.

11    That's the way we solve it so it does correct it.  The

12    mortgage is good.  The judgment I know won't work.  And if

13    Your Honor wants the children I'm sure I -- the only reason I

14    didn't volunteer them --

15         THE COURT:  And I don't know anything about Las

16    Vegas.  I mean, we're --

17         MR. FROCCARO:  -- is because they were going to sell

18    the house.

19         THE COURT:  -- talking about properties in Las

20    Vegas.  We have one in New York with an equity of near 250.

21         MR. FROCCARO:  Judge, I have some experience in Las

22    Vegas.  It's not a problem, Judge.  I've had two cases there

23    in Las Vegas.

24         THE COURT:  And they don't have the same homestead

25    provision?

1          MR. FROCCARO:  There is, but there's a way around

2    with a mortgage.  That's my understanding.

3          THE COURT:  And you said your daughter is selling

4    her home but it says you have three children.

5          THE DEFENDANT:  Yes, I have my 22-year-old son

6    Christopher lives in California.  He recently graduated

7    Florida State University.  He moved out there and my son

8    [inaudible] home [inaudible].

9          MR. FROCCARO:  His son that just graduated from

10   college doesn't --

11         THE DEFENDANT:  He's working.

12         MR. FROCCARO:  But if you want them on the bond,

13   Your Honor, of course, they'll sign.

14         THE COURT:  Well, you know, I'm always on the fence

15   here because, again, one of the things that I think ensures

16   people living up to their obligations is that the people that

17   mean most to them are signing onto the bond.

18         MR. FROCCARO:  Yes.

19         THE COURT:  Your client has to be in one place.

20         MR. FROCCARO:  Judge, he's going to be staying --

21   Your Honor, he's estranged from his wife.  They're separated.

22   In Brooklyn with his girlfriend who's in court here today.  I

23   say "Brooklyn."  Staten Island, Judge.  Excuse me.

24         THE COURT:  Because I don't want this back and forth

25   between Florida but that is where he's employed.  What's the

10

1   deal with Premiere Foods in south Florida?

2           MR. FROCCARO:  Judge, he has an apartment there.

3   He'll be running the business in his absence.

4           THE COURT:  So we don't need anything on that.

5           MR. FROCCARO:  I don't need for him to travel to

6   Florida, Judge.  Unless it's an emergency I'll make an

7   application to the Court if that's necessary.

8           MS. GEDDES:  Your Honor, if I could just add one --

9   two additional comments.  One, with respect to Mr. Froccaro's

10  representation which is correct that the defendant did not

11  personally engage in violence and that the violence advocated

12  by the defendant did not occur, the reason that this

13  particular violence did not occur was because the individual

14  whom he tasked to do this was a cooperating witness.

15          THE COURT:  I -- look, I am not underestimating the

16  strength of the Government's case nor am I underestimating

17  that there are wiretaps that neither myself or Mr. Froccaro

18  have heard at this point that may implicate him.  I'm only

19  going on what you presented here today.  I'm not saying that I

20  absolutely buy the innocent explanation that Mr. Froccaro has

21  put on the record, but what I'm looking at is his last

22  conviction was in Florida.  I'm looking at the last time that

23  he was returned on a warrant was when he was 24 years old in

24  1976.

25          Again, I don't underestimate the seriousness of your

1  allegations that as a captain in the Colombo crime family he

2  does not need to personally do the bidding himself, but all of

3  the same concerns that I had in the last case -- here he

4  doesn't have an autistic son and I'm glad that he doesn't --

5  but I believe a two or two and a half-million-dollar package

6  with the children signing onto the bond.  So as much as I hate

7  for a 22-year-old who's just starting his life to be on a bond

8  so that if his father does wrong his life goes down the tubes,

9  too, but I think that, again, since it can't be your mother

10  and it can't be your wife, your children are, I imagine, the

11  closest thing that we have to that you're going to stay where

12  you're supposed to be and do what you're supposed to do.

13            Yes, Ms. Geddes.

14            MS. GEDDES:  Your Honor, just one additional note

15  for the Court.  The defendant was captured on various

16  recordings discussing a scheme -- an alleged scheme to bribe

17  an individual in order to obtain a commutation of a state

18  inmate's sentence.  I raise this because it's part of the

19  Government's investigation.  The Government through a

20  cooperating witness provided the defendant with a suitcase

21  filled with $25,000.00 in cash.  The following day or a few

22  days later the Government requested that money back again

23  through a cooperating witness and the individ -- and the

24  defendant returned that money.

25            However, the money that he returned was different

1   from the cash that the Government had provided to the

2   defendant just a few days earlier.  I say this only because it

3   shows that the defendant has access to a substantial amount of

4   cash and the Government believes that there -- that at this

5   point the Government has no understanding of the full amount

6   of cash at the defendant's disposal which he would use to

7   reimburse any individual to sign onto a bond no matter how

8   extensive it is.

9          THE COURT:  But that concern if I'm hearing

10  correctly, and I do believe I am, goes to risk of flight

11  because money is fungible, which is why I was saying that

12  having people on the bond who are closer to his heart.  You

13  know, I always like to have a grandmother's apartment or

14  premises because nobody -- you go straight to hell if you, you

15  know, give up your grandmother's apartment.  But I think at

16  this point in time the closest thing that we have is his three

17  children signing onto the bond, that the house that his

18  daughter lives in is currently under sale.  We can't get the

19  papers on that house.

20          And I will up the ante here -- I don't think it

21  matters that much and make it a two and a half million-dollar

22  bond -- and have the same people sign on including the

23  properties that are here that Mr. Froccaro has represented to

24  the Court that there's no problem getting a mortgage on the

25  Florida premises and that he knows what to do to get the Las

13

1   Vegas premises listed.

2           And he's going to be on electronic monitoring, he's

3   going to pay the cost of electronic monitoring.  He's not

4   going to be out of the house except for court prearranged

5   visits to a doctor, prearranged visits to his lawyer, and if

6   there's a medical emergency I am telling you you have to call

7   9-1-1.  You can't just say it's a medical emergency.  You have

8   to call EMS.  And that you will reside, I take it, at 121

9   Third Street, Staten Island, New York.  Is that correct?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And there's a land line there so that we

12  could have the electronic monitoring and there will also be

13  phone monitoring.  And I want this to be discussed with the

14  girlfriend so that she understands Mr. Maragni is not

15  permitted to use other phones.  The Government is going to

16  know the phones and that there's going to be monitoring of all

17  phones.

18          MR. FROCCARO:  I've discussed that with him already,

19  Your Honor.

20          THE COURT:  Okay.  So that's going to be part of the

21  order as well.  And who do we have in court today that needs

22  to sign?  Oh, and this is likewise also going to go up to the

23  Judge.  I can't overrule Judge Townes if Judge Townes believes

24  this is inadequate in any way.  It's a two and a half million-

25  dollar bond secured by the properties with electronic

14

1    monitoring and home detention.  So who do we have in court?

2         MR. FROCCARO:  Judge, we have Angelo Louis

3    Vitagliano [Ph.], Karen Irso [Ph.], and that's it for today,

4    Your Honor.

5         THE COURT:  Okay.  And these are people that own the

6    properties or no?

7         MR. FROCCARO:  Yes, Your Honor.

8         THE COURT:  Okay.  If they could come forward and

9    give their names.  And, Mr. Froccaro, if you could work

10   afterwards because I know that if Judge Townes is going to

11   approve this she wants everybody to be signed on before she

12   sees them --

13        MR. FROCCARO:  Yes, Judge.

14        THE COURT:  -- before she makes her decision.

15        MR. FROCCARO:  I'll set it up with the people who

16   are out of the jurisdiction for them to sign that bond.

17        THE COURT:  Very good.  And the three kids.  Mr.

18   Froccaro, the three kids.  The three kids.

19        MR. FROCCARO:  The three children as well, Your

20   Honor.

21        THE COURT:  Yes, because they -- one is in

22   California; two are here.

23        MR. FROCCARO:  Yes, Your Honor.

24        THE COURT:  Okay.

25                         SURETERS, Sworn

1          MS. GEDDES:  Your Honor, I apologize for

2   interrupting.  The defendant's girlfriend is also present in

3   court today.

4          THE COURT:  I want her on the bond, too.  Thank you.

5   Your name and I'm going to have you sworn, too.

6          MS. JULIANO:  Kim Juliano [Ph.].

7                        KIM JULIANO, Sworn.

8          THE COURT:  Your name?

9          MS. JULIANO:  Kim Juliano.

10          THE COURT:  Thank you.  Ms. Irso, Ms. Juliano, and

11   Mr. and Mrs. Vitagliano, I'm sorry for the circumstances that

12   bring you to the courthouse today.  As you understand your --

13   I don't know how he's related to everybody else except you, so

14   I'll say your boyfriend -- Mr. Maragni, is charged with

15   serious federal crimes and the Government is arguing that he

16   should be held in jail pending his trial on these charges.

17   And his attorney has made an argument to the Court and I've

18   set a two and a half-million-dollar bond.  You heard that

19   there are going to be other people signing on this bond,

20   people in Florida, people in Las Vegas, the three children

21   that Mr. Maragni has, but by coming before the Court today and

22   signing you are binding yourselves.  If for any reason Mr.

23   Maragni does not come back to court when he is directed to do

24   so, all of you will be financially ruined.  There will be a

25   two and a half-million-dollar judgment entered against all of

1   you by the United States.  They will be able to go after your

2   bank accounts.  They will be able to seize your property.

3   They will be able to garnish any wages that you earn.  They

4   will be able to intercept any tax refunds that you may be

5   expecting.

6          May I ask, Ms. Irsa, how do you know Mr. Maragni?

7          MS. IRSA:  I met Mr. Maragni through a boyfriend who

8   I was with and is now deceased.

9          THE COURT:  I'm sorry to hear that.  And how long

10  ago was that?

11         MS. IRSA:  Thirteen, 14 years ago.

12         THE COURT:  And what do you do for a living, Ms.

13  Irso?

14         MS. IRSO:  I have an expedited business.

15         THE COURT:  And what does that mean?

16         MS. IRSO:  I go to the bills department

17  [unintelligible].

18         THE COURT:  And where is that business?

19         MS. IRSO:  I do all five boroughs.

20         THE COURT:  Is this your own personal business?

21  What's the name of the business?

22         MS. IRSO:  BIP Expedite.

23         THE COURT:  And how long have you had the business?

24         MS. IRSO:  Going on 16 years now.

25         THE COURT:  Good for you.  And I'm sorry to ask, but

1    how much did you earn approximately last year?

2           MS. IRSO:  Last year was a bitch [ph.], yeah.  About

3    55,000, 60,000.

4           THE COURT:  That's what you personally earned on

5    your income tax?

6           MS. IRSO:  Yeah.

7           THE COURT:  Thank you.  And do you own a home?

8           MS. IRSO:  Yes.

9           THE COURT:  And is that being posted as part of this

10   bond?  And where is that home?

11          MS. IRSO:  Staten Island.

12          THE COURT:  And it --

13          MS. IRSO:  At 20 Edgewood Road.

14          THE COURT:  And is it a single-family home?

15          MS. IRSO:  20 Edgewood Road.  Yes, it's a single-

16   family home.

17          THE COURT:  And how long have you lived there?

18          MS. IRSO:  Eight years.

19          THE COURT:  And you understand that the papers for

20   that home are going to be filed with the county -- you, of

21   course, understand that with the business that you have.

22          MS. IRSO:  Yes.

23          THE COURT:  And that if for any reason he does not

24   do what he is supposed to do if he violates the terms and

25   conditions, even though you thought he would, you believed

18

1   that he would, they're going to come after your home.  You

2   understand that?

3           MS. IRSO:  Yes.

4           THE COURT:  And, Ms. Julia?

5           MS. JULIANO:  Juliano.

6           THE COURT:  Juliano.  Do you work outside the home?

7           MS. JULIANO:  Yes, I do.

8           THE COURT:  What do you do for a living?

9           MS. JULIANO:  I'm a licensed aesthetician.

10          THE COURT:  And do you work at a spa?

11          MS. JULIANO:  I work at Macy's.

12          THE COURT:  You work at --

13          MS. JULIANO:  I do makeup and facials.

14          THE COURT:  And do you work for a particular brand

15  line?

16          MS. JULIANO:  Laura Mercier and Sue Devitt.

17          THE COURT:  And how long have you worked for them?

18          MS. JULIANO:  About a year and a half.

19          THE COURT:  And may I ask what did you make

20  approximately last year?

21          MS. JULIANO:  Probably roughly about 40 -- 35,

22  40,000.

23          THE COURT:  And you understand that Mr. Maragni is

24  going to be released to live in your home.

25          MS. JULIANO:  Yes.

1          THE COURT:  And that there's going to be electronic

2    monitoring.

3          MS. JULIANO:  Yes.

4          THE COURT:  And that he's going to be subject to

5    random home visits of the Pretrial Services officers and that

6    they're going to be allowed to confirm that he is living there

7    and that they're going to electronically monitor his movements

8    so he is going to be your worst nightmare.  No going out to

9    dinner, no picking up food, no taking out the garbage, no pick

10   up milk on your way home.  Do you understand all of that?

11         MS. JULIANO:  Yes.

12         THE COURT:  And do you also understand that all the

13   telephone service in that house is going to be monitored?

14         MS. JULIANO:  Yes.

15         THE COURT:  And so anybody coming in and leaving can

16   expect that they're going to be monitored?

17         MS. JULIANO:  Yes.

18         THE COURT:  So people aren't going to be able to

19   bring in cell phones that supposedly the Government won't know

20   about.  He's going to be under a microscope, which means

21   you're going to be under a microscope.

22         MS. JULIANO:  I understand.

23         THE COURT:  And how do you both know Mr. Maragni?

24         MS. VITAGLIANO:  Friends of the family.

25         THE COURT:  And what do you both do for a living?

20

1              MR. VITAGLIANO:  I'm retired.  I had a restaurant

2    for 17 years.

3              THE COURT:  And when did you get to retire?

4              MR. VITAGLIANO:  I had medical problems.

5              THE COURT:  Oh, I'm sorry to hear that.

6              MR. VITAGLIANO:  Problems [inaudible].

7              THE COURT:  I was going to say it's the American

8    dream but not if it's for medical reasons.  And do you work

9    outside the home, ma'am?

10             MS. VITAGLIANO:  No, I don't.  I'm -- I'm sorry.

11   I'm also on --

12             THE COURT:  A disability.

13             MS. VITAGLIANO:  Yeah.

14             THE COURT:  But you own a home?

15             MR. VITAGLIANO:  Yes.

16             THE COURT:  And where's the home?

17             MR. VITAGLIANO:  Las Vegas.

18             THE COURT:  And is it a single-family?

19             MR. VITAGLIANO:  Single family.  Just her and I live

20   in it.

21             THE COURT:  And you flew in from Las Vegas?

22             MR. VITAGLIANO:  No.  I come up here for medical

23   reasons.  Medical purposes.

24             THE COURT:  And the home in Las Vegas, what's the

25   equity in the home?

1            MR. VITAGLIANO:  About 350,000.

2            THE COURT:  Even in this market.

3            MR. FROCCARO:  That's the value, Judge.

4            MR. VITAGLIANO:  That's the value.  That's the

5     value, yes.

6            THE COURT:  And how much equity, meaning, how much

7     do you owe on the house?

8            MR. VITAGLIANO:  Oh, 122,000.

9            THE COURT:  Is what you owe?

10           MR. VITAGLIANO:  Yes.

11           THE COURT:  So there's about 220.

12           MR. VITAGLIANO:  Yeah.

13           THE COURT:  Okay.  And you understand that the

14    paperwork for that home is going to be put in the county court

15    in Las Vegas and if for any reason Mr. Maragni does not do

16    what he's supposed to do the Government will go after the home

17    to satisfy this judgment?

18           MR. VITAGLIANO:  Yes.

19           THE COURT:  And especially for both of you because

20    the other people are still gainfully employed so they can go

21    after their -- but I -- pensions are a difficulty so they're

22    certainly going to come after your home.  Do you understand

23    that?

24           MR. VITAGLIANO:  Yes.

25           THE COURT:  Now, I've told you all of this not to

22

1  dissuade you from signing the bond but to make sure that if

2  you do sign the bond that you're doing it with your eyes open

3  and that you understand if for any reason he does not come

4  back to court when he's directed to do so, he tries to flee or

5  he violates the terms and conditions as set forth, all of you

6  will be on the hook for the full amount of the bond to the

7  United States Government.  Do you all still want to sign the

8  bond?

9           SURETERS:  Yes.

10          THE COURT:  Okay.

11          MS. GEDDES:  Your Honor, the Government would

12  request as a standard on these bonds that one of the

13  conditions that he be subject to -- that he not have any

14  contact with other members of organized crime.

15          THE COURT:  If I didn't say that I will put that.

16  Which means, again, Mr. Maragni, it's not as if I know who all

17  those people are but I believe you probably know who all those

18  people are and that you should know that you're under a

19  microscope and that they are going to be monitoring both your

20  phone, your girlfriend's phone, any phone that's brought in

21  they'll find out about it.  You're going to be on an

22  electronic bracelet but I still think you'd rather be there

23  than be in MDC.

24          So I'm sorry, Felix, you handed it up.  Was there

25  something else I needed to do or are we --

23

| | |
|---|---|
| 1 | THE CLERK:  No. |
| 2 | THE COURT:  The passport issue, when can it get |
| 3 | here? |
| 4 | MR. FROCCARO:  Judge, I spoke to his wife.  She's |
| 5 | supposed to be Federal Expressing it up to my office and I'll |
| 6 | make sure it gets surrendered. |
| 7 | THE COURT:  So you'll just make sure that it gets |
| 8 | filed with Pretrial.  They'll give a receipt for it.  You |
| 9 | cannot apply for any other passport and I would like to be |
| 10 | able to say by next Wednesday, because that's our target date, |
| 11 | that it will be surrendered.  You're saying Fed Ex, so it |
| 12 | should be here in another day. |
| 13 | MR. FROCCARO:  Actually, Judge, I have no problem, |
| 14 | Judge. |
| 15 | THE COURT:  What's the date on Tuesday, Felix? |
| 16 | THE CLERK:  Tuesday, the 8th. |
| 17 | THE COURT:  So I'm going to put in by the 8th.  So |
| 18 | everybody understands that was a condition even though I |
| 19 | didn't state it on the record $2500 bond.  He's going to |
| 20 | reside at his girlfriend's house.  He's going to be on |
| 21 | electronic monitoring.  He's under the express supervision of |
| 22 | Pretrial.  He has to report as directed.  You're only out for |
| 23 | medical emergencies, preapproved appointments with either |
| 24 | medical care providers, your attorney and the Court, and your |
| 25 | attorney has to be notified.  If you have any medical |

24

1  appointment they have to make Pretrial is going to have to be

2  told where you're going, when you're getting there, all of

3  that. The apartment -- I'm sorry, the premises that are being

4  put up, when are we getting the confessions filed by?

5          MR. FROCCARO: Judge, I'd like just a little time

6  because I'm going to have this -- you know, counsel from --

7          THE COURT: And I understand that, but I also

8  want --

9          MR. FROCCARO: I'm sure we can have it done by

10  Wednesday if I can get in touch with somebody on Monday.

11          THE COURT: So I'm going to put in by the 8th -- by

12  the 9th.

13          MR. FROCCARO: If I need more time, I'll --

14          THE COURT: You'll ask. Okay.

15          MS. IRSO: [Inaudible]

16          THE COURT: Okay. So I'm going to say -- I actually

17  have it here that the confessions of judgment shall be duly

18  filed before release so I think that covers us and I don't

19  need to put the date.

20          MR. FROCCARO: Fine.

21          THE COURT: Okay. So I'm going to pass this forward

22  and ask all the sureters to sign. I'm also going to ask you

23  to sign, Mr. Maragni.

24          MR. FROCCARO: Two -- there's four -- two in Florida

25  and three kids so total is six and three is nine, right?

25

1          THE COURT:  Your son that's in California is he

2   closer to Los Angeles or --

3          MS. VITAGLIANO:  My glasses, so I can't see.

4          THE DEFENDANT:  I believe he lives in North

5   Hollywood.

6          THE COURT:  There is a central district of

7   California that's downtown LA.  He'll be able to get there.

8   It's right in the center of town.

9          Ms. Juliano, Ms. Irso, if you've signed you can be

10  seated.  Thank you.

11         MR. FROCCARO:  You want him to sign, right?

12         THE COURT:  Mr. Maragni, I'm required by law to give

13  you the following bail warnings, sir.  If for any reason you

14  don't come back to court when you're directed to do so the

15  agents will be dispatched.  They'll find you.  You'll be

16  placed under arrest.  You'll be brought back to court and the

17  likelihood is you will not be released again pending your

18  trial on these charges.

19         In addition, there's a separate federal crime called

20  bail jumping.  If you don't come back to court they have to

21  find you.  You can be prosecuted for bail jumping which is

22  punishable by up to ten years in jail.  It's a separate

23  federal crime.  You can be convicted of bail jumping even if

24  you're never convicted of the underlying crimes which you

25  stand accused today.  Last, if you commit any other crime

1  while you're out on bail they can enhance the penalty for the

2  crime you commit.  If you commit a felony in New York while

3  out on bail they can add ten years onto the sentence for

4  whatever the crime is that you commit.  Do you understand

5  those warnings?

6  　　　　　　THE DEFENDANT:  Yes, I do.

7  　　　　　　THE COURT:  Will you abide by the conditions set

8  forth in the bond?

9  　　　　　　THE DEFENDANT:  Yes, I will, Your Honor.

10  　　　　　　THE COURT:  And will you come back to court whenever

11  you're directed to do so?  Then please sign.  We're going to

12  get the additional sureters to sign in the distant locations.

13  We'll -- Mr. Froccaro, are you going up before Judge Townes?

14  　　　　　　MR. FROCCARO:  Yes.

15  　　　　　　THE COURT:  So you'll also speak to Judge Townes

16  about when she wants to see --

17  　　　　　　MR. FROCCARO:  Yes, Your Honor.

18  　　　　　　THE COURT:  But at least now something is in

19  writing.  I'm ordering that you be released on these

20  conditions as set forth in the bond.  I've seen the four

21  sureters that appeared in court today.  I've set the terms and

22  conditions for the other sureters and this is all subject to

23  the appeal by the Government to Judge Townes.  And with that,

24  anything further on behalf of the Government?

25  　　　　　　MS. GEDDES:  No, Judge, thank you.

27

1          THE COURT:  Mr. Froccaro?

2          MR. FROCCARO:  No, Judge.

3          THE COURT:  This matter is adjourned.

4          MR. FROCCARO:  Thank you.

5          (Proceedings concluded at 1:26 p.m.)

6                        *  *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

28

1           I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6    _____

7                          Ruth Ann Hager

8    Dated:   February 4, 2011