1

441

1             UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

2

      - - - - - - - - - - - - - - - - - X

3

      UNITED STATES OF AMERICA,          :    08-CR-240

4

                    v.                   :    U.S. Courthouse

5                                             Brooklyn, New York

      THOMAS GIOELI and                  :

6     DINO SARACINO,                     :

                                              March 21, 2012

7                   Defendants.    :     9:30 o'clock a.m.

8     - - - - - - - - - - - - - - - - - X

9

                        TRANSCRIPT OF TRIAL

10                      BEFORE THE HONORABLE BRIAN M. COGAN
                        UNITED STATES DISTRICT JUDGE, and a jury.

11

      APPEARANCES:

12

      For the Government:             LORETTA E. LYNCH

13                                    United States Attorney
                                      By:  ELIZABETH GEDDES

14                                        CRISTINA POSA
                                          JAMES GATTA

15                                    Assistant U.S. Attorneys
                                      271 Cadman Plaza East

16                                    Brooklyn, New York 11201

17    For the Defendant Gioeli:       ADAM PERLMUTTER, ESQ.
                                      CARL HERMAN, ESQ.

18                                    DANIEL McGUINNESS, ESQ.

19    For the Defendant Saracino:     SAM BRAVERMAN, ESQ.
                                      LOUIS FASULO, ESQ.

20                                    HEATHER BERGER, ESQ.

21

22    Court Reporter:                 Anthony M. Mancuso
                                      225 Cadman Plaza East

23                                    Brooklyn, New York 11201
                                      (718) 613-2419

24

      Proceedings recorded by mechanical stenography, transcript

25    produced by CAT.
              ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 61

501

18      THE WITNESS:  Reynold Maragni, R-E-Y-N-O-L-D,
19 M-A-R-A-G-N-I.
20      THE CLERK:  Thank you.  You may be seated.
21      THE COURT:  You may inquire, Ms. Geddes.
22 REYNOLD  MARAGNI  ,
23      called as a witness, having been first duly sworn,
24      was examined and testified as follows:
25

CMH    OCR    RMR    CRR    FCRR

Page 62

502

1 DIRECT EXAMINATION
2 BY MS. GEDDES:
3 Q   Sir, did you participate in organized crime?
4 A   Yes.
5 Q   Which family?
6 A   Colombo.
7 Q   Were you an inducted member of the Colombo family?
8 A   Yes, I was.
9 Q   When were you inducted into the Colombo family?
10 A   2008.
11 Q   Prior to becoming a member of the Colombo family, did you
12 associate with members of organized crime?
13 A   Yes.
14 Q   For how long?
15 A   From the '70s.
16 Q   Did anything happen to end your association with the
17 Colombo family?
18 A   I was arrested in January 2011.
19 Q   How did that end your association with the Colombo
20 family?
21 A   I made a decision to cooperate.
22 Q   How old are you?
23 A   I'm 60.
24 Q   When were you born?
25 A   1952.

CMH    OCR    RMR    CRR    FCRR

Page 63

503

1 Q   Where were you born?
2 A   Brooklyn, New York.
3 Q   Did you grow up in Brooklyn?
4 A   Yes.
5 Q   How far did you go in school?
6 A   High school equivalency diploma.
7 Q   You received a GED?
8 A   Yes.
9 Q   Did you serve in the military?
10 A   Yes, I did.
11 Q   Which branch?
12 A   The Army.
13 Q   When did you go into the Army?
14 A   1970.
15 Q   How long were you in the Army for?
16 A   Two years.
17 Q   Were you on active duty?
18 A   Yes, I was.
19 Q   Were you deployed?
20 A   Yes.
21 Q   Where?
22 A   Vietnam.
23 Q   When did you leave Viet Nam?
24 A   1971.
25 Q   How long were you in Vietnam for?

CMH    OCR    RMR    CRR    FCRR

Page 64

504

1 A   Approximately 9 and a half months.
2 Q   Where were you assigned after Vietnam?
3 A   I was assigned to Fort Dix.
4 Q   Did you go to Fort Dix?
5 A   Yes, I did.
6 Q   Did you stay at Fort Dix?
7 A   No, I didn't.
8 Q   How were you discharged?
9 A   I was given a general discharge for less than honorable
10 reasons.
11 Q   Why was that?
12 A   I went AWOL.
13 Q   Why did you go AWOL?
14 A   I received orders to go to Fort Hood, Texas to play war
15 games and I was a combat veteran and didn't feel like I should
16 play war games so I went AWOL.
17 Q   Did you get a legitimate job when you came back from Viet
18 Nam?
19 A   Yes.
20 Q   Where did you go when you came back from Viet Nam?
21 A   I went to Brooklyn.
22 Q   Did you commit crimes to supplement your income?
23 A   Yes.
24 Q   What types of crimes?
25 A   We did trunking which is you burglarize the trunk of a

CMH    OCR    RMR    CRR    FCRR

505

1 car and steal a spare tire or whatever else was in the trunk
2 you could take, and also I dealt in random card games and
3 social clubs.
4 Q    Did you participate in any assaults?
5 A    Yes.
6 Q    Did you injure anyone?
7 A    Yes.
8 Q    Did you develop a reputation?
9 A    Yes.
10 Q    What was that reputation?
11 A    A tough guy.
12 Q    What is the primary purpose of the Colombo family?
13 A    The primary purpose is to engage in criminal activity,
14 make money.
15 Q    To make money?
16 A    Sure.
17 Q    During the course of your involvement in organized crime,
18 did you learn that the Colombo family had a certain structure?
19 A    Yes.
20 Q    And before I ask you about that structure, did you learn
21 that there were other families like the Colombo family?
22 A    Yes.
23 Q    And did those families have the same general structure?
24 A    Yes.
25 Q    And are there also rules associated with the Colombo

CMH    OCR    RMR    CRR    FCRR

506

1 family?
2 A    Yes.
3 Q    Were the rules associated with the Colombo family the
4 same general rules that applied to those other families?
5 A    Yes, there were.
6 Q    How many organized crime families are there in the
7 New York area?
8 A    Five.
9 Q    What are the names of those families?
10 A    Colombo, Bonanno, Luchese, Gambino and Genovese.
11 Q    Are you familiar with the role of a captain in organized
12 crime?
13 A    Yes.
14 Q    Are there other names for captains in organized crime?
15 A    Yes.
16 Q    What are those?
17 A    Caporegime, skipper.
18 Q    What is the role of a captain in an organized crime
19 family?
20 A    It's to oversee a crew of soldiers and supervise their
21 day-to-day.
22 Q    And when you refer to supervising their day-to-day, whose
23 day-to-day are you referring to?
24 A    Your -- the soldiers in your regime.
25 Q    What is the position under captain?

CMH    OCR    RMR    CRR    FCRR

507

1 A    Soldier.
2 Q    Are there other names for a soldier?
3 A    Wiseguy.  Goodfella.
4 Q    Are you familiar with the term "a made man"?
5 A    Yes.
6 Q    What is that?
7 A    That's an inducted member.
8 Q    Is that another term for a soldier?
9 A    Yes.
10 Q    Are you familiar with the term "to be straightened out"?
11 A    Yes.
12 Q    What does it mean to be straightened out?
13 A    That's when you're inducted into a crime family.
14 Q    What is the role of a soldier or made men -- what is the
15 role of soldier in an organized crime family?
16 A    The role of a soldier is to go out and earn and cultivate
17 and develop associates, to enhance the wealth of the crime
18 family earning-wise and manpower-wise.
19 Q    What is the role below a soldier?
20 A    Associate.
21 Q    Are there other terms for associates?
22 A    Yes.
23 Q    What are those?
24 A    Knockaround guy, street guy.
25 Q    What is the role of an associate?

CMH    OCR    RMR    CRR    FCRR

508

1 A    Go out and earn.
2 Q    Go out and earn money?
3 A    Go out and earn money and do whatever his supervisor
4 tells him.
5 Q    Are there certain ethnic requirements that someone has to
6 fulfill to become a made member of an organized crime family?
7 A    Yes.
8 Q    What are those?
9 A    You have to be 100 percent Italian.
10 Q    Has it always been that way?
11 A    No.
12 Q    How was it before?
13 A    Before it was as long as you were Italian on your
14 father's side, you could be inducted as a member.
15 Q    I'm showing the witness only what's been marked for
16 identification as Government Exhibit 37.
17        Do you recognize that?
18 A    Yes.
19 Q    What is it?
20 A    It's a picture of Gerry Langella.
21 Q    Is it a fair and accurate photograph of Mr. Langella?
22 A    Yes.
23        MS. GEDDES:  I offer Government Exhibit 37.
24        MR. PERLMUTTER:  No objection.
25        MR. FASULO:  No objection.

CMH    OCR    RMR    CRR    FCRR

509

1    THE COURT:  Received.
2    (Exhibit 37 so marked.)
3    MS. GEDDES:  May I publish it?
4    THE COURT:  You may.
5    (Exhibit published.)
6  Q  Does Mr. Langella have any nicknames?
7  A  Gerry Lang.
8  Q  What is Gerry Lang's association with organized crime?
9  A  Gerry Lang was an inducted member of the Colombo family
10  and at one time served as acting boss.
11  Q  Where did you first meet Gerry Lang?
12  A  I met Gerry Lang on a, on a visit to my uncle at the
13  West Street Federal Detention Center in New York.
14  Q  Were you incarcerated at that time?
15  A  No, I wasn't.
16  Q  Was your uncle incarcerated?
17  A  Yes, he was.
18  Q  Was Mr. Lang incarcerated?
19  A  Yes, he was.
20  Q  Did you later associate with Gerry Lang out of jail?
21  A  Yes.
22  Q  After Gerry Lang was released -- withdrawn.
23     Are you familiar with the term to be with somebody?
24  A  Yes.
25  Q  Who were you first with in that sense?

CMH   OCR   RMR   CRR   FCRR

510

1  A  Gerry Lang.
2  Q  And what does it mean to be with somebody?
3  A  To be with somebody is you place yourself in somebody's
4  hands and he directs you and supervises you and cultivates you
5  and grooms you and you go out and earn a living and you report
6  directly to him.
7  Q  How old were you when you were first with Gerry Lang?
8  A  Approximately 22, 23.
9  Q  So it was after your time in the military?
10  A  Yes.
11  Q  When you were with Gerry Lang, what did you do for him?
12  A  I mostly delivered messages for him and whatever else he
13  asked me to do.
14  Q  Does that include assault at times?
15  A  Yes.
16    MS. GEDDES:  I'm now showing the witness what's in
17  evidence, I'll publish to the jury as well, as Government
18  Exhibit 52.
19    (Exhibit published.)
20  Q  Do you recognize that individual?
21  A  Yes.
22  Q  Who is that?
23  A  That's Alphonse Persico.
24  Q  Does he have any nicknames?
25  A  Yes.

CMH   OCR   RMR   CRR   FCRR

511

1  Q  What are those?
2  A  Allie Boy, Little Allie.
3  Q  Approximately when did you meet Allie Boy Persico?
4  A  In the early '70s.
5  Q  How did you meet him?
6  A  I met him over a dispute I had with his cousin.
7  Q  What was the nature of your dispute?
8  A  It was an argument that his cousin was having with my
9  cousin and I interceded on it and it almost turned into a
10  fistfight and Allie came to see me and we talked about it and
11  we patched it up.
12  Q  And what was your relationship with Allie Boy Persico
13  after that?
14  A  We were good friends.
15  Q  What, if any, affiliation with organized crime did Allie
16  Boy Persico have?
17  A  His affiliation was with the Colombo family.
18  Q  Was he an inducted member?
19  A  Yes.
20  Q  Did you commit crimes with Allie Boy Persico?
21  A  Yes.
22  Q  What types of crimes?
23  A  Shylocking.
24  Q  What do you mean by shylocking?
25  A  Giving out loans for a high interest rate.

CMH   OCR   RMR   CRR   FCRR

512

1  Q  Did you do anything to ensure that those loans would be
2  repaid?
3  A  Yes.
4  Q  What?
5  A  Well, threats, and -- yeah, threats, basically.
6  Q  Threats of violence?
7  A  Yes.
8  Q  Did you stay in Brooklyn?
9  A  I moved to Florida, I believe it was 1983.
10  Q  Where in Florida?
11  A  Central Florida, Orlando.
12  Q  Did you get a job there?
13  A  Yes, I did.
14  Q  Doing what?
15  A  I was marketing director of Club Sevilla, a time-share
16  resort in Kissammee, Florida.
17  Q  Did you also commit crimes to supplement your income when
18  you lived in Central Florida?
19  A  Yes, I did.
20  Q  What types of crimes?
21  A  I committed credit card fraud.
22  Q  What was the fraud?
23  A  It was we would buy 3-day passes in Walt Disney World
24  with fraudulent credit cards.
25  Q  Where did you obtain the credit cards from?

CMH   OCR   RMR   CRR   FCRR

513

1 A    New York.
2 Q    Were they legitimate credit cards?
3 A    No, they weren't.
4 Q    How long did the scheme last?
5 A    Approximately a year.
6 Q    What would you do with the 3-day passes after you
7 obtained them?
8 A    Sell them to travel agents in the area.
9 Q    Approximately how much money did you earn through that
10 scheme?
11 A    There was thousands earned.
12 Q    How did it end?
13 A    I was arrested.
14 Q    Were you charged with a crime?
15 A    Yes, I was.
16 Q    What crime?
17 A    Credit card fraud.
18 Q    In the federal system or the state system?
19 A    Federal system.
20 Q    How did you resolve your case?
21 A    I pled guilty.
22 Q    What was your sentence?
23 A    Five years.
24 Q    Did you spend five years in jail?
25 A    I spent twenty months.

        CMH    OCR    RMR    CRR    FCRR

514

1 Q    Why were you released early?
2 A    Parole.
3 Q    When were you released?
4 A    July 1987.
5 Q    Where did you live when you were released?
6 A    Central Florida back in the Orlando area.
7 Q    Did you stay in Central Florida?
8 A    No, I didn't.
9 Q    Where did you move to?
10 A    I moved to South Florida, Pompano Beach area.
11 Q    Did you get a job there?
12 A    Yes, I did.
13 Q    Doing what?
14 A    I was in a motorcycle shop. I was a parts manager.
15 Q    Did you stay at that shop?
16 A    Yes, I did.
17 Q    Did you --
18       MR. HERMAN: I'm sorry. Can we take the picture
19 down, please?
20       Thank you, Judge.
21 Q    How long did you stay at that shop for?
22 A    On and off, I was at that shop approximately eight years,
23 nine years.
24 Q    And did you also have your own motorcycle shops?
25 A    Yes, I did.

        CMH    OCR    RMR    CRR    FCRR

515

1 Q    Did you operate those alone or with partners?
2 A    With partners.
3 Q    Did you eventually start to commit a crime again when you
4 were in South Florida?
5 A    Yes, I did.
6 Q    Doing what?
7 A    Shylocking.
8 Q    Are you familiar with the term "money laundering"?
9 A    Yes, I am.
10 Q    What is money laundering?
11 A    Money laundering is when you take money and clean it up
12 and keep the proceeds, keep a percentage of the proceeds and
13 give the money back.
14 Q    Have you engaged in money laundering?
15 A    Yes.
16 Q    When?
17 A    1994 and again in 2010, I believe.
18 Q    Directing your attention back to the early '90s, what did
19 you do in connection with money laundering then?
20 A    I was given a check from a -- I was given a check from a
21 friend and I would deposit that in my corporate account, hold
22 back 10 percent and give them the rest.
23 Q    Did you know where your friend obtained those checks
24 from?
25 A    He says he got them from his clients. He was a

        CMH    OCR    RMR    CRR    FCRR

516

1 stockbroker.
2 Q    Did you believe that your friend had permission to have
3 your friend, his clients' checks?
4 A    No.
5 Q    And what did you do with the checks once you received
6 them?
7 A    I deposited them into my corporate account and when the
8 check cleared, I gave him back 90 percent.
9 Q    And how much did you keep for yourself?
10 A    10 percent.
11 Q    How much money did you earn through that scheme?
12 A    Thousands.
13 Q    Were you caught by law enforcement for your role in that
14 crime?
15 A    No, I wasn't.
16 Q    Were there members of the Colombo family living in
17 Florida?
18 A    Yes.
19 Q    Did you associate with members of the Colombo family
20 while you were in Central Florida?
21 A    No.
22 Q    How about when you were back in South Florida in Pompano
23 Beach?
24 A    Yes.
25 Q    Which Colombo family members did you associate with in

        CMH    OCR    RMR    CRR    FCRR

517

1 South Florida?

2 A    Anthony Black, Tom Farese, Vinny Alloy, Pattie Catalano,

3 Bobby Pate, Allie Boy Persico.

4 Q    Did all of those individuals live in South Florida?

5 A    No.

6 Q    Did some of those individuals live in South Florida?

7 A    Yes.

8 Q    Now, when you associated -- directing your attention to

9 Allie Boy Persico, was he living in South Florida?

10 A    I believe he had dual residence.

11 Q    He traveled back and forth?

12 A    Yes.

13 Q    Where was he traveling back and forth between?

14 A    Florida and New York.

15 Q    You previously testified that you associated with Allie

16 Boy when you were living in Brooklyn growing up.

17 A    Right.

18 Q    Did you stay in touch with Allie Boy that whole time,

19 between the time when you were growing up with him in Brooklyn

20 and when you re associated, when you were associated with him

21 in South Florida?

22 A    No.  There was a time close to fifteen years that we

23 didn't speak.

24 Q    Approximately when did you start to associate with Allie

25 Boy again?

CMH    OCR    RMR    CRR    FCRR

518

1 A    Approximately in 1995, '96.

2 Q    And where was he living at that time?

3 A    He was living in New York and Florida.

4 Q    And where were you living?

5 A    Florida.

6 Q    Where would you see Allie Boy, in New York or in Florida?

7 A    Florida.

8 Q    How frequently did you see Allie Boy?

9 A    Once a month.

10 Q    What was your relationship with him?

11 A    Friendly.

12     MS. GEDDES:  I'm showing the witness only what's

13 been marked for identification as Government Exhibit 367A, B,

14 C and D.

15 Q    Do you recognize those?

16 A    Yes.

17 Q    What are those?

18 A    Those are pictures of Allie Boy and myself.

19 Q    When were they taken?

20 A    They were taken New Year's EVE 2000 -- I'm sorry.  New

21 Year's eve 1998, I believe it was.

22     MS. GEDDES:  The government offers Government

23 Exhibits 367A through D.

24     MR. HERMAN:  No objection.

25     MR. FASULO:  No objection.

CMH    OCR    RMR    CRR    FCRR

519

1     THE COURT:  Received.

2     (Exhibits 367A through D so marked.)

3     MS. GEDDES:  I'm going to publish 367C to the jury.

4     (Exhibit published.)

5 Q    Who's in that photograph?

6 A    Allie Boy and myself.

7 Q    Can you point to, on the screen to which one is Allie

8 Boy?

9 A    (Indicating.)

10 Q    If you touch it, yes.

11     Is that where you've made the little purple mark?

12 That's Allie Boy?

13 A    Yes.

14 Q    Did you eventually begin to commit crimes again with

15 Allie Boy Persico when you were in South Florida?

16 A    Yes.

17 Q    What did you do with him?

18 A    I basically oversaw the day-to-day of the South Florida

19 crew.  I brought messages back and forth for him.  I met with

20 people from other crime families.

21 Q    You mentioned the South Florida crew.  What do you mean

22 by that?

23 A    Members and associates of the Colombo family that were

24 living in the southern district of Florida.

25 Q    Were you an inducted member of the Colombo family at that

CMH    OCR    RMR    CRR    FCRR

520

1 time?

2 A    No, I wasn't.

3 Q    Who were those members and associates of organized crime

4 of the Colombo family?

5 A    Anthony Anduisa, Anthony Black and Tommy Farese.

6 Q    And were there other associates of the Colombo family?

7 A    Yes, there were.

8 Q    Who were those?

9 A    Joey Flowers, Ritchie Delgoio, myself and many others.

10 Q    How did you become, since you were simply an associate,

11 how did you become the person in charge of that crew?

12 A    Well, I was a trusted friend of Allie Boy's so ...

13 Q    And who put you in charge of the crew?

14 A    Allie Boy.

15 Q    You mentioned Anthony Black.  Who is he?

16 A    Anthony Anduisi is a soldier in the Colombo crime family.

17 Q    And is Anthony Black a nickname for Anthony Anduisi?

18 A    Yes.

19 Q    Did he spend time in the jail in the '90s?

20 A    Yes, he did.

21 Q    How about Tommy Farese, what is his association with the

22 Colombo family?

23 A    He's an inducted member in the Colombo family.

24 Q    And did Tommy Farese spend time in jail in the '90s?

25 A    Yes, he did.

CMH    OCR    RMR    CRR    FCRR

521

1 Q   What was Allie Boy's position in the late '90s?
2 A   Allie Boy was acting boss of the Colombo family.
3 Q   In your role as supervising the South Florida crew, did
4 you learn what types of crimes the crew was committing?
5 A   Yes.
6 Q   What types of crimes?
7 A   It was money laundering, extortion, shylocking,
8 bookmaking.
9 Q   Did you profit from those crimes?
10 A   Yes.
11 Q   Who determined your profit?
12 A   Allie.
13 Q   Allie Boy?
14 A   Yes.
15 Q   How much did you earn?
16 A   Thousands.
17 Q   For how long approximately did you act as a supervisor
18 for the crew?
19 A   Approximately a year and a half, two years.
20 Q   Were you always interacting with Allie Boy as your
21 contact in New York?
22 A   Yes.
23 Q   Did there come a time when you stopped interacting with
24 Allie Boy?
25 A   Yes.
         CMH   OCR   RMR   CRR   FCRR

522

1 Q   What happened?
2 A   He was arrested and sent to prison.
3 Q   Did you continue to associate with the Colombo family in
4 New York when Allie Boy was arrested?
5 A   Yes, I did.
6 Q   Who was your point of contact?
7 A   Sal Fusco, Senior.
8 Q   I'm showing the witness only what's been marked for
9 identification as Government Exhibit 33.
10      Do you recognize that individual?
11 A   Yes.
12 Q   Who is it?
13 A   That's Sal Fusco, Senior.
14 Q   Fair and accurate photograph of Sal Fusco, Senior?
15 A   Yes.
16      MS. GEDDES:  I offer Government Exhibit 33.
17      MR. HERMAN:  No objection.
18      MR. FASULO:  No objection.
19      THE COURT:  Received.
20      (So marked.)
21      MS. GEDDES:  May I publish it?
22      (Exhibit published.)
23 Q   What, if any, affiliation with the Colombo family did Sal
24 Fusco, Senior have at the time he was your point of contact?
25 A   Sal Fusco at the time was a ruling member on a panel that
         CMH   OCR   RMR   CRR   FCRR

523

1 was overseeing the Colombo crime family.
2 Q   What happened to Sal Fusco, Senior?
3 A   He died.
4 Q   When?
5 A   I believe it was July of 2000.
6 Q   Were you eventually arrested again?
7 A   Yes, I was.
8 Q   When?
9 A   In June of 2000.
10 Q   For what?
11 A   Racketeering.
12 Q   Is that a federal or a state charge?
13 A   Federal.
14 Q   How did you resolve those charges?
15 A   I pled guilty.
16 Q   To what crime?
17 A   I pled guilty to one count of conspiracy, racketeering
18 conspiracy.
19 Q   Was a particular organized crime family part of that
20 racketeering conviction?
21 A   Yes, the Colombo family.
22 Q   And were there other crimes involved in the racketeering
23 conspiracy that you were charged which and to which you
24 pleaded guilty to?
25 A   Yes.
         CMH   OCR   RMR   CRR   FCRR

524

1 Q   What were those?
2 A   Extortion, shylocking, wire fraud.
3 Q   Did you commit those crimes?
4 A   Yes.
5 Q   What was your sentence?
6 A   Two years.
7 Q   Were you also sentenced to a period of supervised
8 release?
9 A   Yes.
10 Q   What is supervised release?
11 A   Supervised release is, it's like a term of parole but
12 only -- they did away with the parole board.  It's probation.
13 You're on probation for three years.
14 Q   Are there certain conditions that you have to abide by?
15 A   Yes.
16 Q   Are you allowed to associate with other members of
17 organized crime during that period?
18 A   No.
19 Q   You have to have a job?
20 A   Yes.
21 Q   Did you abide by all the conditions of your supervised
22 release?
23 A   Yes.
24 Q   Did you stop associating with members of organized crime
25 while you were on supervised release?
         CMH   OCR   RMR   CRR   FCRR

525

1 A   No, I didn't.
2 Q   When were you released from jail?
3 A   2003.
4 Q   When you were released from jail, did you start to commit
5 crimes?
6 A   Yes.
7 Q   What types of crimes then?
8 A   Shylocking.
9 Q   Other crimes too?
10 A   Yes.
11 Q   What other types of crimes did you commit?
12 A   Money laundering.
13        MS. GEDDES:  I'm showing the witness what's in
14 evidence as Government Exhibit 1B.
15 Q   Do you know that individual?
16 A   Yes, I do.
17        MS. GEDDES:  If you may publish it for the jury.
18 Thank you.
19        (Exhibit published.)
20 Q   Who is that?
21 A   Tomorrow Gioeli.
22 Q   Do you see him in the courtroom today?
23 A   Yes.
24 Q   Can you please point to him and identify him by his
25 clothing?

CMH    OCR    RMR    CRR    FCRR

526

1 A   Where he's sitting there, he's wearing a green shirt.
2        MS. GEDDES:  Let the record reflect the witness is
3 identifying defendant Thomas Gioeli.
4 Q   When did you first meet Tommy Gioeli?
5 A   First time I met Tommy, I believe was the '70s.
6        (Continued on next page.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CMH    OCR    RMR    CRR    FCRR

1 DIRECT EXAMINATION CONTINUED
2 BY MS. GEDDES:
3 Q   Where?
4 A   Restaurant in Brooklyn.
5 Q   Where in Brooklyn?
6 A   Downtown Brooklyn.
7 Q   Do you remember the name of that restaurant?
8 A   Monte's.
9 Q   Did members and associates of the Colombo family spend
10 time at that restaurant?
11 A   Yes, they did.
12 Q   Who?
13 A   Jerry Langella, Andrew Russo, Jo-Jo Russo, Chucky Russo.
14 Q   I'm showing you what's been marked for identification as
15 Government Exhibit 58 and 59.
16        Do you recognize those?
17 A   Yes, I do.
18 Q   What are those?
19 A   Those are photographs of Chucky Russo and Jo-Jo Russo.
20 Q   Fair and accurate photographs of those individuals?
21 A   Yes.
22        MS. GEDDES: I offer Government Exhibits 68 and 69
23 into evidence.
24        MR. PERLMUTTER:  No objection.
25        THE COURT: Received.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

1        (Government Exhibits 68 and 69 received and marked
2 into evidence.)
3        MS. GEDDES:  I publish 68.
4 Q   Who is the individual shown in 68?
5 A   That is Chucky Russo.
6 Q   And how about 69?
7 A   Chucky Russo.
8 Q   Did you stay in touch with Tommy Gioeli after you saw him
9 at Monte's restaurant in the 70s?
10 A   No.
11 Q   When did you next hear from Tommy Gioeli?
12 A   2007.
13 Q   What happened?
14 A   I was asked to come to New York.  Tommy Gioeli wanted to
15 see me.
16 Q   Who asked you to do that?
17 A   Angelo Spata.
18 Q   Who is Angelo Spata?
19 A   He's Allie boy's brother-in-law.
20 Q   Did you agree to meet Gioeli?
21 A   Yes.
22 Q   Did you meet him?
23 A   Yes, I did.
24 Q   Where did you meet him?
25 A   I met him in Long Island at the Hilton Hotel.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 89

Maragni - direct / Geddes                529

1  Q   Do you know where that hotel was located on Long Island?
2  A   It was in Huntington.
3  Q   Did you choose the location?
4  A   No.
5  Q   How did you know to go to that location?
6  A   I was driven there.
7  Q   Why whom?
8  A   Angelo.
9  Q   Spata?
10 A   Yes.
11 Q   When you agreed to meet with Gioeli did you know the
12 nature of the meeting?
13 A   No.
14 Q   Who did you see when you arrived at the hotel?
15 A   When I got to the hotel I saw Jimmy Padulla, Tommy Gioeli
16 and Dennis DeLucia.
17 Q   Had you meet Jimmy Padulla that before that occasion?
18 A   No.
19 Q   How about Dennis DeLucia?
20 A   No.
21 Q   Did you recognize Gioeli as the individual that you met
22 in the 70s?
23 A   No, I didn't.
24 Q   How did you realize he was the same one you met in the
25 70s?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 90

Maragni - direct / Geddes                530

1  A   Tommy refreshed my memory.
2  Q   What did he say?
3  A   He says that he met me years ago in Monte's and I
4  probably don't recognize him because he had hair back then.
5  Q   What was the reason for the meeting at the Huntington
6  hotel?
7  A   Tommy wanted me to straighten out a dispute of a person
8  that was claiming that I owed $25,000 to.
9  Q   Did you learn who said you owed that money?
10 A   Yes, I did.
11 Q   Who?
12 A   It was a fellow Joseph Imbergamo (ph).
13 Q   Did Mr. Imbergamo have ties to organized crime?
14 A   Yes.
15 Q   What are those?
16 A   He was inducted member of the Lucchese family.
17 Q   Did you owe that money?
18 A   No, I didn't.
19 Q   Did Gioeli propose how to resolve this situation?
20 A   Yes.
21 Q   What did he say?
22 A   He said he wanted me to meet with Joe Imbergamo and
23 straighten it out.
24 Q   Did you agree to meet with Imbergamo?
25 A   Yes, I did.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 91

Maragni - direct / Geddes                531

1  Q   When?
2  A   The next day.
3  Q   Where?
4  A   At Barnes & Noble book store,  Staten Island.
5  Q   Was it just you and Joe Imbergamo?
6  A   When I got to Barnes & Noble Tommy Gioeli was there,
7  Junior Lollipop, Jimmy Padulla and myself and Joe Imbergamo
8  came in and I was introduced to him, and we sat down, Joe
9  Imbergamo and myself, and we talked about it, and we
10 straightened the problem out, and he realized I didn't owe the
11 money.
12 Q   You mentioned an individual by the name of Junior
13 Lollipop, who's that?
14 A   His name is Joe Carna.  He is an inducted member in the
15 Colombo family.
16 Q   And how about Dennis DeLucia, you testified you met at
17 the Hilton hotel in Huntington Long Island?
18 A   He is also an inducted member of the Colombo family.
19 Q   Directing your attention to Christmas of 2007, did you
20 travel to New York then?
21 A   Yes, I did.
22 Q   Where did you stay during your visit?
23 A   I stayed in the Hilton hotel in Long Island.
24 Q   The same location where you met defendant Tommy Gioeli?
25 A   Yes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 92

Maragni - direct / Geddes                532

1  Q   Did you see Gioeli while you were in New York on that
2  trip?
3  A   Yes, I did.
4  Q   Where?
5  A   I saw him at the hotel and we went out to a nightclub and
6  then to dinner.
7  Q   What nightclub did you go to?
8  A   We went to Mirage in Long Island.
9  Q   When you were inside the Mirage nightclub, what part of
10 nightclub were you?
11 A   He was sitting in a little area off to the side.  I guess
12 it is a little VIP area.
13 Q   Were any other members of organized crime with you that
14 night?
15 A   Dennis DeLucia showed up.  There was just some friends
16 that Tommy knew that -- there was a doctor and his friend.
17 Q   Did you see Gioeli after that?
18 A   After what?
19 Q   After you saw him during Christmas 2007?
20 A   Yes, I did.
21 Q   When did you see him next?
22 A   I saw him in Florida.
23 Q   Where did you meet him in Florida?
24 A   I met him in West Palm Beach at a restaurant, Villagio's
25 (ph) restaurant.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                    533

1  Q   Did you request a meeting?
2  A   No.
3  Q   Did he?
4  A   Yes.
5  Q   Why did you meet with Gioeli at that time?
6  A   I met with Tommy.  We had a couple of coffee and.
7        MR. PERLMUTTER:  Objection; nonresponsive.
8        THE COURT:  Sustained.
9  Q   What happened when you met with Gioeli at that time?
10 A   What happened? I sat with him, I spoke with him, and he
11 informed me that I was going to be a made member of the
12 Colombo family.
13 Q   You were going to be inducted into the Colombo family?
14 A   Yes, I was going to be straightened out, yes.
15 Q   You testified that you were eventually straightened out;
16 is that correct?
17 A   Yes, I was.
18 Q   When were you inducted in the Colombo family?
19 A   2008.
20 Q   Do you remember when in 2008?
21 A   On Palm Sunday.
22 Q   What month is Palm Sunday in?
23 A   I believe it was March that year.
24 Q   Where did the ceremony takes place?
25 A   Bronx, New York.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                    534

1  Q   Do you remember the location in the Bronx?
2  A   Yes, it was down in the basement of -- they had some
3  makeshift social club.  There was --
4  Q   Who was present at the ceremony?
5  A   Richie Fusco, Benjie Castellazo, Dennis DeLucia and
6  myself.
7  Q   What, if any, affiliation did Richie Fusco have with
8  organized crime in terms of your ceremony?
9  A   Richie Fusco at the time he told me was acting underboss
10 of the Colombo family.
11 Q   How about Castellazo?
12 A   He was a captain.
13 Q   How did you learn their positions in the Colombo family?
14 A   They told me.
15 Q   During the ceremony?
16 A   Yes.
17 Q   Who resided over your ceremony?
18 A   Richie Fusco.
19 Q   What happened during the ceremony?
20 A   What happened?
21 Q   Yes.
22 A   What happened.  I put my hand on a gun and got my finger
23 pinched and they burned the saint in my hand.
24 Q   When you say "they" who are you referring to?
25 A   Richie Fusco, and Benjie Castellazo.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                    535

1  Q   Was the defendant Tommy Gioeli present at your ceremony?
2  A   No, he wasn't.
3  Q   Did you see the defendant Gioeli after you became an
4  inducted member in the Colombo family?
5  A   Yes.
6  Q   Where did you see him?
7  A   I first saw him at Allie Russo's wedding.
8  Q   Who is Allie Russo?
9  A   Chucky Russo's son.
10 Q   Were there other members of the Colombo family present at
11 that wedding?
12 A   Yes.
13 Q   Who?
14 A   Jimmy Gooch, Dennis DeLucia. Billie Russo, myself, Tommy
15 Gioeli, Vincent Manzo.
16 Q   And all those individuals are inducted members in the
17 Colombo family?
18 A   Yes.
19 Q   You mentioned Jimmy Gooch, is that a real name or a
20 nickname?
21 A   Nickname.
22 Q   Do you know his real name?
23 A   No, I don't know his last name.
24 Q   What happened when you saw Gioeli at the wedding?
25 A   When I saw Tommy at the wedding I was introduced to him.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                    536

1  Q   By whom?
2  A   Dennis DeLucia.
3  Q   What do you mean by "introduced"?
4  A   I was introduced formally to Tommy as inducted member of
5  the Colombo family.
6  Q   Can you describe for the jury precisely how you were
7  introduced to Tommy Gioeli?
8  A   Dennis DeLucia took my hand in his and put Tommy's hand
9  in his and put our hands together, and he told Tommy -- he
10 says, Tommy, this is Reynald Maragni amigo nostro (ph) Colombo
11 family. He says Reynalda, this is Tommy Gioeli amigo nostro,
12 acting boss of the Colombo family.
13 Q   What did you understand Gioeli's position to be in the
14 Colombo family based on what he said told you?
15 A   Acting boss.
16 Q   You used the term amigo nostro, what is that?
17 A   My friend.  Close friend.
18 Q   In what language?
19 A   Italian.
20 Q   Were you formally introduced to any other members of the
21 Colombo family that night?
22 A   Yes I was.
23 Q   Who?
24 A   I was introduced to Jimmy Gooch, and Billy Russo.
25 Q   Who introduced you?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          537

1  A    Tommy did.
2  Q    Did Gioeli mention your ceremony at which you were
3  inducted in the Colombo family?
4  A    Yes.
5  Q    What did he say?
6  A    He says he would have liked to have been there but he
7  couldn't.  He says that he was followed.  He had a tail.  So
8  he didn't come to the ceremony.
9  Q    What did you understand him to mean by his being followed
10 or that he had a tail?
11 A    Cops were following him.
12 Q    You previously testified that Vincent Manzo was present
13 at the wedding as well?
14 A    Yes, he was.
15 Q    Did Gioeli introduce you to Manzo?
16 A    No, he didn't.
17 Q    Did you learn why he did not?
18 A    Yes.
19 Q    What did Gioeli tell you about Mr. Manzo?
20 A    Vincent Manzo is on the shelf.
21 Q    What does it mean to be on the  shelf?
22 A    To be on the shelf is basically you are exiled. You
23 aren't entitled to any representation, you are not to
24 associate with other members of organized crime and you are
25 not to be recognized.
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          538

1  Q    What do you mean by representation?
2  A    You are -- don't have any right to go to a captain to
3  settle disputed or be represented by anybody.
4  Q    How are disputes resolved in organized crime?
5  A    Usually members sit down and they try to hash out their
6  differences and if they can't, they'll go -- what we would
7  call -- they will go to wiser heads.  They will go to
8  superiors.
9  Q    Are you familiar with the term sit-down?
10 A    Yes.
11 Q    Who attends a sit-down?
12 A    Usually it's two members straightening out a dispute of
13 their own, over someone else, or they are representing someone
14 else.
15 Q    You testified that Gioeli told you that Manzo was on the
16 shelf, who of the crime families who put someone on the shelf?
17 A    The boss.
18 Q    Who can take someone off the shelf?
19 A    Only the boss.
20 Q    Were you given any other instructions as to Mr. Manzo?
21 A    Yes, I was.
22 Q    What were those?
23 A    Tommy asked me to talk to Vincent and tell him to start
24 doing things right, and start acting the right way, and maybe
25 he can find himself back in the good graces and good
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          539

1  standings.
2  Q    Did Gioeli explain to you what Manzo had done that was
3  not the right way?
4  A    Yes.
5  Q    What had he done?
6  A    Vincent Manzo's son owed a lot of money to a lot of
7  different people and Vincent went around making deals, making
8  promises to pay these people and didn't live up to any.  So
9  for that it was -- he became a big embarrassment and Tommy put
10 him on the shelf.
11 Q    Did you ever meet in Brooklyn with Gioeli after you were
12 inducted into the Colombo family?
13 A    Yes, I did.
14 Q    Where was that?
15 A    We met on Bay 8th Street and 86th Street in Brooklyn.
16 Q    Who else was there?
17 A    Dennis DeLucia and Sal Fusco Junior.
18 Q    And how is Sal Fusco Junior related to Sal Fusco?
19 A    He is his son.
20 Q    What is Sal Fusco Junior's affiliation with the Colombo
21 family?
22 A    He is an inducted member of the Colombo family.
23 Q    Where did you go that day?
24 A    We went to La Polema (ph) restaurant and had lunch.
25 Q    Was it just the four of you or were there others there?
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          540

1  A    No, Jimmy Gooch.
2  Q    What happened at the lunch?
3  A    At the lunch we were sitting down and basically
4  socialized and Louie Canoli come in.
5  Q    Who's Louie Canoli?
6  A    He's an associate of the Colombo family.
7  Q    Inducted member?
8  A    No.
9  Q    What happened when Louie Canoli came in?
10 A    He sat down and Tommy was reprimanding him.
11 Q    For what?
12 A    Louie Canoli was going around passing himself off as a
13 made guy.  Wiseguy.
14 Q    He was reprimanded for that?
15 A    Yes, he was.
16      MS. GEDDES: I'm showing the witness what's been
17 marked for identification as Government Exhibits 17, 19, 29,
18 30, 32, 38, 53 73, and 75.
19 Q    Beginning with Government Exhibit 75 -- I'm sorry -- 17,
20 do you recognize this?
21 A    Yes.
22 Q    What is this?
23 A    That's Jimmy Lollipop.
24 Q    And again is Jimmy Lollipop a real name or a nickname?
25 A    It's a nickname.
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                541

1  Q   And Government Exhibit 19, do you recognize this?
2  A   Benjie.
3  Q   What is his last name?
4  A   Castellazo.
5  Q   Government Exhibit 29, who is that?
6  A   That's Luca.
7  Q   What is Luca's last name?
8  A   DiMatteo.
9  Q   What is Luca Demateo's situation with organized?
10 A   He is an inducted member of the Colombo family.
11 Q   Government Exhibit 30.
12 A   Jimmy Gooch.
13 Q   And again, is that a nickname or a real name?
14 A   That's a nickname.
15 Q   And what's Jimmy Gooch's affiliation with organized
16 crime, if any?
17 A   He is an inducted member of the Colombo family.
18 Q   Government Exhibit 32, do you recognize that individual?
19 A   Richie Fusco.
20 Q   Government Exhibit 38, who is that?
21 A   Ralphie Lombardi.
22 Q   Government 53.
23 A   Junior Persico.
24 Q   Is that his real name?
25 A   Carmine Persico.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                542

1  Q   How is Carmine Persico related to Allie boy Persico?
2  A   His father.
3  Q   Whose father?
4  A   Carmine is Allie boy's father.
5  Q   Government Exhibit 56.
6  A   Andrew Russo.
7  Q   What is Andrew Russo's affiliation with organized crime?
8  A   He is an inducted member in the Colombo family.
9  Q   And Government Exhibit 73.
10 A   That's Dennis DeLucia.
11 Q   And finally, Government Exhibit 75.
12 A   That's Big Allie Persico or Uncle Allie as I call him.
13 Q   How is Uncle Allie related to Alphonse or Allie boy
14 Persico?
15 A   That his uncle.  His father's brother.
16 Q   How is he related to Carmine Persico?
17 A   They are brothers.
18 Q   Carmine and Uncle Allie are brothers?
19 A   Yes.
20     MS. GEDDES:  I offer Government Exhibits  17, 19,
21 29, 30, 32, 38, 53 73, and 75.
22     MR. BRAVERMAN: No objection.
23     THE COURT: Received.
24     (Government Exhibit  17, 19, 29, 30, 32, 38, 53 73,
25 and 75, received and marked into evidence)

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                543

1  Q   Have you ever held any other positions in the Colombo
2  family other than soldier?
3  A   Yes.
4  Q   What?
5  A   I was a capo regime.
6  Q   When were you elevated to position of captain?
7  A   2008.
8  Q   Who promoted you?
9  A   Ralph DeLeo -- Benjie Castellazo was the one who informed
10 of me.
11 Q   You mentioned Ralph DeLeo, who is that?
12 A   Ralph DeLeo was the acting boss of the Colombo family at
13 that time.
14 Q   Why was Gioeli no longer the acting boss?
15 A   Tommy was locked up?
16 Q   He'd been arrested?
17 A   Yes.
18 Q   I'm showing you what's been marked for identification as
19 Government Exhibit 51. Do you recognize this individual?
20 A   Yes, I do.
21 Q   Who is that?
22 A   Robert Pate.
23 Q   Is that a fair and accurate photograph of Pate?
24 A   Yes.
25     MS. GEDDES:  I offer 51.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                544

1      MR. PERLMUTTER:  No objection.
2      MR. BRAVERMAN: No objection.
3      THE COURT:  51 is received.
4      MS. GEDDES:  May I publish 51?
5      THE COURT:  You may.
6  Q   Do you recall when you first met Robert Pate?
7  A   Yes.
8  Q   When?
9  A   It was in the -- it was in the 90s.  Right around 1996,
10 1997.
11 Q   Where did you meet him?
12 A   South Beach in Miami.
13 Q   Who introduced you to him?
14 A   Allie Boy.
15 Q   And when Pate was introduced to you, were you formally
16 introduced or just introduced?
17 A   I was introduce.
18 Q   Did you learn whether Pate had any ties to organized
19 crime?
20 A   Yes.
21 Q   What were those?
22 A   He was inducted member of the Colombo family.
23 Q   Were you ever officially or formally introduced to Robert
24 Pate?
25 A   Yes, I was.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                       545

1  Q   When?
2  A   2008.
3  Q   After you, yourself, were inducted?
4  A   Yes.
5  Q   Where were you introduced to him?
6  A   I -- we met at the Cheesecake factory in West Palm Beach,
7  in Florida.
8  Q   And who introduced you to him?
9  A   Tommy Gioeli.
10 Q   Gioeli was in Florida for that meeting?
11 A   Yes.
12 Q   Did you learn to whom Pate reported in the context of the
13 Colombo family at that time?
14 A   He was reporting to Tommy.
15 Q   Gioeli?
16 A   Yes.
17 Q   How about after Gioeli was arrested?
18 A   He was staying with Junior Lollipop.
19 Q   You are referring to Robert Pate when you say "he"?
20 A   Yes.
21 Q   Did Pate tell you what criminal activities he was
22 involved in?
23 A   Yes.
24 Q   What were those?
25 A   Bookmaking.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                       546

1  Q   Did you learn whether Pate gave any money to anyone in
2  the Colombo family?
3  A   Yes, I did.
4  Q   How did you learn that?
5  A   I was told by Junior Lollipop.
6  Q   When?
7  A   I met Junior Lollipop an Robert Pate was being
8  transferred to my regime.
9  Q   Was that after you had been elevated to the position of
10 captain?
11 A   Yes.
12 Q   Why was Pate being transferred to your regime or your
13 crew?
14 A   Because he lived in Florida.
15 Q   And what did Junior Lollipop tell you?
16 A   Junior Lollipop --
17     MR. PERLMUTTER:  Objection; hearsay.
18     Side-bar please.
19     (Continued on next page).
20
21
22
23
24
25

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes                       547

1

Maragni - direct / Geddes                       548

1      (The following took place in open court.)
2      MS. GEDDES:  Judge, can I publish -- that is on the
3  Elmo to the jury, please?  Thank you.
4  Q   You testified of Bobby -- Robert Pate was being
5  transferred to your crew; is that correct?
6  A   Yes.
7  Q   Why were you meeting with Junior Lollipop that day?
8  A   Junior Lollipop wanted to inform me about what Bobby Pate
9  was doing.
10 Q   Why is that?
11 A   Because he was going to be part of my regime and I have a
12 right to know.
13 Q   What did Junior Lollipop tell you?
14 A   Junior told me that Bobby Pate was giving $600 a month to
15 him.
16 Q   To whom?
17 A   To Junior Lollipop to have that money go to Tommy's
18 family -- Tommy Gioeli.
19 Q   Are you referring to the defendant Tommy Gioeli?
20 A   Yes, I am.
21 Q   Did Junior Lollipop tell you that about any other
22 payments that Bobby Pate was making?
23 A   He also told me that there was a $3,000 gift every
24 Christmastime.
25 Q   And who did that go to?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          549

1  A    That went to Junior Lollipop and he passed it a long.
2  Q    To whom?
3  A    To whomever. I don't know who his contact was.
4  Q    Did Lollipop tell you whether he gave that entire $600 a
5  month to Gioeli?
6  A    He told me he passed $480 and kept 120.
7  Q    Why is that? Why did he keep a portion for himself?
8  A    He says he was entitled to keep 20 percent because he was
9  servicing Bobby Pate.
10  Q    Did you agree with that?
11  A    No.
12  Q    Why not?
13  A    Because I felt that if he is passing money to Tommy's
14  family, Tommy's family should have gotten the whole amount.
15  Q    For what reason?
16  A    The guy was in jail. I'm sure his family could have used
17  it.
18  Q    When Pate was transferred to your crew did you begin to
19  collect money from Robert Pate?
20  A    No.
21  Q    Why not?
22  A    I just let Junior Lollipop continue doing it because they
23  already -- however they were going it, it was working, and I
24  just told Junior to continue.
25  Q    Directing your attention to January 2011, what happened?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          550

1  A    I was arrested.
2  Q    What were you charged with?
3  A    Racketeering.
4  Q    As a result of your arrest, were you incarcerated?
5  A    Yes, I was.
6  Q    And during the time that you were incarcerated, did you
7  make a decision about how you wanted to proceed with your
8  case?
9  A    Yes, I did.
10  Q    What did you decide to do?
11  A    I decided to cooperate.
12  Q    As a result of that decision to cooperate did you meet
13  with the government?
14  A    Yes.
15  Q    Were you debriefed by the government?
16  A    Yes.
17  Q    When you were first debriefed were you still
18  incarcerated?
19  A    Yes.
20  Q    What were you initially debriefed about?
21  A    Crimes that I committed.
22  Q    Did you later sign an agreement?
23  A    Yes.
24       MS. GEDDES: May I approach, Your Honor?
25       THE COURT: You may.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          551

1       MS. GEDDES: I am showing the witness what has been
2  marked for identification as Government Exhibit 3500-RM-8
3  (handing).
4  Q    Do you recognize that?
5  A    Yes.
6  Q    What is that?
7  A    This was the first agreement I signed with the
8  government.
9  Q    What did you agree to do in this agreement?
10  A    I agreed to be debriefed, to meet with the government any
11  time they wanted to meet with me, and not to reveal my
12  cooperation to anyone, and to also work proactively wearing a
13  recording device.
14  Q    And when you say "work proactively" what did you mean?
15  A    Record other members of organized crime.
16  Q    What did the government agree to do in that agreement?
17  A    The government agreed to make a recommendation that I be
18  allowed out on bail.
19  Q    For what reason?
20  A    For reasons that I could work proactively and make
21  recordings.
22  Q    Did the government recommend that you be released from
23  jail?
24  A    Yes.
25  Q    Were you then released?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          552

1  A    Yes, I was.
2  Q    What were the terms of your bail when you were released?
3  A    I was under house arrest.
4  Q    What did you mean by "house arrest"?
5  A    I was -- I had to wear an ankle bracelet and I wasn't
6  allowed to leave the house.
7  Q    Were you allowed to leave the house if you were given
8  permission by certain people?
9  A    Yes.
10  Q    What entities could give you permission to leave?
11  A    The FBI.
12  Q    Are you currently incarcerated?
13  A    No.
14  Q    Were there additional terms of your bail besides the home
15  confinement?
16  A    The conditions of my bail was that I wouldn't be allowed
17  to commit any crimes that the FBI wasn't aware of and --
18  Q    Did you have a security company?
19  A    Yes, I did. I had a security company sitting outside my
20  house.
21  Q    Who had to pay for that?
22  A    I did.
23  Q    Did you make recordings?
24  A    Yes, I did.
25  Q    Of whom?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          553

1  A    Members of organized crime.  Various members.
2  Q    For what period of time?
3  A    From April 2011 until December 2011.
4  Q    After each recording that you made did you talk to an FBI
5  agent?
6  A    Yes, I did.
7  Q    What was the purposes of those discussions?
8  A    They wanted to know what my conversations were about.
9  Q    Did you always tell the agents everything that happened
10 during the meetings that you recorded?
11 A    No.
12 Q    What did you leave out?
13 A    I left out some stuff from time to time.
14 Q    Like what?
15 A    I left out when I collected money.
16 Q    When you say "collected money" what did you mean?
17 A    I collected shylock money that was due me.
18 Q    You didn't tell the FBI about that?
19 A    No, I didn't.
20 Q    On occasion did you tell the FBI when you collected
21 money?
22 A    Yes.
23 Q    How were you able to collect money without the FBI
24 learning about it if you were wearing a recording device?
25 A    I passed notes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          554

1  Q    Why did you do that?
2  A    Well, I didn't want the FBI to know I was getting money
3  and I was trying to protect who I was talking to.
4  Q    Have you resolved the charges for which you were
5  initially arrested for in January of 2011?
6  A    Yes.
7  Q    How?
8  A    I pled guilty.
9  Q    To what did you plead guilty to, what crime?
10 A    I pled guilty to racketeering.
11 Q    What family?
12 A    Colombo family.
13 Q    Were there crimes as part of that racketeering plea?
14 A    Yes.
15 Q    What types of crimes?
16 A    Shylocking, extortion, wire fraud.
17 Q    Other crimes, too?
18 A    Yes.
19 Q    Did you commit all the crimes you pleaded guilty to?
20 A    Yes.
21 Q    When you pled guilty did you appear before a judge?
22 A    Yes, I did.
23 Q    Which judge?
24 A    Judge Matsumoto.
25 Q    Is she a federal judge?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          555

1  A    Yes.
2  Q    Did you later enter into another agreement with the
3  government?
4  A    Yes.
5       MS. GEDDES:  May I approach?
6       THE COURT:  You may.
7       MS. GEDDES:  I am showing the witness what has been
8  marked for identification as Government Exhibit 3500-RM-244.
9  Q    Do you recognize that?
10 A    Yes, I do.
11 Q    What is that?
12 A    Cooperation agreement.
13 Q    Whose cooperation agreement is it?
14 A    Mine.
15 Q    In that agreement did you agree to plead guilty to
16 additional crimes?
17 A    Yes.
18 Q    What crimes?
19 A    Marijuana distribution, extortion, shylocking and money
20 laundering.
21 Q    What did you do that made you guilty of marijuana
22 distribution?
23 A    I --
24 A    Marijuana distribution conspiracy, I should say.
25 A    I made a phone call, an introduction.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          556

1  Q    Who did you introduce?
2  A    I introduced a buyer to a seller.
3  Q    Who was the buyer?
4  A    The buyer was Ralph DiLeo.
5  Q    At the time you made that introduction what was Ralph
6  DiLeo's position in the Colombo family?
7  A    He was acting boss at the time.
8  Q    When was that?
9  A    I believe that was 2009.
10 Q    When you pled guilty a second time, what judge did you
11 plead guilty before?
12 A    Judge Matsumoto.
13 Q    The same judge that before who -- is that the same judge
14 who you previously pled guilty before?
15 A    Yes.
16 Q    Were the penalties of your guilty plea explained to you?
17 A    Yes, they were.
18 Q    What is the maximum jail time that you're facing as a
19 result of your guilty plea when you pled guilty to the
20 cooperation agreement, plus your prior guilty plea?
21 A    Forty years.
22 Q    What is the minimum time jail time you are facing?
23 A    Five.
24 Q    You are you also facing fines ?
25 A    Yes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          557

1  Q   How much?
2  A   Five hundred thousand.
3  Q   How about forfeiture?
4  A   Yes.
5  Q   How much?
6  A   Five hundred thousand.
7  Q   Is that negotiable?
8  A   The forfeiture isn't.
9  Q   As part of your agreement -- your cooperation agreement,
10 that is, did you make certain promises to the government?
11 A   Yes.
12 Q   What were those?
13 A   I promised to tell them the truth.
14 Q   You have to testify?
15 A   Yes.
16 Q   Did you admit to crimes that you weren't charged with in
17 your -- when you pled guilty a second time?
18     MR. PERLMUTTER:  Judge, objection to leading.
19     THE COURT:  No.  Overruled.
20 Q   Did you plead guilty to crimes that you weren't charged
21 with when you pled guilty for a second time?
22 A   Yes.
23 Q   If you live up to your obligations under the agreement
24 what do you hope to get in return?
25 A   I hope to get a reduced sentence.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          558

1  Q   What do you hope to get from the government?
2  A   I hope to get a 5k1 letter.
3  Q   What is a 5k1 letter?
4  A   It's a letter that states my cooperation.
5  Q   Who writes the 5k letter?
6  A   The United States Attorney.
7  Q   And what is the subject matter of that letter?
8  A   The subject matter informs the judge of my cooperation,
9  and also, crimes that I have committed that I haven't been
10 charged with.
11 Q   Is that letter important to you?
12 A   Yes.
13 Q   Why?
14 A   If the letter that's -- if the letter is written strongly
15 it will give the judge a reason to go below my minimum
16 guideline.
17 Q   If you don't get that letter, can the judge sentence you
18 to less than five years in jail?
19 A   No.
20 Q   Even if you do get the letter is the judge obligated to
21 give you a lower sentence?
22 A   No.
23 Q   Do you recall the date on which you pled guilty a second
24 time pursuant to that cooperation agreement?
25 A   I don't remember the exact date. I believe it was in

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          559

1  February.
2  Q   Of what year?
3  A   2012.
4  Q   Who decides what your sentence will be?
5  A   The judge.
6  Q   What happens if you breach your cooperation agreement,
7  you don't get that letter?
8  A   Then I stand to go to jail for a very long time.
9  Q   Is lying to the government a breach?
10 A   Yes.
11 Q   As you sit here today do you know what your sentence will
12 be?
13 A   No.
14     MS. GEDDES: I'm showing the witness what's been
15 marked for identification as Government Exhibit 2.
16 Q   Do you recognize that individual?
17 A   Yes, I did.
18 Q   Who is that?
19 A   Dino.
20 Q   Dino who?
21 A   Dino Saracino.
22 Q   Is that fair and accurate picture of Dino Saracino?
23 A   Yes.
24     MS. GEDDES: I offer Government Exhibit 2.
25     MR. BRAVERMAN:  No objection.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          560

1      THE COURT: Received.
2      (Government Exhibit 2  received and marked into
3  evidence)
4  Q   Do you see Dino Saracino in the courtroom today?
5  A   Yes, I do.
6  Q   Can you point to him and describe an article of clothing?
7  A   Dino is sitting with the white shirt.
8      MS. GEDDES: Let the record reflect the witness
9  identified the defendant Dino Saracino?
10 Q   Do you know any nicknames for Dino Saracino?
11 A   Little Dino.
12 Q   Where did you first meet Dino Saracino?
13 A   MDC.
14 Q   What is the MDC?
15 A   That is the federal detention holding facility in
16 Brooklyn.
17 Q   When did you meet him?
18 A   I met him coming back from a visit.
19 Q   What year?
20 A   2011.
21 Q   How did you meet him?
22 A   I met him in the elevator.
23 Q   Were you introduced to him?
24 A   Yes, I was.
25 Q   Officially?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          561

1  A   Yes.
2  Q   By whom?
3  A   Andrew Russo.
4  Q   Who is Andrew Russo at the time that you were introduced
5  to Dino Saracino?
6  A   Andrew Russo was the acting boss of the Colombo family at
7  that time.
8        MS. GEDDES:I am showing the witness what's been
9  marked for identification as Government Exhibit 40.
10 Q   Do you recognize that individual.
11 A   Yes.
12 Q   Who is that?
13 A   Vincent Manzo Junior.
14       MS. GEDDES: I am showing the witness what's been
15 marked Government Exhibit 41.
16 Q   Do you recognize that individual?
17 A   Yes.
18 Q   Who is that?
19 A   Vincent Manzo Senior.
20       MS. GEDDES: I offer Government Exhibits 41 and 41.
21       MR. PERLMUTTER: Objection.
22       MR. BRAVERMAN:  No objection.
23       THE COURT:  They are received.
24       (Government Exhibits 40 and 42  received and marked
25 in evidence).

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          562

16
17
18
19
20
21
22
23
24
25

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          563

1  BY MS. GEDDES:
2  Q   You previously testified that Gioeli told you that
3  Vincent Manzo was on the shelf, which Manzo was he referring
4  to?
5  A   Vincent Manzo Senior.
6  Q   Was he ever taken off the shelf?
7  A   Yes.
8  Q   By whom?
9  A   Andrew Russo.
10 Q   Who did Manzo report to in the Colombo family once he was
11 taken off the shelf?
12 A   He reported to me.
13 Q   As part of your cooperation did you make secret
14 recordings of Vincent Manzo?
15 A   Yes, I did.
16 Q   Just one, more than one?
17 A   More than one.
18       MS. GEDDES:  May I approach?
19       THE COURT:  You may.
20       MS. GEDDES: I am showing the witness what's been
21 marked for identification as Government Exhibits 502 and
22 502-T, A, B and C. .
23 Q   Beginning with 502, do you recognize this?
24 A   Yes.
25 Q   How do you recognize it?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct / Geddes          564

1  A   My initials.
2  Q   What is it?
3  A   CD.
4  Q   Containing?
5  A   Recordings that I made with Vincent Manzo.
6  Q   One recording or multiple recordings?
7  A   I believe it's multiple recordings.
8        MS. GEDDES: I offer Government Exhibit 502.
9        THE COURT:  502 is received.
10       (Government Exhibit 502 received and marked into
11 evidence)
12 Q   I am now directing your attention to Government
13 Exhibit 502-T, A, B and C.
14       Do you recognize those?
15 A   Yes.
16 Q   How?
17 A   These are conversations I had with Vincent Manzo, and my
18 initials are on them.
19 Q   Are they fair and accurate transcripts of those
20 conversations?
21 A   Yes.
22       MS. GEDDES: I offer Government Exhibits 502-T, A, B
23 and C.
24       THE COURT:  Any objection?
25       MR. PERLMUTTER: No objection.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 125

Maragni - direct / Geddes          565

1     THE COURT:  They are received.

2         (Government Exhibits 502-T, A, B, and C received and

3    marked into evidence)

4  Q   Did there come a time while you were cooperating with the

5  FBI and the government that you learned someone had received a

6  subpoena?

7  A   Yes.

8  Q   How did you learn about that subpoena?

9  A   I was -- I got a phone call from a friend that said that

10  Vincent Manzo Junior was given a subpoena.

11  Q   Did you see the subpoena that Vincent Manzo Junior was

12  given?

13  A   Yes, I did.

14  Q   What was the nature of the subpoena?

15  A   He was to go to the federal building for photographs and

16  records update.

17  Q   Was there an FBI agent listed on the subpoena?

18  A   Yes.

19  Q   Who?

20  A   Scott Curtis.

21  Q   Directing your attention to November 18, 2011 who, if

22  anyone, did you meet with on that day?

23  A   I met with Vincent Manzo Junior, Vincent Manzo Senior and

24  myself.

25  Q   Where did you meet?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 126

Maragni - direct / Geddes          566

1  A   I met at LaRocca's restaurant in Staten Island.

2  Q    Were you wearing a secret recording device?

3  A   Yes, I was.

4  Q    What was the purpose of your meeting with Vincent Manzo

5  Senior an Vincent Manzo Junior?

6  A    We were there -- I was there to find out what Vincent

7  Manzo Junior was asked by the FBI at that meeting with the

8  subpoena.

9  Q   Did you learn what happened or what he was asked?

10  A   Yes.

11  Q   How did you learn?

12  A   Vincent Manzo Junior told me.

13  Q   What did he tell you?

14  A   He told me that when he met with Scott Curtis, Scott

15  showed him a picture of a --

16      MR. PERLMUTTER:  May we have a side-bar briefly?

17      THE COURT: All right.

18      (Continued on next page)

19

20

21

22

23

24

25

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 127

Maragni - direct / Geddes          567

Page 129

Maragni - direct / Geddes          569

1  end

---

Page 130

Maragni - direct / Geddes          570

1       (The following took place in open court)
2       THE COURT: Left us continue.
3  BY MS. GEDDES:
4       MS. GEDDES: I am showing the witness a post -- I am
5  showing the jury too, what is already in evidence Government
6  Exhibit 24.
7  Q    Who is that.
8  A    Bill Cutolo.
9  Q    How do you know Bill Cutolo?
10 A    I know Billy from Brooklyn.
11 Q    Does he have any nicknames?
12 A    Yes.
13 Q    What are those?
14 A    Wild Bill and Billy Fingers.
15 Q    How did he get the name nickname Billy Fingers?
16 A    He had a couple of fingers missing.
17 Q    Did Vincent Manzo Senior -- what happened to -- what
18 happened to Wild Bill?
19 A    Disappeared.
20 Q    Did Vincent Manzo Senior tell you his role in that
21 disappearance?
22 A    Yes.
23 Q    What did he tell you, briefly?
24 A    He told me that he drove Bill Cutolo's body to the
25 gravesite.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Page 131

Maragni - direct / Geddes          571

1       MS. GEDDES:  I am going to play an expert of a
2  recording but before I do I am going to distribute transcript
3  binders to members of the jury containing those transcriptions
4  that were admitted into evidence.
5       THE COURT: Ladies and gentlemen, the transcripts
6  that you are about to receive in relation to these recordings
7  are not themselves evidence in the case.  They are just an aid
8  to help you follow the tape-recordings that you are going to
9  hear. If there's a conflict between what you hear and what you
10 see on the transcript, you go with what you hear. What you
11 hear is the evidence. What you see in the transcript is,
12 again, just an aid to help you understand what you are
13 hearing.
14      MS. GEDDES:  Do all the members of the jury have
15 copies of the transcript binder?
16 Q    You testified that Vincent Manzo Senior told you that he
17 assisted in transporting Cutolo's body.  Did he indicate who
18 helped him?
19 A    Yes.
20 Q    Who did he tell you helped him?
21 A    He told me that Joey Caves and Dino Saracino, and Big
22 Dino helped him.
23 Q    Who else?
24 A    Tommy Gioeli.

All right.  I think this would be a good time to
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Page 133

Maragni - direct / Geddes                573

1  take our lunch break.

---

Page 134

Maragni - direct / Geddes                574

8  R E Y N O L D   M A R A G N I,
9      called as a witness, having been previously duly
10     sworn, was examined and testified as follows:
11
12         (Jury present.)
13         THE COURT:  Please be seated.
14         The government may proceed.
15
16         So, we're at Tab 1 in the book with headphones, and
17  you're going to play that?
18         MS. GEDDES:  Please.
19         (Tape plays.)
20         (Tape stops.)
21         THE COURT:  We didn't have overhead, do you all know
22  that at the government table?
23         MS. GEDDES:  No, we believe we had it.
24         THE COURT:  You didn't have overhead; right?  People
25  in the back, you didn't hear that; right?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Page 135

Maragni - direct - Geddes                575

1      ALL:  No.
2      MS. GEDDES:  I think if we put the mike a little
3  closer for the next one.
4      THE COURT:  You're running this tape off an open
5  mike.  Try it.  We'll try it on the next one.
6  DIRECT EXAMINATION (Continued)
7  BY MS. GEDDES:
8  Q   Directing your attention to page two of the transcript
9  that we just looked into, the recording that we just looked
10 into, line three, you said, "Do you think Dino told 'em?"
11     What were you referring to when you said "Do you
12 think Dino told them?"
13 A   I was referring to Big Dino, and saying that I think that
14 Big Dino talked to the agents.
15 Q   And directing your attention again to page two, lines 42
16 through 45, when Manzo, Sr. on the transcript says: "The only
17 ones that really knew I had anything to do with that are me,
18 Joey Caves and the other guy Dino, the two Dinos, Joey Caves
19 and Tommy."
20     Who did you understand Manzo to mean when he
21 said "Tommy".
22 A   Tommy Gioeli.
23 Q   The defendant?
24 A   Yes.
25 Q   How about the two Dinos, who did you understand Manzo to

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Page 136

Maragni - direct - Geddes                576

1  mean?
2  A   Big Dino and Little Dino.
3  Q   Who is Little Dino?
4  A   Dino Saracino.
5  Q   Now, directing your attention to the last page of that
6  transcript, page four.  Right after on line 19, Manzo, Sr.
7  said, "Jesus Christ Almighty," and then there was a pause.
8  And Manzo, Sr. then responds, "No, I didn't.  I didn't even
9  touch it.  Just threw it in the car."
10     What, if anything, did you say to Manzo during that
11 pause.
12 A   I mouthed to Vincent Manzo if he shot him, and I used my
13 hands.
14 Q   What were you indicating with your hands?
15 A   I made a gun gesture.
16 Q   How did Manzo, Sr. respond?
17 A   He says he didn't.  He says he never touched it.
18 Q   What did you understand him to mean when he said he
19 didn't even touch it?  What did you understand him to mean by
20 it?
21 A   He never touched the body.
22 Q   Whose body?
23 A   Billy.
24 Q   Wild Bill?
25 A   Yes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Maragni - direct - Geddes          577

1 Q   Following your meeting on November 18 2011, did you set
2 up another meeting with Vincent Manzo, Sr.?
3 A   Yes.
4 Q   For when?
5 A   I believe it was the day before Thanksgiving.
6 Q   What was the purpose of that meeting?
7 A   I was to introduce Vincent Manzo to Luca DiMatteo.
8 Q   What position did you hold at that point in the Colombo
9 Family?
10 A   I was -- at that point, I was a soldier.
11 Q   You previously testified that you had been a captain?
12 A   Yes.
13 Q   How did you become a soldier after you were previously a
14 captain?
15 A   I was relieved of that position because they claimed they
16 were going to break up my regime and all the guys that were in
17 my regime were going to go back to their original respective
18 captains.
19 Q   And what position did Luca -- by the way, who are you
20 referring to when you said Luca?
21 A   Luca DiMatteo.
22 Q   What position did Luca DiMatteo hold at that time?
23 A   He was acting captain.
24 Q   When you say  "acting captain," what do you mean by that?
25 A   He was acting captain for Ralph Lombardo.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct - Geddes          578

1 Q   Why might someone be an acting captain as opposed to an
2 official captain?
3 A   Well, he's probably helping  -- he can help out a
4 captain, because maybe the guy's got ill health or a lot of
5 heat is on the guy and he can't get around and do his job.
6 So, he appoints somebody to function for him.
7 Q   Did you introduce Manzo, Sr. to Luca DiMatteo?
8 A   Yes, I did.
9 Q   Where were you?
10 A   I was at the 69th Street pier in Brooklyn.
11 Q   And you testified that was the day before Thanksgiving?
12 A   Yes.
13 Q   Were you again wearing a recording device?
14 A   Yes, I was.
15 Q   Who else was present that day?
16 A   There was myself, Vincent Manzo, Vincent Manzo, and Lenny
17 Dello. Jr.
18 Q   Who is Lenny Dello?
19 A   Lenny Dello is an associate.
20 Q   Of what family?
21 A   Colombo Crime Family.
22       MS. GEDDES:  I'm now going to play another excerpt.
23 If the members of the jury could turn to Tab 2.
24       (Pause.)
25       THE COURT:  All right.  That's the best we can do

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct - Geddes          579

1 with the overhead.  Why don't you play it again.
2       (Tape plays.)
3       (Tape stops.)
4 BY MS. GEDDES:
5 Q   If I could direct your attention to page three, line 14:
6       Who said: "Were you involved?" and "They are
7 involved?"  Who asked that question?
8 A   Dino.  Luca DiMatteo.
9       MR. FASULO:  Sorry.  We couldn't hear.
10       THE COURT:  Again, please.
11 Q   Again, directing your attention to line 14:
12       Who said "Were you involved?" and asked "and they
13 are involved?"
14 A   Luca DiMatteo.
15 Q   Did Manzo, Sr. answer that question, whether he was
16 involved?
17 A   Yes.
18 Q   How did he answer?
19 A   He said, yes, he was involved.
20 Q   What did you understand Manzo, Sr. to mean when he said
21 he was involved?
22 A   That he was involved with the murder of Billy.
23 Q   Now, directing your attention to line 35, where Manzo,
24 Sr. on the transcript says: "I drove, I drove."
25       What did you understand Manzo, Sr. to mean when he

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct - Geddes          580

1 said "I drove, I drove"?
2       MR. BRAVERMAN:  Objection, speaks for itself.
3       THE COURT:  No, it doesn't.  Overruled.
4       You may answer.
5 A   He said that  -- I believe he meant to say he drove the
6 body.
7 Q   Whose body?
8 A   Billy Cutolo.
9 Q   And during that conversation and in your conversations
10 with Vincent Manzo, Sr., prior conversations, did you learn
11 who Vincent Manzo, Sr.'s captain or who he reported to at the
12 time of the murder of Bill Cutolo?
13 A   Yes.
14 Q   Who?
15 A   Thomas Gioeli.
16 Q   And when you said, on page four of line nine: "Tommy
17 Gioeli was his skipper?"  At the time when you asked that
18 question, what did you mean by that question?
19 A   I asked if Thomas Gioeli was Vincent Manzo's captain.
20 Q   Is that another term for skipper?
21 A   Yes.
22 Q   How did he respond?
23 A   "Yes."
24 Q   He answered, yes?
25 A   Yes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct - Geddes          581

1 Q   Directing your attention to December 8 of 2011.
2     Did you meet with anyone on that day.
3 A   Yes, I did.
4 Q   Who did you meet with?
5 A   Vincent Manzo.
6 Q   Where did you meet that day?
7 A   I met him at the Staten Island Mall.
8 Q   Were you wearing a recording device?
9 A   Yes, I was.
10 Q  To be clear:  Aside from November 18, November 23 and
11 December 8, 2011, did you have other conversations with
12 Vincent Manzo, Sr. about his participation in the disposal of
13 William Cutolo's body?
14 A   Yes.
15     MS. GEDDES:  If the members of the jury could now
16 turn to Tab 3 in your binder, and I'm now going to play the
17 third set of excerpts.
18     (Tape plays.)
19     (Tape stops.)
20 BY MS. GEDDES:
21 Q   Directing your attention to page two, line ten, where
22 Manzo, Sr. on the transcript says  "Almost sure it was his
23 house," and you asked  "Dino is Little Dino not Big Dino?,"
24 Manzo, Sr. responded  "Little Dino, Little Dino."  Who did
25 you understand Manzo, Sr. to mean?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct - Geddes          582

1 A   Little Dino Saracino.
2 Q   Based on what Manzo, Sr. told you that day and the other
3 days, what did you understand happened at Little Dino's house
4 that day?
5     MR. BRAVERMAN:  Objection.
6     THE COURT:  Sustained.
7 Q   Based on what Manzo, Sr. told you that day and the other
8 dates that you met with Manzo, Sr., what did you understand
9 that Manzo, Sr. told you occurred at the house where he
10 arrived that day?
11 A   He told me that he went to a driveway, and Joey Caves and
12 Little Dino put something in his trunk.
13 Q   And directing your attention to line 16.
14     When you asked  "Was Tommy there or not there?,"
15 Manzo, Sr. responded  "Tommy was there," who did you
16 understand Manzo, Sr. to be referring to when he said
17 "Tommy".
18 A   Tommy Gioeli.
19 Q   When he said "Tommy was there," where did you understand
20 there to be?
21 A   The driveway.
22 Q   Based on what Manzo, Sr. told you that day and the other
23 dates, where did you understand Manzo, Sr. went after the
24 driveway?
25 A   He went to Long Island.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - direct - Geddes          583

1 Q   Did they go directly to Long Island?
2 A   He says he drove to a bowling alley.
3 Q   And then what?
4 A   And then he picked up Tommy, and they went to  -- they
5 went to go look at a hole.
6 Q   What happened when they got to that area where the hole
7 was?
8 A   They says that they popped the trunk, and the body was
9 removed from the trunk.
10 Q   Where did they go next, according to what Manzo, Sr. told
11 you?
12 A   They went back to the bowling alley.
13 Q   Finally, directing your attention to page seven, line 19,
14 when Manzo, Sr. said, in the transcript,  "I've been in this
15 thing for a long time," what did you understand Manzo, Sr. to
16 mean when he referred to  "this thing"?
17 A   He's been in the life for a long time.
18 Q   What do you mean by  "the life"?
19 A   He's been a street guy a long time.
20     (Continued on next page.)
21
22
23
24
25

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          584

1 BY MS. GEDDES:
2 Q   And, again, on line 47, Manzo, Senior said, "This is in
3 my blood," what did you understand Manzo, Senior to be
4 referring to when he said this?
5 A   Cosa Nostra.
6 Q   La Cosa Nostra?
7 A   Yes.
8     MS. GEDDES:  The government has no further
9 questions.
10     THE COURT:  All right.  Cross-examination.
11     Sir, I'm going to ask you to hold the mic a little
12 closer to you.
13     THE COURT:  Mr. Perlmutter or Mr. Braverman, are the
14 jurors going to need your notebooks for the cross-examination?
15     MR. PERLMUTTER:  I think they will, but it's not
16 going to be for quite a while, Judge.
17     THE COURT:  Let me ask the jurors to close those up
18 for a while so you're listening to the questions.
19     MR. PERLMUTTER:  May I, Judge?
20     THE COURT:  You may.
21 CROSS-EXAMINATION
22 BY MR. PERLMUTTER:
23 Q   Good afternoon, Mr. Maragni, my name is Adam Perlmutter
24 and I'm the attorney for Tommy Gioeli.  I have some questions
25 for you.  We have never met before?

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          585

1  A  No.
2  Q  Now you grew up in Brooklyn, right?
3  A  Yes.
4  Q  You've got to speak up for me?
5  A  Okay.
6  Q  You grew up in Bensonhurst?
7  A  Yes.
8  Q  Were you were a child in a large family?
9  A  Yes.
10 Q  You had nine brothers and sisters?
11 A  No.
12 Q  Didn't have nine brothers and sisters.
13     How many brothers and sisters did you have growing
14 up?
15 A  I have three brothers.
16 Q  Just three brothers?
17 A  A lot of cousins.
18     MR. PERLMUTTER:  One second, Your Honor.
19 Q  Now, so you have three brothers, right?
20 A  Yes.
21 Q  Your mom and your dad?
22 A  Yes, my mom and dad.
23 Q  You went to public school?
24 A  Yes.
25 Q  P.S. 229?
          CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          586

1  A  Yes.
2  Q  What grades did you attend 229?
3  A  Until the sixth.
4  Q  And then you went to P.S. 201?
5  A  Yes.
6  Q  That was a junior high school?
7  A  Yes, it was.
8  Q  And then you wound up at Lafayette high school, right?
9  A  Yes.
10 Q  Pretty famous high school, Lafayette, right?
11 A  I guess.
12 Q  Larry King went there?
13 A  I don't know if Larry King went there.  Sandy Koufax went
14 there.
15 Q  That's right.  Sandy Koufax.  Paul Sorvino.  And you got
16 a GED, right?
17 A  Yes.
18 Q  Equivalency diploma when you were 19 years old?
19 A  Correct.
20 Q  Now, you were testifying about your military service.
21 I'm going to get back to that, but one of the things that we
22 didn't talk about or the government didn't raise is that when
23 you were 19 following getting your GED, you started getting
24 involved in insurance fraud, right?
25 A  I was 19.  I was in the Army.
          CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          587

1  Q  Well, isn't it a fact that you started staging accidents
2  with Gene Lombardo to get involved, to get insurance proceeds?
3  A  That's not when I was 19.
4  Q  Okay.  Well, how old are you when you were staging
5  accidents to commit insurance fraud?
6  A  It was probably, that was probably about 27.
7  Q  About 27 years old?
8  A  Yes.
9  Q  May I look at 3500RM-25.  I'll move on and we'll get back
10 to that.
11     Now, you went into the military, I think you said,
12 what year, hold were you?
13 A  18.
14 Q  All right.  Now, did your brothers go in the military?
15 A  No.
16 Q  And, in fact, you had a brother who, he was eligible for
17 the military, right?
18 A  Yes.
19     MS. GEDDES:  Objection, Judge.
20     THE COURT:  Overruled.
21 Q  But you worked out some way to manipulate his draft
22 number, didn't you?
23 A  No.
24 Q  Well, did you manipulate your own draft number?
25 A  No.  Well, what I did is I went sooner.
          CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          588

1  Q  So you enlisted earlier?
2  A  Right.  It was a first year in a lottery.
3  President Nixon came out with a lottery.  My name was 16 so I
4  could have waited until February or boosted the draft earlier
5  and went three months earlier so that's what I did.
6  Q  All right.  You went in and you went AWOL, you were
7  ordered to Fort Hood, right?
8  A  Yes.
9  Q  And you went AWOL?
10 A  Yes, I did.
11 Q  And you went to -- one second.
12     And you were arrested at that point?
13 A  Yes.
14 Q  Where were you arrested?
15 A  At my home in Brooklyn.
16 Q  And you were sent to Fort Hamilton, right?
17 A  Yes.
18 Q  And where is that?
19 A  Brooklyn.
20 Q  And then back to Fort Dix, correct?
21 A  Yes.
22 Q  Now, you were demoted at that point, correct?
23 A  Yes.
24 Q  And you were ordered again to Fort Hood, right?
25 A  Yes, later on, yes.
          CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          589

1 Q   Well, how, how far after your demotion were you ordered
2 to Fort Hood again?
3 A   About two months.
4 Q   And what was the purpose of your being re-sent to Fort
5 Hood?
6 A   Play war games.
7 Q   And you went AWOL again at that point?
8 A   Yes, I did.
9 Q   Now, you were claiming that you were disabled?
10 A   No.
11 Q   Well, you claim that you had some type of injury that
12 prevented you from engaging in your training as, war games in
13 Fort Dix?
14 A   No.
15 Q   You just didn't feel that you should be deployed to war
16 games, right?
17 A   I didn't feel that after serving in Viet Nam that I
18 should be playing war games with two or three months left in
19 the service.
20 Q   But the fact is that you were still in the service,
21 right?
22 A   Yes, I was.
23 Q   And you were -- and basically, the way you felt was that
24 you had done your time overseas and you shouldn't really have
25 to do anything, you should burn out three months and then get

          CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          590

1 discharged?
2 A   Well, that's not exactly true.  I didn't mind being put
3 back in active duty but I just didn't feel as a veteran in a
4 war zone, you should come back to the state and play war
5 games.
6 Q   You didn't re-up?
7 A   No, I didn't.
8 Q   And you didn't volunteer to go back to Viet Nam?
9 A   No, I didn't.
10 Q   You didn't say I don't want to play games, put me in the
11 real action, send me back?
12 A   No, I didn't say that.
13 Q   So you split again, right?
14 A   Yes, I did.
15 Q   You went AWOL?
16 A   Yes.
17 Q   And you got rearrested?
18 A   Yes.
19 Q   Where were you rearrested?
20 A   I was rearrested on 12th Avenue and 86th Street.
21 Q   Here in Brooklyn, right?
22 A   Yes, I was.
23 Q   Sent back to Fort Dix?
24 A   Yes.
25 Q   And you were discharged in the Army, right?

          CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          591

1 A   Yes.
2 Q   And you said that was a general discharge, right?
3 A   Yes.
4 Q   Now, just educate me and the jury for a second.
5        You can get an honorable discharge?
6 A   Yes.
7 Q   You can get a dishonorable discharge?
8 A   Yes.
9 Q   You can get a general discharge?
10 A   Yes.
11 Q   Your discharge was a discharge other than honorable,
12 right?
13 A   Yes.
14 Q   Now, you got out of the Army and how old were you?
15 A   I believe that was, I was 24, I believe, at that point.
16 Q   Well, you started, you started committing crimes earlier
17 than that, right?
18 A   Yes.
19 Q   Okay.  So, in fact, you started committing crimes, I
20 guess, probably about the age of 21, 22?
21 A   Yes.
22 Q   And you became involved in something called the Bath
23 Avenue Social Club, right?
24 A   Yes.
25 Q   Now, that's a, that's an Italian social club?

          CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          592

1 A   Yes.
2 Q   Okay.  And it's, it's a place to gather for organized
3 crime purposes, right?
4 A   Well, the Bath Avenue Social Club that I was involved in
5 was friends of mine my own age.
6 Q   Okay.  But you, while you were there, you ran into a guy
7 named Joey Papa?
8 A   Jerry Papa.
9 Q   Jerry Papa?  Okay.  And you and he started to run a
10 gambling operation out of there, right?
11 A   Yes.
12 Q   And the gambling operation, that was for -- you were
13 running what, poker?
14 A   Poker.
15 Q   Okay.  And you were making money off of that, right?
16 A   Yes, I was.
17 Q   Making about 100, 125 a night?
18 A   Yes.
19 Q   And the people that were gambling there, you would
20 advance them credit to gamble at times?
21 A   I wouldn't advance them anything.  I was just a card
22 dealer.
23 Q   But other people, other people who were involved in
24 running it, they would advance credit to people, right?
25 A   Yes.

          CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          593

1 Q    And sometimes players would come up short with money,
2 right?
3 A    Yes.
4 Q    And they'd be beaten up, right, if they couldn't pay?
5 A    I never seen that.
6 Q    So you were never involved in that type of violence?
7 A    No, not over card games, no.
8 Q    But you've been involved in other violence, right?
9 A    Yes.
10 Q    We'll get to that.
11        Now, around this same time, you said that you were,
12 you were doing trunking?
13 A    Yes.
14 Q    Robbing trunks?
15 A    Yes.
16 Q    You were also robbing trucks, right?
17 A    Trunks, not trucks.
18 Q    Just trunks, not trucks?
19 A    No.
20 Q    And that involved what, popping open people's trunks and
21 going in and seeing what was there?
22 A    Yes.
23 Q    Okay.  And who did you do that with?
24 A    I did that with a bunch of guys from the neighborhood
25 that we would hook up at night and we would call it going to

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Perlmutter          594

1 work.
2 Q    All right.  Well, my question was who.
3 A    There was a fellow Frank Siriani, there was another
4 fellow Carmine Sciandra.  Mostly Carmine Sciandra.
5 Q    And how many times did you do that?
6 A    About five times a week.
7 Q    For how long?
8 A    A couple of years.
9 Q    How many years?
10 A    Two, three.
11 Q    And where did you do it?
12 A    All over New York.
13 Q    When you say all over, be more specific?
14 A    All the boroughs.
15 Q    You would drive through a neighborhood?
16 A    Right.
17 Q    And what time would you do it?
18 A    After midnight.
19 Q    So you would just pick some neighborhood and you would
20 drive in with one of your friends and you would just start
21 busting open trunks?
22 A    Yes.
23 Q    How many would you do on a night?
24 A    Ten.
25 Q    Ten, that was your quota?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Perlmutter          595

1 A    Yes.
2 Q    You wouldn't do eleven, right?
3 A    Very rare.
4 Q    You wouldn't do nine, right?
5 A    Sometimes I would do eight, sometimes we would do 12.
6 Q    Okay.  Now, while you were doing that, you, you were also
7 involved in running a craps game, correct?
8 A    No.
9 Q    Well, there came a time when you ran a crap game on
10 15th Avenue and 79th Street, right?
11 A    I worked at a crap game.
12 Q    You worked at a crap game?
13 A    Yes.
14 Q    And that was with a guy named Ron Colucci?
15 A    It was Ron Colucci's club.
16 Q    All right.  And you -- how long did you do that for?
17 A    I think three months.
18 Q    All right.  And you also, in 1975, you started running
19 gambling at an after hours club called the Mon Ami?
20 Q    And was that your club?
21 A    That was Allie Boy Persico's club.
22 Q    Let me ask you, it's something I was wondering about.
23 Q    You said that you met Mr. Persico way back and then
24 sometime in the mid '90s, you started working on his behalf in

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Perlmutter          596

1 South Florida?
2 A    Yes.
3 Q    And you ran his operation there?
4 A    Well, I didn't run his operation.  I just was in touch
5 with all the associates down there in South Florida.
6 Q    And made members, right?
7 A    Yes.  The made members that were living in Florida at the
8 time were incarcerated.
9 Q    Okay.  But you -- let me be clear though.  You were the,
10 you were the -- you were the go-between, right?
11 A    Yes.
12 Q    And it's your testimony there were no made members in
13 South Florida at all?
14 A    There weren't any made members that were around at that
15 time in South Florida.  They were locked up.
16 Q    Okay.  Now, you have been involved in violence, right?
17 A    Yes.
18 Q    And, in fact, what we were talking about, violence in
19 connection with card games, right?
20 A    Yes.
21 Q    Do you remember telling the government that you actually
22 were involved in an assault in connection with the card game
23 involving somebody with the initials of FS?
24 A    No.
25 Q    You don't recall that?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Perlmutter          597

1  A   No.

2       MR. PERLMUTTER:  May I have 3500RM-25, page four.

3  Q   Now, you were arrested for assaults, right?

4  A   I was arrested for an assault, yes.

5  Q   You assaulted a detective's son, correct?

6  A   Yes.

7  Q   I'm going to show you what's been marked as 3500RM-25

8  and I'm going to show you a binder as well.

9       Judge, can I approach the witness?

10      THE COURT:  You may.

11 Q   Now, I was asking you whether you were, if you recall

12 ever being involved in violence in connection with some of

13 your card games.  All right?

14 A   Yes.

15 Q   And do you remember being interviewed by the government

16 on April 18th of 2011?

17 A   Vaguely, yes.

18 Q   Okay.  And do you recall -- do you recall who was at that

19 meeting?

20 A   Who was at that meeting?  No, I don't recall.

21 Q   All right.  Well, you had a lot of meetings with the

22 government, right?

23 A   Yes, I did.

24 Q   Now, do you recall at that meeting telling the government

25 that, involving a black, there was a blackjack game where you

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          598

1  smacked around FS?

2  A   No, I don't recall saying that.

3  Q   All right.

4       MR. PERLMUTTER:  If I can approach the witness, Your

5  Honor.

6       THE COURT:  You can.

7  Q   I'm going to direct your attention to 3500RM-25 at page

8  four, and I'm also going to show you a typed version which is

9  from paragraphs 3500RM-25X at page four, and I'd like to

10 direct you to the top of the page.  There's handwritten notes.

11 There's the typed version.

12      Do you recall telling the government that at

13 West 75th Street and Avenue T, there was a blackjack game

14 where FS got smacked around?

15 A   No.  The blackjack game that I worked on was on West 7th

16 and Avenue T.

17 Q   All right.  Well, do you remember telling the government

18 that at that location, FS got smacked around?

19 A   No, I don't remember that.

20 Q   You have no recollection of that?

21 A   No, I don't.

22 Q   Okay.  Thank you.

23      (Continued on next page.)

24

25

CMH   OCR   RMR   CRR   FCRR

Side Bar          599

1

23      MR. PERLMUTTER:  May I continue?

24      THE COURT:  You may.

25

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          601

1 BY MR. PERLMUTTER:

2 Q    Now, so just -- I was asking you about this violence

3 associated with this blackjack game, and it's your testimony

4 you have no recollection of that?

5 A    I don't -- I don't know who FS is.

6 Q    But do you know some man Frank Sparaco?

7 A    I know Frank Sparaco.

8 Q    Could it be Frank Sparaco?

9 A    I never had a fight with Frank Sparaco.

10 Q    Now, other violence that you have were instructed or were

11 involved in, there was a stolen, an incident stolen jewelry?

12 A    Yes.

13 Q    Do you recall that?  And you were instructed by GL to get

14 your stuff back.

15         Could you tell us who is that, is that Gerry

16 Langella?

17 A    That is Gerry Langella, yes.

18 Q    And you found the individual that stole the jewelry?

19 A    Yes.

20 Q    And you assaulted that individual?

21 A    Yes, I did.

22 Q    What did you do to that individual who you assaulted?

23 A    I hit him with a bat.

24 Q    Where did you hit him with the bat?

25 A    On the side of his head.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Perlmutter          602

1 Q    And did you break his skull?

2 A    No.

3 Q    Did he go to the hospital?

4 A    No.

5 Q    And let me ask if the assault that you perpetrated on

6 this detective's son, what did you do with him?

7 A    That was a fistfight.

8 Q    And you -- you've bragged in the past that you've dragged

9 people out of cars and crippled them to keep them out of the

10 neighborhood, didn't you?

11 A    No, I don't think so.

12 Q    Never did that?

13         MR. PERLMUTTER:  Can we prepare DX199A at 5148.

14         Your Honor, if you give me a second.

15         THE COURT:  All right.

16 Q    Do you know someone named Tom McLaughlin?

17 A    Do I know Tommy McLaughlin?  Yes, I do.

18 Q    Do you remember speaking with him at some point where you

19 were recorded speaking about your or bragging about what you

20 do to black people in your neighborhood?

21 A    That was, I believe that was colorful talk.  I don't

22 think it was me that was doing that.  I said the kids in the

23 neighborhood were doing that.

24 Q    Okay.  Well, let's -- if you give us a second.

25         Now, Tommy McLaughlin, that's why you got arrested,

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Perlmutter          603

1 isn't it?  He picked you up on a recording device, didn't he?

2 A    Yes.

3 Q    And you came to learn that he, that he was using that

4 recording device for the FBI, correct?

5 A    Yes.

6 Q    And in connection with your time when you were

7 incarcerated and learning about your case, the reasons why you

8 were arrested, you came to learn how he was able to use that

9 recording device, turn it on, turn it off, et cetera?

10         MS. GEDDES:  Objection.

11 A    Yes.

12         THE COURT:  Overruled.

13         Continued on next page.

CMH    OCR    RMR    CRR    FCRR

Side bar          604

1

CMH    OCR    RMR    CRR    FCRR

Side bar                    605

21
22
23
24
25

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          606

1 MR. PERLMUTTER:
2 Q   Do you have a set of headphones up there?
3 A   Yes, I do.
4 Q   Could you put them on and just you put them on.
5       Now, remember we were talking about your bragging
6 about dragging black people out and crippling them?
7       MS. GEDDES:  Objection.
8 A   Yes --
9       THE COURT:  Wait until I rule on the objection.
10       The objection is overruled.
11 Q   Okay.  Could you just listen to the tape.  I'm going to
12 play it for you.
13       Do you hear anything?
14 A   No.
15       (Pause.)
16 Q   Okay?
17       THE COURT:  You don't want it on the overhead.
18       (Pause.)
19       THE COURT:  Not on the overhead.
20       MR. PERLMUTTER:  Judge, what we'll do is bring the
21 computer to him and play it to for him.
22       (Pause.)
23       (Continued on next page.)
24
25

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Perlmutter          607

1       MR. PERLMUTTER:  The government is saying they are
2 not able to hear it.
3       THE CLERK:  But it is overhead.
4       THE COURT:  What can I tell you?  You can refresh
5 his recollection.  You can attempt to.
6       MR. PERLMUTTER:  Okay.
7       THE COURT:  The government has to know what you are
8 using.
9       MR. PERLMUTTER:  I have told them the tape number
10 and the location of the tape.
11       THE COURT:  You can play it for him and he'll listen
12 and then you can play it for the government and then you can
13 ask him the question.
14       MR. PERLMUTTER:  Thank you.
15       (Pause.)
16       MR. McGUINNESS:  May I approach, Your Honor?
17       THE COURT:  Yes.
18       MR. PERLMUTTER:  Okay.  Wrong headsets.
19       (Pause.)
20       MR. PERLMUTTER:  Judge, the government has listened.
21 I will wait for the government to hear it as well before I ask
22 my question.
23       THE COURT:  All right.
24       MR. PERLMUTTER:  That's not going to work.
25       (Pause.)

GR   OCR   CM   CRR   CSR

Maragni - cross - Perlmutter          608

1 EXAMINATION CONTINUES
2 BY MR. PERLMUTTER:
3 Q   Does that refresh your recollection that you said that?
4 A   Yes.
5 Q   Now, you were also involved in a conspiracy to murder
6 someone named Jerry Clemenza?
7       MS. GEDDES:  Objection; 608.
8       THE COURT:  Sustained.
9       MR. PERLMUTTER:  I'm sorry, Judge?
10       THE COURT:  608, sustained.
11 Q   Do you know somebody named Jerry Clemenza?
12 A   I know of him.  I never met him.
13 Q   Do you know another name that he has?
14 A   Jerry Green Eyes.
15 Q   And do you -- do you recall that William Cutolo had put
16 out orders to beat up Clemenza?
17       MS. GEDDES:  Objection.
18       THE COURT:  Overruled.
19 A   No.
20 Q   Do you remember having a meeting this Florida and
21 discussing finding Jerry Clemenza?
22       MS. GEDDES:  Objection.
23       THE COURT:  I will have to talk to you at side bar.
24       (Continued on next page.)
25

GR   OCR   CM   CRR   CSR

Page 169

Maragni - cross - Perlmutter          609

1

Page 171

Maragni - cross - Perlmutter          611

Page 172

Maragni - cross - Perlmutter          612

1      (In open court.)
2  EXAMINATION CONTINUES.
3  BY MR. PERLMUTTER:
4  Q    Have you ever possessed a firearm?
5  A    Yes.
6  Q    When did you possess a firearm?
7       MS. GEDDES:  Objection.
8       THE COURT:  Overruled.
9  A    I possessed a firearm when I was in Orlando, when I was
10  arrested on my first case.
11  Q    Down in Florida, right?
12  A    Yes.
13  Q    Now, there was a time in connection with your involvement
14  in the Colombo Family that there was an underboss that asked
15  you to attack the boyfriend of one -- of his relative?
16       MS. GEDDES:  Objection.
17  Q    Do you recall that?
18       THE COURT:  Sustained.
19  Q    Well, do you recall an instance where you were owed money
20  by a landscaper or surveyor?
21  A    It wasn't me that was owed the money.
22  Q    Okay.  But it was somebody that you knew was owed the
23  money?
24  A    Yes.
25  Q    You got involved in collecting that money, right?

tated, that I

GR    OCR    CM    CRR    CSR                    GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          613

1 A  Yes.

2 Q  In connection with that, did you -- I mean, you just
3 didn't go to the guy and say we are going to take you to Small
4 Claims Court, right?

5     MS. GEDDES:  Objection.

6     THE COURT:  Sustained.

7 Q  Isn't it a fact that you -- that you threatened that
8 individual?

9     MS. GEDDES:  Objection.

10     THE COURT:  Sustained.

11 Q  You got married in 1975?

12 A  No.

13 Q  Did you matter Barbara DiCicco?

14 A  I married Barbara DiCicco in 1978.

15 Q  Barbara DiCicco.  Okay.

16     Her father, he was a capo in the Gambino Crime
17 Family, right?

18 A  Yes.

19 Q  He ran activities in Brooklyn and Staten Island?

20 A  Yes.

21 Q  Involved in labor racketeering?

22 A  I don't know what he was involved; in what specific
23 crimes I don't know.

24 Q  You have no idea?

25 A  I don't know what specific crimes he was involved in.

           GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          614

1 Q  So if he was involved in loansharking, you have no
2 knowledge of that?

3     MS. GEDDES:  Objection.

4     THE COURT:  Sustained.

5 Q  Now, you married her in 1978?

6 A  Yes.

7 Q  At that point you were running additional card games?

8 A  Yes.

9 Q  You were running I think Joker-Poker machines?

10 A  Yes.

11 Q  Now, one of the card games that you were running, that
12 was at Bay 13th Street and Bath Avenue?

13 A  Yes.

14 Q  What type of games were you running there?

15 A  Poker.

16 Q  You kept the bank?

17 A  No.

18 Q  How much money did you make there?

19 A  I made about 150 a night.

20 Q  Seven nights a week?

21 A  No.  It was -- I think the game, if I recall, the game
22 ran maybe two nights a week, sometimes three.

23 Q  Did you run any other games other than at that -- at
24 Bay 13th and Bath Avenue?

25 A  I ran a game on 75th Street and New Utrecht Avenue in

           GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          615

1 Brooklyn.

2 Q  Any other games?

3 A  I ran a game on Bay 17th Street and Bath Avenue in
4 Brooklyn.

5 Q  All right.  So the one on New Utrecht, how many nights a
6 week did that run?

7 A  That would start on a Friday and sometimes go to Sunday.

8 Q  It was a two-day game?

9 A  Sometimes; it broke up earlier at other times.

10 Q  Okay.  You said there was a third game that you ran?

11 A  There was a social club that we ran a game on the 17th --
12 Bay 17th and Bath Avenue.

13 Q  How many days a week would that run?

14 A  Once.

15 Q  Basically, you were running games five nights a week,
16 right?

17 A  All these clubs weren't open in the same years.  This was
18 all different times.

19 Q  You -- you also ran Joker-Poker machines?

20 A  Yes.

21 Q  What is a Joker-Poker machine?

22 A  It is a machine where you put money in and there is a
23 joker.  It's a card game.  It's like a poker machine.

24 Q  How many of these machines did you run?

25 A  Not that I ran them; I asked people if they would want to

           GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          616

1 put them in their stores.

2 Q  Okay.  How many did you install?

3 A  Maybe four.

4 Q  Where did you place them?

5 A  In candy stores around the neighborhood in Brooklyn.

6 Q  When you placed them, how was it that you got permission
7 to put them in?

8 A  I asked the people that owned the stores if they would
9 put them in.

10 Q  They would agree to put them in?

11 A  Yes.

12 Q  What type of profits would this generate?

13 A  Well, I don't know.  It all varied.  It all depended on
14 how many players would play, how many people would play the
15 machines.

16 Q  Average?

17 A  A couple of hundred dollars a week.

18 Q  Now, you were also involved in boosting records from
19 department stores?

20 A  Yes.

21 Q  You acted as a spotter on those thefts, right?

22 A  No; I acted as a carrier.

23 Q  As a carrier.

24     How many times were you boosting department stores?

25 A  Three days a week.

           GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          617

1  Q    What years was that?
2  A    I believe that was 1974.
3  Q    Where would you boost those -- where were you boosting?
4  A    All over New York, Upstate New York, Long Island; all
5  over the place.
6  Q    Other than -- when you say records, you mean like the old
7  LPs?
8  A    Yes.  The old record albums, yes.
9  Q    Did you steal other type of stuff as well?
10 A    No.
11 Q    You were just exclusive to records?
12 A    Yes.
13 Q    You also got involved in loansharking, right?
14 A    Yes.
15 Q    When -- thee is the term shylocking, right?
16 A    Yes.
17 Q    Shylocking is loansharking, right?
18 A    Yes, it is.
19 Q    All right.  You began to do what is called pushing money
20 out, right?
21 A    Right.
22 Q    And collecting money?
23 A    Right.
24 Q    When did you start doing that?
25 A    Around 1975.

                GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          618

1  Q    Around '75.
2        Did you obtain -- did you obtain money from your
3  father-in-law to start loansharking?
4  A    No; he wasn't my father-in-law in 1975.
5  Q    How about 1978, did you get money from him to start
6  loansharking?
7  A    No.
8  Q    You used your own money to loanshark?
9  A    I wasn't loansharking in 1978.
10 Q    How about in 1975, you were loansharking?
11 A    Yes, I was.
12 Q    You used your own money?
13 A    No, I didn't.
14 Q    Whose money did you use?
15 A    I got the money from my friend, Alli Boy.
16 Q    From Alphonse Persico?
17 A    Yes.
18 Q    How many loans did you have outstanding with -- how much
19 money did you get from Alphonse Persico?
20 A    About 10,000.
21 Q    How many loans did you break up that ten thousand into?
22 A    All varied.  We wouldn't -- I wouldn't give anybody over
23 a thousand dollar loan.
24 Q    All right.  So it would be loans for a thousand or less?
25 A    Yes.

                GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          619

1  Q    Now, I just want to understand how this works.  Let's say
2  you give a loan for a thousand dollars.
3  A    Yes.
4  Q    How do you charge interest on that thousand dollars?
5  A    It's a percentage of the money.
6  Q    Okay.  What percentage is it?
7  A    It was -- at the time it was two percent.
8  Q    That's weekly, right?
9  A    Yes, it is.
10 Q    So that's -- that percentage, that's also called points,
11 right?
12 A    Yes.
13 Q    So two points on a thousand dollars, that's 20 bucks a
14 week?
15 A    Yes.
16 Q    All right.  Did there come a time when the points that
17 you would charge changed?
18 A    Yes.
19 Q    And I am assuming that's not because the Federal Reserve
20 changed interest rates, right?
21 A    That's correct.
22 Q    Okay.  What did it change to?
23 A    It changed to three points.
24 Q    All right.  So in your experience, either you charged two
25 points or three points, correct?

                GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          620

1  A    Yes.
2  Q    If somebody didn't pay their interest, what would happen
3  to them?
4  A    Well, if somebody didn't pay their interest, we would
5  roll the interest over to the following week.  We really never
6  had any trouble getting paid.
7  Q    Because people knew that you should get paid, right?
8  A    People paid.
9  Q    Now, at two points -- my math is not very good -- that
10 means you are charging 104 percent interest, right?
11 A    I am not sure.
12 Q    Well, it's two points a week, right?
13 A    Yes.
14 Q    Times 52 weeks, 104 percent interest, right?
15 A    Okay.
16 Q    It's not whether it's okay or not.  It is math.
17 A    All right.
18       MS. GEDDES:  Objection, Judge.
19       THE COURT:  Sustained.
20 Q    How long did you run loansharking?
21       You said you did it in 1975?
22 A    Yes.
23 Q    Did you do it in '76?
24 A    Yes.
25 Q    '77?

                GR    OCR    CM    CRR    CSR

Maragni - cross - Perlmutter          621

1  A   No.
2  Q   '78?
3  A   No.
4  Q   When did you start loansharking again?
5  A   I started loansharking again when I moved to Florida,
6  after I got out of jail.
7  Q   After you got out of jail?
8  A   Yes.
9  Q   All right.  You moved to Florida before you went to jail,
10 right?
11 A   Yes.
12 Q   What year did you move to Florida?
13 A   I think it was '83; '83 or '84.  I am not sure.
14 Q   In '84, you started getting involved in this credit card
15 fraud, right?
16 A   That's correct.
17 Q   I want to understand this fraud.  You would -- you would
18 get fraudulent credit card numbers?
19 A   I would get fraudulent credit cards.
20 Q   Those were stolen credit cards, right?
21 A   They were duplicate credit cards.
22 Q   All right.  But they were -- but the numbers were stolen,
23 right?
24 A   The numbers were stolen off of receipts that the original
25 people made purchases of.  It was the carbon copies that the

                GR   OCR   CM   CRR   CSR

Maragni - cross - Perlmutter          622

1  cards were made duplicate of.
2  Q   Where did you get those stolen receipts?
3  A   New York.
4  Q   From whom?
5  A   Louis Melitto.
6  Q   Where did he get them from?
7  A   I -- I believe they had a machine that made them.
8  Q   That made the receipts or the cards?
9  A   That made the cards.
10 Q   Where did you get the receipts though, to manufacture the
11 cards?
12 A   I didn't; he did.
13 Q   Do you know where he got them?
14 A   No.
15 Q   Now, when you got these duplicate cards, as you referred
16 to them, you would then use them to purchase passes to Walt
17 Disney World?
18 A   Yes.
19 Q   Then you would sell those passes to travel agents?
20 A   Yes.
21 Q   They would sell those passes to families that wanted to
22 go on a vacation to Walt Disney World, right?
23 A   Yes.
24 Q   Those passes wouldn't work, would they?
25 A   Sure, they would.

                GR   OCR   CM   CRR   CSR

Maragni - cross - Perlmutter          623

1  Q   They would work?
2  A   Yes.
3  Q   Okay.  They wouldn't come back that it was a stolen
4  credit card number and they wouldn't honor it?
5  A   No.
6  Q   Kids still got to go to Walt Disney World?
7  A   Yes.
8  Q   I'm glad.  Okay.
9      Now, you had this phrase that you said when you were
10 asked how much money you'd make.
11     You would say thousands, right?
12 A   Yes.
13 Q   I think, for example, you were talking about a money
14 laundering scheme you were involved in in the middle nineties
15 with a stockbroker?
16 A   Yes.
17 Q   You used that phrase there too, right?
18 A   Yes, I did.
19 Q   You said thousands.
20     The fact is that you told the government that you
21 made about $200,000 on that scam, right?
22 A   I don't know if it was 200,000.  But I made -- I made a
23 lot of money.
24 Q   You made a lot of money, didn't you?
25 A   Yes.

                GR   OCR   CM   CRR   CSR

Maragni - cross - Perlmutter          624

1  Q   In fact, you made enough money to be able to support
2  yourself in the motorcycle business?
3  A   I was already into the motorcycle business.
4  Q   You certainly made enough money to be able to continue in
5  your operations?
6  A   Yes.
7      MR. PERLMUTTER:  May I have 3500-MR-30, at three?
8  Q   Now, you -- this credit card fraud back in 1984,
9  you -- the credit cards weren't just used to purchase Walt
10 Disney World tickets, right?
11 A   I wasn't the one doing the purchasing.  I am not sure.
12 Q   They were used all over the country, weren't they?
13 A   No, not that I am aware of, no.
14 Q   Isn't it a fact that the -- that the fraud was discovered
15 when someone made purchases in California?
16 A   Yes.
17     That was the fellow David Panisi that was involved
18 with us in the credit card fraud.  When he went to California
19 he took his father out to dinner and used one of the cards to
20 pay for the dinner.
21 Q   Again, it just wasn't -- people weren't just using these
22 cards in Walt Disney World.  They were using these cards
23 elsewhere too, right?
24 A   He used the card elsewhere.
25     (Continued on next page.)

                GR   OCR   CM   CRR   CSR

Maragni - cross - Perlmutter       625

1  BY MR. PERLMUTTER:
2  Q   Now, one second?
3      How much did you make on the credit card fraud.
4  A   We made thousands of dollars.
5  Q   2,000?
6  A   No.  Thousands of dollars.
7  Q   10,000?
8  A   More.
9  Q   Fifty?
10  A   I think right around 50.
11  Q   Around 50,000?
12  A   Somewhere like that.  I'm not exactly sure how much.
13  Q   100?
14      MS. GEDDES:  Objection.
15      THE COURT:  Overruled.
16  Q   Was it 100?
17  A   I don't think.  I'm talking about my end.  I don't think
18  it was a hundred.
19  Q   I'm not just talking about your end.  I'm talking about
20  this whole scam.
21  A   Altogether, 100,000.
22  Q   You don't know?
23  A   I don't know.
24  Q   Could have been 200?
25  A   I don't know.  I couldn't answer, honestly.
       ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter       626

1  Q   How many people were involved in this scam?
2  A   Three.
3  Q   Well, there was a guy name PJ that was involved?
4  A   Yes.
5  Q   What does PJ stand for?
6  A   PJ stands for Peter John.
7  Q   That was that guy Louis Milito you were getting the cards
8  from?
9  A   Yes.
10  Q   And David?
11  A   Dave Panisi, yes.
12  Q   There was a guy named Sammy G?
13  A   I don't know who Sammy G is.
14  Q   That's four of you that are involved; right?
15  A   Well, Louis Milito wasn't involved  -- Louis Milito was
16  selling me credit cards.  He knew nothing about what was going
17  on in Disney World.
18  Q   Did you all make equal amounts of money?
19  A   No.
20  Q   I asked you about this stock fraud, this --
21      THE COURT:  But go on, Mr. Perlmutter.  Do you have
22  a lot more?
23      MR. PERLMUTTER:  I do, Judge.
24      THE COURT:  Let's take a midafternoon break now.

Maragni - cross - Perlmutter       627

1

Maragni - cross - Perlmutter        629

18       You may continue, Mr. Perlmutter.

19       MR. PERLMUTTER: Thank you, your Honor.

20 BY MR. PERLMUTTER:

21 Q   Mr. Maragni, before we broke, I was asking how much money

22 you made off of the money-laundering scam that you did with

23 the stockbroker?

24 A   Yes.

25 Q   And you said you didn't know; right?

Maragni - cross - Perlmutter        630

1 A   I'm not sure of the total amount, no.

2 Q   I asked you if it was about $200,000?

3 A   I'm not sure.  I don't know.

4 Q   Do you recall being interviewed by the government on

5 September 13 of 2011?

6 A   Yes.

7 Q   Do you recall who was present for that meeting?

8 A   I believe Agent Curtis was present, and Elizabeth Geddes

9 was present.

10 Q   When you say "Agent Curtis," you mean Scott Curtis?

11 A   Yes.

12 Q   Do you see Scott Curtis in the courtroom today?

13 A   Yes, I do.

14 Q   Can you identify a piece of clothing he's wearing?

15 A   He's wearing a green tie.

16       MR. PERLMUTTER: The record should reflect that the

17 witness has identified Scott Curtis.

18 Q   Now, I'm going to approach you, with the judge's

19 permission.

20       THE COURT: You may.

21 Q   I'm going to show you what's marked as 3500-RM-30 at page

22 four, and I am also going to show you RM  -- 3500-RM-30-X at

23 page four. So, you have the handwritten version, and the

24 typed version.  I'm going to point you to the middle of the

25 page towards the top?

Maragni - cross - Perlmutter        631

1       Now, if you would take a look at that.  Does that

2 refresh your recollection that you told the government that

3 you made about $200,000 off of that money-laundering scheme.

4 A   Yes, approximately $200,000, yes.

5 Q   Thank you.  And you got involved in this scheme after you

6 got released from your 1986 credit-card fraud case; right?

7 A   Yes.

8 Q   And you did, I think you said you were sentenced to five

9 years, but you only did twenty months on that case?

10 A   Yes, that's correct.

11 Q   Now, after you were arrested on this case, you were

12 released and tried to cooperate for the government; right?

13 A   No.

14 Q   I mean, on this case, on the case that we're here about

15 today.

16 A   Yes.  Okay.  I didn't know which case you were referring

17 to.

18 Q   I meant this case.  That's why I said that.

19 A   Okay.

20       MS. GEDDES: Your Honor, can counsel specify what he

21 means by this?

22       THE COURT: Do you mean the instant prosecution?

23 Q   This case, the case here in court on today?

24 A   Yes.

25 Q   You understand?

Maragni - cross - Perlmutter        632

1 A   Now, I do.

2       MR. PERLMUTTER: Judge, I'm going to mark two pages,

3 and I'm going to ask that they  --

4

5 Q   Let me ask you: What date were you arrested in

6 connection with the case that you are  -- the case that you

7 became a cooperator on?

8 A   January 21, 2011.

9 Q   January 21, 2011.

10       MR. PERLMUTTER: Judge with the government's

11 consent, I'm going to admit Defendants' J and K.

12       THE COURT: All right.  Those are admitted.

13       (So marked.)

14       MR. PERLMUTTER: If I could have the Elmo up.

15 Q   So, you said that you were arrested what day in January?

16 A   Actually, it was the 20th.  I'm sorry, I said the 21st.

17 It was the 20th of January.

18 Q   So, it was Thursday, January 20; right?

19 A   Correct.

20 Q   Now, there came a time when you entered into a plea

21 agreement with the government; right?

22 A   Yes.

23 Q   And do you remember the date of that?

24 A   I believe it was August 4.

25 Q   August 4.

Page 193

Maragni - cross - Perlmutter          633

1       MR. PERLMUTTER:  Judge, I would like to admit at
2 this point 3500-RM-20.
3       MS. GEDDES:  No objection.
4       THE COURT:  What is it marked as?
5       MR. PERLMUTTER:  We can mark it as Defendants' L, as
6 in Larry.
7       THE COURT:  All right.  Defendants' L is admitted.
8       (So marked.)
9 Q   I'm going to show you what's now admitted as Defendants'
10 Exhibit L, and I'm going to ask you to refer to the last page?
11      What is Defendants' L?  Would you tell the jury?
12 Mr. Maragni.
13 A   What is?
14 Q   What is the document that you have in your hand,
15 Defendants' L?
16 A   It's a plea agreement.
17 Q   It's your plea agreement; right?
18 A   Yes.
19 Q   Would you look at the date on the back, and tell me if
20 that refreshes your recollection as to the exact date that you
21 pled?
22 A   August 1.
23 Q   August 1.  Do you see your signature on there?
24 A   Yes, I do.
25 Q   And you read that agreement before you signed it?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 194

Maragni - cross - Perlmutter          634

1 A   Yes.
2 Q   And you discussed it with a lawyer?
3 A   Yes.
4 Q   And you understood all the terms of it; correct?
5 A   Yes.
6 Q   Can I have it back, please?
7       And that was August 1 of 2011.
8 A   Yes.
9 Q   That was a Monday; right?
10 A   Yes.
11 Q   Yes?
12 A   Yes.
13 Q   Now  -- just to be clear:  That's one two, three, four,
14 five, a little more than six months before you entered a plea
15 agreement; right?
16 A   Six months before I entered a plea agreement?
17 Q   Yes.  You were arrested on January 20, and you entered a
18 plea agreement on August 1; right?
19 A   Correct.
20 Q   That's not a cooperation agreement.  That was a plea
21 agreement; right?
22 A   Plea agreement, yes.
23 Q   Now, I'm going to get back to that in a minute.  Let me
24 ask you:  Around the same time that you were doing this
25 money-laundering scam, you hooked up with Alphonse Persico

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 195

Maragni - cross - Perlmutter          635

1 again?
2 A   A few years after.
3 Q   What year did you hook up with him again?
4 A   '95, '96.  I'm not sure what year this was.
5 Q   You started to collect gambling money for him; right?
6 A   Yes.
7 Q   And you would  -- he would pay you in connection with
8 that right?
9 A   He would give me a piece of what I brought, yes.
10 Q   He paid you about 50,000 for that work?
11 A   All total.
12 Q   Now, you were arrested again  -- you were arrested again
13 in 2000?
14 A   Yes.
15 Q   And that was for racketeering; right?
16 A   Yes.
17 Q   And that was for another credit-card fraud?
18 A   I don't know if credit-card fraud was part of the
19 indictment.  I'm not sure.
20      MR. PERLMUTTER:  Can I have 3500-RM-2, please?
21 Q   You were indicted on bank fraud; right?
22 A   I believe so.
23 Q   And loan-sharking?
24 A   Yes.
25 Q   Let's go back to the bank fraud.  Let me ask you:  The

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 196

Maragni - cross - Perlmutter          636

1 bank fraud, would you describe what you do, for the jury?
2 What was that fraud, what did it involve?
3 A   I have no idea.  I was charged with the underlying
4 crimes, because I was in a supervisory position.
5 Q   Well, do you remember what the credit-card fraud was?
6 A   No, I don't.
7 Q   You remember what the loan-sharking was, though; right?
8 A   Yes.
9 Q   And you were also charged with illegal gambling?
10 A   Yes, I was.
11 Q   And also bribing a public official; right?
12 A   Yes.
13 Q   Now, in connection with that, you were bribing officials
14 at the Florida DMV?
15 A   I obtained a driver's license from an official at the
16 DMV.
17 Q   How many driver's licenses did you obtain?
18 A   One.
19 Q   And you pled guilty to that; right?
20 A   Yes, I did.
21 Q   You served twenty-four months?
22 A   Yes.
23 Q   When you got out  -- let me ask you:  When you were in
24 jail for that twenty-four months, you still engaged in crime,
25 even while you were locked up; right?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter      637

1  A    Yes.
2  Q    You were engaged in loan-sharking?
3  A    Yes.
4  Q    You had about 40 to 80 thousand dollars on the street in
5  loan-sharking loans?
6  A    Yes.
7  Q    And you were getting three points on those loans at that
8  time, weren't you?
9  A    Yes.
10 Q    Now, you worked out an arrangement with somebody named
11 Louis Desione?
12 A    Louis DeSimone.
13 Q    DeSimone?
14 A    Yes.
15 Q    And he would keep a point, and you would get two points;
16 right?
17 A    Yes.
18 Q    That means while you were in jail, you were making about
19 1600 bucks a week on your loan-sharking loans?
20 A    Approximately.
21 Q    About $83,000 a year?
22 A    Approximately.
23 Q    And you had that money delivered to your new wife?
24 A    Yes.
25 Q    When you got out, you were on supervised release; right?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter      638

1  A    Yes.
2  Q    The fact is that you said  -- you told the jury before
3  that you abided by the requirements of the supervised release;
4  right?
5  A    I -- yes.  That's what I said, yes.
6  Q    But you didn't, did you?
7  A    No, I didn't.
8  Q    You went back to the life of crime?
9  A    Well, I said that I was still shylocking while I was on
10 supervised release.  I also said that.
11 Q    But the fact is that at one point, you told the jury that
12 you complied with supervised release; right?
13 A    Yes, I did.
14 Q    And part of being on supervised release is leading a
15 law-abiding life; right?
16 A    Yes.
17 Q    Not committing crimes?
18 A    Correct.
19 Q    And you were committing crimes?
20 A    Yes, I was.
21 Q    You went back to bookmaking?
22 A    No.
23 Q    You went back to gambling; right?
24 A    No.
25 Q    Running gambling operations --

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter      639

1  A    No.
2  Q    -- in 2002?
3  A    No.
4       MR. PERLMUTTER:  Can I see 3500-RM-26 at one.
5  Q    What's a phone room?
6  A    A phone room is a room that people  -- there's a bunch of
7  phones, telephones in a room.  People read off a script and
8  sell a product.
9  Q    Were you involved in a phone-room scam at that point?
10 A    No.
11 Q    Were you involved in a bookmaking operation, a gambling
12 bookmaking operation for sports betting at that point?
13 A    No.
14 Q    Were you involved in extortion after 2002?
15 A    Yes.
16 Q    And that was a company called Argo Construction?
17 A    I don't remember the company.
18 Q    Does the name RS International ring a bell?
19 A    No.
20 Q    Tell us who extorted around 2002.
21 A    I don't remember.
22 Q    But you were engaged in extortion?
23 A    2002, I was in jail.
24 Q    After 2002, you were engaged in extortion?  You just said
25 before that you engaged in extortion at some point?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter      640

1  A    The only extortion that I was engaged in was extortionate
2  loans.
3  Q    Well, did you have some type of involvement with a strip
4  club called RS International  --
5  A    No.
6  Q    -- located in North Carolina?
7  A    No.  That was owned by a friend of mine.
8  Q    That was owned by a friend of yours?
9  A    Yes.
10 Q    What was the name of that friend?
11 A    Rocco Scarano.
12 Q    You had dealings with him?
13 A    He was my friend.
14 Q    And he owned RS International; right?
15 A    I don't know.  I don't know his company name.
16 Q    Didn't you tell the government that you were involved
17 with an extortion involving a place called RS International?
18 A    I don't recall saying that.
19 Q    All right.
20       MR. PERLMUTTER:  Hold on one second.
21       (Pause.)
22 Q    Rocco, he tried to open up a club in Florida; right?
23 A    He was looking into it, yes.
24 Q    And he needed money?
25 A    Yes, he was looking for investors.

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter      641

1  Q   Did you invest with him?
2  A   No.
3  Q   Other than extortionate loans, have you ever extorted a
4  business?
5  A   No.
6  Q   The marijuana dealing that you spoke about, Vito Marcel,
7  is that the Canadian marijuana supplier you are talking about?
8  A   No.  I don't know Vito Marcel.
9  Q   Now, after 2002, you were also involved in a
10 gambling-debt collection; right?
11 A   There were people that were collecting gambling debts.  I
12 wasn't part of it.
13 Q   But you were aware of it; right?
14 A   I was aware of it.
15 Q   A guy name Smiley owed money on bookmaking?
16 A   I don't know anything about Smiley owed.
17     MS. GEDDES:  Objection.
18     THE COURT:  Overruled.
19 Q   Well, do you know something called Romantique Limousine?
20 A   Yes, I do.
21 Q   What's Romantique Limousine?
22 A   A limousine company.
23 Q   Who owns it?
24 A   My friend Michael Persico.
25 Q   He's the brother of Alphonse Persico?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter      642

1  A   Yes, he is.
2  Q   Do you know a guy named John DiLeo?
3  A   Yes, I did.
4  Q   He works there; right?
5  A   Yes.
6  Q   Do you recall meeting a guy named Smiley at Romantique
7  Limousine through John DiLeo?
8  A   I know Smiley.
9  Q   Before, you said you had no idea who he was.  Do you know
10 Smiley?
11 A   I know Smiley.  I have no idea of his gambling debt.
12 Q   Do you remember telling the government he owed money on
13 bookmaking?
14 A   No.
15
16 Q   Do you remember being interviewed by the government on
17 November 16 of 2011?
18 A   Yes.
19 Q   I'm going to show you what's marked as 3500-RM-29-X, and
20 I'm going to refer you to the fourth line from the bottom.
21     Do you see that.
22 A   Yes.
23 Q   Do you recall telling the government that Smiley owed
24 money from bookmaking?
25 A   No, I don't.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter      643

1  Q   And that doesn't refresh your recollection that you said
2  that to the government?
3  A   No, it doesn't.
4  Q   Who was at that meeting on November 16 of 2011?
5  A   I'm not sure exactly who was there.
6  Q   Scott Curtis there?
7  A   Probably.  I'm not sure.
8  Q   He was at all your meetings, wasn't he?
9  A   Basically.
10     (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter      644

1  CROSS EXAMINATION CONTINUED
2  BY MR. PERLMUTTER:
3  Q   Showing you again Defendant's Exhibit -- what's on the
4  Elmo, Defendant's J.  Talked about your arrest on January 20th
5  of 2011, right?
6  A   Yes.
7  Q   And took a plea on August 1st of 2011, right, and you
8  didn't enter into -- you weren't given a cooperating agreement
9  by the government at any time during 2011, right?
10 A   Correct.
11 Q   It wasn't until -- I am now showing you Defendant's K, it
12 wasn't until then that you entered into a cooperation
13 agreement, right?
14 A   Yes.
15 Q   You remember the date of the cooperation agreement?
16 A   No.
17 Q   Showing you what's been marked 3500-RM-244, which I'm
18 going to mark as Defendant's Exhibit M for Mary.
19     Do you recognize that document?
20     Judge, I am assuming I can approach and I don't to
21 ask?
22     THE COURT:  That is fine.
23     Thank you, for asking.
24 Q   (Cont'd):  So is that your cooperation agreement?
25 A   Yes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          645

1 Q   What is the date of it?
2 A   February 9th, 2012.
3     MR. PERLMUTTER:  Judge, I ask that it be admitted
4 into evidence.
5     MS. GEDDES:  No objection.
6     THE COURT:  It is received.
7     MR. PERLMUTTER:  Thank you Judge.
8     (Defendant Exhibit M received and marked in
9 evidence.)
10 Q   So that was February 9, 2012; correct?
11 A   Yes.
12 Q   So it took more than a year for you to finally gain your
13 cooperation agreement, right?
14 A   Yes.
15 Q   Now, let me go back to your plea agreement which we put
16 in evidence as Defendant's Exhibit L.
17     Put it up on the Elmo.  See it, right?  I've shown
18 you this before?
19 A   Yes.
20 Q   In connection with this plea agreement -- well, the
21 government -- you were at liberty at the time that you signed
22 this plea agreement, right?  You weren't incarcerated, right?
23 A   No, I wasn't.  I was on bail.
24 Q   You're not incarcerated now, are you?
25 A   No, I'm not.
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          646

1 Q   But at the time that you signed this plea agreement there
2 was frustrations about whether you were going to become a
3 cooperator or not, right?
4 A   I don't think so, no.
5 Q   You hadn't been offered a cooperation agreement yet,
6 right?
7 A   No.
8 Q   And you had numerous meetings with the government,
9 correct?
10 A   Yes.
11 Q   And you'd been on the street for quite a while wearing a
12 wire?
13 A   Yes.
14 Q   And the government wasn't willing to allow you -- to
15 offer you a cooperation agreement at that time, right?
16 A   I don't know what they were willing to do or not.
17 Q   You were told you were going to take a plea agreement?
18 A   I was told I had a plea, yes.
19 Q   And you wanted to get a cooperation agreement, right?
20 A   Yes.
21 Q   But you weren't being offered a cooperation agreement,
22 you were being offered a plea agreement only, correct?
23 A   Not at that point, right.
24 Q   So your cooperation hadn't gotten to the point where that
25 the work you'd done out on the street, it wasn't meriting a
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          647

1 cooperation agreement by August 1st, 2011; right?
2 A   I don't know.  I -- I don't know what merits a
3 cooperation agreement.
4 Q   Okay.  Well, you know when you cooperate you want to give
5 them information, correct?
6 A   Right.
7 Q   And if you give them information you might get one of
8 these agreements, right?  Cooperation agreement, right?
9 A   A cooperation agreement is not determined by me.  It is
10 determined by the government.
11 Q   Okay.  And they had not determined to give you one then?
12     MS. GEDDES:  Objection.
13     THE COURT:  Mr. Perlmutter, let's move it along.
14 Q   You don't get a 5k1 letter on just a straight plea,
15 right?
16 A   I don't know.
17 Q   Now, when you entered this plea agreement you pled guilty
18 to racketeering, right?
19 A   Yes.
20 Q   And I'm going to get back exactly to what you had pled to
21 later -- well, I can actually get to it now, so we don't have
22 to go back over it.
23     You pled guilty to a racketeering act three which
24 was a money laundering conspiracy?
25 A   Yes.
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          648

1 Q   And racketeering act 13, that was an extortion?
2 A   Yes.
3 Q   And racketeering act 20, that was possession of
4 contraband cigarettes?
5 A   Yes.
6 Q   And that was basically you were selling cigarettes
7 without tax stamps?
8 A   Yes.
9 Q   You were selling how many cigarettes?
10 A   Two cases?
11 Q   How many cases are two cases?
12 A   Fifty cartons to a case.
13 Q   And how many -- can you tell us how many cigarettes that
14 is?
15 A   Twenty to a pack.  It's ten packs to a carton and well --
16 Q   I can't figure that out and you can't either.  We will
17 figure it out later?
18     You also said pled guilty to extortion of an
19 individual in North Carolina.
20 A   Yes.
21 Q   Marijuana distribution?
22 A   Yes.
23 Q   Extortion of another fellow, John Doe 19?
24 A   Yes.
25 Q   Wire fraud of, Florida official?
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          649

1 A    Yes.
2 Q    And now in connection with the agreement, the government
3 agreed that they wouldn't prosecute you for other crimes that
4 you committed?
5 A    No, not at that point.
6 Q    Well, they said that they wouldn't bring you -- they
7 wouldn't bring criminal charges against you for a whole host
8 of criminal activities, didn't they?
9 A    Not that I am aware of.
10 Q    Well, let me show you paragraph 12. You see paragraph 12,
11 you see that?
12 A    Yes, I do.
13 Q    No further criminal charges will be brought against the
14 defendant, that's you, right?
15 A    Yes.
16 Q    And it refers to, one, conspiring to launder the proceeds
17 of illegal gambling business of a cousin of John Doe 8 in or
18 about 2008 to 12011; do you see that?
19 A    Yes.
20 Q    Who was the cousin of -- who is John Doe 8?
21 A    I have no idea.
22 Q    And do you know who the cousin was?
23 A    No.
24 Q    You told the government that you didn't -- you engaged in
25 this money laundering and gambling proceeds with these

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          650

1 individuals, right?
2 A    Yes.
3 Q    And they agreed that you wouldn't be prosecuted for that,
4 right?
5 A    Yes.
6 Q    And two, conspiring to use extortionate means to collect
7 an extension of credit from John Doe 11 in or about in between
8 March 2010 and January 11th; do you see that? January 2011
9 do you see that?
10 A    Yes.
11 Q    Now, this person, John Doe 11, who was that?
12 A    I don't know.
13 Q    Okay, but you agreed with the government that you had a
14 -- that you used extortionate means to collect an extension of
15 credit, right?
16      MS. GEDDES:  Objection.
17      THE COURT: Sustained.
18 Q    Well, that means that you threatened somebody, doesn't
19 it?
20      MS. GEDDES:  Objection?
21      THE COURT:  That is what was charged.
22      MR. PERLMUTTER:  Okay.
23      THE COURT: They are agreeing they wouldn't prosecute
24 him for that.
25 Q    Did you tell the government you had done that?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          651

1 A    I don't remember.
2 Q    Okay.  But the government agreed they wouldn't prosecute
3 you for that, right?
4 A    Yes.
5 Q    Three, shipping and transporting, receiving, possessing,
6 selling contraband cigarettes, do you see that?
7 A    Yes.
8 Q    You pled guilty to one charge of that, right?
9 A    Yes.
10 Q    But they agreed they wouldn't pursue additional charges
11 against you for that, right?
12 A    Yes.
13 Q    And then there's another conspiracy to use extortionate
14 means involving an individual from North Carolina.  They greed
15 they wouldn't prosecute you for that, right?
16 A    Yes.
17 Q    And then there was the marijuana charge that they agreed
18 they wouldn't prosecute you for that, right?
19 A    Yes.
20 Q    And there was extortionate means for extension of credit
21 for John Doe 19, right?
22 A    Yes.
23 Q    They wouldn't prosecute you for that further, correct?
24 A    Correct.
25 Q    Okay. And then here they talk about the scheme involving

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          652

1 a bribery of a Florida official.  You wouldn't be prosecuted
2 further for that, right?
3 A    No.
4 Q    Okay. Now, all of the other stuff that we talked about,
5 all the other criminal activities that we discussed, you
6 disclosed that to the government and they've agreed also that
7 you wouldn't be prosecuted for that as well, right?
8      MS. GEDDES:  Objection.
9      THE COURT:  The question is overbroad.  Rephrase.
10 Q    We talked about a whole host of criminal activities that
11 you were involved with -- collecting proceeds for Allie
12 Persico, for being involved in all sorts of activities after
13 you were released in 2002 from jail, and you disclosed that to
14 the government and you are not being prosecuted for any of
15 that, are you?
16      MS. GEDDES:  Objection.
17      THE COURT:  Overruled.
18 A    No.
19 Q    Now, there's discussion about this fellow Vincent Manzo?
20 A    Yes.
21 Q    And there's two, there's a Vincent Manzo Senior and a
22 Vincent Manzo Junior, right?
23 A    Correct.
24 Q    And Vincent Manzo Junior, he had a large gambling debt to
25 people with the Gambinos, right?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          653

1  A   I'm not sure what family.

2  Q   It was about around $50,000 that he owed to another

3  family?

4  A   Roughly, yes.

5  Q   And Vincent Manzo Senior, he came to you about that debt,

6  right?

7  A   I went to him.

8  Q   You went to him about that debt?

9  A   Yes.

10  Q   You had discussions with him about that, right?

11  A   Yes.

12  Q   And Vincent Manzo Seniors's, hes' quite an old fellow,

13  isn't he?

14  A   Yes, he's in his 70s.

15  Q   He is in his late 70s, early 80s?

16  A   No, not early 80s.  He's in his 70s.  I think he's

17  somewhere around 76.

18  Q   Now, you testified in the case before you have no

19  personal knowledge about Tommy Gioeli being involved in any

20  homicides, right?

21  A   That's correct.

22  Q   And that's despite the fact that you were in this liaison

23  for Allie Persico according to the 2000 indictment on behalf

24  of the Colombo family, right?

25  A   That is also correct.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          654

1  Q   And in fact, when you were at meetings with the

2  government you never said at all that you had any personal

3  knowledge about any homicides involving Tommy Gioeli, right?

4  A   Correct.

5  Q   Now, you were talking about contacts that you had with

6  Mr. Gioeli during your direct testimony, remember that?

7  A   Yes.

8  Q   You said there were payments that were made involving a

9  guy named Pate -- Robert Pate?

10  A   Yes?

11  Q   You had no way to corroborate that, do you?

12  A   No.

13  Q   There were also visits of Florida, I think you were

14  talking about that?

15  A   Yes.

16  Q   Now, in the current case, and when I say the current case

17  I mean the case you were arrested on back in January 2011, all

18  right, you were accused at that point of being a capo, captain

19  in the Colombo family, right?

20  A   Yes.

21  Q   And one of the things that you were charged there with

22  what was labor racketeering?

23  A   Yes.

24  Q   And corruption of a labor union, right?

25  A   Yes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          655

1  Q   And is there something funny about that?

2  A   No.

3  Q   You were laughing.

4  A   No.

5  Q   I am curious.

6      And that was the cement and concrete workers Local

7  6A.

8  A   Yes.

9  Q   Now, you acted with an individual named Ralph Scopo in

10  connection with that, right?

11  A   Yes.

12  Q   And that involved taking over positions in the union?

13  A   No.

14  Q   Well, it involved taking actions of stealing wages and

15  benefits from workers, right?

16  A   No.

17  Q   Didn't it involve preventing the union from having proper

18  elections?

19  A   No.

20  Q   Why don't you tell us then what it involved?

21  A   My extortion of Local 6A was I went to Ralph Scopo and

22  asked him to hire three people.

23  Q   Okay.  Those were three people for no-show jobs?

24  A   No.  Guys that needed to go to work.

25  Q   So there was no crime then, right;  is that your opinion?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter          656

1  A   I don't think there was a crime. I was going to somebody

2  that I knew had something to do with the union, there were

3  three fellows that were out of work that worked for that union

4  before, and they needed work, and I asked them if he could put

5  them on.

6  Q   And so you just -- it is your testimony then, that there

7  was no basis for the government to charge you with labor

8  racketeering corruption?

9  A   That is exactly correct.

10  Q   Now, when you were arrested -- you were arrested on

11  January 20th, as we discussed, right?

12  A   Yes.

13  Q   When you were arrested you appeared before a Magistrate

14  Judge named Judge Gold, right?

15  A   Yes.

16  Q   And he entered an order of detention against you,

17  correct?

18  A   Yes.

19  Q   You were being held, you weren't out on the street the

20  way you are today, right?

21  A   Yes.

22  Q   And you wanted to get out of jail?

23  A   Yes.

24  Q   So there was an application made to another Judge, Judge

25  Bloom?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter         657

1  A   Yes.
2  Q   And she granted you bail on the 4th of February 2011,
3  right?
4  A   Yes.
5  Q   All right. Now, can I have one second? So that was on
6  February 4th, 2011, right?
7  A   Yes.
8  Q   And she said that you could actually be released,
9  correct?
10 A   Yes.
11 Q   And the government, they didn't agree with this, right?
12 A   They appealed it.
13 Q   They appealed it to Judge Matsumoto, correct?
14 A   Yes.
15 Q   They said that you were a danger to the community, right?
16 A   Yes.
17 Q   And that you shouldn't be on the street?
18 A   Yes.
19 Q   And they went for a hearing in front of Judge Matsumoto
20 and that happened on March 4th of 2011, right?
21 A   I am not sure of the date.
22     MR. PERLMUTTER: Could I see 3500-RM-19-C.
23 Q   I show you what's been marked as -- I'm sorry --
24 3500-RM-19-F.  Take a look at that.  Does that refresh your
25 recollection as to the date that you were before Judge

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter         658

1  Matsumoto seeking bail?
2  A   This says April 7th.
3      MR. PERLMUTTER: I am sorry. Excuse me one second.
4  One second, Your Honor.  I apologize.
5  THE COURT:  All right.
6      (Pause in the proceeding)
7  Q   The fact is that at some point after February 4th you
8  sought from Judge Matsumoto to be released, correct?
9  A   Yes.
10 Q   And Judge Matsumoto agreed with Judge Bloom and wouldn't
11 release you initially?
12 A   Judge Matsumoto, no she went against Judge Bloom.
13     THE COURT:  Judge Bloom had ordered release.
14     MR. PERLMUTTER: Judge, I am sorry.
15 Q   Judge Bloom had ordered release and Judge Matsumoto said
16 no, you are a danger to the community, you can't be released,
17 right?
18 A   Right.
19 Q   And then on the 25th of March the government wrote you --
20 I'm sorry -- the government wrote to Judge Matsumoto and asked
21 that you be released, right?
22 A   I am not sure of the date. I don't know.
23 Q   Well, let me show you what's marked as -- let me show you
24 what's marked as 3500-RM-19-C and you can see if that
25 refreshes your recollection (handing to the witness).

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter         659

1  A   Yes.
2  Q   So the government wrote -- just to clarify, on
3  March 25th, 2011 asking for your release, right?
4  A   Yes.
5  Q   Now, when the government wrote and asked for your release
6  on that day, you had never met with the government yet, had
7  you?
8  A   I have already met with them.
9  Q   Well, when did you first meet with the government?
10 A   I'm not sure of the exact date.
11 Q   Isn't it a fact that your first meeting with the
12 government occurred on March 29th, 2011?
13 A   I'm not sure about that. I don't think so.
14     MR. PERLMUTTER:  One second, Your Honor.
15     THE COURT: Okay.
16     (Pause in the proceeding).
17 Q   The fact is that you have a specific recollection of
18 meeting with the government prior to their writing on
19 March 25th of 2011 asking Judge Matsumoto for your release?
20 A   I believe I already entered into -- I already entered
21 into -- I made an agreement to cooperate before the government
22 wrote a letter asking the Judge to grant me bail.
23 Q   The fact is, Judge, given our issue with the
24 exhibits, this might be a good time to break.  I don't know if
25 you want me to keep going.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross / Perlmutter         660

1      THE COURT: I take it you are not likely to finish
2  within the next 20 minutes?
3      MR. PERLMUTTER:  Not at all, Judge. I think the
4  mechanics would be more smooth in the morning.
5      THE COURT:  Okay.

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
       - - - - - - - - - - - - - - - - - - - X
 3
       UNITED STATES OF AMERICA,          :      08-CR-240
 4
                         v.               :      U.S. Courthouse
 5                                               Brooklyn, New York
       THOMAS GIOELI and                  :
 6     DINO SARACINO,                     :
                                                 March 22, 2012
 7                       Defendants.      :      9:30 o'clock a.m.

 8     - - - - - - - - - - - - - - - - - - - X

 9
                         TRANSCRIPT OF TRIAL
10              BEFORE THE HONORABLE BRIAN M. COGAN
                UNITED STATES DISTRICT JUDGE, and a jury.
11
       APPEARANCES:
12
       For the Government:               LORETTA E. LYNCH
13                                       United States Attorney
                                         By:  ELIZABETH GEDDES
14                                            CRISTINA POSA
                                              JAMES GATTA
15                                       Assistant U.S. Attorneys
                                         271 Cadman Plaza East
16                                       Brooklyn, New York 11201

17     For the Defendant Gioeli:         ADAM PERLMUTTER, ESQ.
                                         CARL HERMAN, ESQ.
18                                       DANIEL McGUINNESS, ESQ.

19     For the Defendant Saracino:       SAM BRAVERMAN, ESQ.
                                         LOUIS FASULO, ESQ.
20                                       HEATHER BERGER, ESQ.

21

22     Court Reporter:                   Anthony M. Mancuso
                                         225 Cadman Plaza East
23                                       Brooklyn, New York 11201
                                         (718) 613-2419
24
       Proceedings recorded by mechanical stenography, transcript
25     produced by CAT.
```

ANTHONY M. MANCUSO, CSR OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter        680

1

6 R E Y N O L D         M A R A G N I,

7     called as a witness, having been previously duly

8     sworn, was examined and testified as follows:

9         THE COURT:  Mr. Perlmutter, you may continue.

10        MR. PERLMUTTER:  Thank you, your Honor.

11        Good morning, everybody.

12 CROSS-EXAMINATION (Continued)

13 BY MR. PERLMUTTER:

14 Q    Good morning, Mr. Maragni.

15 A    Good morning.

16 Q    Mr. Maragni, you testified yesterday that there were

17 times when you would come up to New York, and it was your

18 testimony that you visited with my client, Thomas Gioeli;

19 right?

20 A    Yes.

21 Q    Now, you are a friend of Alphonse Persico's?

22 A    Yes.

23 Q    And he's incarcerated right now; correct?

24 A    Yes.

25 Q    In fact, he was incarcerated for quite a long time in New

                ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter        681

1 York; right?

2 A    Yes.

3 Q    And when you would come up and you would have these

4 visits that you say you had with Mr. Gioeli, you would also

5 visit Mr. Persico; right?

6 A    Mr. Persico was in jail.  I visited him once while he was

7 incarcerated.

8 Q    Right.  You visited him in jail; right?

9 A    Yes.

10 Q    And that was up here in New York; right?

11 A    Yes.

12 Q    Now, you testified yesterday that you were involved in

13 some type of induction ceremony; isn't that right?

14 A    Yes.

15 Q    That was in what year?

16 A    2008.

17 Q    Exactly, exactly when was that ceremony?

18 A    That was on Palm Sunday.

19 Q    Now, you also said that when you were at the MDC  -- you

20 were incarcerated at the MDC; right?

21 A    Yes.

22 Q    Now, when I use that term the  "MDC," that stands for

23 Metropolitan Detention Center; right?

24 A    Yes.

25 Q    And that is a federal facility here in Brooklyn, where

                ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter        682

1 people are incarcerated before trial; right?

2 A    Yes.

3 Q    And you were incarcerated there; correct?

4 A    Yes, I was.

5 Q    Now, you said  -- well, when you were there  -- when were

6 you incarcerated there?

7 A    January 2011.

8 Q    You started your incarceration January 2011?

9 A    Yes.

10 Q    Then you finished it I think sometime in early April of

11 2011; right?

12 A    Yes.

13 Q    You were released pursuant to an agreement that we're

14 going to get back to that we talked about yesterday?

15 A    Yes.

16 Q    When you were there, Thomas Gioeli was also there; right?

17 A    Yes.

18 Q    And it was your testimony yesterday that the acting boss

19 of the Colombo Crime Family was incarcerated with you at that

20 time?

21 A    Yes.

22 Q    And that was Andrew Russo?

23 A    Yes.

24 Q    And it's your testimony that you engaged in Mafia rituals

25 in jail involving Andrew Russo?

                ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter        683

1 A    Yes.

2 Q    Now, yesterday, I was asking you about your release from

3 jail in April of 2011; remember?

4 A    Yes.

5 Q    And I said to you, Do you recall that the government

6 wrote to Judge Matsumoto on the 25th of March 2011 seeking

7 your release?

8 A    I remember you saying that.

9 Q    Previously, you hadn't been released, because you were

10 considered dangerous; right?

11 A    Yes.

12 Q    A danger to society and a danger to the community; right?

13        THE COURT:  Mr. Perlmutter, we covered this

14 yesterday.

15        MR. PERLMUTTER:  I'm laying a foundation to get back

16 to where I was.

17        THE COURT:  I understand.

18 Q    The fact is, is that the government, in fact, Ms. Geddes,

19 she wrote to Judge Matsumoto before there ever even had been a

20 meeting with you seeking to have you released; right?

21 A    I'm not aware of that.

22 Q    Well, remember yesterday, you said that you had signed an

23 agreement?  Do you recall that?

24 A    Yes.

25 Q    And you said that you had signed an agreement at your

                ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 13

Maragni - cross - Perlmutter      684

1 first meeting with the government; right?

2 A   Yes.

3 Q   And isn't it a fact -- isn't it a fact that that

4 agreement -- well, let's be clear.

5      MR. PERLMUTTER:   If I could have the Elmo, please,

6 Judge?

7 Q   Do you remember yesterday, we said that the government

8 had written Judge Matsumoto on March 25?

9 A   Yes, I remember you saying that.

10 Q   Okay.  And you said that at your first meeting with the

11 government, you signed an agreement; right?

12 A   Yes.

13 Q   And that was an agreement to obtain your release from

14 jail; right?

15 A   I believe it was a proffer agreement.

16 Q   You signed a proffer agreement and an agreement to obtain

17 your release from jail; right?

18 A   I don't remember if that was signed that day.

19 Q   Isn't it a fact that the first agreement you signed with

20 the government, the first proffer agreement you signed with

21 the government, was done on the same day that you signed a

22 release agreement for your release, as well?

23 A   It could be possible.  I'm not sure.

24 Q   You don't remember?

25 A   I don't remember.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 14

Maragni - cross - Perlmutter      685

1      MR. PERLMUTTER:   Well, if I can approach the

2 witness, Judge?

3      THE COURT:   You may.

4 Q   I'm showing the witness 3500-RM-8 and 9?

5      (Pause.)

6 Q   Does that refresh your recollection that at your first

7 meeting -- that your first meeting with the government was on

8 March 29, 2011?

9 A   Yes.

10 Q   So, that was your first meeting; right?

11 A   Yes.

12 Q   I'm sorry?

13 A   Yes.

14 Q   So, the fact is, is that without ever meeting you, the

15 government wrote to the Court and asked for your release, and

16 then they met you on March 29, 2011 for the first time?

17      MS. GEDDES:   Objection, the compound nature.

18      THE COURT:   Sustained.

19      Rephrase it, please.

20 Q   The government wrote to the Court and asked for your

21 release on March 25?

22 A   If that's what you are saying, yes.

23 Q   It's not what I am just saying.  Do you remember seeing

24 the letter yesterday to Judge Matsumoto asking for your

25 release dated March 25, 2011?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 15

Maragni - cross - Perlmutter      686

1      MS. GEDDES:   Objection.

2      THE COURT:   Overruled.

3 A   Yes, I remember seeing that.

4 Q   You said now that the first time you met with the

5 government was on March 29; correct?

6 A   Yes.

7 Q   So, the government requested your release prior to any

8 meeting with you; correct?

9 A   Yes.

10 Q   The fact is, is that Judge Matsumoto, she denied the

11 government's request to release you from jail; isn't that

12 right, initially?

13 A   Initially, Judge Matsumoto left a standing detention

14 order with me.  I don't know what took place after the

15 government met with her.

16 Q   But the fact is, is that after the government's

17 application on March 25, you weren't released from jail

18 immediately, were you?

19 A   No, I wasn't.

20 Q   And do you recall, that standing order from Judge

21 Matsumoto wanted to know how the government was going to be

22 able to effectively monitor you if you were released?

23      MS. GEDDES:   Objection.

24      THE COURT:   Overruled.

25 A   Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 16

Maragni - cross - Perlmutter      687

1 Q   In fact, that became a problem with you, didn't it, being

2 able to effectively monitor you while you were released;

3 right?

4 A   Yes.

5 Q   And Judge Matsumoto also wanted to know who was going to

6 monitor you; right?

7 A   Yes.

8 Q   And the government said Scott Curtis?

9 A   Well, the government said the FBI, and I had to secure a

10 security company.

11 Q   Isn't it a fact that the government said that in

12 particular it would be Scott Curtis?

13 A   I don't remember that, sir.

14      MR. PERLMUTTER:   One second, your Honor.

15      (Pause.)

16 Q   I'm showing you a document that's been marked as

17 3500-RM-19-E, and I'm referring you in particular to the

18 section of who will handle the defendant?

19      Does that refresh your recollection that the

20 government said that Scott Curtis would be the one handling

21 you.

22 A   I know what it says on this paper, but that's not what I

23 heard.  I never heard of this.  I never heard of this.

24 Q   The fact is, it was Scott Curtis that was handling you,

25 wasn't it?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 17

Maragni - cross - Perlmutter          688

1  A   He was the arresting agent.
2  Q   And he was your  handling agent while you were out?
3  A   And he was my handling agent; that's correct.
4  Q   Let's talk about that handling.  You signed an agreement
5  with the government to be released; right?
6  A   Yes.
7  Q   While you were released, it was discovered that you
8  continued loan-sharking  -- right?
9  A   Yes.
10 Q   -- and revealed to people that you were wearing a wire
11 while you were released; right?
12 A   No.
13 Q   We'll get back to that.
14     But one of the conditions of your release was that
15 you couldn't reveal to any third party that you were
16 cooperating; right.
17 A   Correct.
18 Q   Now, you got confronted about the fact that you were
19 found to be collecting loan-sharking proceeds; right?
20 A   Yes.
21 Q   And you said to the government, Well, I got 5500 from a
22 fellow Cinnante; is that it?
23 A   Yes.
24 Q   When you met him in Staten Island; right?
25 A   Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 18

Maragni - cross - Perlmutter          689

1  Q   And Curtis, he let you go down to Florida and meet with
2  this guy; right?
3  A   Yes.
4  Q   And you collected 15,000 from this guy when you were down
5  in Florida; right?
6  A   Yes.
7  Q   And there was another guy named DeSantis in Hollywood?
8  A   Yes.
9  Q   And you got 4,000 from him; right?
10 A   Yes.  But that was at a different time.  That was not
11 down in Florida.
12 Q   All right.  But that's why you were out being handled by
13 Agent Curtis; right?
14 A   Right.
15 Q   That money that you got, you never turned it over to the
16 FBI; right?
17 A   No.
18 Q   In fact, Agent Curtis knew that at least some of it you
19 collected and he didn't require you to turn it over; right?
20 A   He didn't know that I collected that money.
21 Q   That's what you say; right?
22 A   Yes.
23 Q   And we don't really know how much money you collected,
24 only what you say you collected; right?
25 A   Correct.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 19

Maragni - cross - Perlmutter          690

1  Q   We just have to trust you and take your word for it?
2  A   Yes.
3  Q   The fact is, when you were doing all that, you weren't
4  under a cooperation agreement, were you?
5  A   No, I wasn't.
6  Q   Now, you started cooperating, and you did several things.
7  You attended meetings with the government; right?
8  A   Yes.
9  Q   What are those meetings called?
10 A   Proffer sessions.
11 Q   Proffer sessions; right?
12 A   Correct.
13 Q   Can you spell  "proffer" for us?
14 A   P R O --
15     MS. GEDDES:  Objection.
16     THE COURT:  Sustained.
17 Q   It's P R O F F E R; right?
18 A   Correct.
19     MR. PERLMUTTER:  Just to educate the jury, because
20 it's a term we use that is not as common.
21     THE COURT:  So, you spelled it, Mr. Perlmutter.
22 Q   Proffer session, where you proffer information to the
23 government; right?
24 A   Correct.
25 Q   You hope the government will find your information

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 20

Maragni - cross - Perlmutter          691

1  valuable, so they will give you a cooperation agreement?
2  A   Correct.
3  Q   The first proffer session that we talked about, that was
4  on March 29; right?
5  A   Yes.
6  Q   Then you went to a second proffer session on April 8?
7  A   I don't know the exact date of the second proffer
8  session.
9  Q   Okay.  Let's work through it.  Showing you what's marked
10 as 3500-RM-10.  Does that refresh your recollection as to the
11 date of your next proffer session?
12 A   Yes.
13 Q   So, that's April 8?
14 A   Yes.
15 Q   Showing you 3500-RM-11 -- I'm sorry.
16     Let me set it up.
17     MR. PERLMUTTER:  I apologize, your Honor.
18 Q   Was your next session on April 18, 2011?
19 A   Probably.  I'm not sure of the date.
20 Q   Let me show you 3500-RM-11.  Does that refresh your
21 recollection that April 18 was the date of your next proffer
22 session?
23 A   Yes.
24 Q   Was April 28 the date of the next proffer session after
25 that?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 21

Maragni - cross - Perlmutter        692

1  A   I'm not sure.
2  Q   Showing you 3500-RM-12.  Does that refresh your
3  recollection as to the next proffer session?
4  A   Yes.
5  Q   Was the next proffer session you had on May 10, 2011?
6  A   Not sure of the date.
7  Q   Showing you 3500-RM-13.  Does that refresh your
8  recollection?
9  A   Yes.
10  Q   Showing you  -- was your next proffer session June 30,
11  2011?
12  A   I'm not sure.
13  Q   Showing you 3500-RM-14.  Does that refresh your
14  recollection?
15  A   Yes.
16  Q   Thank you?
17       So, you were there on the 8th.  You were there on
18  the 18th.  You were there on the 28th.  You were there on the
19  10th of May.  You were there on the 20th of June.
20       You had six proffer sessions between March 29 and
21  June 20; correct.
22  A   I believe it's seven.
23  Q   Well, this was your first proffer session, was on the
24  29th.  One, two, three, four, five, six?
25  A   Correct.

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 22

Maragni - cross - Perlmutter        693

1  Q   And just to be clear:  As we said yesterday, despite
2  those proffer sessions, on August 1, the government made you
3  plead guilty without a cooperation agreement; correct?
4  A   Yes.
5  Q   And at that point  -- I will get back to that in a
6  second.  Actually, let me get back to that now.  Hang on a
7  second?
8       (Pause.)
9  Q   At that point, you attended even more proffer sessions
10  with the government; right?
11  A   Yes.
12  Q   Do you recall that your next proffer session was on
13  September 6, 2011?
14  A   Possible.  I'm not sure of the date.
15  Q   Showing you 3500-RM-15.
16  A   Yes.
17  Q   And the next meeting was on September 13, 2011?
18  A   I'm not sure of the date, again.
19  Q   Showing you 3500-RM-16.
20  A   Yes.
21  Q   And you still didn't have a cooperation agreement from
22  the government; right?
23  A   That's correct.
24  Q   So, you were there on the 6th and on the 13th; right?
25  A   Yes.

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 23

Maragni - cross - Perlmutter        694

1  Q   You had yet more meetings with the government; right?
2  A   Yes.
3  Q   Your next proffer session was on November 3  -- I'm
4  sorry -- November 2, 2011?
5  A   It's possible.  I don't recall the date.
6  Q   I understand.
7  A   I'm not sure of the dates.
8  Q   Showing you 3500-RM-17.  Is that your next meeting with
9  the government?
10  A   Yes.
11  Q   Then your next meeting was November 21 of 2011?
12  A   Possible.  I'm not sure.
13  Q   Showing you 3500-RM-18.  See if that refreshes your
14  recollection.
15  A   Yes.
16  Q   Then your next meeting was on December 2, 2011?
17  A   I'm not sure of the date.
18  Q   Showing you 3500-RM-34.
19  A   Yes.
20  Q   And you still didn't have a cooperation agreement from
21  the government; right?
22  A   Correct.
23  Q   So, you were there on the 2nd  --
24       MS. GEDDES:  Objection, your Honor.
25       THE COURT:  Mr. Perlmutter, can we pick up this up

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 24

Maragni - cross - Perlmutter        695

1  somehow?
2       MR. PERLMUTTER:  I'm working on it, Judge.
3  Q   The 21st and the 2nd of December?
4       Now, in addition to attending these meetings, you
5  also allowed the government to listen to your telephone calls;
6  right.
7  A   Correct.
8  Q   And you consented to applications so that your calls
9  could be monitored; right?
10  A   Yes.
11  Q   And you started doing that from the get-go; right,
12  basically?
13  A   Yes.
14  Q   And in addition, you wore a wire?
15  A   Yes.
16  Q   And you were recorded constantly on that wire; correct?
17  A   Yes.
18  Q   Not every day, but several times a week?
19  A   On an average of twice a week.
20  Q   Now, do you recall that at one point while you were
21  wearing that wire, Agent Curtis instructed that you should say
22  nothing that could corroborate any of your conversations?
23  A   I don't recall that.
24       MR. PERLMUTTER:  One second, your Honor.
25       (Pause.)

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 25

Maragni - cross - Perlmutter          696

1     MR. PERLMUTTER:  If we could set up the witness to
2 hear something?  I would like to have him listen to it and see
3 if that refreshes his recollection.
4     THE COURT:  We'll do the best we can.
5     (Pause.)
6     MR. PERLMUTTER:  We're going to come back to that.
7 I'll just keep moving, Judge.
8     THE COURT:  Okay.
9 Q   Do you recall at some point in May expressing frustration
10 because the government wasn't happy with the information that
11 you were giving them?
12 A   I don't recall it.
13 Q   Do you recall telling somebody, So, what I'm doing right
14 now is all bullshit, I'm spinning my wheels?
15 A   I might have said that.  I'm not sure.
16 Q   You thought they were pretty happy with everything,
17 meaning the government?
18 A   Yes.
19 Q   The feedback I was getting was, they were happy with what
20 I was doing, and they were happy with what I was getting them,
21 and now I'm hearing they are not?
22     MS. GEDDES:  Objection.
23     THE COURT:  Mr. Perlmutter, what's the purpose?
24 Q   Do you recall that the expressions from the government
25 was that the information you were giving them was no good?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 26

Maragni - cross - Perlmutter          697

1 A   I don't remember that -- thinking that the information
2 that I was giving them  -- that the government thought that
3 the information I was giving them was no good.
4 Q   You weren't getting a cooperation agreement?
5 A   Not that point, no.
6 Q   Not for a long time?
7 A   Not for a long time.
8 Q   There was in May of 2011; right?
9 A   Right.
10 Q   And the fact is, the reason why you weren't getting any
11 information is because people you were dealing with on the
12 outside, they thought you were wearing a wire; right?
13 A   At some point, they suspected, yes.
14 Q   Because you had been locked up for so long, and then
15 suddenly you were released and out on the street; right?
16 A   Yes.
17 Q   And a lot of people, they wouldn't speak to you anymore,
18 would they?
19 A   That's correct.
20 Q   Now, at one point, from what we know, you were found
21 engaging -- at several points, you were found engaging in
22 techniques to manipulate what was caught on your wire;
23 correct?
24 A   Yes.
25 Q   And, for example, you were found to be passing notes to

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 27

Maragni - cross - Perlmutter          698

1 somebody about a loan-sharking payment, so that it wouldn't
2 get picked up on the wire; right?
3 A   Correct.
4 Q   And when I asked you before whether you disclosed your
5 activities for the government to any third parties, the fact
6 is that you did, didn't you?
7 A   No, I didn't.
8 Q   Well, you were passing notes to the person, so that you
9 wouldn't be overheard on your wire; correct?
10 A   That's correct.
11 Q   And we heard conversations yesterday with Vincent Manzo,
12 and you did the same thing with him, as well, you passed him
13 notes to manipulate your conversation with him, didn't you?
14 A   No, I didn't.
15 Q   We'll get back to that?
16     Now, you said that you signed papers with the
17 government, so that they could monitor your telephone calls;
18 correct.
19 A   Yes.
20 Q   And the fact is, is that you worked out a system so that
21 the government couldn't monitor all your telephone calls,
22 didn't you?
23 A   I don't know what that system would be.
24 Q   Didn't you get a cell phone, to have discussions that the
25 government didn't know about?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 28

Maragni - cross - Perlmutter          699

1 A   I got a cell phone to have contact with my family.
2 Q   Well, it wasn't just with your family, it was with people
3 about collecting loan-sharking obligations, wasn't it?
4 A   It was conversations with my business partner.
5 Q   Who you were using to collect loan-sharking obligations?
6 A   He was doing that, but also we had a meat business
7 together, also.
8 Q   You just said two minutes ago that the only reason why
9 you were using that cell phone was to have conversations with
10 your family; so, that wasn't true; right?
11 A   It's not a yes-or-no answer.
12 Q   It is a yes-or-no answer.  Is that true or not?
13     MS. GEDDES:  Objection.
14     THE COURT:  Sustained.
15 Q   Are you related to your business partner?
16 A   No.
17 Q   So now, we have with your family and with your business
18 partner collecting loan-sharking proceeds for you, and you are
19 telling us there was nobody else?
20 A   There came a point that one of the phones that were being
21 recorded, the system was down, and I was using my phone to
22 make the phone calls because neither phone was being recorded,
23 anyway.
24 Q   The fact is, you know that it's easy to buy a prepaid
25 cell phone and use that, because it can't be traced, and

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 29

Maragni - cross - Perlmutter          700

1  that's exactly what you were doing?
2  A   I never had a prepaid cell phone.
3  Q   In fact, you had conversations with Vincent Manzo on that
4  phone, so that you could set up these recordings that the
5  government has put in; right?
6  A   I had conversations with Vincent Manzo on the phones that
7  I was given.
8  Q   And other conversations, as well; right?
9  A   I had conversations with him in person.
10 Q   In fact, you had conversations with him that you arranged
11 not to have recorded?
12 A   That's not true.
13 Q   Let's ask about the recording device that you were using.
14 A   Okay.
15 Q   Curtis gave you a recording device; right?
16     MS. GEDDES:  Objection.
17     THE COURT:  Overruled.
18 A   I got different recording devices through the months.
19 Q   Okay.  They were given to you by Curtis?
20 A   And other agents.
21 Q   And for some reason, the recording devices you had, they
22 kept going out of service, didn't they?
23 A   It was a watch that was malfunctioning.
24 Q   Right.  Okay.  Well, let's see.  On the 28th of April,
25 your recording device, it went out of service?

          ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 30

Maragni - cross - Perlmutter          701

1  A   I'm not sure.  I'm not sure when it was.
2      MR. PERLMUTTER:  Can I see 126-A and B, please?
3      Judge, I think it will be easier if I leave this
4  with him, and he can reference it.
5      THE COURT:  Okay.
6  Q   I'm showing you what is marked 3500-RM-126-A and 126-B.
7  They are rather lengthy.  There's a blue sheet separating the
8  A and B documents, and I'm going to flip back and forth
9  between them?
10     If the witness would look at 3500-RM-126-B, at two.
11     THE COURT:  At page two?
12     MR. PERLMUTTER:  Yes.
13 Q   Does that refresh your recollection that on the 28th of
14 April, your recording device malfunctioned?
15 A   This page is April 19.
16 Q   Let me make sure.  I think you are on the first document,
17 not the second document.  You are looking at the A document,
18 and the B document  -- hang on a second.
19     Here is the B document.  Page two.  Does that
20 refresh your recollection that the recording device didn't
21 work that day?
22 A   Yes.
23 Q   And that happened again to you on May 12 of 2011; right?
24 A   I'm not sure of the date.
25 Q   If you would refer to 126-B, at ten?

          ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 31

Maragni - cross - Perlmutter          702

1      (Pause.)
2  A   This is the 17th of May.
3      MR. PERLMUTTER:  One second, your Honor.
4  Q   All right.  I'm sorry.  On May 12, the device was found
5  not to be working correctly; is that right?
6  A   Yes.  It says after three hours and twenty-two minutes,
7  it shut down.
8  Q   And then you had a problem again with the unit on May 23
9  of 2011?  If you look at 126-A, at page 25?
10     (Pause.)
11 A   25-A is the 13th of May.
12     MR. PERLMUTTER:  Judge, I'll move on briefly.
13     THE COURT:  Please.
14     MR. PERLMUTTER:  Yes.
15     Could you check that date?
16     MR. PERLMUTTER:  Hang on one second.  I think the
17 government found it.
18 Q   So, on May 13, you were recorded, and your device was not
19 working; right?  Isn't that right?
20 A   Yes.
21 Q   Let me ask you about that day, because on that day, the
22 FBI did an inspection of this recording device that you were
23 using; right?
24 A   They might have.  I'm not sure.  I don't know.
25 Q   Well, the fact is, is that device was found to have no

          ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 32

Maragni - cross - Perlmutter          703

1  damage to it?
2  A   Okay.
3  Q   Isn't that right?
4  A   Yes.
5  Q   And on June 21 of 2011, the same thing happened; your
6  recordings didn't get recorded, your conversations didn't get
7  recorded?
8  A   I don't know if all the conversations didn't get
9  recorded.  There were times that the recording device ran out
10 of time.
11 Q   I'm asking you about June 21 of 2011.
12 A   I don't recall.
13 Q   If you look at 3500-RM-126-B, at thirty.
14 A   Yes.
15 Q   Your device didn't work that day?
16 A   That's correct.  It shut down.
17 Q   Isn't it a fact that the device was inspected and it
18 showed there was no damage to it?
19 A   Yes.
20 Q   It just didn't shut down?
21 A   Well, it could have been turned off, because if it was in
22 my pocket or somewhere else on my body, I could have hit it
23 and turned it off.
24 Q   There was a way to turn off that recording device while
25 you had it?

          ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 33

Maragni - cross - Perlmutter     704

1 A   There was a way to turn off the device, but unless you
2 pressed a certain button, you couldn't turn it off.  If it was
3 located somewhere that there were other things going on in the
4 same vicinity with it and touched up against it, it might have
5 turned it off.
6 Q   The fact is, you knew how to turn off that recording
7 device, didn't you?
8 A   Yes.
9 Q   In fact, there were times when you did turn off that
10 recording device so that the FBI couldn't get a recording of
11 your conversation, didn't you?
12 A   I only turned off the recording device in between
13 appointments.
14 Q   You turned it off when you were collecting loan-sharking
15 proceeds, didn't you?
16 A   I didn't turn it off.  I passed notes.
17 Q   So, you did pass notes?
18 A   Yes, I did.  I said I did.
19 Q   After all these recordings that you made and all these
20 meetings that you had from the 29th of March until August 1,
21 the government didn't give you a cooperation agreement; right?
22 A   They eventually did.
23 Q   But they didn't by August 1?  That was my question.
24 A   No, they didn't.
25 Q   That was a problem for you once you took a plea on August

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 34

Maragni - cross - Perlmutter     705

1 1, wasn't it?
2 A   Sure.
3 Q   Because you had pled guilty to racketeering?
4 A   Yes.
5 Q   Money laundering?
6 A   Yes.
7 Q   Extortion?
8 A   Yes.
9 Q   Involving violence and threats of violence; right?
10 A   Yes.
11 Q   Loan-sharking?
12 A   Yes.
13 Q   Wire fraud?
14 A   Yes.
15 Q   Bribery?
16 A   I don't know if I pled guilty to bribery.
17 Q   All right.  You certainly pled --
18     THE COURT:  Mr. Perlmutter, I may be wrong, but I
19 thought you had previously gone through the --
20     MR. PERLMUTTER:  I'm going to move on right now,
21 your Honor.
22     THE COURT:  Thank you.
23 Q   Then you kept trying to record conversations for the
24 government, didn't you?
25 A   Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 35

Maragni - cross - Perlmutter     706

1 Q   But your machine kept having problems, according to what
2 you say?
3 A   It had problems on and off.  It malfunctioned on and off,
4 yes.
5 Q   Do you remember that on August 30 of 2011, the machine
6 shut down and there was no explanation, there was no
7 explanation for why it shut down?
8 A   I remember something like that, but I don't remember the
9 exact date.
10 Q   Do you remember on September 27, that the device shut
11 off, but there was no damage to the device?
12 A   Possible.
13 Q   In fact, on that day, you were meeting with your partner
14 about collecting loan-sharking proceeds?
15 A   It's possible.  But I had the device on.  If I was
16 meeting with my partner, whether I was meeting with him or
17 not, the device was on.  The device was somewhere that it
18 could have got turned off, if it leaned up against something
19 and that's what probably happened.
20 Q   The fact is, on September 27, while you were meeting with
21 your partner, the device wasn't turned on?
22 A   It wasn't turned on?
23 Q   There were no recordings made?
24 A   Okay.  It was turned on.  It probably went off, but it
25 was turned on.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 36

Maragni - cross - Perlmutter     707

1 Q   Because you turned it off?
2 A   The device could have turned off.  If it was on a part of
3 my body that something else was touching it, it could have
4 turned it off.
5 Q   And it wouldn't turn off because you turned it off;
6 right?
7 A   If I wanted to turn it off, yes, I could have turned it
8 off.
9 Q   Then again, on  -- well, on October 5, again, the unit
10 mysteriously wasn't working?
11 A   I don't know if it was October 5 or what the date was.
12 Q   Refer to 126-B, at 78.
13 A   This is the 16th  -- the 6th of October?
14 Q   Yes.
15 A   I wasn't aware that the device turned off.
16 Q   The device didn't work  -- according to you, the device
17 turned off that day, but you weren't aware of it?
18 A   I wasn't aware of it.
19 Q   But the device it had no signs of damage or any problems
20 with it; right?
21 A   Yes.
22 Q   And on that day, there were no recordings made?
23 A   I don't know.  I'm not sure.
24 Q   In fact, there were no recordings made?
25     Why don't you look at the document.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          708

1      MS. GEDDES:  Objection.
2      THE COURT:  Sustained.
3  Q   Well, can you look at the document and see if it
4  refreshes your recollection that no recordings were made that
5  day?
6  A   I'm reading the document now.
7  Q   Thank you?
8      (Pause.)
9  A   It doesn't say if it was recording or not.
10 Q   Are you aware of any recordings made of that day?
11 A   I was under the assumption that there was a recording
12 made that day.
13 Q   But there were no recordings made that day, were there?
14 A   No.
15 Q   And on that day, you met with Vincent Manzo, didn't you?
16 A   Yes, I did.
17 Q   That was the person that you were involved in these
18 discussions with, that we played to the jury yesterday; right?
19 A   Yes.
20 Q   But we don't know really what was said during that
21 meeting, only what you say was said; right?
22 A   Yes.
23 Q   Because your recording device didn't go on that day, did
24 it?
25     THE COURT:  Mr. Perlmutter, it's the dead-horse

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          709

1  rule.
2      MR. PERLMUTTER:  I'll move on.
3  Q   Now, you developed other techniques to evade any
4  recording on that device, didn't you?
5  A   I'm not sure what you mean.
6  Q   Well, didn't you develop a technique where you would
7  leave the device and walk away from it and have conversations?
8  A   I had the device with me or in a part of my clothing.
9  Q   At all times?
10 A   Yes.
11 Q   Isn't it a fact that on June 2, you left it in the car
12 and then you walked away to have a conversation with somebody
13 named Billy for twenty-five minutes?
14 A   I don't know who "Billy" is.
15 Q   How about on June 23, you left it in the car and had a
16 fifteen-minute conversation with someone?
17 A   I don't recall.
18 Q   And on June 12, you did that for forty-five minutes?
19 A   I don't recall that, either.
20 Q   And on October 19, you did that for seventeen minutes?
21 A   I'm not sure.  I don't recall doing it.
22 Q   And on June 2, you did that for twenty-five minutes?
23 A   I don't remember that, no.
24 Q   You did that with Mr. Manzo, didn't you?
25 A   No.

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          710

1  Q   You did it for about twenty-five minutes with him at one
2  point, didn't you  --
3  A   I don't recall that.
4  Q   -- right in the middle of all the conversations that the
5  government tried to put in yesterday, didn't you?
6  A   I don't recall that at all.
7  Q   I'll get back to that?
8      Now, yesterday, I asked you about Mr. Manzo; right?
9  I asked you about his age.
10 A   Yes.
11 Q   And you said you thought he was in his seventies,
12 mid-seventies?
13 A   Yes.
14 Q   In fact, he's eighty years old, isn't he?
15     MS. GEDDES:  Objection.
16     THE COURT:  Overruled.
17 A   I don't know.  I don't know his exact age.  I thought him
18 to be in his mid-seventies.
19 Q   Showing you what's marked as Defendants' N, as in Nancy.
20     MS. GEDDES:  Objection.
21     THE COURT:  Are you going to refresh him as to
22 whether he's seventy-six or eighty?
23     MR. PERLMUTTER:  Yes, I am.
24     THE COURT:  Sustained.
25 Q   In fact, he's eighty years old, isn't he?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          711

1      MS. GEDDES:  Objection.
2      THE COURT:  Sustained.
3  Q   Now, Vincent Manzo, he came to you because he wanted to
4  clear his son's debt; right?
5  A   He came to me, yeah.  He needed to clear his son's debt,
6  yes.
7  Q   His son had a $50,000 loan-sharking debt to the Gambinos?
8  A   He had a $50,000 gambling debt.
9  Q   And you spoke to him about it several times, didn't you?
10 A   Yes.
11 Q   Including one of the times when your recording device
12 wasn't on; right?
13 A   Probably.  It could have been.
14 Q   Now, do you remember telling him at one point that you
15 had a way to not only get him out of that objection, but do
16 even better than that?  Do you remember telling him that?
17 A   Yes.
18 Q   And he told you that he would do whatever you told him to
19 do; right?
20 A   Yes.
21 Q   Now, on November 11 of 2011, you learned that Vincent
22 Manzo's son had been subpoenaed; right?
23 A   Yes.
24 Q   By Curtis; right?
25 A   Yes.

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          712

1  Q   And yesterday, you referred  -- you said you learned that
2  from a friend; right?
3  A   Yes.
4  Q   That friend was Curtis, wasn't it?
5  A   No.
6  Q   The fact is that you spoke with Curtis before Manzo, Jr.
7  was subpoenaed that he was going to be subpoenaed?
8  A   I spoke with Agent Curtis mostly every day.
9  Q   And one of the things you spoke about was that Vincent
10 Manzo, Jr. was going to get subpoenaed?
11 A   I recall being told that he might be subpoenaed.
12 Q   Agent Curtis told that you; right?
13 A   Yes.
14 Q   And he told you why he was going to subpoena him, didn't
15 he?
16 A   The subpoena was supposed to be for records and photo
17 updates.
18 Q   He also told you that he was going to talk to Manzo about
19 William Cutolo; right?
20 A   No.
21 Q   Now, Vincent Manzo, Sr., the father, he's never been
22 subpoenaed, has he?
23 A   Not that I know of.
24 Q   And he's never been charged with anything related to
25 Cutolo's death; right?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          713

1      MS. GEDDES:  Objection.
2      THE COURT:  Overruled.
3  A   Not that I know of.
4  Q   Now, I want to turn back to the conversations that you
5  had that were put into evidence yesterday, and ask you some
6  questions about them?
7      Do you recall where Manzo, Sr. said, "Dino is the
8  main guy, though"?  I'm looking at Conversation 1 at page two
9  at line 17.
10 A   I don't have that in front of me.
11 Q   I'm going to show you the conversation?
12     Conversation 1, page two, line 17.
13     Do you see that.
14 A   Yes, I do.
15 Q   You were told that Dino was the main guy involved in what
16 was going on; right?
17 A   Yes.
18 Q   And that's Dino Calabro; right?
19 A   That's what I understood it to be.
20 Q   Now --
21     MR. PERLMUTTER:  Can I have 502-T, please?
22     I'll withdraw that.  I'll withdraw that.
23 Q   There's several times in your conversations with
24 Mr. Manzo that day where there are long pauses; isn't that
25 right?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          714

1  A   Yes.
2  Q   And the reason why there are long pauses is because you
3  were passing notes to him during those pauses; isn't that
4  right?
5  A   That's not true.
6  Q   Well, do you remember yesterday, on page four, line 17
7  -- I'm sorry  -- line 19, between 17 and 19, I believe, maybe
8  on 19, there was a long pause, and you were asked about that
9  from the government; do you remember that?
10 A   Yes.
11 Q   And the government said that  -- you said that the reason
12 for that pause is that there was a hand gesture?
13 A   Yes.
14 Q   Do you recall that?
15 A   Yes, I do.
16 Q   That's because there's some rustling on the recording
17 device; correct?
18 A   Well, we were outside.
19 Q   That's not what you said yesterday; you said there was
20 rustling on the recording device because you were making the
21 sign of a gun?
22 A   I was making the sign of a gun and mouthing the words to
23 Vincent Manzo.
24 Q   You were --
25 A   Did you shoot him?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter          715

1  Q   The fact is, that you never mentioned that to the
2  government before, did you?
3  A   Yes, I did.
4  Q   I'm going to show you what is marked as 3500-RM-199 and
5  199-X?
6      Do you see 199 and 199-X.
7  A   Yes.
8  Q   Does that refresh your recollection that you never told
9  the government about using your hand to make a gun gesture?
10 A   When I was asked about the pause, where it says it's
11 unaudible, I told them what I did.
12 Q   That's what you say now; right?
13 A   That's what I said before, also.
14 Q   Are you aware of whether that's recorded anywhere?
15 A   I don't know.  I don't know if it's been recorded.
16 Q   Now, I want to refer you to the third call.  In
17 particular, look at line 16 to line 27?
18 A   What page?
19 Q   Page two.  The fact is, is that Mr. Manzo, he never told
20 you that Tommy Gioeli was in Brooklyn when this incident first
21 started, did he?
22 A   All he said was Tommy was there.
23 Q   Okay.  Well, you said, at line 16, "Was Tommy there or
24 not?," and the answer was, "Tommy was there."
25     And then you asked, "Tommy was there?  I thought

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - cross - Perlmutter        716

1 Tommy was at the bowling alley".
2 A    I'm on a different page than you.
3 Q    Call 3, page two.
4        THE COURT:  Call 3, page two.
5        MR. PERLMUTTER:  The third tab, page two.
6 A    Okay.  What line are we on now?
7 Q    Lines 16 and following.
8 A    Okay.
9 Q    You asked  "Was Tommy there or not there?."
10 A    I'm on  -- hold on.
11        THE COURT:  It's the third tab.
12        THE WITNESS:  I have it.
13 A    Yes, I am there.
14 Q    That was immediately following the discussion about the
15 house; right, Big Dino, Little Dino's house?
16 A    Right.
17 Q    And Manzo said Tommy was there; right?
18 A    Yes.
19 Q    And then you said  "Tommy was there?  I thought Tommy was
20 at the bowling alley"  -- do you see that?
21 A    Yes.
22 Q     -- in fact, because your understanding was that Tommy
23 Gioeli was not in Brooklyn, but may have been at a bowling
24 alley out on Long Island; right?
25 A    I thought that Tommy was at a bowling alley in Long

Maragni - cross - Perlmutter        717

1 Island, yes.
2 Q    And Manzo said,  "We met him there"; right?
3 A    Yes.
4        (Continued on next page.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Maragni - cross - Perlmutter        718

1 BY MR. PERLMUTTER:
2 Q    And then you said, You met him there, all right, meaning
3 that he was encountered on the bowling alley in Long Island?
4 A    Yes.
5 Q    And then you related to Mr. Manzo, who was in Brooklyn,
6 and you said, Okay, so we had Dino, Little Dino, Big Dino,
7 Little Dino and Joey Caves.
8        And he said, Right, they put him in the car.
9        So, in fact, Mr. Gioeli, he was never in Brooklyn
10 when this happened, right?
11 A    I don't know.
12 Q    But Mr. Manzo didn't tell he was in Brooklyn when this
13 happened, right?
14 A    No.
15 Q    In fact, he said repeatedly that he had driven by himself
16 out to Long Island?
17 A    Yes.
18        MR. PERLMUTTER:  Hang on one second.
19 Q    Now, just prior to that meeting that you had with Vincent
20 Manzo on December eighth, you had had a previous meeting with
21 him where you took the occasion to walk away with him for
22 about 25 minutes so that wouldn't get caught in a recording
23 device, right?
24 A    No, that's not true.
25 Q    One second.

Side Bar        719

1        MR. PERLMUTTER:  Judge, can I have a moment to
2 confer with Mr. Herman?
3        THE COURT:  Sure.
4        MR. PERLMUTTER:  Thank you.
5        (Pause.)
6        THE COURT:  How are you doing, ladies and gentlemen?
7 Are you all with us here?
8        THE JUROR:  Okay.
9        MR. PERLMUTTER:  Judge, can we approach for a
10 second?
11        THE COURT:  Okay.
12        (Side bar conference.)
13

720

Maragni - cross - Perlmutter        722

1    THE COURT:  Yes.

2    MR. McGUINNESS:  May I approach, Judge?

3    THE COURT:  You may.

4    MR. PERLMUTTER:  And, Judge, I'm going to mark for

5  identification the translation and give it to the witness as

6  well.

7    THE COURT:  Okay.

8    MR. PERLMUTTER:  And that will be marked as

9  Defendants Exhibit I.

10    (Pause.)

11    THE COURT:  Mr. Perlmutter, I think we're ready.

12  BY MR. PERLMUTTER:

13  Q    Does that refresh your recollection that Agent Curtis

14  told you not to speak with anyone about corroboration when you

15  had your recording device on?

16  A    Yes.

17  Q    He did say it to you, didn't he?

18  A    Yes, but it wasn't in the context that I thought it was.

19  Q    Did he say that to you, sir?

20  A    Yes.

21    MR. PERLMUTTER:  Judge, I have no more questions.

22    THE COURT:  All right.

23    Anything?

24    MR. BRAVERMAN:  I do have a couple of questions.

25    THE COURT:  Go ahead.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Perlmutter        721

1  BY MR. PERLMUTTER:  (Continuing)

2  Q    Mr. Maragni, do you remember speaking with, having a wire

3  on May 17th of 2011?

4  A    Yes.

5  Q    And during that wire, you had a conversation with Scott

6  Curtis, right?

7  A    I don't recall the discussion.

8  Q    Do you remember at any point Scott Curtis telling you

9  don't say anything on the wire that may --

10    MS. GEDDES:  Objection.

11    THE COURT:  Overruled.

12  Q    -- that may be corroboration, do you remember him saying

13  that?

14  A    No, I don't recall that.

15    MR. PERLMUTTER:  Judge, at this time, I'd like to

16  admit Exhibit H.

17    THE COURT:  You want to admit it?

18    MR. PERLMUTTER:  Yes, I would, because I'd like to

19  play it for the jury.

20    MS. GEDDES:  Objection.

21    MR. PERLMUTTER:  What I'd like to do, Judge, is let

22  me mark it as Defendants H, let me play it for the witness and

23  see if it refreshes his recollection.

24    THE COURT:  Right.  That you may do.

25    MR. PERLMUTTER:  This is going to go to the witness.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman        723

1    MR. BRAVERMAN:  Thank you.

2  CROSS EXAMINATION

3  BY MR. BRAVERMAN:

4  Q    Good morning, Mr. Maragni.

5  A    Good morning.

6  Q    Still is.

7  A    Yes.

8  Q    I'd like to ask you a couple of questions about your

9  testimony.

10    My name is Sam Braverman.  I represent Dino

11  Saracino.

12  A    Okay.

13  Q    Did you have any personal business with Mr. Saracino

14  before?

15  A    No.

16  Q    You have no personal knowledge about him based on your

17  own eyes, ears, nose, smell, taste?

18  A    No.

19  Q    Okay.  So I'm going to ask you a bunch of questions.  At

20  any time I phrase a question for you, you don't understand it,

21  just tell me.  I'll rephrase.

22  A    Okay.

23  Q    You had, as we heard earlier today, a lot of

24  conversations with the government either in a proffer session

25  with an Assistant United States Attorney or in a meeting with

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman        724

1  or telephone call with one of the law enforcement agents.
2  A  That's correct.
3  Q  And you are familiar with the obligation that you had to
4  always be honest with the government when you speak to them,
5  correct?
6  A  Correct.
7  Q  I'm sure they told you many times if you lie to them even
8  once, it's a separate crime?
9  A  Yes.
10  Q  And they also told you that if you lie to them, it would
11  be a way that they could breach your plea agreement and
12  cooperation agreement but you could not get your plea back and
13  still be stuck with being guilty?
14  A  That's correct.
15  Q  And you wouldn't get your 5K letter either, right?
16  A  Yes.
17  Q  In terms of your plea, one of things I believe that they
18  went over earlier, I think, today was that you had, one count
19  has a mandatory maximum sentence of 40 years.
20  A  That's correct.
21  Q  And all of the other ones have the mandatory maximum
22  sentence of 20 years?
23  A  Yes.
24  Q  Ironically, the one that has the maximum sentence of 40
25  years is that marijuana case, right?

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Braverman        725

1  A  Yes, that's right.
2  Q  Seemingly the least significant of all the other things
3  that you pled guilty to?
4  A  Yes.
5  Q  That one also has a mandatory minimum sentence of five
6  years?
7  A  That's true.
8  Q  None of the others have a minimum sentence?
9  A  No.
10  Q  And so if you don't get this 5K letter at the end of the
11  whole day, not today but at the end of your period of work,
12  then the Judge has no ability to go below that five years,
13  correct?
14  A  That's what I was made to understand, yes.
15  Q  Right.  And the only person who can give the Judge that
16  kind of permission to go below that statutory minimum sentence
17  is the government in their 5K letter, correct?
18  A  Well, I don't know about permission.  I know they can
19  give a recommendation that could allow the five year minimum
20  sentence.
21  Q  Did you ever hear from the government or any other source
22  that without the 5K letter, you would not be allowed to get
23  less than a statutory minimum sentence?
24  A  Yes.
25  Q  You heard that?

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Braverman        726

1  A  Yes.
2  Q  Okay.  Now, to start again from the beginning, I'm going
3  to cover a couple of topics that have been covered, but
4  hopefully we'll clarify a couple of points here.
5       As we've heard, when you got arrested, you were
6  detained without bail, right?
7  A  Correct.
8  Q  On two grounds, that being danger to the community and
9  risk of flight, right?
10  A  I think it was just danger to the community.  I don't
11  think it was ever risk of flight.
12  Q  Okay.  At some point, you make an application for bail
13  before the Magistrate Judge.
14  A  Yes.
15  Q  And that Magistrate Judge grants you bail?
16  A  Yes.
17  Q  And the District Judge Matsumoto rejected that and kept
18  you detained, correct?
19  A  Correct.
20  Q  And then there was a period of time where there was
21  letters to the Judge, conversations between you and your
22  lawyer, lawyer and the government, ultimately Matsumoto
23  changed the bail?
24  A  Correct.
25  Q  During that time period, you were at the MDC, right?

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Braverman        727

1  A  Yes.
2  Q  And during that time period, you learned that the people
3  who were at that point giving information about you were Tommy
4  McLaughlin and Peter Rizzo?
5  A  I knew that the morning I was arrested.
6  Q  The morning you were arrested?
7  A  Yes.
8  Q  Who told you that?
9  A  I was notified that by the FBI.
10  Q  And who was the FBI agent who actually -- was
11  Agent Curtis at your arrest?
12  A  Yes, he was.
13  Q  Was he the one who told you that they're the ones?
14  A  Yes.
15  Q  Okay.  And you know that you had committed a variety of
16  different crimes with either Mr. McLaughlin or Mr. Rizzo?
17  A  Yes.
18  Q  So they could testify based on personal knowledge about
19  you?
20  A  Yes.
21  Q  And so one of the things -- how long was it after that --
22  on that moment of your arrest you learned right away that
23  people you had committed crimes with were testifying against
24  you, how long after that did you decide you would try and
25  cooperate?

CMH   OCR   RMR   CRR   FCRR

Maragni - cross - Braverman          728

1  A    A couple of months after that.
2  Q    A couple of months?
3  A    Yes.
4  Q    Okay.  And when were you arrested?
5  A    The 20th of January.
6  Q    Of 2011?
7  A    Yes.
8  Q    And when you -- when you had your bail hearing, the
9  second one where Matsumoto rejected the lower court Judge's
10 decision to release you, did you have a conversation with
11 Agent Curtis about that bail application?
12 A    Yes.
13 Q    You called him on the telephone?
14 A    Someone called him on the telephone.
15 Q    Okay.  Did you -- but did you speak with him personally?
16 A    I spoke with him after the bail denial.
17 Q    After the bail denial?
18 A    Yes.
19 Q    Was that about 7:51 in the evening on March the 4th?
20 A    Somewhere around that.  I'm not sure of the time.
21 Q    Okay.  And did you call him directly from your, from the
22 MDC or did you call him through a third party?
23 A    I called him through a third party.
24 Q    Okay.  And who was that third party that you called?
25 A    It was a friend of mine.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          729

1  Q    All right.  Do you remember the person's name?
2  A    Karen Urso.
3  Q    And when you did that, how did you have Agent Curtis's
4  telephone number?
5  A    I was given his number.  I believe it was either by my
6  attorney or by Agent Curtis himself.
7  Q    But Agent Curtis had given you that number at the time of
8  your arrest?
9  A    I believe I had Agent Curtis's number before I was
10 arrested.
11 Q    Before you were arrested?
12 A    Yes.
13 Q    He had given it to you before you got arrested?
14 A    Yes, he had given me the number.  He came to the house
15 and spoke to me and asked me to cooperate and I refused and he
16 left his card with me so I had his number.
17 Q    And you had another conversation with Agent Curtis, is it
18 fair to say, the day before March 3, 2011 also about the idea
19 of whether or not the government would accept your offer to
20 cooperate?
21 A    Yes.
22 Q    And at that point, you knew you were not going to get out
23 because Matsumoto was going to deny your bail, right?
24 A    Right.
25 Q    And you knew that people were about to testify based on

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          730

1  personal knowledge of your criminal activity, you knew you
2  were sunk?
3  A    Yes.
4  Q    So how would you rate your level of interest in trying to
5  be a cooperator?  Was it pretty --
6  A    Pretty high.
7  Q    Pretty high, right?
8  A    Yeah.
9  Q    So you were calling Agent Curtis on a somewhat regular
10 basis at this point trying to get his interest in taking you
11 on as a cooperator?
12 A    I believe he was only called once.
13 Q    Only once?  Could it have been at least twice in those
14 two days?
15 A    It could have been.  I'm not sure.
16 Q    But either way, you were very interested in trying to get
17 this?
18 A    Yes.
19 Q    Did you say anything to him like, I could really help you
20 out, I'll work really hard, words to that effect?
21 A    To that effect.
22 Q    Was he immediately interested now that you were arrested
23 or was he a little distant?
24 A    He was interested.
25 Q    He was interested.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          731

1      Did you tell him -- when was the first time you told
2  Agent Curtis a particular piece of information about the case,
3  for instance, in a cooperative nature?
4  A    I don't remember.
5  Q    Was it while you were still in prison?
6  A    I don't believe so.  I think it was after I was out.
7  Q    When you got out, as we've heard earlier, the government
8  had essentially consented to your bail package?
9  A    Right.
10 Q    And still it was a big bail package, right?
11 A    Yes, it was.
12 Q    It was what, like half a million dollar bond?
13 A    Two and a half million.
14 Q    Two and a half million dollar bond.  And you posted
15 properties for those?
16 A    Yes.
17 Q    Whose properties were posted?
18 A    Friends.
19 Q    Do you remember their names?
20 A    Yes.  Frank Donofrio, Karen Urso, Louis Rutigliano and my
21 personal house in Florida.
22 Q    One of the things that you had picked up earlier in your
23 career, you had prior felony convictions, correct?
24 A    Yes.
25 Q    And in this particular case, one of the things you

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman        732

1 ultimately agreed to as well was a $500,000 forfeiture, is
2 that right?
3 A   Yes.
4 Q   That's part of this instant case that you're working on
5 now?
6 A   Yes.
7 Q   Have you paid a dime towards that forfeiture yet?
8 A   No.
9 Q   One of the -- was one of the conditions of your release
10 that you would ultimately start paying down on that forfeiture
11 by August of last year?
12 A   I don't believe so, no.
13 Q   One of the things of your conditions of being released
14 was that you had to pay for your own security?
15 A   Yes.
16 Q   Some, I guess, former law enforcement who were charged
17 with making sure you didn't run?
18 A   Right.
19 Q   That was one of Judge Matsumoto's concerns?
20 A   I don't think they were worried about me running.  It was
21 because she deemed me a danger to the community that they had
22 to have the security force outside my house.
23 Q   So despite what the government said in terms of
24 consenting to your release, Judge Matsumoto was still really
25 concerned?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman        733

1 A   She wanted another layer of protection, yes.
2 Q   And how much did that cost a month?
3 A   It varied.
4 Q   It was about $33,000 a month?
5 A   Yes, approximately.
6 Q   Now, so -- and are you still paying for such security?
7 A   No.
8 Q   Now you're in a different security program?
9 A   Yes.
10 Q   Okay.  How many months did you pay for that personal
11 security program?
12 A   Approximately 10.
13 Q   So that would be about 3 hundred plus thousand dollars?
14 A   Well, it wasn't always $33,000 a month, but I'm, I don't
15 know the total, no.
16 Q   But it's a big number like that?
17 A   Yes.
18 Q   You had described for us a series of jobs that you've had
19 in different places, some of which were lawful employments,
20 some of which were, let's say, generously less than lawful
21 employment, some might be a mix.  Fair to say?
22 A   Yes.
23 Q   What was the last hundred percent straight, square job
24 you had?
25 A   When I was in the motorcycle shop, motorcycle business.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman        734

1 Q   And what year was that about?
2 A   That ended in 1998.
3 Q   And when you were done with that, how much money had you
4 squirreled away at that point from your legitimate business
5 interest?
6 A   I'm not sure.
7 Q   But a lot less than let's say $300,000?
8 A   Yes.
9 Q   So is it fair to say that some of the money, if not
10 almost all of the money that was paying for your private
11 security force to keep you from getting into trouble was paid
12 for with your illegal gains from your criminal activity?
13 A   That would be true.
14 Q   And yet you've not paid anything on the forfeiture yet at
15 all?
16 A   No.
17 Q   We heard a lot of discussion this morning about a tape,
18 the recording devices?
19 A   Right.
20 Q   You had two or three different types during your time
21 period, correct?
22 A   Yes.  Maybe more.
23 Q   Maybe more?  How many would you say, four, five, six?
24 A   Maybe four.
25 Q   Okay.  And each one was different -- we're not going to

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman        735

1 go into the specifics of it, but each one was different
2 designed to look like an ordinary object that a person might
3 carry around?
4 A   Right.
5 Q   So you don't alert somebody you are potentially trying to
6 record?
7 A   Yes.
8 Q   And whichever these devices were, you were always
9 personally aware of what you were carrying around that day was
10 a recording device?
11 A   Yes.
12 Q   Now times -- let me ask you this.
13    One of the things you learned early on in the case
14 about Mr. McLaughlin was he was able to turn his tape on and
15 off from time to time?
16 A   Yes.
17 Q   And your understanding of that was that allowed him some
18 control over his, what was recorded and passed on to the
19 government?
20 A   Yes.
21 Q   And you, in fact, took advantage of that as well but
22 sometimes, as I think you said yesterday, you may have wanted
23 to protect somebody you were talking to?
24 A   That's correct.
25 Q   And there were a variety of different ways, whether you

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          736

1 turned on -- turned off the machine or left it in the car or
2 went to a place with a lot of background noise, there were
3 ways of making sure that the tape didn't properly record some
4 conversations?
5 A    Correct.
6 Q    And that happened fairly regularly?
7 A    Well, I won't say regularly but it happened.
8 Q    Can you tell this jury now who were the people that you
9 were trying to protect?
10 A    I was trying to protect Dennis Cinnante.
11 Q    And who else?
12 A    I was trying to protect family members.
13 Q    Your own blood relatives?
14 A    My own, yes.
15 Q    Even if they may have had some knowledge of your criminal
16 activity, you were still trying to do the right thing by them?
17 A    Yes.
18 Q    But the other nostra amigos that you tried to protect,
19 you were trying to protect them because you didn't want them
20 to get arrested for being near you?
21 A    Correct.
22 Q    And you knew that if you had conversations with them
23 about what you knew about them, they would make admissions and
24 then Agent Curtis would get that information?
25 A    I'm not sure.  I'm not sure what you're saying.

              CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          737

1 Q    Sure.  Some of these people that you were trying to
2 protect, not just your immediate family but your other family,
3 when you were trying to protect them, it was because you knew
4 if you had a conversation with them and you talked about
5 business, Cosa Nostra business, they would say things that
6 would get them in trouble with the feds?
7 A    Yes, that was one person.
8 Q    The rest of the people, you had no worries about getting
9 in trouble?
10 A    The rest of the people I was recording.
11 Q    Because you wanted to get them in trouble?
12 A    Well, we were talking about business and we were -- we
13 had to -- I had to keep it as natural as possible.
14 Q    You had to blend in?
15 A    Exactly.
16 Q    When you were arrested back in your Florida case back in
17 the early 2000s --
18 A    Yes.
19 Q    -- do you recall that case?  Did you have a chance to
20 hear some of the wiretaps that were from that case?
21 A    Yes.
22 Q    Did you hear yourself saying the line, In this life --
23 you speaking, In this life, we live every day, if you ain't a
24 chameleon, if you can't change, you're finished?
25 A    Yes.

              CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          738

1 Q    So you had to be a chameleon in this case?
2 A    You have to be a chameleon every day.
3 Q    One of the things that you were ordered to do when you
4 were released by the Judge and when you had your agreement
5 with the government, even just the proffer, the proactive
6 proffer, were essentially three conditions, right?
7 A    Yes.
8 Q    The three conditions you listed yesterday were no
9 association with criminals, stay out of trouble, no new
10 crimes, and get a real job?
11 A    That was after my Florida case.
12 Q    After your Florida case?
13 A    Yes.
14 Q    Okay.  Did you do any of those three?
15 A    Well, I got a real job, but I associated with criminals.
16 Q    And committed more crimes?
17 A    And committed more crimes, yes.
18 Q    And then when you made your agreement with the government
19 about proactive cooperation before the cooperation agreement
20 -- by "proactive cooperation," I mean that you are going out
21 making recordings before you get the actual signed document
22 cooperation agreement, right?
23 A    That's correct.
24 Q    That's what your -- so it's like a five-step process.
25 The first one is the proffer agreement, right?

              CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          739

1 A    Uh-huh.
2 Q    Where you go in there and you say we talked today about
3 what they want to know?
4 A    Yes.
5 Q    But it's not a cooperation agreement?
6 A    Right.
7 Q    But the next step is you go get a cooperation agreement
8 of sorts that says I'm going to cooperate and if that works,
9 I'm going to get my 5K down the road?
10 A    Yes.
11 Q    And then I have my plea agreement where I actually agree
12 to what crimes I'm going to admit to and then I go in front of
13 the judge and I enter those pleas of guilty?
14 A    Correct.
15 Q    And then after that, then the government has their 5K
16 letter at the end of your cooperation?
17 A    Yes.
18 Q    And then after that, the judge makes a sentence?
19 A    Correct.
20 Q    When you were in that proffer agreement stage, that first
21 stage, one of the things I'm sure you were told by the
22 government and by law enforcement is no crimes on your own,
23 right?
24 A    Yes.
25 Q    Don't go out there and commit crimes without getting our

              CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          740

1 permission first to go commit these crimes?
2 A   They wanted to be aware of everything I was doing, yes.
3 Q   Right.  And you gave them some information but withheld
4 some information?
5 A   That's correct.
6 Q   One of the things was, that you withheld was about the
7 money?
8 A   Yes.
9 Q   Because you still need money to live?
10 A   That's correct.
11 Q   And you had developed a standard of living; you didn't
12 want to live on the McDonald's salary?
13 A   Correct.
14 Q   Right.  You've got a nice jacket on, nice haircut, the
15 things you get used to after living the life for a couple of
16 years, right?
17 A   Yes.
18 Q   Like, for instance, when you got sent, when you were
19 ordered to go to Fort Hood, you had lived in the, you know the
20 expression, you had lived in country during the battle.  To go
21 out there to Fort Hood to play games was kind of below your
22 rank?
23 A   I thought so.
24 Q   And so you went AWOL?
25 A   Yeah.

CMH     OCR     RMR     CRR     FCRR

Maragni - cross - Braverman          741

1 Q   It was your decision, just I'm not doing that?
2 A   Yes.
3 Q   And when you got ordered to come back -- did you get any
4 break time for that by the way?
5 A   What do you mean break time?
6 Q   Break time.
7 A   No.
8 Q   AWOL during war time you didn't get any --
9 A   No.
10 Q   For either of the AWOLs?
11 A   Nope.
12 Q   Let's talk about Mr. Clemenza for a second.
13       Now, I think you were asked yesterday questions
14 about Jerry Clemenza.  You identified him as Jerry Green Eyes?
15 A   Yes.
16 Q   And you know him?
17 A   Never met him.
18 Q   Never met him?
19 A   No.
20 Q   And do you know of him?
21 A   Yes.
22 Q   Who do you know him to be?
23 A   He's an inducted member of the Colombo family.
24 Q   Do you know what crew he worked on?
25 A   No.

CMH     OCR     RMR     CRR     FCRR

Maragni - cross - Braverman          742

1 Q   Now, at some point during your proffering or your
2 cooperation, you were asked by the government whether or not
3 you had ever conspired with anybody to kill him, correct?
4 A   Yes.
5 Q   When was that that they asked you that?
6 A   A few weeks back.
7 Q   Sometime in the beginning of this year?
8 A   Yes.
9 Q   And you understood that the basis of their information
10 was some other cooperator?
11 A   I -- yes.  Yes.  Correct.
12 Q   Somebody else had told them?
13 A   Yes.
14 Q   Somebody else in a situation similar to yours had told
15 them that you had committed a serious offense?
16       MS. GEDDES:  Objection.
17       MR. BRAVERMAN:  Just his understanding.  I'm not
18 asking the truth.  I'm just asking his understanding.
19       THE COURT:  If you have an understanding, you can
20 give it.
21 A   Yes.
22 Q   And you told them that's totally not true, right?
23 A   Yes.
24 Q   That you never had anything to do with it?
25 A   I told them I never had any intentions of killing Jerry

CMH     OCR     RMR     CRR     FCRR

Maragni - cross - Braverman          743

1 Clemenza.
2 Q   Did you tell them that you had any involvement in any
3 way?
4 A   Yes.
5 Q   And what did you tell them?
6 A   I told them that we were to meet with Jerry Clemenza.
7 Q   Okay.  To do what?
8 A   There was to be a conversation with Jerry Clemenza.
9 A   A conversation that I might use in my world might be
10 different from a conversation you might use in the business
11 world.
12       THE COURT:  You mean what do you mean by
13 conversation?
14 A   I mean what do you mean by conversation?
15 A   There was supposed to be a conversation between Jerry
16 Clemenza and someone.
17 Q   And what was the nature of that conversation supposed to
18 be?
19 A   I, I guess it was a business conversation.
20 Q   Would you say --
21 A   -- to hash out, or to hash out a problem.  I don't know.
22 Q   Would you say, Hey, you're dead or else?
23 A   No.  I knew nothing of any debt that Jerry Clemenza owed.
24 Q   But straighten out your situation meaning what?
25 A   Meaning it could have been a personal problem between two

CMH     OCR     RMR     CRR     FCRR

Maragni - cross - Braverman          744

1 people that they were trying to straighten out.
2       I didn't know anything about any debt or any money
3 or anything like that. I didn't think that was the root of
4 any problem there.
5 Q    Let me ask you this. You talked yesterday about an event
6 where you had hit somebody with a baseball bat?
7 A    That's correct.
8 Q    When was that approximately?
9 A    1982.
10 Q    It was a long time -- 30 years ago?
11 A    Yes.
12 Q    You were a young kid at the time?
13 A    I was a young man.
14 Q    Younger.
15      So you hit him in the head with a baseball bat.
16 What was the reason why you hit him in the head with a
17 baseball bat?
18 A    He stole, he burglarized a friend of mine's family's
19 home.
20 Q    Was it a light tap to the head or was it a full cut?
21 A    Well, it was --
22      MS. GEDDES:  Objection.
23      THE COURT:  Overruled.
24 Q    You can answer.
25 A    It was more of a medium.

          CMH     OCR     RMR     CRR     FCRR

Maragni - cross - Braverman          745

1 Q    Medium, like a double?
2 A    Yes.
3 Q    Okay. And how many times did you hit him with the bat?
4 A    Once.
5 Q    Did he go down?
6 A    No.
7 Q    Stood there?
8 A    Well, he backed up.
9 Q    A couple of steps right?
10 A    Yeah.
11 Q    I mean, you're a big guy now. Back in the day, you were
12 probably pretty fit.
13 A    Back in the day, I was a lot thinner.
14 Q    So was I.
15 A    Yeah.
16 Q    But anyway, so you take the double cut at this guy and
17 then you said he didn't go to the hospital, right?
18 A    No, he didn't.
19 Q    Did he know who you were? I mean, had you guys spoken
20 before?
21 A    He knew me.
22 Q    And he knew that you were involved in La Cosa Nostra?
23 A    Yes.
24 Q    So his not going to the hospital is not necessarily a
25 reflection of his injuries, but perhaps he knew who you were,

          CMH     OCR     RMR     CRR     FCRR

Maragni - cross - Braverman          746

1 fair to say?
2 A    He wasn't hurt that bad.
3 Q    To you.
4       You seen worse, right?
5 A    Yes.
6 Q    But he didn't go to the hospital. Is it fair to say he
7 was aware of your position within organized crime?
8 A    He was aware who I was. I don't know if he was aware of
9 any positions. He was aware of -- he was from the
10 neighborhood that I was from and he knew me from the
11 neighborhood.
12 Q    And you were man of serious intentions?
13 A    Well, I was -- when you hit a guy with a bat, you
14 probably have some serious intentions.
15 Q    I agree.
16      You described yourself yesterday, one of the things
17 is you were a tough guy?
18 A    I was a tough kid, yes.
19 Q    But regarding the Clemenza situation, you said that there
20 was originally a plan that somebody was going to talk to this
21 guy about whatever the situation was?
22 A    Yes.
23 Q    And you were aware of that plan beforehand?
24 A    Yes.
25 Q    And who did you hear that from?

          CMH     OCR     RMR     CRR     FCRR

Maragni - cross - Braverman          747

1 A    Who did I hear what from?
2 Q    That there was a plan to go have a conversation with this
3 guy.
4 A    My friend Allie.
5 Q    And that would be Allie Persico?
6 A    Yes.
7 Q    Okay. You were also, I assume, questioned about whether
8 or not you ever possessed a gun in furtherance of this
9 conversation?
10 A    Yes.
11 Q    And you denied any gun, is that correct?
12 A    No.
13 Q    Did you tell him you had a gun?
14 A    Yes.
15 Q    And when you told him that you had a gun, what kind of
16 gun did you have?
17 A    That was a .38.
18 Q    And where did you get that gun?
19 A    I got it from Allie.
20 Q    Now, you are aware of the statute about a felon in
21 possession of a firearm?
22 A    Yes, I am.
23 Q    What did you understand that to mean?
24 A    Possession, a felon is not supposed to have a firearm.
25 Q    And so -- and you are a felon?

          CMH     OCR     RMR     CRR     FCRR

Page 77

Maragni - cross - Braverman        748

1  A   Yes, I am.
2  Q   Several times out of the federal courts or state courts
3  in Florida?
4  A   Yes, twice.
5  Q   Twice.  And so just merely possessing that firearm would
6  be another federal crime, correct?
7  A   Yes.
8  Q   For which you would have to go to prison?
9  A   Correct.
10 Q   All right.  Did you plead guilty to that charge?
11 A   I never was charged.
12 Q   You never pled guilty being a felon in possession of a
13 gun?
14 A   No.
15 Q   Despite the fact that the government knows that you are a
16 felon in possession of a gun because you told them?
17 A   I told them, yes.
18 Q   Yesterday one of the things that was brought up was about
19 whether or not you tried to extort a union by getting them to
20 accept some people for work?
21 A   Yes.
22 Q   And you described yesterday that it was just three guys
23 looking for a job, right?
24 A   Correct.
25 Q   And they were goodfellas or just really squares?

CMH    OCR    RMR    CRR    FCRR

Page 78

Maragni - cross - Braverman        749

1  A   They were people that we knew, friends of ours.
2  Q   Friends of ours?
3  A   Yes.
4  Q   By friends of ours, nostra amigos?
5  A   No.  No.
6  Q   Not that close?
7  A   No.
8  Q   But friends?
9  A   Yes.
10 Q   Like I might use the word "friends"?
11 A   Yes.
12 Q   And but yet, you were charged with extorting the union?
13 A   Yes, I was.
14 Q   And what was it claimed that you actually did?
15 A   It say I exploited the union.
16 Q   By doing what, not by asking three guys to get a job?
17 A   I don't know, what they meant behind the charge.
18 Q   You never read a complaint?
19 A   I read it.  I read it briefly.
20 Q   What's your best recollection of what they said to you?
21 A   I don't know but ultimately, all the charges were
22 dropped.
23 Q   As part of a deal?
24 A   No.  I don't know what it was part of, but the concession
25 was made on that charge.

CMH    OCR    RMR    CRR    FCRR

Page 79

Maragni - cross - Braverman        750

1  Q   And did you ultimately plead guilty at or about the same
2  time those charges were made?
3  A   Afterward, yes.
4  Q   So it was part of the, whatever deal, plea agreement you
5  made in that five-step process we talked about before?
6  A   Correct.
7  Q   You had said, by the way, about, I asked you before about
8  Dino, he had any personal knowledge.  By Dino, I know it's not
9  confusing to you, it's not confusing to me, but I want to be
10 clear for the jury.
11     There are two Dino's in this world that we are aware
12 of that are relevant, correct?
13 A   Yes.
14 Q   And they are Dino Saracino who is my guy over there?
15 A   Yes.
16 Q   And Dino Calabro was your guy, was their guy?
17 A   He was never my guy.  I don't know him.
18 Q   Don't know him?
19 A   No.
20 Q   But in the conversations you talked about with tapes,
21 when you were saying Dino told them, we're always talking
22 about Dino Calabro, right?
23 A   Yes.
24 Q   So when you said that you met with Dino at the MDC?
25 A   Yes.

CMH    OCR    RMR    CRR    FCRR

Page 80

Maragni - cross - Braverman        751

1  Q   Did you ever tell the FBI that you met this Dino at the
2  MDC?
3  A   Yes.
4  Q   And you say in questions yesterday, I believe, was
5  whether or not you were formally introduced to him?
6  A   Yes.
7  Q   We've heard formerly introduced or officially introduced
8  as a hand-holding ceremony?
9  A   Yes.
10 Q   Now, this was on the elevator at the MDC?
11 A   Yes.
12 Q   Going from the visiting area to the eighth floor?
13 A   I believe it was on the visiting area at Dino's floor.  I
14 don't remember if he was on the sixth floor at the time.
15 Q   Sixth floor or eighth floor, either way?
16 A   Yes.
17 Q   When you walk into the MDC area, there's two elevators,
18 past the second sally port, two elevators that go upstairs to
19 the inmate area, correct?
20 A   Yes.
21 Q   There's a video camera there, right?
22 A   Uh-huh.
23 Q   Yes?
24 A   Yes.
25 Q   And there's officers who escort people up and down?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          752

1  A   Yes.

2  Q   So was the officer invited also to hold hands at this

3  ceremony?

4  A   The officer -- I don't believe the officer was on the

5  elevator when we did it.

6  Q   All right.  Now how long have you known Allie Persico?

7  A   I know him quite a few years.  I know Allie 30 years.

8  Q   So he's -- and you know he was charged with extremely

9  serious crimes, correct?

10  A   Yes.

11  Q   And you know that now because Dino was charged with

12  extremely serious crimes, correct?

13  A   Yes, I do.

14  Q   And you were at least charged with crimes, even though

15  you weren't charged with the murder, you were charged with

16  serious offenses?

17  A   Yes.

18  Q   So it's your testimony that three guys charged with

19  murders were allowed to just travel on their own up and down

20  this elevator?

21  A   We weren't traveling on their own.  When the elevator

22  stops, the officer would get out of the elevator and look to

23  see if anybody was through a door and then had to come back on

24  to the elevator.

25  Q   But there's a video camera there, right?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          753

1  A   Yes.

2      MR. BRAVERMAN:  I call upon the government to

3  produce such a video if it exists.

4  BY MR. BRAVERMAN:

5  Q   Back to the Army for a second, I -- in reviewing your

6  notes, when you were in the Army in Viet Nam, were you in the

7  military police?

8  A   Yes, I was.

9  Q   Ironic, isn't it?

10  A   Yes.  I was attached to the military police, yes.

11  Q   When you got made into the family, did you alert them

12  that you were formerly a cop?

13  A   They knew that.  I wasn't a cop.  I was attached to a

14  military police unit.

15  Q   What was your job with the military police?

16  A   I was to escort convoys through the Hai Van Pass to Hue.

17  Q   Gerry Lang.  Tell us who Gerry Lang was?

18  A   Gerry Langella.

19  Q   Who was he?

20  A   Gerry Langella was a friend of mine and a member of the

21  Colombo crime family.

22  Q   And was he the one who ultimately was an early mentor for

23  you?

24  A   Yes.

25  Q   And he was the one who introduced you -- did he introduce

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          754

1  to other members of the family?

2  A   Yes.

3  Q   Did he ultimately suggest to you directly or indirectly

4  that you become a made member?

5  A   No.

6  Q   No?  But you knew his family?

7  A   Yes.

8  Q   You knew him.

9      One of the things -- let me do a little quick

10  summation here of these things.

11      When you pled guilty to the crimes, the credit card

12  fraud case, what was your total sentence there?

13  A   Five years.

14  Q   And how much of that did you do?

15  A   I did -- I got what they called a note of action from the

16  parole board.  Back in what they called old, old law, when you

17  were sentenced to a term of incarceration, it was either

18  one-third or two-thirds of the time you had to do.

19      I was a first offender so the parole board came back

20  with a notice of action and that meant do one-third of the

21  time.

22  Q   So that's 20 months out of a 60 month sentence?

23  A   Yes, and you did the rest on parole.

24  Q   And then in your RICO conviction, how much time were you

25  sentenced to?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          755

1  A   24 months.

2  Q   And were you set back 85 percent?

3  A   Probably 85 percent, yes.

4  Q   So at 24, you did about 20.

5  A   20.

6  Q   So twice, you've done about 20?

7  A   Plus a three-year supervised release.

8  Q   We'll get to that in a second.  So twice you did about 20

9  months?

10  A   Yes.

11  Q   And in this case, you did about two months?

12  A   About two months, yes.

13  Q   Right?  And in each of the other cases, I assume there

14  was some suggestion to you that you might cooperate?

15  A   They asked for help.

16  Q   Right.  Cooperate?

17  A   Yeah.

18  Q   To use their language?

19  A   Yes.

20  Q   And both times, you said not a problem, not going to do

21  it?

22  A   Right.

23  Q   In this case, you said not a problem, I will do it?

24  A   Yes.

25  Q   After just two months?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          756

1  A    Yes.
2  Q    Because you were certain this was not going to be some
3  20-month bid?
4  A    Well, there was a whole bunch of circumstances that, that
5  caused me to do that.
6  Q    A health issue?
7  A    Somewhat.
8  Q    Had some family issues?
9  A    Somewhat.
10 Q    And you knew you were sunk as the Titanic was?
11 A    Well, I don't know what sunk means, but was I going to go
12 to jail?  Yes.
13 Q    Yes.  You mentioned Club Sevilla before?
14 A    Yes.
15 Q    That was a legit business?
16 A    Yes.
17 Q    Who were your partners in that?
18 A    I wasn't partners.  I worked there.
19 Q    You just worked there?
20 A    Yes.
21 Q    What did you do for them?
22 A    I was a marketing director.
23 Q    How long was that?
24 A    Approximately maybe a year, year and half.
25 Q    Had you already been inducted at that point or was it

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          757

1  pre?
2  A    No, it was pre.
3  Q    It was a long time ago?
4  A    Yes.
5  Q    And the motorcycle shop you said was on and off for 8 to
6  9 years?
7  A    Yes.
8  Q    Back in the '80s?
9  A    '90s.
10 Q    Early '90s?
11 A    '89 to '89.
12 Q    And when did you get made?
13 A    2008.
14 Q    Were you associated with anybody at that time?
15 A    Yes.
16 Q    Who was that?
17 A    I was associated with Allie Persico and the Colombo
18 family.
19 Q    Were you kicking up any of the money that you made from
20 the motorcycle shop?
21 A    No.
22 Q    When you say that you supervised a crew in south Florida,
23 what time period was that about?
24 A    From around '97 to '99.
25 Q    So it was about 10 years before you were made?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          758

1  A    Yes.
2  Q    You were still associated with Allie Persico at this
3  time?
4  A    Up until his arrest.
5  Q    Up until his arrest.  And that was when?
6  A    I believe it was -- he was arrested in '98.
7  Q    And were these crew, were these other associated members,
8  associated people or were they members?
9  A    They were associates.
10 Q    They were all associates.  And did you kick up money from
11 that endeavor?
12 A    No, I didn't.
13 Q    Did you collect money?
14 A    Yes.
15 Q    How much did you collect?
16 A    Approximately 100,000 maybe, 80,000.
17 Q    And that all got kicked up to Allie Persico?
18 A    It was -- whatever I collected was given to him.
19 Q    And even after he went to prison, you still continued
20 to --
21 A    No.
22 Q    -- collect?  You stopped?
23 A    I collected but I gave the money to other people.
24 Q    And then 2000, you had your RICO case?
25 A    Yes.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          759

1  Q    And this is when you first really learned about RICO, the
2  breadth of RICO?
3  A    Yes.
4  Q    You had a pretty broad first exposure to it, extortion,
5  wire fraud, shylocking, all those different things?
6  A    Well, I was charged with all the underlying crimes that,
7  that were on the indictment because they put me in a
8  supervisory position.
9  Q    And that was one of the things you were debating about,
10 whether or not you were properly a supervisor or not?
11 A    Yes.
12 Q    Because that's a big enhancement to be a leader?
13 A    Yes.
14 Q    When you talked about a meeting at Barnes & Noble about a
15 $25,000 debt, do you recall that?
16 A    Yes.
17 Q    Who was the guy who was owed the debt or claimed that you
18 owed the debt to him?
19 A    The guy, the original guy that claimed I owed the money
20 to him, his name was Tony Cioffe.
21 Q    Did he ultimately sell that debt to someone else?
22 A    Well, he spoke to a friend of his, Joseph Lubrano.
23 Q    And he came to you, you had a sit-down to settle this
24 one?
25 A    Yes.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          760

1 Q   And they ultimately decided, I think your words yesterday
2 is that you didn't owe him the money?
3 A   I didn't owe him the money, no.
4 Q   Was that just a rational kind of conclusion on their part
5 as far as you can tell or was that because of your position in
6 the family?
7 A   Well, at that time, I had no position with the family, I
8 was an associate, and the $25,000 debt was disputed over a
9 load of shrimp that was supposed to be delivered to me in
10 Florida that never got there.
11 Q   It was intercepted?
12 A   It wasn't intercepted.  It was never sent.
13 Q   So why would they claim that you owe them the money?
14 A   Well, what happened was they sent it to someone else and
15 didn't pay them the money, and they thought that I had what to
16 do with it and we straightened it out and they knew I had
17 nothing to do with it.
18 Q   You had a conversation?
19 A   Yes.
20 Q   Who were you associated with at that time?
21 A   I was associated with Tommy Gioeli.
22 Q   You talked before about the Allie Russo wedding?
23 A   Yes.
24 Q   Was Dino Saracino at that wedding?
25 A   No.

          CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          761

1 Q   You talked about meeting at La Palina restaurant?
2 A   Yes.
3 Q   About a guy named Louie Cannoli?
4 A   Yes.
5 Q   Great name.
6       And he was pretending to be made, right?
7 A   Yes.
8 Q   What was he doing that he was pretending to be made?
9 A   Well, he was passing himself off on the street as a made
10 member, and even to a few made members of other families, he
11 was trying to pass himself off.
12 Q   Either get money, get power, get respect, territory,
13 whatever?
14 A   Yes.
15 Q   That's a severe violation of the rules?
16 A   Yes.
17 Q   That is punishable by stringent punishment kind of
18 situation?
19 A   Could be.
20 Q   All right.  Such as?
21 A   Such as anything.
22 Q   Anything?
23 A   From a kick in the ass to --
24 Q   The ultimate?  And was he punished?
25 A   No.

          CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          762

1 Q   One of the things that I think you've told us is that the
2 Cosa Nostra requires rules.
3 A   There are rules.
4 Q   And these rules, you know, if there's no punishment, then
5 there's really no rule, right?
6 A   Well, punishment varies.
7 Q   But this guy wasn't punished at all?
8 A   Well, he was, he was, he was abused verbally and told to
9 mind his business and actually the words that we use is, I
10 want you to sit in a corner and I don't want you to come out
11 of there, I want you to behave yourself, and that's what he
12 was told.  And he was told that in front of five people or
13 four people.  That's enough to embarrass a man and de-pants
14 him and that's all it took.
15 Q   All those guys were made guys?
16 A   All the guys at the table, yes, were made guys.
17 Q   One of the things that you talked about the other day was
18 about Cutolo, is it Billy Fingers?
19 A   Yes.
20 Q   Do you know how he lost that middle finger?
21 A   Don't have any idea.
22 Q   He also was called Wild Bill, right?
23 A   Yes.
24 Q   Why was he called that?
25 A   I have no idea.

          CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          763

1 Q   You don't know?
2 A   No.
3 Q   Did you know him personally?
4 A   Yes.
5 Q   Let's talk about your conversation with Mr. Manzo that we
6 heard played.
7       As far as you knew, he had no idea that you were
8 taping?
9 A   Correct.
10 Q   There was nothing that you said or did that would tip him
11 off, that's your testimony, right?
12 A   Correct.
13 Q   You were not videotaped during any of these encounters
14 with Mr. Manzo, right?
15 A   I'm not sure.
16 Q   You've never seen a videotape of your encounters?
17 A   No, I never knew if I was videotaped or not.
18 Q   And when you had this particular one where you talked
19 about the gun gesture and mouthed the words, where did you
20 actually meet him at the time?
21 A   I was outside LaRocca's Restaurant in Staten Island on
22 Midland Avenue.
23 Q   Were you on the street side, parking lot side?
24 A   I was on the street side.
25 Q   And when you did -- this is the not the only time that

          CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          764

1  you either mouthed words or did hand gestures; you did this a
2  couple different times?
3  A    Right.
4  Q    Did you ever explain to anybody why you were having a
5  quiet conversation with somebody and then would do something
6  that kind of suggested it's not a private conversation?  Did
7  you ever have to explain that to anybody?
8  A    No.
9  Q    Like if, if you and I were talking in a corner, we're
10 leaning in, we're talking quietly.  You did that to gain
11 people's confidence, right?
12 A    Yes.
13 Q    Because you wanted them to feel like they could talk to
14 you?
15 A    Yes.
16 Q    You didn't want them to know you were recording every
17 word?
18 A    That's correct.
19 Q    But sometimes you did other things like hand somebody a
20 note?
21 A    Yes.
22 Q    Did you ever have to explain that to anybody why you were
23 doing something that seemed to undercut the rest of your
24 chameleon work?
25 A    No.  It was understood that if we were in a place that

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          765

1  was suspect, there could be a suspected bug in the place, we
2  would pass a note or something like that.  We would blame it
3  on the place that we were in.
4  Q    But at this particular point with Mr. Manzo, you're now
5  outside.  There's not going to be a bug outside, right?
6  A    That's correct.
7  Q    And, in fact, what's much more likely would be seen from
8  a distance by some agent who's videotaping you as a gesture as
9  opposed to a word, correct?
10 A    Correct.
11 Q    So what you were doing at that point would appear to be
12 totally opposite what you were trying to convey to Mr. Manzo,
13 right?
14 A    I think if I would have asked him out loud did you shoot
15 him, it would have, it would have tipped him off or, it's a
16 trigger.
17 Q    Your choice of words, but he also -- you had good
18 conversation with him generally about the whole event?
19 A    Yes.
20 Q    One of the things, and you were down in Florida, go back
21 to Florida for a second.  You know what?  I'm going to change
22 the point.
23     Let me ask you this --
24     THE COURT:  Mr. Braverman, how are we doing on time?
25     MR. BRAVERMAN:  Less than 5.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          766

1      THE COURT:  Okay.
2  Q    One of the things that you had said, in some of your
3  conversations, sometimes you used, I'm not going to get into
4  it exactly, but you've used colorful language before?
5  A    Yes.
6  Q    And sometimes you say some things to the people you're
7  talking with, you want to gain their confidence?
8  A    Yes.
9  Q    You're trying to tell them about who you are as a person
10 because if you talk about your life, they might talk more
11 about theirs?
12 A    Correct.
13 Q    Now, sometimes the people know about your background,
14 they may know what you're saying is true or not true, right?
15 A    Yes.
16 Q    And sometimes all they have is your word whether that's
17 true or not true, right?
18 A    That's correct.
19 Q    Now, one of the things that you talked about -- you've
20 heard your own tapes, by the way?
21 A    No.
22 Q    You have not heard them all?
23 A    No.
24 Q    But you were there when they were recorded because you
25 were there?

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          767

1  A    I guess I'm on them.
2  Q    Yes?
3  A    Yes.
4  Q    So one of the conversations where you talk about tossing
5  the guy out a window, do you recall this one?
6  A    Yes.
7  Q    You said a couple of times to a couple of different
8  people how you threw a guy out the third floor window?
9  A    Yes.
10 Q    And he had the gall, the temerity to hit the awning on
11 the way down and live, right?
12 A    Yes.
13 Q    And that you kicked him afterwards a couple of times,
14 right?
15 A    Yes.
16 Q    Because he survived, which was kind of annoying, right?
17 A    No.
18 Q    Oh, either way, this conversation about this guy, it's
19 recorded on these tapes, right?
20 A    I don't know.
21 Q    Well, you were there, right?
22 A    I was, I was -- I don't know if this conversation was
23 recorded.  I don't know.  I don't know that there was a
24 recording of it, so ...
25 Q    Okay.

CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          768

1 A   I never heard it.  I never heard the recording.
2 Q   Okay.  Let me ask about this.
3        Do you recall a conversation -- you walk around in
4 Florida at some point and you have a conversation with
5 somebody.  Do you recall the words, you say, Cops in Florida
6 are good kids, I could kill someone?
7        MS. GEDDES:  Objection.
8        THE COURT:  Well --
9 Q   Do you recall saying that?
10        THE COURT:  I'm not sure of the grounds of the
11 objection.
12        MS. GEDDES:  Hearsay.
13        MR. BRAVERMAN:  His words.
14        THE COURT:  Overruled.
15 Q   Do you recall saying that, sir?
16 A   I recall saying that.  I was referring to a fellow that
17 was at a, he had a restaurant detail that he worked and he
18 basically stopped all trouble and didn't want to arrest
19 anybody or bother anybody.
20        It was an expression used, not fact.
21 Q   Because you hadn't killed anybody in Florida to test it?
22 A   I haven't killed anybody anymore.
23 Q   In some of your conversations -- let me ask you this.
24        Sal, Salvatore Vitale, do you know him?
25 A   No, I don't.

          CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          769

1 Q   Do you know of him?
2 A   Yes, I do.
3 Q   You're familiar with the deal that he got in his case?
4 A   Yes.
5 Q   What do you -- what do you understand that to be?
6        MS. GEDDES:  Objection.
7        THE COURT:  Overruled.
8 Q   You can answer it.
9 A   I understand he walked away.
10 Q   And didn't have to, quote, unquote, run away?
11 A   Exactly.
12 Q   You said the words the other day, yesterday, about a 5K
13 letter, if the letter is written strongly enough.  Do you
14 recall saying that yesterday?
15 A   Yes.
16 Q   And you're kind of, the sentence kind of trailed off.
17        If the letter is written strongly enough, then what?
18 A   If the letter is written strongly enough outlining my
19 cooperation and my other criminal activities, because both
20 things have to be written in the 5K1, the Judge will take into
21 consideration what I've done against all I've done and she'll
22 make the ultimate decision on what happens with me.
23 Q   You might get out of jail?
24 A   Or I might not.
25 Q   Certainly that's your hope, right?

          CMH    OCR    RMR    CRR    FCRR

Maragni - cross - Braverman          770

1 A   Well, it's my hope, but that's not what going to happen.
2 It's ultimately up to the judge.
3 Q   Oh, I understand that.  But that's why there calls to
4 Curtis and you try to be as proactive as you can.
5 A   That's what I agreed to do.
6 Q   And that's what you wanted to do?
7 A   Yes.  Yes.
8 Q   Some of the information that you got about targets or
9 things of that, when you had conversations with Agent Curtis
10 or any other law enforcement agent, did you discuss potential
11 targets?
12 A   I discussed people I was going to have appointments with.
13        (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25

          CMH    OCR    RMR    CRR    FCRR

Maragni - cross/ Braverman          771

1 By MR. BRAVERMAN:
2 Q   Did you discuss people you could make appointments with
3 potential to target them?
4 A   I discussed people I could make appointments with and
5 have conversations with.
6 Q   You discussed, for instance, with the FBI about this
7 doctor that you talking with about some narcotics conspiracy?
8 A   Yes.
9 Q   And that if you wanted to, you could follow up on and
10 perhaps get some good information, right?
11 A   Yes.
12 Q   The FBI was interested in that?
13 A   Yes.
14 Q   And so.  Before you had gone in and tape-recorded a
15 conversation with that doctor, you had discussed the
16 possibilities and parameters, how you would do that with the
17 FBI, right?
18 A   Yes.
19 Q   And like some of the your other conversations, you had
20 discussed you might do topics you might talk about?
21 A   Right.
22        MR. BRAVERMAN:  One second, Your Honor?
23        (Mr. Braverman and defense conferred)
24 Q   The one you said before about Allie Persico, but your
25 claim was that in the elevator it was Mr. Russo; is that

          MARSHA DIAMOND, CSR
          OFFICIAL COURT REPORTER

Maragni - cross/ Braverman                 772

1 right?

2 A   Yes.

3 Q   I was mistaken when I said that?

4 A   Yes.

5 Q   But nevertheless, that is still your story that that

6 event happened?

7 A   Yes.

8 Q   Last question about this. One of the things that you

9 certainly were aware of was that the FBI  would be listening

10 to your tapes?

11 A   Yes.

12 Q   And that the government would be listening to your tapes?

13 A   Yes.

14 Q   And so some of the things that you say on these tapes

15 like, for instance, one of the conversation we had that we

16 listened to -- I think it was the end of conversation number

17 one, you still have your binder up there with you?

18 A   Yes.

19 Q   Sir, if you look at Tab One in the last page, page four

20 --

21        MR. BRAVERMAN: Ladies and gentlemen of the jury, you

22 would do that as well.

23 Q   (Cont'd): You can all see on this page there's a long

24 little speech here by you?

25 A   Yes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross/ Braverman                 773

1 Q   You know the FBI is listening to you, right?

2 A   Yes.

3 Q   You know the government is listening to you, right?

4 A   Yes.

5 Q   Trying to make nice-nice with government, right?

6 A   Yes.

7 Q   So say nice things about them, you don't say, you know,

8 something personal about Mr. Curtis or the government agents,

9 you say when this guy's coming, government's coming, right?

10 You know they're listening to you?

11 A   Well, it was also back, you know, when -- when there was

12 something going on the FBI visited you and told you there's

13 something going on and there's something coming down the pipe

14 here, so you want to help yourself.  You know now's the time

15 to do it.  They just didn't come blowing smoke.

16 Q   So, certainly, when the FBI knocks on your door it is

17 certainly just business, no doubt about?

18 A   That is what I was referring to.

19 Q   No doubt about that, about whether, in fact, they had a

20 -- the proof is a totally different situation, right, your

21 story is -- your own story is an example of that?

22 A   They knocked on my door and months later I was locked up

23 in that.

24 Q   That is this case, but you talked about a variety of

25 other cases.  Government knocked on the door and you say you

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross/ Braverman                 774

1 didn't commit any of those crimes?

2 A   That's right.

3 Q   And like when you talk to somebody like Manzo and the

4 other people you spoke with, one of the things that you are

5 doing, you are trying to gain their sympathy, right, or at

6 least appear sympathetic to them, how about that?

7 A   Yes.

8 Q   You are trying to get them to talk about things you want

9 them to talk about?

10 A   Yes.

11 Q   You want to overcome their resistance to talk about

12 things?

13 A   Yes.

14 Q   And you want to kind of get that information, like in

15 this one here I think is the -- it is the third one.  You go

16 on and on about whether or not Mr. Manzo was ever -- whether

17 or not he did something more than just move a body, right?

18 A   Where are you at there?

19 Q   That one here.  I'm talking about page six under Tab

20 Number Three.  We've already heard page seven.  Essentially

21 you talk to him about what he did and what your opinion of

22 that is, you are giving him your advice, your counsel, right?

23 A   Yes.

24 Q   Part of what you are doing, because all the time you know

25 you are being recorded, would you say it is fair to say that

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - cross/ Braverman                 775

1 you were kind of trying to control this person?

2 A   I was trying to get information.

3 Q   To do that part of what you have to do is get some kind

4 control.  Mr. Manzo appeared to be relatively nervous in this

5 conversation, right?

6 A   We were both nervous.

7 Q   You were nervous about getting caught, he was nervous

8 about the situation, you are describing he was nervous about

9 the situation, you were nervous about getting exposed to

10 somebody wearing a wire?

11 A   I wasn't nervous about being exposed at that point.

12 Q   So what is there to be nervous about on your part?

13 A   Nervous in general about the whole situation.

14 Q   You don't strike mean as a nervous guy.

15        THE COURT:  Ask a question please.

16 Q   One of the things you have going for you is charisma,

17 that is the successful  part of your career?

18 A   You say that.

19 Q   Your a charming guy?

20 A   Again, if you say so.

21 Q   It helps in your line of work, right?

22 A   Does it heard?  It doesn't hurt.

23 Q   It doesn't hurt?

24 A   And it could help.

25 Q   It could help.  And it could help in a situation like

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

side-bar                    776

1  this with somebody who is nervous enough to be saying things
2  like, Jesus Christ?
3  A    That's an expression for the last hundred years.
4  Q    Maybe 2000?
5  A    Maybe longer.
6  Q    But in this context that charism you had was able to help
7  you get Mr. Manzo where you wanted him on the tape, right?
8  A    I am not so sure about all of this charisma you are
9  talking about. I am sure there are other people that you could
10  talk to and they will tell you about my lack of charisma.
11        MR. BRAVERMAN: I am at the end.
12        Thank you very much.
13        No further questions.
14        THE COURT: Redirect.
15        MS. GEDDES:  Yes Judge, but before I redirect, may
16  we have a brief side-bar?
17        (Continued on next page)
18
19
20
21
22
23
24
25

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

side-bar                    777

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

side-bar                    778

780

1

Maragni - redirect/ Geddes          781

1    (The following took place in open court).
2  REDIRECT EXAMINATION.
3  BY MS. GEDDES:
4        THE COURT: Ladies and gentlemen, we are going to
5  wrap up soon.  Now, I know it's been a long morning.  We get
6  you to lunch soon.  Please stay focussed on testimony, as you
7  have been.
8  Q    Good afternoon.
9  A    Good afternoon.
10 Q    Mr. Braverman asked you whether you had listened to or
11 whether you were aware the FBI was going to listen to your
12 recordings;  is that correct?
13 A    Yes.
14 Q    Were you aware that the FBI was listening to the
15 recordings?
16 A    Yes.
17 Q    You were also aware the FBI conducted surveillance of
18 your meetings from time to time?
19 A    Yes.
20 Q    Were you aware of when the FBI conducted surveillance?
21 A    No.
22 Q    Were you given advance notice that the FBI would be
23 conducting your surveillance on a particular day?
24 A    No.
25 Q    To clarify the record, Mr. Braverman asked you some
              MARSHA DIAMOND, CSR
              OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          782

1  questions regarding individuals you referred to a Peter Risk,
2  do you know an individual by that name?
3  A    No.
4  Q    You were questioned, however, about individuals who made
5  secret recordings of you prior to your arrest in January 2011;
6  is that right?
7  A    Yes.
8  Q    Was one of those individuals named Peter?
9  A    Yes.
10 Q    Do you know his last name?
11 A    No.
12 Q    In cross examination Mr. Perlmutter showed you your plea
13 agreement.
14       MS. GEDDES: I am showing the witness what's been
15 marked for identification Government Exhibit 3500-RM-20.
16 Q    (Cont'd): I believe he asked you questions about various
17 conversations that were listed in paragraph 12-A; is that
18 correct (handing)?
19 A    Yes.
20 Q    In paragraph 12-A were you given an agreement by the
21 government to not further prosecute for any crimes, other than
22 those you were initially charged with in your indictment from
23 January 2011?
24 A    No.
25 Q    And with respect to your August 2011 guilty plea, what
              MARSHA DIAMOND, CSR
              OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          783

1  did you plead guilty to?
2  A    I pled guilty to racketeering and all underlying crimes
3  that were on the indictment.
4  Q    With one exception; is that right?
5  A    Yes.
6  Q    What was that?  What didn't you have to plead guilty to?
7  A    I didn't have to plead guilty to extorting Local 6A.
8  Q    That is the union?
9  A    Yes.
10 Q    On cross-examination you were also shown a variety of
11 handwritten notes, do you recall that?
12 A    Yes.
13 Q    Do you write any of those notes?
14 A    No.
15 Q    Prior to today have you reviewed any of those notes?
16 A    No.
17 Q    You were also shown various typewritten reports; is that
18 right?
19 A    Yes.
20 Q    Do you write any of those typewritten reports?
21 A    No.
22 Q    And prior to today had you reviewed any of those type
23 written reports?
24 A    No.
25 Q    On cross examination you were asked various questions
              MARSHA DIAMOND, CSR
              OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          784

1 about Special Agent Curtis; is that correct?
2 A    Yes.
3 Q    Have you met with other FBI, special agents, in the
4 course of your cooperation with the government?
5 A    Yes.
6 Q    More than one?
7 A    Yes.
8 Q    How many?
9 A    Four, five, six.
10 Q    Have you met with those individuals on occasion without
11 Special Agent Curtis?
12 A    Most of the times, yes.
13 Q    You were also asked about your use of cellular telephones
14 during the time of your proactive cooperation when you were
15 making secret recordings; do you recall those questions?
16 A    Yes.
17 Q    As part of your cooperation did you agree to have certain
18 cellular telephones recorded by the FBI?
19 A    Yes.
20 Q    Were you also given permission not to have all your
21 telephones recorded?
22 A    Yes.
23 Q    What was your understanding of what you were to do with
24 those telephones that were not recorded?
25 A    Use it to speak to my family.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          785

1 Q    You were asked some questions about a conversation that
2 you had with Special Agent Curtis regarding what conversations
3 you were to have while you were still wearing the recording
4 device, do you recall?
5 A    Yes.
6 Q    And during those questions you started so say that it
7 wasn't in the context do you recall your answering that?
8 A    Yes.
9 Q    What was your understanding of how you were to report
10 what occurred during the meetings that you recorded?
11 A    What I was supposed to do is after my day is finished of
12 making recordings, I was to call the FBI or they would call me
13 on another phone and I would not have the recording device on
14 my person being active. I was to be debriefed without the
15 recording device with me, and I think that's what Mr. Curtis
16 was getting at. Don't talk to me while the recording device is
17 active. We will debrief you afterwards, so it is not part of
18 the recordings.
19 Q    And the information that you were being debriefed about,
20 what was that information?
21 A    It was the information of what took place that day.
22 Q    That day, which was recorded itself?
23 A    Yes.
24 Q    You provided the FBI with the device that made that
25 recording?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          786

1 A    Yes.
2 Q    And they had access to that?
3 A    Yes.
4 Q    When you were on cross-examination -- defense attorney
5 spent some time on notes that you had passed during certain
6 conversations.  Where were you when you passed those notes the
7 first time?
8 A    I was at the Cafe Sportive (ph) in Florida and another
9 time I was at the -- my meat business in Seville (ph),
10 Florida.
11 Q    Did you ever pass a note when you were not inside a
12 particular building or location?
13 A    No.
14 Q    Did you ever pass a note in a location which could not
15 have been bugged or had a secret recording device there?
16 A    No.
17 Q    Did you ever pass note when you were outside talking to
18 an associate?
19 A    No.
20 Q    You were also asked various questions about meetings that
21 may not have been -- where your recording may have
22 malfunctioned?
23 A    That's correct.
24 Q    Following your meeting, did you learn which meeting had
25 been recorded and which meeting may not have been recorded due

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          787

1 to a malfunction?
2 A    I found out a few days later.
3 Q    And did you ever learn whether any of these meetings with
4 Vincent Manzo were not recorded due to a malfunction?
5 A    No -- yes, one time, yes.
6 Q    Do you recall which meeting that was?
7 A    We met at the Colony Diner.  I was wearing a watch that
8 day.
9 Q    And did you discuss Manzo's participation in the
10 transport of William Cutolo's body?
11        MR. BRAVERMAN:  Objection; leading.
12        THE COURT: Sustained.
13 Q    What did you discuss during that meeting that you later
14 learned that was not recorded?
15 A    I discussed -- we were talking about what his involvement
16 was in the --
17 Q    -- what --
18 A    In the transport of Billy Cutolo's body.
19 Q    And following the meeting, what did you learn about what
20 happened to the recording device?
21 A    I found out that it wasn't recorded.
22 Q    What did the FBI tell you to do?
23 A    Told me to make an appointment with Vincent Manzo and do
24 it all over again.
25 Q    Did you?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          788

1  A    Yes.

2  Q    You were also asked various questions about pauses on the

3  recordings that you made of your conversations with Manzo, do

4  you recall those questions?

5  A    Yes.

6  Q    You listened to at least some of your conversations with

7  Vincent Manzo; is that correct?

8  A    Yes.

9  Q    How did Vincent Manzo speak generally when you talked to

10 him about his participation in the transport of Cutolo's body?

11      MR. PERLMAN:  Objection?

12      THE COURT:  Overruled.

13 A    I am not sure what you mean.

14 Q    Did he speak up, did he speak loudly?

15 A    He was -- he whispered.  He was whispering and then

16 sometimes when we were outside he would just speak, so it

17 varied where were.  If we were indoors he would whisper, if he

18 were outdoors he would talk.

19 Q    You met with Luca DiMatteo on November 23, 2011; is that

20 correct.

21 A    Yes.

22      MR. PERLMAN:  Objection beyond the scope?

23      THE COURT:  There was so much cross I really can't

24 remember.  I am going to allow it.

25 Q    Who else was present at that meeting?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          789

1  A    Myself, Luca DiMatteo, Vincent Manzo Junior, Vincent

2  Manzo Senior and Lenny Jr.

3  Q    And did you tell any of these individuals that you were

4  wearing a wire?

5  A    No.

6  Q    Why not?

7  A    I didn't want to be found out that I was wearing a

8  wire --

9  Q    -- did you ever have --

10 A    -- no.

11      MS. GEDDES:  One moment.

12      (Ms. Geddes and government conferred)

13 Q    On cross examination Mr. Perlmutter referenced an

14 individual named Dino who is talked about on several of those

15 recordings, do you recall?

16 A    Yes.

17 Q    You responded he never met you?

18 A    I never met the Dino he is referring to, no.

19 Q    Have you ever had a conversation with Tommy Gioeli about

20 that individual Dino?

21 A    Yes.

22 Q    What did Gioeli say about Dino?

23      MR. PERLMAN:  Objection; beyond the scope?

24      THE COURT:  I am not seeing where that is going,

25 Ms. Geddes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          790

1  Q    On cross examination you were --

2       MS. GEDDES:  Let me rephrase, Judge.

3  Q    (Cont'd):  On cross-examination you were also asked about

4  a recording on which Manzo said Dino's the main guy that can

5  put you there, do you recall that?

6  A    Yes.

7  Q    And when I say you, I am actually referring to Manzo,

8  that can put me there.  Mr. Perlmutter asked you about that,

9  right?

10 A    Yes.

11 Q    Did you have any conversations with Gioeli about Dino?

12 A    Yes.

13      MR. PERLMAN:  Objection.

14      THE COURT:  It is not related to the tape.

15      MS. GEDDES:  It is related.

16      THE COURT:  Let's have a side-bar.

17      (Continued on next page)

18

19

20

21

22

23

24

25

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Maragni - redirect/ Geddes          791

Maragni - redirect/ Geddes          792

1

10 BY MS. GEDDES:
11 Q    Mr. Maragni, just to clarify the record, and I am not
12 going to continue along this line of questioning, but when I
13 was referring to Dino and you testified about Dino, you were
14 not referring to Dino Saracino, were you?
15 A    No, I wasn't.
16 Q    You previously testified about a meeting that you had
17 with Mr. Gioeli at the Mirage nightclub, do you recall that?
18 A    Yes.
19 Q    A dinner you had there?
20 A    Well, we went out, we had a few drinks.
21 Q    Without disclosing the nature of the event, was there an
22 event that night at the Mirage while you were there?
23 A    Yes.
24       THE COURT:  Don't tell us what the event was.
25       THE WITNESS:  It was --
                    MARSHA DIAMOND, CSR
                    OFFICIAL COURT REPORTER

793

1        THE COURT:  Don't tell us what the event was.
2        THE WITNESS:  Oh, don't.
3        THE COURT:  Was there an event?
4        THE WITNESS:  Yes.
5 Q    Without naming the particular group that had the event
6 there, what type of group or what -- give me one moment,
7 Judge.
8        MR. PERLMAN:  She can lead on this one.
9        MS. GEDDES:  Okay. One moment.
10       THE COURT:  Without telling the us the names, did
11 this involve a TV show?
12       THE WITNESS:  There were celebrities.
13       THE COURT:  Just tell us did it involve a TV show?
14       THE WITNESS:  Yes.
15       THE COURT:  Individuals of a cast of a TV show?
16       THE WITNESS:  Yes.
17       THE COURT:  Anything else?
18       MS. GEDDES:  No further questions.
19       Thank you.
20       MR. PERLMAN:  There is some recross but do you want
21 to take a break now?
22       THE COURT:  How long can the recross be?  She is out
23 there for five minutes.
24       MR. PERLMAN:  Very, very short.
25       THE COURT:  Let's do it and get him off.
                    MARSHA DIAMOND, CSR
                    OFFICIAL COURT REPORTER

794

1        MR. PERLMAN:  Judge, I am not going to have any
2 cross.
3        THE COURT: Anything, Mr. Braverman?
4        MR. BRAVERMAN:  No, Your Honor.
5        Thank you.
6        THE COURT: You may step down.