1

1                                                                    1452

2

                          UNITED STATES DISTRICT COURT
3                         EASTERN DISTRICT OF NEW YORK

4        - - - - - - - - - - - - - X

5        UNITED STATES OF AMERICA,      : 10-CR-00147(SLT)
                                        :
6                                       :
                                        :
7              -against-               : United States Courthouse
                                       : Brooklyn, New York
8                                       :
                                        :
9                                      : Thursday, June 21, 2012
         FRANCIS GUERRA,                : 9:30 a.m.
10                                      :
                    Defendant.          :
11                                      :

12       - - - - - - - - - - - - - X

13                TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
                   BEFORE THE HONORABLE SANDRA L. TOWNES
14                      UNITED STATES DISTRICT JUDGE

15                       A P P E A R A N C E S :

16       For the Government: LORETTA E. LYNCH, ESQ.
                             United States Attorney
17                           Eastern District of New York
                             271 Cadman Plaza East
18                           Brooklyn, New York 11201
                         BY:  NICOLE M. ARGENTIERI, ESQ.
19                           RACHEL NASH, ESQ.
                             ALLON LIFSHITZ, ESQ.
20                           Assistant United States Attorneys

21       For the Defendant:   LAW OFFICE OF GERALD J. MCMAHON
                              67 Wall Street
22                            New York, New York 10005
                         BY:GERALD J. MCMAHON, ESQ.

23

24
                             Victoria A. Torres Butler, CRR
25                             Official Court Reporter

Page 117

Carmichael - direct - Lifshitz          1568

1  Q

11        THE WITNESS:  My name is Reynold Charles Maragni,
12  R-E-Y-N-O-L-D, C-H-A-R-L-E-S, M-A-R-A-G-N-I.
13        THE COURT:  Thank you.
14        MR. LIFSHITZ:  May I inquire, Your Honor?
15        THE COURT:  Yes.  Yes.
16  REYNOLD   MARAGNI   ,
17     called as a witness, having been first duly sworn,
18     was examined and testified as follows:
19  DIRECT EXAMINATION
20  BY MR. LIFSHITZ:
21  Q   Good afternoon, sir.
22  A   Good afternoon.
23  Q   What, if any, affiliation have you had in your life with
24  organized crime?
25  A   I've been affiliated with the Colombo crime family from
            CMH    OCR    RMR    CRR    FCRR

Page 121

Maragni - direct - Lifshitz        1572

1 the '70s.
2 Q   Until when?
3 A   Until March 2011.
4 Q   What positions, if any, have you held in the Colombo
5 family?
6 A   I've been an associate, a soldier and a captain.
7 Q   Why did your affiliation end in March of 2011?
8 A   I decided to cooperate with the government.
9 Q   How old are you?
10 A   I'm 60.
11 Q   Where were you born?
12 A   Brooklyn, New York.
13 Q   Where did you grow up?
14 A   Bensonhurst.
15 Q   In Brooklyn?
16 A   Yes.
17 Q   How far did you go in school?
18 A   I dropped out of school my senior year and then I
19 obtained a GED approximately two years after I dropped out.
20 Q   What did you do after you dropped out?
21 A   I enlisted in the Army.
22 Q   Did you do anything else before you enlisted in the Army?
23 A   When I dropped out of school, we made a bunch of friends.
24 We used to trunk cars, steal, operate illegal card games, deal
25 in illegal card games.  That's how I made a living.

              CMH   OCR   RMR   CRR   FCRR

Page 122

Maragni - direct - Lifshitz        1573

1 Q   Did you use the phrase "trunking"?
2 A   Yes.
3 Q   What does that mean?
4 A   Trunking is you burglarize the trunk of a car and steal
5 any items of value that are in there including the tire.
6 Q   When did you enlist in the Army?
7 A   November 1970.
8 Q   How old were you?
9 A   Eighteen.
10 Q   Why did you enlist?
11 A   I was due to be drafted in February of that coming year
12 so I enlisted three months earlier.
13 Q   Were you deployed in any wars?
14 A   Yes, I was.
15 Q   Which war or wars?
16 A   Viet Nam.
17 Q   For how long?
18 A   I was there approximately nine and a half months.
19 Q   Beginning and ending when, approximately?
20 A   Beginning I believe it was March, ending in December.
21 Q   Of what year?
22 A   1971.
23 Q   When were you discharged from the Army?
24 A   1976.
25 Q   What category of discharge did you receive?

              CMH   OCR   RMR   CRR   FCRR

Page 123

Maragni - direct - Lifshitz        1574

1 A   I received a general discharge for less than honorable
2 reasons.
3 Q   Why was it for less than honorable reasons?
4 A   Because I went AWOL.
5 Q   What does it mean to go AWOL?
6 A   I was absent without leave.
7 Q   Why did you go AWOL?
8 A   When I got home from Viet Nam, I got orders to go to
9 Fort Hood, Texas to play war games and I refused to do it.
10 Q   Why you did you refuse?
11 A   I was a combat veteran and I refused to play war games.
12 Q   When you came home from Viet Nam, what crimes, if any,
13 did you commit?
14 A   Well, we were trunking again.  We still did some
15 trunking, record boosting, again, social clubs and illegal
16 gambling.
17        (Continued on next page.)
18
19
20
21
22
23
24
25

              CMH   OCR   RMR   CRR   FCRR

Page 124

Maragni - direct - Lifshitz        1575

1 BY MR. LIFSHITZ:
2
3 Q   What is record boasting?
4 A   Record boasting is a crew of people that go out and
5 shoplift record albums, ten albums, twenty albums at a time.
6 Q   You mentioned social clubs.  What is a social club?
7 A   A social club is basically a storefront that's opened up
8 in a neighborhood that you are very familiar with, and it's a
9 place for your friends and people that are trusted in your
10 neighborhood to come and spend time, play cards, shoot pool,
11 play the vending machines.  Sometimes there's slot machines to
12 play.
13 Q   Did you operate a social club when you returned from
14 Vietnam?
15 A   Yes, I did.
16 Q   Did you earn money from the social club?
17 A   Yes, I did.
18 Q   How was that money generated?
19 A   The money was generated from card games, it was generated
20 from vending machines, where you're entitled to fifty percent,
21 you and the owner split fifty percent of the take.  At the
22 time, it was slot machines, you are entitled to fifty percent
23 of all revenue that goes through the machine.
24 Q   Did that revenue include revenue from illegal gambling?
25 A   Yes.

        ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz       1576

1 Q   You testified you were associated with the Colombo
2 Family.  When did you first become associated with that
3 family?
4 A   It was in the '70s.
5 Q   Who were, if anyone, were you specifically associated
6 with at first?
7 A   Jerry Langella.
8 Q   Does he have a nickname?
9 A   Yes.
10 Q   What is that?
11 A   Jerry Lang.
12 Q   How did you first meet him?
13 A   I met him when I was on a visit.  My uncle was in the
14 West Street Federal Detention Center, and I went to visit my
15 uncle, and Jerry Lang was sitting in the chair next to him.
16 He also had a visit that day, so I was introduced to him that
17 day.
18 Q   Are you familiar with the phrase to be around somebody
19 in, the context of organized crime?
20 A   Yes.
21 Q   What does it mean to be around someone?
22 A   When you are around someone, you're around someone that's
23 a made member.  He is your mentor.  Any crimes that you are
24 going to commit, anything that has anything to do with the
25 street, you would run by him first.  He would advise you if

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz       1577

1 you should do something or not, if you're infringing on
2 somebody else's business or illegal income or legal income.
3 He would check things out for you before you would go out and
4 make a living.
5 Q   So, what benefit, if any, did you receive from being
6 around someone?
7 A   Well, you have protection from other members in organized
8 crime.  It gives you street credence.  Also, like I said, if
9 you had plans to do something, you would run it by your friend
10 or your guy, and he would give you an okay or a not-okay to do
11 it.
12 Q   Were you around Jerry Lang in the '70s?
13 A   Yes, I was.
14 Q   When were you first around him?
15 A   Approximately 1974, '75.
16 Q   And until when were you around Jerry Lang?
17 A   1983.
18 Q   While you were around Jerry Lang, what crimes, if any,
19 did you commit?
20 A   Assaults, extortion, operation of illegal gambling.
21 Q   While you were around Jerry Lang, did you discuss your
22 criminal activity with him?
23 A   Yes.
24 Q   Was it important to do that?
25 A   Yes, it was.

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz       1578

1 Q   Why was it important to do that?
2 A   It's important, so your guy knows what you're doing.  And
3 like I says before, he knows what you're doing, and he could
4 advise you in what to do and what not to do.  Also, it's
5 important to let him know what you're doing, to show that
6 you're not trying to hide any income that he might have
7 coming.
8 Q   Are you responsible in organized crime to give a portion
9 of your income to the person you're around?
10 A   You're committed to do so.  It would be up to the person
11 that you are around if he would accept it or not.
12 Q   While you were around Jerry Lang, did he tell you
13 information about the Colombo Family?
14 A   Yes.
15 Q   Was it important to you that he do that?
16 A   Yes.
17 Q   Why was that important to you?
18 A   Well, you need to know who your friends are.  You need to
19 know the structure.  You need to know who to trust.  You need
20 to know who you're dealing with.
21 Q   While you were around Jerry Lang, did you learn any rules
22 about organized crime?
23 A   Yes, I did.
24 Q   What rules did you learn?
25 A   Well, in our family, the rules were, you couldn't take or

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz       1579

1 sell narcotics.  You couldn't deal with any counterfeit money.
2 You couldn't deal in securities or bearer bonds.
3 Q   Are there any rules in organized crime relating to
4 people's wives?
5 A   Oh, yes.  You couldn't bother with anybody's wife or
6 daughter or sister.
7 Q   What penalties, if any, existed for violating the rules
8 you just described?
9 A   Well, it would depend.  I mean, it could be as little as
10 a reprimand, or as serious as getting killed.
11 Q   While you were around Jerry Lang, what positions, if any,
12 did he hold in the Colombo Family?
13 A   He held captain, underboss and acting boss.
14 Q   I'm showing the witness what's in evidence as
15 Government's Exhibit 152-B.
16       THE COURT:  It's in evidence.
17       MR. LIFSHITZ:  Is the Elmo on?
18       THE COURT:  Okay.  It's on.
19 Q   Who is this?  Can you see a picture on your monitor?
20 A   No.
21       THE COURT:  Can the jury see it?
22       And you are showing Exhibit --
23       MR. LIFSHITZ:  152-B.
24 A   That's Allie Boy Persico.
25 Q   Do you know his real name?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 129

Maragni - direct - Lifshitz       1580

1  A    Alphonse Persico.
2  Q    Do you know any other name for him besides Allie Boy and
3  Alphonse Persico?
4  A    Little Allie and Young Allie.
5  Q    Do you know him personally?
6  A    Yes, I do.
7  Q    Around when did you first meet him?
8  A    Around 1969.
9  Q    How old were you then?
10  A    I was seventeen.
11  Q    How old was he?
12  A    He was fifteen.
13  Q    Can you tell us briefly how you first met him?
14  A    I met him through mutual friends that grew up in our
15  neighborhood together.  He had just moved into the
16  neighborhood on Eleventh Avenue and 85th Street, and people
17  that I knew him and said that we would get along, and
18  introduced us.
19  Q    Was this before or after you went to Vietnam?
20  A    This was before.
21  Q    After you returned from Vietnam, did you reunite with
22  him?
23  A    Yes.  I met him in 1972.
24  Q    What happened then?
25  A    There was a situation with  -- between his cousin Carmine
ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 130

Maragni - direct - Lifshitz       1581

1  and my cousin Ricky.  And my cousin was quite a few years
2  younger than his cousin, and it was going to turn violent.
3  So, I interceded, and I told his cousin, If you want to have
4  trouble with somebody, why don't you have trouble with me?
5  I'm more your age and more your standing.  And his cousin
6  Allie Boy came to see me, and we straightened out the problem.
7  Q    How old were you at the time of this dispute?
8  A    I was twenty.
9  Q    How old was Alphonse Persico?
10  A    Eighteen.
11  Q    After that incident, what, if any, relationship did you
12  have with Alphonse Persico?
13  A    We were friendly.
14  Q    During your friendship with him, did you know him to be
15  involved with organized crime?
16  A    Yes.
17  Q    With any particular family?
18  A    Yes.
19  Q    Which family was that?
20  A    Colombo Family.
21  Q    During the course of your friendship with him, what
22  positions, if any, did he hold in the Colombo Family?
23  A    He was an associate, he was a soldier, and he was an
24  acting boss.
25  Q    Directing your attention to the mid-1970s, what crimes,
ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 131

Maragni - direct - Lifshitz       1582

1  if any, did you commit with Alphonse Persico?
2  A    We shylocked together.
3  Q    What does it mean to shylock?
4  A    Give out loans for a high interest rate of return.
5  Q    Can you briefly explain how shylocking works?
6  A    You loan a fellow $100, you charge him five points, which
7  is $5 interest a week, and that interest is paid every week
8  until the whole $100 principal is paid.
9  Q    So, it's a point, a percentage; one point is one percent?
10  A    Yes.
11  Q    Just to be clear:  When a customer of a shylock pays
12  points, does that count toward the principal?
13  A    No.
14  Q    What, if anything, is done to assure repayment of a
15  shylocking loan?
16  A    Whatever is necessary.
17  Q    What does that mean?
18  A    Whatever means necessary to collect your money, including
19  violence.
20  Q    What, if any, arrangement did you have with Alphonse
21  Persico regarding shylocking in the mid-1970s?
22  A    Allie bought the money for a point, he gave the money to
23  me, I put it out on the street, I collected the interest on it
24  and split the money that we took in.
25  Q    Did you ever make threats of violence to insure that you
ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 132

Maragni - direct - Lifshitz       1583

1  and Alphonse Persico would be repaid?
2  A    Yes.
3  Q    Now, between the mid-1970s and 1983, did you meet any
4  members of Alphonse Persico's family?
5  A    Yes, I did.
6  Q    Who did you meet?
7  A    I met his uncle Allie.  I met his uncle Teddy.  I met his
8  father, his mother, his brother Michael, his brother Larry,
9  his sister Barbara, his sister Susan.  I met his whole
10  family.
11  Q    What was his father's name?
12  A    Carmine.
13  Q    What was the names of the brothers you mentioned?
14  A    Larry and Michael.
15  Q    I'm showing the witness what's in evidence as
16  Government's Exhibit 155.  Do you recognize this person?
17  A    Yes.
18  Q    Who is it?
19  A    That's Michael Persico.
20  Q    During your friendship with Alphonse Persico, did you
21  also meet his wife?
22  A    Yes.
23  Q    What was her name?
24  A    Tori.
25  Q    Is Tori short for anything?
ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 133

Maragni - direct - Lifshitz          1584

1  A  Yes.  It's short for Teresa.
2  Q  Did you eventually meet their children, Alphonse
3  Persico's children?
4  A  Yes.
5  Q  What were their chidren's names?
6  A  Allison and Victoria.
7  Q  In the mid- to late 1970s, how often did you see Alphonse
8  Persico?
9  A  Basically every day.
10 Q  Where did you spend time with him during that period?
11 A  Well, we hung out together.  We rode around in the car
12 together.  We played ball together.  We went to dinner.  We
13 went to nightclubs.  We were close friends.
14 Q  Other than you, who were some of his other close friends
15 during that period?
16 A  Chucky Russo and Jo Jo.
17 Q  When is your birthday, by the way?
18 A  February 6.
19 Q  What year were you born?
20 A  1952.
21 Q  Do you know Alphonse Persico's birthday?
22 A  Yes.
23 Q  What is it?
24 A  February 8, 1954.
25 Q  When, if ever, did you celebrate your birthdays together?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 134

Maragni - direct - Lifshitz          1585

1  A  We celebrated them in the '70s together.  The first time
2  was at his mother's house, and a couple of years after that,
3  and then again in  -- later on in the  '90s.
4  Q  Did you ever live with Alphonse Persico?
5  A  Yes, I did.
6  Q  When was that?
7  A  That was in the  '70s.
8  Q  For about how long?
9  A  About nine, ten months.
10 Q  What happened after nine or ten months?
11 A  Well, his girlfriend Tori at the time came back.  She had
12 left for California.  She came back.  She was living with him,
13 and the apartment got a little crowded, and we always had
14 money in the house, and money turned up missing, and I could
15 tell by Allie's demeanor that he was thinking that I took the
16 money.
17 Q  Did you take it?
18 A  No, I didn't.
19 Q  How, if at all, did your relationship change as a result
20 of that incident?
21 A  Well, it got cold.  It got cold between us for a long
22 time.
23 Q  Did you eventually move away from Brooklyn?
24 A  Yes.  I moved away from Brooklyn in 1983.
25 Q  Where did you move to?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 135

Maragni - direct - Lifshitz          1586

1  A  I moved to Florida.
2  Q  What part of Florida?
3  A  Orlando.
4  Q  Why did you move there?
5  A  Well, I got separated from my wife, and my family was
6  down there.  My mother and my brothers were down there.  So,
7  I moved to Orlando.
8  Q  When, if ever, did you begin committing crimes in
9  Florida?
10 A  1984.
11 Q  What crimes did you commit at first?
12 A  Credit card fraud.
13 Q  Can you briefly describe the frauds you were committing?
14 A  I would buy fraudulent credit cards, stolen credit cards,
15 and use them in Disney World and Epcot to purchase three day
16 passes, and sell those passes to travel agents in the area.
17 Q  How long did that fraud last?
18 A  Approximately a year.
19 Q  How much money did you earn from that fraud?
20 A  Over $100,000.
21 Q  Why did the fraud end after a year?
22 A  We were arrested.
23 Q  What were you are charged with when you were arrested?
24 A  Credit card fraud.
25 Q  Was that a federal or state charge?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 136

Maragni - direct - Lifshitz          1587

1  A  Federal.
2  Q  Around when were you arrested?
3  A  1985.
4  Q  And how did you resolve that case?
5  A  I pled guilty.
6  Q  Were you sentenced?
7  A  Yes.
8  Q  How much time in prison were you sentenced to?
9  A  Five years.
10 Q  When were you released?
11 A  I was released in July 1987.
12 Q  So, how long did you spend in prison in total?
13 A  I was in jail twenty months.
14 Q  What's your understanding of why you were released after
15 only twenty months?
16 A  Back in the early  '80s, in the mid-'80s, now it is
17 called old, old law, you did a third or two-thirds of your
18 sentence.  It was my first offense, so the parole board
19 paroled me after one-third of my time.
20 Q  And after you were released, what was your status?
21 A  I was on parole until the finish of the five years.
22 Q  When you were released, where did you live?
23 A  I lived in the Orlando area, Altamont Springs.
24 Q  When, if ever, did you move away from the Orlando area?
25 A  1989, I moved to south Florida.

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Page 137

Maragni - direct - Lifshitz      1588

1  Q   What town did you move to?
2  A   Pompano Beach.
3  Q   Did you get a job when you moved to south Florida?
4  A   Yes.
5  Q   Doing what?
6  A   I was in the motorcycle business.
7  Q   Did you work at someone else's store at first?
8  A   Yes.
9  Q   What did you do after you worked at that store?
10 A   I opened up my own store.
11 Q   Until when did you work in the motorcycle business?
12 A   Until 1999.
13 Q   After you moved to Pompano Beach in 1989, when, if ever,
14 did you begin committing crimes again?
15 A   1993 or 1994.
16 Q   What crimes or crimes did you commit at that time?
17 A   Money laundering.
18 Q   What does money laundering mean?
19 A   Money launder means, you take illegal money and turn it
20 into clean money, so it can be used for a legitimate business,
21 or give the appearance of the money being legitimate.
22 Q   What was the source of the illegal money that you were
23 laundering?
24 A   It was a fellow that was a stockbroker and had control of
25 his clients' accounts.  He was stealing the money from them,

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 138

Maragni - direct - Lifshitz      1589

1  writing a check from me.  I was depositing that money in my
2  corporate account, and giving him back a check from my
3  corporate account, minus ten percent of the money he gave me.
4  Q   How much money did you earn from this money laundering
5  scheme?
6  A   About 150 thou.
7  Q   Were you ever arrested or prosecuted for that?
8  A   No.
9  Q   While you lived in central Florida from 1983 to 1989, did
10 you associate with anyone in the Colombo Family?
11 A   No.
12 Q   After you moved to Pompano Beach, did you associate with
13 any members or associates of the Colombo Family?
14 A   Yes, I did.
15 Q   Who were some of the members and associates of the
16 Colombo Family you associated with at that time?
17 A   It was Anthony Black, Tom Farese, Allie Boy Persico,
18 Bobby Pate, Bobby Catalano, Vinny Aloi.
19 Q   Where was Allie Boy Persico living at that time?
20 A   Allie Boy Persico in 1995,  '96 had a house in Lighthouse
21 Point, Florida, and he was also living in New York.  He was
22 splitting his time.
23 Q   I meant to ask about the period in the mid- to late
24 '80s, '83 to '89?
25 A   '83 to  '89, well, one of us was incarcerated in that

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 139

Maragni - direct - Lifshitz      1590

1  time.  I went to jail -- Allie Boy in  '83 was living in
2  New York.  I went to jail in  '85.  I got out in  '87.  Allie
3  Boy was in jail.
4  Q   Go ahead.  Sorry.
5  A   So.  There was a time from  '83 to like  '95 that we
6  didn't have any contact with each other.
7  Q   Because one or the other of you was in jail?
8  A   One of us was locked up.
9  Q   Did you have any relationship during that period?
10 A   No.
11 Q   Now, what happened in 1996 between the two of you?
12 A   What happened is this.  Well, we got together in Florida.
13 Q   How did that happen?
14 A   I was having dinner in a restaurant in  -- actually, this
15 restaurant that was part of a nightclub, and he walked in.
16 Q   Okay.  You may have said this earlier, but beginning in
17 1996, where did Allie Boy Persico live?
18 A   He lived in New York and Florida.
19 Q   Where in Florida?
20 A   Lighthouse Point.
21 Q   Beginning in 1996, how often did you see Alphonse
22 Persico?
23 A   About once a month.
24 Q   After you saw him again in 1996, where did you spend time
25 with him?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Page 140

Maragni - direct - Lifshitz      1591

1  A   Well, we spent time in Florida.  We spent time on his
2  boat.  We went out to dinner together.  We rode motorcycles
3  together.  I saw him at my motorcycle shop.  I had a cafe
4  attached to my motorcycle shop.  I saw him there.   We were
5  friends.  We hung out.
6  Q   Beginning in 1996, did you also see each other in
7  New York?
8  A   Yes.
9  Q   Where would you see him in New York?
10 A   When I would go to New York, I would go up to Eleventh
11 Avenue and see him.  He was working at the time in his
12 brother's limousine place.
13 Q   What is that placed called?
14 A   Romantique.
15 Q   Which brother, when you say his brother?
16 A   His brother Michael.
17 Q   In the late 1990s  -- mid- to late 1990s, who, if anyone
18 else, did you see when you went to Romantique?
19 A   I saw whatever guys were in the neighborhood that used to
20 stop by outside if they seen anybody they knew.  I used to see
21 Smiley quite a bit there.  I saw Michael there.   I saw Carl
22 Panarella there.  I saw Danny Persico.  Sal Fusco.  I saw BF a
23 couple of times out there.
24 Q   You mentioned someone named Smiley.  What's his real
25 name?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz     1592

1  A   Michael Sessa.

2  Q   You mentioned someone named BF.   What is his real name?

3  A   Francis Guerra.

4  Q   Do you see him here in this room?

5  A   Right.

6  Q   Can you please point him out and identify him by his

7  clothing?

8  A   He's wearing a suit.  He's sitting between two older

9  gentlemen.

10     Sorry.

11  Q   Two gentlemen who are older than him?

12  A   Exactly.  He's the goodlooking one.

13     MR. LIFSHITZ:  Your Honor, I believe the witness

14  indicated the defendant, for the record.

15     MR. McMAHON:  We will so stipulate, Judge.

16     THE COURT:  Yes.

17  Q   In the mid- to late 1990s, did you know Alphonse

18  Persico's other friends?

19  A   Yes.

20  Q   Who were his closest friends in that period?

21  A   In the 1990s, he was very close with me, my brother PJ,

22  he was close to BF.  I don't know all who his closest friends

23  were up in New York.

24  Q   I'll show the witness what's in evidence as Government's

25  Exhibit 174.  Do you recognize this guy?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz     1593

1  A   That's Smiley.

2  Q   Michael Sessa?

3  A   Yes.

4  Q   How did you meet him?

5  A   I met him in the  '90s with Allie Boy.  I was introduced

6  to him.

7     MR. McMAHON:  Is that 174?

8     MR. LIFSHITZ:  Yes.

9  Q   Around when did you first meet Michael Sessa?

10  A   That would be around 1996.

11  Q   Who else, if anyone, have you seen him with, seen Michael

12  Sessa with?

13  A   I seen him with Allie Boy.  I seen him with Michael.  I

14  seen him with Angelo.  I seen him talking to Teddy Boy.  I

15  mean, he's a friend.

16  Q   You mentioned someone named Angelo.  Is that Angelo?

17  A   Angelo Spata is Allie Boy's brother-in-law.

18  Q   You mentioned Teddy Boy.  Who is that?

19  A   Teddy Persico, Jr.

20  Q   Based on your personal observations, what did you observe

21  Alphonse Persico's relationship to be with Michael Sessa?

22  A   They were very close.

23  Q   What did you personally observe Alphonse Persico's

24  relationship to be with his brother Michael?

25  A   Loves his brother Michael.  Very close.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz     1594

1     MR. LIFSHITZ:  Your Honor, may I approach?

2     THE COURT:  Yes.

3  Q   I'm showing the witness exhibits marked for

4  identification as 230-A through D.

5     THE COURT:  A through D?

6     MR. LIFSHITZ:  Yes, your Honor.

7  Q   Do you recognize these items?

8  A   Yes, I do.

9  Q   What are they?

10  A   They are pictures of Allie Boy and me, and these are

11  pictures taken at my brother's house on New Year's Eve.

12  Q   In what year?

13  A   I believe it was 1998.

14  Q   Are these fair and accurate depictions and the settings

15  they depict?

16  A   Yes.

17     MR. LIFSHITZ:  Your Honor, we would offer these two

18  into evidence, 230-A, B, C and D.

19     MR. McMAHON:  May I see them, your Honor?

20     THE COURT:  Yes.

21     (Pause.)

22     MR. McMAHON:  No objection, your Honor.

23     THE COURT:  I'll receive Government's Exhibits

24  230-A, B, C and D.

25     (So marked.)

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz     1595

1     MR. LIFSHITZ:  May I publish them, your Honor?

2     THE COURT:  Yes.

3  Q   I'll show you them one by one.  If you can tell us who is

4  in each picture.  This is 230-A.  Left to right?

5  A   Left to right is Allie's wife Tori, Allie Boy, myself,

6  Lyle Howzer and his wife Rachel.

7     THE COURT:  What is the name of the male to the

8  right, far right?

9     MR. LIFSHITZ:  In the picture, your Honor?

10     THE COURT:  Yes.  Blue shirt.

11     THE WITNESS:  Lyle Howzer.  Lyle Howzer.

12  Q   Who were the Howzers?

13  A   They were friends.  They were friends with my brother PJ.

14  Q   230-B.  Who does this picture depict?

15  A   Allie Boy and myself.

16  Q   This is 230-C.

17  A   Allie Boy and me.

18  Q   I'm sorry?

19  A   Allie Boy and myself.

20  Q   Finally, 230-D, who are these people?

21  A   That's Tori, Allie's wife, Allie Boy in the middle, and

22  me.

23  Q   Throughout the course of your life, about how many times

24  were you with Allie Boy and Tori Persico?

25  A   I couldn't accurately answer how many times.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz        1596

1  Q   More than ten?

2  A   Absolutely.

3  Q   More than 100?

4  A   I would say more than ten and less than a thousand.  I

5  would have no way of knowing.  It was many, many times.

6  Q   And from when to when?  From about what year to what year

7  was it that you would see them together?

8  A   Well, I met Tori before she was married to Allie.  I was

9  introduced to her by Allie in the '90s.  I believe it was

10  '90 -- I'm sorry.  In the '70s.  I believe it was '75 or

11  '76 when I met her.  I don't know exactly.  I don't remember

12  exactly what date it was.

13  Q   When was the last time you saw them together?

14  A   1999, before Allie went to prison.

15  Q   Based on your personal observations, how would you

16  describe their relationship?

17  A   They loved each other, but it was very futile.

18  Q   It was very what?

19  A   It was very futile.  They fought a lot.

20  Q   They fought a lot?

21  A   They loved each other.  A crazy relationship.

22  Q   I think you mentioned when you first met Tori.  In your

23  understanding, when were they first together as a couple?

24  A   Well, they were together as a couple when he introduced

25  her to me.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Maragni - direct - Lifshitz        1597

1        MR. McMAHON:  Your Honor, may we have a sidebar?

2        THE COURT:  Yes.

3        (Sidebar.)

4

1598

R. Maragni - Direct/Mr. Lifshitz

1        (In open court.)

2  BY MR. LIFSHITZ: (Continued)

3  Q   Mr. Maragni, around when, from what you could observe,

4  were Alphonse and Tori Persico a couple?

5  A   From when?

6  Q   That's right.

7  A   1970s.  1976.

8  Q   Were they still a couple when you left New York in the

9  '80s?

10  A   Yes, they were.

11  Q   And when you were you reunited with Alphonse Persico in

12  the mid-'90s, were they together then?

13  A   No, they weren't.  They were divorced.

14  Q   Did they get back together after that?

15  A   Yes, they did.

16  Q   Around when?

17  A   Had to be around 1997.

18  Q   Now, turning back to the 1970s, when, if ever, do you

19  recall any conflict between them?

20  A   There was conflict every other day.  I mean some kind of

21  argument or another, but it got serious.  They broke up.  And

22  she, she moved away to California.

23  Q   And what, if anything, happened then next?

24  A   We got on a plane and we went looking for her.

25  Q   Who's we?

Victoria A. Torres Butler, CRR

Official Court Reporter

1599

R. Maragni - Direct/Mr. Lifshitz

1  A   Allie Boy and myself.

2  Q   When you went looking for her, did you know an address

3  where she could be found?

4  A   No, but we had a friend in California, actually,

5  Allie Boy had a friend in California that was operating a

6  private after-hours club on Sunset Boulevard and anybody that

7  was anybody would go to that club.  So, he went there and

8  talked to his friend and gave his friend a photo of Tori and

9  told him to keep his eyes out for her, if he seen her to get

10  in touch with him, let him know, try to find out where she

11  lives, where she is, so he could go there and talk with her.

12  Q   Were you two able to find Tori during that trip?

13  A   No.

14        MR. LIFSHITZ:  Your Honor, I'd like to show the

15  witness what's in evidence as Government's Exhibit 224-A for

16  the record, part of it is covered with a sticker.

17        THE COURT:  All right.

18        (The above-referred to Exhibit was published to the

19  jury.)

20  Q   Do you recognize the person who is not covered in that

21  picture?

22  A   That looks like Ally's daughter, Victoria.

23  Q   After you and Ally Persico got back in contact in the

24  mid-'90s, when, if ever, did you begin to commit crimes

25  together?

Victoria A. Torres Butler, CRR

Official Court Reporter

1600

R. Maragni - Direct/Mr. Lifshitz

1 A  Around 1997.

2 Q  What crime or crimes did you begin committing together?

3 A  Well, I was basically a go-between, between Allie Boy and

4 the people down in Florida.  And whatever was going on,

5 whatever book-making businesses were going on, whatever Lotto

6 rooms, fraud were going on, they would pass along the money to

7 me and I would bring the money to Allie Boy.

8     Plus, any appointments that anybody needed to have

9 with him, they would make through me, for him.

10 Q  What was his position, if any, at that time?

11 A  He was acting boss.

12 Q  In the Colombo family?

13 A  Yes.

14 Q  About how many Colombo family associates were you dealing

15 with in Florida as a go-between?

16 A  Between 12 and 18.

17 Q  How long were you a go-between, between the Florida

18 associates and Alphonse Persico?

19 A  Until 1999.

20 Q  What happened in 1999?

21 A  Ally Boy went to prison.

22 Q  And during that period, 1996 to 1999, were you committing

23 any crimes?

24 A  Yes, I was.

25 Q  What crimes were you committing?

Victoria A. Torres Butler, CRR
Official Court Reporter

1601

R. Maragni - Direct/Mr. Lifshitz

1 A  I was shylocking.

2 Q  Did you give Alphonse Persico money in this period?

3 A  Yes, I did.

4 Q  Money from what?

5 A  Money from crimes that the associates were committing.

6 Q  The associates in Florida?

7 A  Yes.

8 Q  Did you profit from those crimes yourself?

9 A  Yes, I did.

10 Q  And briefly, what were some of those crimes?

11 A  There was book-making, there was extortion, there was

12 driver's license fraud, phone room fraud.

13     THE COURT:  Phone room?

14     THE WITNESS:  Phone room fraud.

15 Q  What is a phone room?

16 A  Phone room is a room that's set up to say you're going to

17 sell a certain product and you call customers, it's a

18 telemarketing room.  You call customers, they purchase

19 whatever item that you're pitching on the phone and

20 eventually, they never receive the item.  The money's taken

21 and cashed and the corporation is closed down and moved on.

22 Q  During this period, 1996 to 1999, did you discuss your

23 own crimes with Alphonse Persico?

24 A  Yes.

25 Q  And did you advise him of crimes the other Florida

Victoria A. Torres Butler, CRR
Official Court Reporter

1602

R. Maragni - Direct/Mr. Lifshitz

1 associates were committing?

2 A  Yes.

3 Q  And during that period, did Alphonse Persico tell you

4 information about the Colombo family?

5 A  Yes.

6 Q  What kind of things did he tell you?

7 A  Well, we always spoke about what would happen if he was

8 ever taken off the street, who I would trust, who was who.  I

9 needed to know who was who, so I would know who to trust.  It

10 wasn't too many years pass that the war was over and there was

11 still a bunch of people, what we referred to as the term

12 didn't come home, they were still out on the other side for

13 whatever reason and I needed to know what was going on so I

14 would know who to trust and who to deal with.

15 Q  You mentioned a war.  What war were you referring to?

16 A  That was the Colombo war.

17 Q  And approximately when did that take place?

18 A  That took place from, I believe, it was '90 to '93.

19 Q  Was it important during the period you've been

20 discussing, '96 to '99, that you told Allie Boy about your

21 crimes?

22 A  Of course.

23 Q  Was it important to you that he gave you information

24 about the Colombo family?

25 A  Yes.

Victoria A. Torres Butler, CRR
Official Court Reporter

1603

R. Maragni - Direct/Mr. Lifshitz

1 Q  At this point, 1996 to 1999, were you an inducted member

2 of the Colombo family?

3 A  No, I wasn't.

4 Q  After Allie Boy went to prison in 1999, did you continue

5 to serve as a go-between, between associates in Florida and

6 anyone in New York?

7 A  Yes.

8 Q  Who were the people in New York, the person in New York?

9 A  It was Sal Fusco, Senior, and Jackie DeRoss.

10 Q  What were their positions?

11 A  Underboss and street boss.

12 Q  And after Alphonse Persico went to prison in 1999, who,

13 if anyone, in his family, the Persico family, did you talk to

14 next?

15 A  His brother Mike.

16 Q  Approximately when?

17 A  1999.

18 Q  Where?

19 A  In Pompano Beach.

20 Q  How did that come about?

21 A  Michael was visiting friends in Florida and he called me

22 up, asked me if he could have a cup of coffee with me so I

23 agreed to meet him.

24 Q  What happened -- go ahead.  I'm sorry.  What happened

25 next?

Victoria A. Torres Butler, CRR
Official Court Reporter

1604

R. Maragni - Direct/Mr. Lifshitz

1  A   He met me down in the cafe, down at the beach in Pompano
2  Beach and we went for a walk and we talked.
3  Q   What did he say to you?  What did you say to him?
4  A   He asked me how I was doing, I said I'm doing okay.  He
5  said what are you doing, and I told him.  I said I'm
6  shylocking.
7  Q   What, if anything, else did you say to each other?
8  A   He said does anybody know about it?  I said yeah, your
9  brother knows about it.  He's known about it all along.  He
10  says did you give anything to anybody?  I said no, I don't
11  give anything to anybody.  I started this business a long time
12  ago with my own money, your brother never asked a dime from me
13  and I said if anybody wants a piece of my business, I'll put
14  up their money like I put up mine and I'll put it on the
15  street for them.
16  Q   After Alphonse Persico was incarcerated in 1999, when, if
17  ever, were you next arrested?
18  A   I was rested in June of 2000.
19  Q   What were you charged with?
20  A   Racketeering conspiracy.
21  Q   In connection with the Colombo family?
22  A   Yes.
23  Q   Were you charged with underlying crimes relating to that
24  racketeering conspiracy?
25  A   Yes, I was.

Victoria A. Torres Butler, CRR
Official Court Reporter

1605

R. Maragni - Direct/Mr. Lifshitz

1  Q   What were some of the underlying crimes?
2  A   It was extortion, book-making, driver's license fraud,
3  wire fraud.  I don't remember all the underlying crimes.
4  Q   What was the driver's license fraud?
5  A   It was in connection that one of our guys had in a
6  driver's license bureau.  He would pay the person $800, give
7  them the name you wanted to use and they would put the name in
8  the computer, take your particular picture and it would be for
9  all intents and purposes a legal Florida driver's license.
10  Q   How did that racketeering conspiracy case get resolved?
11  A   I pled guilty.
12  Q   To what crime?
13  A   I pled guilty to one count of RICO conspiracy.
14  Q   With all the other underlying acts?
15  A   They condensed -- I pled guilty to all the underlying
16  acts, but I was convicted of one count of RICO conspiracy.
17  That was the plea agreement.
18  Q   Were you sentenced?
19  A   Yes, I was.
20  Q   To how much time?
21  A   I was sentenced to two years and three years supervised
22  release.
23  Q   So the two years refers to prison, prison time?
24  A   Yes.
25  Q   When were you released from prison?

Victoria A. Torres Butler, CRR
Official Court Reporter

1606

R. Maragni - Direct/Mr. Lifshitz

1  A   2003.
2  Q   Where did you go?
3  A   Pompano Beach, my house.
4  Q   While you were on supervised release, in that case, did
5  you associate with people in the Colombo family?
6  A   Yes, I did.
7  Q   Did you commit crimes while you were on supervised
8  release?
9  A   Yes.
10  Q   What crime or crimes?
11  A   I was shylocking.
12  Q   When did your supervised release end?
13  A   I believe it was late 2005, early 2006.
14  Q   And from then, until 2011, did you continue to commit
15  crimes?
16  A   Yes.
17  Q   How often?
18  A   Every week.
19  Q   What are some of the crimes you committed in that period?
20  A   Shylocking, money laundering, extortion, illegal
21  cigarettes, receiving stolen property, selling stolen
22  property.
23  Q   Did you conspire to distribute drugs?
24  A   Yes, yes.
25  Q   Did you commit fraud?

Victoria A. Torres Butler, CRR
Official Court Reporter

1607

R. Maragni - Direct/Mr. Lifshitz

1  A   Yes, I did.
2  Q   Please briefly describe the fraud you committed?
3  A   I told -- one of the frauds was, I told somebody I had a
4  connection with the governor of Florida that I can have
5  someone's sentence reduced for 75,000.
6  Q   And did the person you told that to give you money?
7  A   Yes, he gave me 25,000.
8  Q   Was he a friend of yours?
9  A   Yes, I knew him.
10  Q   But what you told him was a lie?
11  A   Yes.
12  Q   You testified that you were at some point a soldier in
13  the Colombo family; is that correct?
14  A   Yes.
15  Q   When were your inducted into the family?
16  A   March 2008.
17  Q   Was there a ceremony?
18  A   Yes, there was.
19  Q   Where did that take place?
20  A   Bronx, New York.
21  Q   Who were some of the people who were present at the
22  ceremony?
23  A   Richie Fusco, Benji Castellazzo, Dennis DeLucia, and
24  myself.
25  Q   Did you learn the positions those other people held in

Victoria A. Torres Butler, CRR
Official Court Reporter

Page 157

1608

R. Maragni - Direct/Mr. Lifshitz

1 the Colombo family during the ceremony?
2 A   Yes.
3 Q   How did you learn that?
4 A   Richie Fusco told me.
5 Q   What were their positions?
6 A   At the time Richie Fusco was the acting underboss,
7 Benji Castellazzo was a Captain and Dennis DeLucia was a
8 Captain.
9       MR. LIFSHITZ:  I'd like to show the witness
10 Government's Exhibit 109, which is in evidence, Your Honor.
11      THE COURT:  Yes.
12      (The above-referred to Exhibit was published to the
13 jury.)
14 Q   Do you recognize this person?
15 A   That's Benji.
16 Q   Benji Castellazzo?
17 A   Yes.
18 Q   Was he known by any other names or nicknames?
19 A   Benjamin.
20 Q   Directing your attention back to the year 2000.  With
21 whom, if anyone, did you discuss getting inducted into the
22 Colombo family in the year 2000?
23 A   Sally Fusco, Senior.
24 Q   What was his position at the time?
25 A   He was a street boss.

Victoria A. Torres Butler, CRR
Official Court Reporter

Page 158

1609

R. Maragni - Direct/Mr. Lifshitz

1 Q   What, if anything, did he say to you about the subject of
2 getting inducted?
3 A   In May of -- April of 2000, he came to me and told me
4 that I was proposed to be inducted into the crime family and
5 that it would take between six and eight weeks after my name
6 went on the list to get approved.
7 Q   And what happened next in your life?
8 A   Subsequently, between my name going out on the list, I
9 got arrested.  And Sal Fusco died.
10 Q   You mentioned the list a moment ago.  What do you mean by
11 list?
12 A   Your name gets put on a list when you're proposed for
13 induction and it gets passed along to all the Captains in your
14 crime family to see if there's any outstanding trouble or any
15 beefs that anybody might have with you or any knocks against
16 you.  Then it goes out to the captains of the other four crime
17 families.
18 Q   Now, when you were arrested, as you just mentioned, were
19 you incarcerated or were you out on bail?
20 A   I was out on bail.
21 Q   After you were arrested, what happened next with respect
22 to your possible induction?
23 A   Well, they wanted to go ahead and induct me into the
24 family before I went to prison, but I passed on it.
25 Q   Why did you pass on it?

Victoria A. Torres Butler, CRR
Official Court Reporter

Page 159

1610

R. Maragni - Direct/Mr. Lifshitz

1 A   Well, I didn't think it was a good idea to go before a
2 Federal Judge knowing that the FBI would no 15 minutes after I
3 got made that I was a made member of a crime family just
4 before turning.
5 Q   So, turning back to 2008, after you were inducted into
6 the Colombo family, did you hold any other positions other
7 than soldier?
8 A   Yes.
9 Q   What position or positions?
10 A   Captain.
11 Q   When did you become a Captain?
12 A   August of 2008.
13 Q   Who promoted you?
14 A   Benji Castellazzo.
15 Q   And what was his position at the time?
16 A   Underboss.
17 Q   What is the primary purpose of the Colombo family?
18 A   To earn money.
19 Q   Can you briefly describe the structure of the Colombo
20 family?
21 A   There's a boss, an underboss, and a consigliere.  That's
22 called the administration.
23      Then you have Captains under them, and soldiers
24 under the Captains, and associates under the soldiers.
25 Q   How many organized crime families are there in

Victoria A. Torres Butler, CRR
Official Court Reporter

Page 160

1611

R. Maragni - Direct/Mr. Lifshitz

1 New York City?
2 A   There's five.
3 Q   What are the names of those families?
4 A   Colombo, Bonanno, Lucchese, Gambino, and Genovese.
5 Q   How were the other families structured?
6 A   The same.
7 Q   Same as the Colombo family?
8 A   Yes.
9 Q   What's the role of a Captain in an organized crime
10 family?
11 A   It's a direct crew of soldiers and associates.
12 Q   Were there any other names for a Captain in an organized
13 crime family?
14 A   Yes.
15 Q   What are some of those names?
16 A   Called a Skipper, Caporegime.
17 Q   Who, if anyone, does the Captain report to?
18 A   He reports to the administration.
19 Q   Are you familiar with the term acting in the context of
20 organized crime?
21 A   Yes.
22 Q   What does it mean?
23 A   If anyone in the administration, the boss or the
24 underboss, is in jail or they're going to be away from their
25 position for a long period of time, they could put someone to

Victoria A. Torres Butler, CRR
Official Court Reporter

1612
R. Maragni - Direct/Mr. Lifshitz

1 act in their place and make decisions for them.
2      Also, Captains.  Also, if a Captain is in jail or
3 he's going to be out of his respective area for a long period
4 of time, he'll designate someone to act for him as an acting
5 Captain.
6 Q   So, what positions can have a person acting in them?
7 A   Boss, underboss, and Captain.
8 Q   You testified that the position under a Captain is a
9 soldier.  Are there any other names for that position?
10 A   Yes.  They could be called a friend, a wiseguy, a head
11 guy, a button guy, a goodfella, amigo nostro.
12      THE COURT:  What was that last?
13      THE WITNESS:  Amigo nostro.
14      THE COURT:  Thank you.
15 Q   Is that Italian?
16 A   Yes, it is.
17 Q   Are you familiar with the term to be straightened out?
18 A   Yes, I am.
19 Q   What does that mean?
20 A   It means to be inducted into a crime family.
21 Q   Is a soldier an inducted member of a crime family?
22 A   Yes, he is.
23 Q   What is the role of a soldier?
24 A   A role of a soldier is to earn money and to direct his
25 associates and report to his Captain.

Victoria A. Torres Butler, CRR
Official Court Reporter

1613
R. Maragni - Direct/Mr. Lifshitz

1 Q   What is the position below a soldier?
2 A   Associate.
3 Q   What's the role of an associate?
4 A   Role of an associate is basically to do what he's told,
5 whether it be acts of violence or go out and earn money,
6 whatever his guy tells him to do, he's to do.
7 Q   What requirements, if any, must someone fulfill to become
8 an inducted member of an organized crime family?
9 A   First of all, you have to be male.  You have to be
10 Italian.  You either get your recognition by acts of violence
11 or being a big money earner or a very, very trusted friend or
12 associate.
13 Q   Are you familiar with the term sit-down in the context of
14 organized crime?
15 A   Yes.
16 Q   What does the phrase sit-down mean?
17 A   Sit-down means when there's a dispute that needs to be
18 straightened out, two main members will get together and sit
19 down and hash out whatever the problem is and come to a
20 reasonable decision.
21 Q   So, do soldiers attend a sit-down?
22 A   Yes.
23 Q   Captains attend sit-downs?
24 A   Yes, they will.
25 Q   After you were inducted into the Colombo family in

Victoria A. Torres Butler, CRR
Official Court Reporter

1614
R. Maragni - Direct/Mr. Lifshitz

1 March 2008, when, if ever, did you next attend an induction
2 ceremony?
3 A   February 2009.
4 Q   Were any other people there who were already inducted
5 members of the Colombo family?
6 A   Yes, there were.
7 Q   Who were they?
8 A   Ralph DiLeo, Richie Fusco, Benji Castellazzo, Dennis
9 DeLucia, Joseph Carna, Teddy Persico, and myself.
10 Q   Who, if anyone, was inducted at that ceremony?
11 A   Anthony Russo, Joe Savarese, John Maggio, Danny Capaldo,
12 Manny Favuzza, and Mike Ferrara.
13      MR. LIFSHITZ:  Showing the witness what's in
14 evidence as Government's Exhibit 167.
15      (The above-referred to Exhibit was published to the
16 jury.)
17 Q   Who is this?
18 A   Anthony Russo.
19 Q   What process, if any, exists in the New York organized
20 crime families for inducting new members?
21 A   What process?
22 A   Yes, for proposing and inducting new members.
23 A   Well, when someone is to be proposed, it would be his
24 Captain.  Or a Captain would do the proposing.  And you would
25 go to the other Captains and the administration and you would

Victoria A. Torres Butler, CRR
Official Court Reporter

1615
R. Maragni - Direct/Mr. Lifshitz

1 say, I want to propose this person, this candidate for
2 membership.
3 Q   And does this process involve the list you referred to
4 earlier?
5 A   Yes.  After it's agreed upon by all the Captains and the
6 administration that this person is a good candidate, it's then
7 that the person's name goes on a list to be passed around to
8 make sure that there's no outstanding problems with anyone
9 else in any other crime families that might come and stop this
10 candidate from being inducted.
11 Q   Prior to the induction ceremony you attended in
12 February 2009, did you see a list like the one you just
13 described?
14 A   Yes.
15 Q   And who, if anyone, showed you the list?
16 A   I was showed the list by Benji Castellazzo.
17 Q   What, if anything, did you and Benji Castellazzo discuss
18 when he showed you the list?
19 A   Well, I read the list with Anthony's name and Joey's name
20 and everybody that was on there and my first question is to
21 him I says, I says, well where's BF's name.
22 Q   What, if anything, did he say back?
23 A   Benji told me, he says "BF" passed on it.
24 Q   After the February 2009 induction ceremony, when, if
25 ever, did you discuss the subject of induction with the

Victoria A. Torres Butler, CRR
Official Court Reporter

1616

R. Maragni - Direct/Mr. Lifshitz

1 defendant, Frank Guerra?

2 A   Well, it had to be around March or April of the same
3 year, of 2009.  I had a social club on Bath Avenue in Brooklyn
4 and Anthony and Frank stopped by to say hello to me and
5 Anthony got out of the van and went into the club, said hello
6 to my uncle.  I was standing outside talking to B.

7         THE COURT:  Who were you talking to?

8         THE WITNESS:  "BF."

9 Q   You mentioned Anthony and Frank, just to be clear?

10 A   Anthony Russo and Frank Guerra.

11 Q   Okay.  What happened next?

12 A   I was talking to "BF" because Anthony went inside and I
13 told him, I says, all your friends got straightened out.  This
14 guy, I know you had to be feeling left out of this thing, I
15 said you passed on it.  I mean, it was up to you, you passed
16 on it.  You could have got it the same as them.  But I think
17 at the time --

18         MR. McMAHON:  Objection to what he thinks.

19         THE COURT:  Sustained.

20 Q   What did you observe and what, if anything, did the
21 defendant say to you?

22 A   I told Frank I says you're feeling funny that all your
23 friends got straightened out.  You feel like you've been sort
24 of left behind.  He shook his head yeah, gave me that little
25 smile that he does.  I said well, next time this thing comes

Victoria A. Torres Butler, CRR
Official Court Reporter

1617

R. Maragni - Direct/Mr. Lifshitz

1 around and you're on there, don't pass on it.

2 Q   After that conversation, what, if ever, did you next see
3 a list of people proposed for induction into the Colombo
4 family?

5 A   September of the same year.

6 Q   September of, sorry what year?

7 A   September, I'm sorry, it was September of 2010.

8 Q   And what year was the discussion we discussed a moment
9 ago?

10 A   That was 2009.

11 Q   Okay.  So, in September 2010, who, if anyone, showed you
12 the list?

13 A   I was shown the list by Richie Fusco.

14 Q   Who was he at that time?

15 A   He was the consigliere.

16 Q   Who was on the list?

17 A   Joey Petillo, Fat Larry, Big Richie, Philly, and "BF."

18

19         (Continued on following page.)

20

21

22

23

24

25

Victoria A. Torres Butler, CRR
Official Court Reporter

Maragni - direct - Lifshitz        1618

1 BY MR. LIFSHITZ:  (Continuing)

2 Q   When you saw the list, what, if anything, did you and
3 Richie Fusco say to each other?

4 A   Well, Richie asked me if I had a problem with anybody
5 that was on the list and I told him, I said I don't have a
6 problem with anybody.  I don't know who Philly is, I said, but
7 everybody else on here is good with me.

8 Q   When, if ever, did you next discuss the subject of
9 induction with the defendant?

10 A   I think it was in October.

11 Q   Of what year?

12 A   Of 2010.

13 Q   Where were you when you had this discussion?

14 A   I was outside my club on Staten Island.

15 Q   What street was your club on?

16 A   Ocean, Ocean Avenue.

17 Q   And what, if anything, did you say to the defendant?
18 What, if anything, did he say back?

19 A   I told Frankie that I saw his name on a list.  I says:
20 You know, you're getting ready to have a birthday, we're going
21 to be brothers and, you know, it would be good to have you.
22 It's been a long time coming.  You deserve it.  I'm happy for
23 you.

24 Q   How did he respond?

25 A   He smiled and shook his head.

CMH   OCR   RDR   RMR   CRR   FCRR

Maragni - direct - Lifshitz        1619

1 Q   You testified earlier that there's a rule against selling
2 drugs in the Colombo family, is that right?

3 A   Yes.

4 Q   When, if ever, did you consider breaking that rule?

5 A   Well, I had a discussion with Ralph DeLeo who was the
6 acting boss at the time and Ralph had a plan to buy marijuana
7 in Canada and have it brought into the United States.

8 Q   When did you discuss that plan with him?

9 A   That was in 2009.

10 Q   What position did he hold at the time?

11 A   He was acting boss.

12 Q   And what position did you hold at the time?

13 A   I was a captain.

14 Q   What concerns, if any, did you have about breaking that
15 rule?

16 A   Well, I had concerns because it was Junior's rule that he
17 didn't want anybody selling or using drugs.  So I told Ralph,
18 I said, before I go forward, I want to get an okay.

19 Q   Who was junior?

20 A   Junior Persico is the boss of our family.

21 Q   What's his real name?

22 A   Carmine Persico.

23 Q   Who are his sons?

24 A   His sons are Allie, Michael and Larry.

25 Q   What, if anything, did you believe can happen if you

CMH   OCR   RDR   RMR   CRR   FCRR

Maragni - direct - Lifshitz        1620

1 broke the rule without permission from Carmine?
2 A   Well, you could be put on a shelf, you could be, you
3 could be killed.
4 Q   What do you mean by put on a shelf?
5 A   Put on a shelf means basically you get put into exile.
6 You're stripped of your rank. You're no longer recognized as
7 a made member. You're not entitled to any representation.
8 All your earnings on the street are taken from you and like I
9 says, you're basically in exile. You stay to yourself. You
10 have no dealings on the street with anybody.
11 Q   What, if anything, did you do to address your concern?
12 A   Well, I wanted to get a message to Junior and let him
13 know, you know, what we were planning to do and if it was all
14 right with him or not all right with him.
15 Q   And how did you go about trying to get him that message?
16 A   Well, I wanted to see, I wanted to see Michael and tell
17 Michael I wanted to get a message to his father.
18 Q   Michael Persico?
19 A   Yes.
20 Q   And before you tried to do that, what, if anything, had
21 you done to begin facilitating the drug importation scheme of
22 Ralph DeLeo?
23 A   Ralph DeLeo took a trip to Canada, to Montreal, and
24 there's a fellow I'm very friendly with up there and I had
25 Ralph meet him. We did an introduction and he was someone

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz        1621

1 that could have put Ralph in touch of who he needed to be in
2 touch with to buy this marijuana.
3 Q   Did you, in fact, meet with Michael Persico to address
4 your concerns?
5 A   Yes, I did.
6 Q   In what year?
7 A   That was in 2009.
8 Q   When you met him, what, if anything, did you say to each
9 other?
10 A   Well, I told Michael what Ralph's intentions were. I
11 said: Listen, this is what we laid out what we wanted to do,
12 what we're interested in doing, but I'm not going to go
13 forward with this unless I get an okay from your father. I
14 said: I know what his rule is against this so I want to make
15 myself very clear of what we're planning to do here and I want
16 to get an okay from your dad so I need to get a message to
17 him.
18       I said: Now, I know your father. The minute that
19 he hears what we're planning to do, he's going to blow his top
20 in the visiting room and he's probably going to get pissed off
21 and call me some kind of a name.
22       Michael started laughing. What if my father says
23 no? I said: If your father says no, that's no, that's it,
24 that's the end of the story. I don't want anything to do with
25 it.

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz        1622

1       He told me: Maybe I should make a decision. I
2 says: You can't, you can't make this decision. It's nobody's
3 decision. I'm not listening to a decision from nobody but
4 your father. So I said: That's the end of it.
5 Q   Did you have any further discussions about this topic
6 with Michael Persico?
7 A   No.
8 Q   When did you first meet the defendant Frank Guerra?
9 A   I believe it was 1996.
10 Q   How did you meet him?
11 A   I met, I met Frank in Key West, Florida with Allie Boy.
12 They were, they were in Key West going down there to get their
13 dive, scuba dive certification.
14 Q   Did you ever see the defendant in New York?
15 A   Yes. I used to see Frank in Brooklyn when I went up
16 there to visit, visit my family. I stopped by 11th Avenue to
17 see Allie Boy. Frankie was in the neighborhood. Whenever he
18 saw me, he would drive by and stop and say hello.
19 Q   You mentioned 11th Avenue. Where on 11th Avenue are you
20 talking about?
21 A   Right outside the Romantique, Perks Coffee place.
22 Q   Between 1996 and 2000, about when you were arrested in 2000, about
23 how many times did you see the defendant?
24 A   Maybe six times.
25 Q   Aside from 11th Avenue in Brooklyn and Key West, where,

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz        1623

1 if anywhere else, did you see them?
2 A   That's where I saw Frankie. I saw him in Florida one
3 time and then I saw him on 11th Avenue, Brooklyn. Once he
4 drove me to the airport.
5 Q   Was that in New York or Florida?
6 A   That was in New York.
7 Q   Around when?
8 A   1997.
9 Q   How did it come about that he drove you to the airport?
10 A   I needed a lift to the airport and Allie Boy said, I'll
11 have BF drive you.
12 Q   What, if anything, did you and Allie Boy say to each
13 other next?
14 A   I said: What you got to bother the guy for? I said:
15 First of all, Frankie's got a bad hand. I said: Why does he
16 have to drive me?
17       He said: No, Frankie is the best wheel guy you'll
18 ever meet.
19 Q   Had you heard the term "wheel guy" before?
20 A   Yes.
21 Q   In what context?
22 A   Wheel guy is a getaway -- a driver, a good driver.
23 Q   Let me direct your attention to 2010. About how many
24 times, if at all, did you see the defendant in that year?
25 A   Between Brooklyn and Staten Island, maybe five, six

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz          1624

1 times, seven times.

2 Q   And where would you see him in that time?

3 A   I would see him outside my club, either on Bath Avenue

4 and then when I moved the club to Staten Island, I would see

5 him there.

6 Q   Bath Avenue, is that in Brooklyn?

7 A   Yes.

8 Q   Was the defendant with anyone when he came to your clubs

9 in 2010?

10 A   Yes.

11 Q   Who was he with?

12 A   Anthony Russo.

13 Q   Every time?

14 A   Yes, they used to work together.

15 Q   Are you familiar with a place called The Square?

16 A   Yes, I am.

17 Q   Have you been there yourself?

18 A   /UPL, yes, I have.

19 Q   Do you know the owner?

20 A   Yes.

21 Q   Who is he?

22 A   Gene Lombardo.

23 Q   And who is Gene Lombardo, if anyone, within organized

24 crime?

25 A   He's an associate of the Bonanno family.

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz          1625

1 Q   What is The Square?

2 A   It's a pizzeria.

3 Q   Where is it?

4 A   It's off Highland Boulevard in Staten Island.

5 Q   In 2010, with whom, if anyone, did you discuss The

6 Square?

7 A   I discussed The Square with BF one day.

8 Q   How did it first come up?  How did the subject of The

9 Square first come up between the two of you?

10 A   The subject came up because BF was annoyed that Gene

11 Lombardo's sons were working for his in-laws and stole the,

12 his in-laws' family recipe.

13 Q   Where were you when you had this conversation?

14 A   I was outside my club in Staten Island.

15 Q   Was anyone else involved in the conversation?

16 A   Anthony Russo was standing nearby but he wasn't really

17 involved in the conversation.  It was just Frankie and myself

18 talking about it.

19 Q   What, if anything, did the defendant say about, about his

20 in-laws in that conversation?

21 A   He felt that Gene Lombardo stole from his in-laws.

22 Q   Did he explain what that meant?

23 A   Yes, he says that they stole the recipe for the sauce for

24 the pizza and, and I'm not sure, but I think an employee also.

25 Q   Did he explain where the recipe that was stolen came

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz          1626

1 from?

2 A   It came from L&B Pizza.

3 Q   Did he explain what, if any, relationship he had with L&B

4 Pizza?

5 A   They were his in-laws.

6 Q   His in-laws?  What do you mean?

7 A   Frankie's in-laws owned L&B Pizza.

8 Q   Had you been to L&B Pizza?

9 A   Many times.

10 Q   Where is it?

11 A   It's off Avenue U and 86th Street in Brooklyn.

12 Q   During this conversation, did the defendant say that he

13 wanted to do anything as a response to how he felt about this?

14 A   Well, he wanted to confront Gene Lombardo about it and

15 tell him that, you know, he was, he was angry, his family was

16 stolen from him.  He felt that Gene stole from his family.

17 Q   Did anyone else become involved in this conversation?

18 A   Well, Anthony Russo walked over and Frankie Notch walked

19 out of my club and walked over to us while I was finishing up

20 the conversation.

21 Q   What's Frankie notch's real name?

22 A   Frank Iannaci.

23     MR. LIFSHITZ:  I'm showing the witness Government

24 Exhibit 132 in evidence.

25     (Exhibit published to the jury.)

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz          1627

1 Q   Who is this?

2 A   That's Frankie Iannaci.  Frankie Notch.

3     THE COURT:  What was that, 132 in evidence?

4     MR. LIFSHITZ:  Yes, Your Honor.

5     THE COURT:  Thank you.

6 Q   What role, if any, did Frankie Notch have in the Colombo

7 family in 2010?

8 A   He was an associate.

9 Q   Was he around anyone?

10 A   He was around me.

11 Q   How did he become involved in the conversation you're

12 describing?

13 A   Well, BF wanted to go see Gene Lombardo.  I said:  I told

14 BF well go see him, talk to him, see what he's got to say and,

15 you know, try to work something out, try to work this thing

16 out.

17     So they were going to get in a van and they were

18 going to go and see Gene and --

19 Q   Who's "they"?

20 A   Anthony Russo and Frankie, BF.

21 Q   Go ahead.

22 A   But I knew Gene Lombardo had two partners also and I

23 didn't want a confrontation to break out and there was Gene

24 Lombardo and his two partners and there was BF and Anthony

25 Russo and BF has got that bad hand, so I didn't think that,

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz        1628

1 you know, he would be able to fight, physically fistfight with
2 these people if anything broke out.  So Frankie said:  I'll
3 take a ride with them.  So Frank got in the van with them and
4 took a ride to The Square.
5 Q   When is the next time did you see the defendant, Anthony
6 Russo and Frankie Notch?
7 A   About a half hour later.
8 Q   Where?
9 A   The same place.  They dropped Frankie Notch off.
10 Q   Did you talk to them?
11 A   Yes, I did.
12 Q   What, if anything, did you say to them?
13 A   Well, I said how did you make out?  And Frankie Notch
14 says:  Well, Gene Lombardo got mouthy like he always does so I
15 gave him a smack.  I told BF, I says what happened?
16        He says:  Well, after Frankie, you know, after that
17 whole situation got settled down, that Gene agreed to work
18 something out.
19        They were going to work something out.  They were
20 going to get together and work something out.
21 Q   Directing your attention to January of 2011, what, if
22 anything, happened to you?
23 A   I was arrested.
24 Q   What were you charged with?
25 A   RICO conspiracy, racketeering conspiracy.

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz        1629

1 Q   After you were arrested, were you incarcerated?
2 A   Yes, I was.
3 Q   While you were incarcerated, did you commit any crimes?
4 A   Yes.
5 Q   What did you do?
6 A   I was a shylock.
7 Q   How were you able to do at that while you were
8 incarcerated?
9 A   My partner was taking care of my shylock business on the
10 street.
11 Q   Was he collecting money on your behalf?
12 A   Yes, he was.
13 Q   At your direction?
14 A   Uh-huh, yes.
15 Q   While you were incarcerated, did you make a decision
16 about how to proceed with your case?
17 A   Yes, I did.
18 Q   What did you decide to do?
19 A   I decided to cooperate.
20 Q   When did you decide to do that?
21 A   In March 2011.
22 Q   Did you then meet with the government?
23 A   Yes, I did.
24 Q   And when you first did that, were you still incarcerated?
25 A   Yes, I was.

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz        1630

1 Q   What did you discuss in your initial meetings with the
2 government?
3 A   I discussed my crimes.
4 Q   After you began meeting with the government, did you
5 later sign an agreement?
6 A   Yes, I did.
7        MR. LIFSHITZ:  May I approach, Your Honor?
8        THE COURT:  Yes.
9        MR. LIFSHITZ:  I'll show the witness 3500RM-4C.
10        THE COURT:  3500RM-4C?
11        MR. LIFSHITZ:  Yes.
12 Q   Take a look at this and tell us if you recognize it?
13        (Pause.)
14 A   Yes.
15 Q   What is it?
16 A   This is the first agreement that I signed.
17 Q   When did you sign it?
18 A   March 29, 2011.
19 Q   What did you agree to do in this agreement?
20 A   I agreed to be debriefed.  I also agreed to furnish the
21 FBI and the government all documents and material that might
22 be relevant to the investigation.  I agreed to not reveal my
23 cooperation and to wear a recording device.
24 Q   What, if anything, did the government agree to do in your
25 understanding?

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz        1631

1 A   The government agreed to recommend that I be let out on
2 bail.
3 Q   Did the government, in fact, then recommend that you be
4 released on bail?
5 A   Yes, they did.
6 Q   Were you released on bail?
7 A   Yes.
8 Q   What were the terms of your bail?
9 A   I would be on under house arrest, I would wear a
10 monitoring bracelet and I would secure a security company to
11 sit outside my house because I was deemed a danger to the
12 community. I was to pay for the security company with my own
13 money.
14 Q   After you were released, did you make recordings?
15 A   Yes, I did.
16 Q   And, generally speaking, who were the people you
17 recorded?
18 A   Various members of organized crime.
19 Q   Over what period of time?
20 A   From April 2011 until December 2011.
21 Q   After each recording you made, did you talk to an FBI
22 agent?
23 A   Yes.
24 Q   And what was the purpose of talking to the FBI agent?
25 A   Well, they talked to me to debrief the day's session and

CMH    OCR    RDR    RMR    CRR    FCRR

Maragni - direct - Lifshitz       1632

1 clarify what the, what the recordings were about.
2 Q   Did you always tell the agency you met with everything
3 that happened during your meetings?
4 A   No.
5 Q   What did you leave out?
6 A   I left out conversations I had with my partner regarding
7 shylock money.  I left out when I received money from my
8 shylock business.  I didn't tell the agents that I got money
9 and there were certain instances when I knew that the
10 recording device was on, I was having conversations with my
11 partner.  I would write him notes saying not to mention
12 people's names or say certain things out loud.  I didn't want
13 his, I didn't want his voice or his opinions recorded.
14 Q   Whose names did you tell him to leave out?
15 A   I told him to leave out my wife and my brother.
16 Q   And what other information, if any, did you tell him not
17 to say out loud?
18 A   I told him not to mention anything about the shylock
19 business, don't mention anything about the shylock business at
20 all, anything about money.
21 Q   Why did you withhold all the information you just
22 described from the FBI agents you were meeting with?
23 A   Well, I didn't want my family discussed, I wanted to
24 protect my family, and I didn't want my money discussed
25 because I wanted to keep my money.  I didn't want it

CMH   OCR   RDR   RMR   CRR   FCRR

Maragni - direct - Lifshitz       1633

1 confiscated.
2 Q   Have you resolved the charges that you were arrested in
3 January 2011?
4 A   Yes, I have.
5 Q   What did you do?
6 A   I pled guilty.
7 Q   To what charges?
8 A   I pled guilty to all the underlying charges.
9 Q   Did you plead guilty to the racketeering conspiracy as
10 well?
11 A   Yes, I did.
12 Q   And did you say what family you were engaged in the
13 racketeering conspiracy with when you pled guilty?
14 A   Yes, I did.
15 Q   What family?
16 A   The Colombo family.
17 Q   You mentioned underlying crimes that you pled guilty to.
18 What crimes did you allocute to or plead guilty to?
19 A   I pled guilty to extortion, to shylocking, receiving
20 stolen property, wire fraud.  I think there's like four or
21 five different crimes.  I'm not sure of all of them.
22 Q   Did you plead guilty to assault or assaults?
23 A   Yes, I pled guilty to assault also.
24 Q   You mentioned wire fraud.  Is that a fraud you've already
25 testified about here today?

CMH   OCR   RDR   RMR   CRR   FCRR

Maragni - direct - Lifshitz       1634

1 A   No.
2 Q   What was the wire fraud?
3 A   The wire fraud was $25,000 that was sent via the U.S.
4 mail to someone to pay me.
5 Q   To pay you for what?
6 A   To pay me towards having their nephew's sentence reduced
7 and have it arranged.  It was basically a scam that I was
8 going to bribe the Governor of Florida and get the person's
9 sentence reduced in Florida.
10 Q   Is that different or the same from the fraud scheme you
11 described earlier where you lied to your friends?
12 A   That's the same thing.
13 Q   When you pled guilty, did you appear before a judge?
14 A   Yes.
15 Q   Which judge?
16 A   Judge Matsumoto.
17 Q   Is Judge Matsumoto a federal judge?
18 A   Yes, she is.
19 Q   And is her courtroom here in this courthouse?
20 A   Yes.
21 Q   When you pled guilty, did you plead guilty pursuant to a
22 plea agreement?
23 A   Yes.
24 Q   After you pled guilty pursuant to a plea agreement, did
25 you later enter another agreement?

CMH   OCR   RDR   RMR   CRR   FCRR

Maragni - direct - Lifshitz       1635

1 A   Yes.
2 Q   Is that a cooperation agreement?
3 A   Yes.
4      MR. McMAHON:  Judge, object to leading.
5      THE COURT:  Yes, sustained.
6      MR. LIFSHITZ:  May I approach, Your Honor?
7      THE COURT:  Yes, you may.
8      MR. LIFSHITZ:  I'll show the witness 3500RM-5A.
9      THE COURT:  3500RM-5A.
10 Q   Do you recognize this document?
11 A   Yes.
12 Q   What is it?
13 A   It's a cooperation agreement.
14 Q   Did you --
15      THE COURT:  Excuse me.  What is 3500RM-4C?
16      MR. LIFSHITZ:  That was an earlier agreement.  It
17 was not the cooperation agreement.
18      THE COURT:  All right.
19 Q   Did you sign this agreement?
20 A   Yes, I did.
21 Q   On what date?
22 A   February 9, 2012.
23 Q   When you signed that agreement, did you plead guilty to
24 additional crimes?
25 A   Yes.

CMH   OCR   RDR   RMR   CRR   FCRR

Maragni - direct - Lifshitz     1636

1  Q   What crime or crimes did you plead guilty to when you
2  signed this agreement?
3  A   I pled guilty to shylocking and money laundering in
4  Florida and the marijuana charge in Massachusetts.
5  Q   What did you do that made you guilty of a marijuana
6  charge?
7  A   I provided the introduction between a buyer for the
8  seller.
9  Q   Who was the buyer?
10 A   Ralph DeLeo.
11 Q   Is that the importation scheme you testified about
12 earlier?
13 A   Yes.
14 Q   Before what judge did you plead to this agreement, the
15 cooperation agreement?
16 A   Judge Matsumoto.
17 Q   Were the potential penalties explained to you?
18 A   Yes, they were.
19 Q   And in your understanding, what is the maximum jail time
20 you face under this agreement?
21 A   Forty years.
22 Q   And what is the minimum jail time you face?
23 A   Five years.
24 Q   What is the maximum fine, if any?
25 A   $500,000.

CMH     OCR     RDR     RMR     CRR     FCRR

Maragni - direct - Lifshitz     1638

1  letter, is the judge obligated to lower your sentence?
2  A   No.
3  Q   Is the judge obligated to sentence you below the
4  mandatory minimum?
5  A   No.
6  Q   Who determines what your sentence will be?
7  A   Judge Matsumoto.
8  Q   What happens if you don't do what you agree to do in this
9  agreement?
10 A   I won't get a letter.
11 Q   Is lying to the government a breach of your agreement?
12 A   Yes, it is.
13 Q   Sitting here today, do you know what your sentence will
14 be?
15 A   No.
16 Q   As part of your cooperation, did you record any
17 conversations with the defendant?
18 A   Yes.
19 Q   Did you record any conversations with Frankie Notch?
20 A   Yes.
21     MR. LIFSHITZ:  May I approach, Your Honor?
22     THE COURT:  Yes, you may.
23 Q   I'll show the witness a compact disc that's marked
24 Government Exhibit 4000 series.
25     Do you recognize this exhibit?

CMH     OCR     RDR     RMR     CRR     FCRR

Maragni - direct - Lifshitz     1637

1  Q   Did you agree to any forfeiture provisions in this
2  agreement?
3  A   I agreed to forfeit $500,000.
4  Q   Have you, in fact, forfeited any of that money yet?
5  A   No.
6  Q   As part of your cooperation agreement, did you make any
7  promises to the government?
8  A   I didn't make any promises.  I entered into an agreement
9  with the government to tell the truth and to testify
10 truthfully.
11 Q   And as part of entering into this cooperation agreement,
12 did you admit to crimes you had never been charged with?
13 A   Yes.
14 Q   If you agree to do this agreement, what do you hope to
15 get in return?
16 A   I hope to get a 5K letter written by the government.
17 Q   What is a 5K letter?
18 A   It's a letter informing the judge to the extent of my
19 cooperation plus all the crimes I've never been charged with
20 and this letter will act as a, maybe a guideline or a
21 reference and the judge, it will enable the judge to go below
22 my minimum sentence if she so fits to do.
23 Q   Is getting that letter important to you?
24 A   Yes, it is.
25 Q   If you get that letter, if the government writes that

CMH     OCR     RDR     RMR     CRR     FCRR

Maragni - direct - Lifshitz     1639

1  A   Yes.
2  Q   How are you able to recognize it?
3  A   It's my initials and it's dated.
4  Q   Have you listened to contents of this CD?
5  A   Yes.
6  Q   Was what does it contain?
7  A   It contains a conversation that I had with BF and also a
8  conversation that I had with Frankie Notch.
9  Q   Are the recordings on this CD fair and accurate excerpts
10 of conversations you had with each of those people?
11 A   Yes.
12     MR. LIFSHITZ:  Your Honor, the government would move
13 to admit the disc marked Government Exhibit 4000 series.
14     MR. McMAHON:  No objection, Judge.
15     THE COURT:  Judge, I'll receive -- tell me how I
16 refer to this, 4000 series?
17     MR. LIFSHITZ:  Yes.  It contains files that are
18 designated Exhibit 4000 and 4001, but the disc itself is
19 labeled 4000 series.
20     THE COURT:  All right.  Received.
21     (So marked.)
22     MR. LIFSHITZ:  I'm showing the witness what has been
23 marked for identification as Government Exhibit 4000T, as in
24 transcript, and 4001T.
25 Q   Do you recognize Exhibits 4000T and 4001T?

CMH     OCR     RDR     RMR     CRR     FCRR

Page 189

Maragni - direct - Lifshitz      1640

1  A   Yes.
2  Q   How are you able to recognize those exhibits?
3  A   I initialed, I read them and initialed it and dated it.
4  Q   Did you read them as you listened to the recordings --
5  A   Yes, I did.
6  Q   -- on the CD marked 4000 series?
7  A   Yes.
8  Q   Turning to 4000T, is it a fair and accurate transcript of
9  the recording of you and the defendant that's on the CD marked
10 4000 series?
11 A   Yes.
12 Q   And is the transcript marked 4000T a fair and accurate
13 transcript --
14 A   Yes.
15 Q   Let me finish, please.
16     -- of the conversation between you and Frankie Notch
17 that's on the 4000 series?
18 A   Yes.
19     MR. LIFSHITZ:  Your Honor, at this time, the
20 government would ask to distribute copies of these transcripts
21 as aids to the jury and to play the two recordings on 4000
22 series.
23     THE COURT:  Yes.
24     MR. McMAHON:  Judge, I don't think he's offered them
25 in evidence yet.

CMH    OCR    RDR    RMR    CRR    FCRR

Page 190

Maragni - direct - Lifshitz      1641

1      THE COURT:  Yes, I received -- maybe I didn't.
2      MR. LIFSHITZ:  I offered the disc into evidence.
3  The transcripts are an aid to the jury.
4      MR. McMAHON:  Never mind, Judge.  That's fine.
5      THE COURT:  All right.
6      MR. LIFSHITZ:  I would suggest that the jurors wear
7  their headphones and refer to the transcript that's labeled
8  4000T.  If everyone's is ready, I'll play Government
9  Exhibit 4000.
10     (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CMH    OCR    RDR    RMR    CRR    FCRR

Page 191

Maragni - direct - Lifshitz      1642

1      (Audio plays.)
2      (Audio stops.)
3      MR. LIFSHITZ:  Your Honor, for the record, we
4  mistakenly played 4001.
5      Can you please play 4000.
6      (Audio plays.)
7      (Audio stops.)
8      MR. LIFSHITZ:  For the record, Mr. Maragni, whose
9  voices were on that recording.
10 A   That was myself and Frank Guerra.
11     MR. LIFSHITZ:  If everyone could turn to 4001-T, the
12 other transcript we just distributed.  I would ask to play
13 4001.
14     (Audio plays.)
15     (Audio stops.)
16     MR. LIFSHITZ:  No further questions, Judge.
17     THE COURT:  All right.
18     Would counsel come up to the sidebar.
19     MR. McMAHON:  Yes.
20     (Sidebar.)
21     THE COURT:  What are we doing?

1

1646

```
1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - X
4   UNITED STATES OF AMERICA,  :
                                        10-CR-147
5
          -against-                 United States Courthouse
6
                            :       Brooklyn, New York
7
    FRANCIS GUERRA,
8
                    Defendant.
9                           :       June 25, 2012
                                    9:30 o'clock a.m.
10   - - - - - - - - - - - - - X
11   TRANSCRIPT OF TRIAL
     BEFORE THE HONORABLE SANDRA L. TOWNES
12   UNITED STATES DISTRICT JUDGE, and a jury
13   ATTORNEYS FOR GOVERNMENT:
     LORETTA E. LYNCH
14   UNITED STATES ATTORNEY
     BY:  NICOLE ARGENTIERI
15       ALLON LIFSHITZ
         RACHEL NASH
16   Assistant United States Attorney
     271 Cadman Plaza East
17   Brooklyn, New York 11201
18   ATTORNEY FOR DEFENDANT:
     GERALD McMAHON, ESQ.
19   MATHEW J. MARI, ESQ
20
21   Court Reporter:
     Marsha Diamond
22   225 Cadman Plaza East
     Brooklyn, New York
23   TEL: (718) 613-2489
     FAX: (718) 613-2369
24
         Proceedings recorded by mechanical stenography,
25   transcript produced by CAT.
                      MARSHA DIAMOND, CSR
                   OFFICIAL COURT REPORTER
```

Page 1

.

4        Good morning.  The record will reflect that the
5   jurors are present and the defendant, counsel, Mr. Miragni is
6   still on the stand and still under oath.
7        MR. LIFSHITZ: May I inquire, Your Honor?
8        THE COURT:  Yes.  Yes.
9   DIRECT EXAMINATION CONTINUED
10  BY MR. LIFSHITZ:
11  Q    Good morning, sir.
12       Mr. Miragni, after you were arrested 2011 can you
13  remind us around when you were released after that arrest?
14  A   I believe it was April 8th.
15  Q   2011?
16  A   Yes.
17  Q   Can you remind us what were the conditions of your
18  release, if any?
19  A   The conditions of my release.  I was under house arrest,
20  I had to wear a monitoring device and I had to secure a
21  security company to sit outside my house.
22  Q   After you were released, how soon did you begin making
23  recordings immediately?
24  A   Immediately.
25  Q   And on Friday do you recall we played two recordings for

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 4

Miragni - direct/ Lifshitz            1649

1   you?
2   A   Yes.
3        MR. LIFSHITZ: Your Honor, may I approach and show
4   the witness 4000-T, one of the transcripts that we used on
5   Friday?
6        THE COURT: Yes.
7        MR. LIFSHITZ: Thank you.
8        I will remind the jurors that this appears as the
9   second to last transcript in their binders.
10  Q   Please take a minute to read that to yourself
11  Mr. Miragni?
12  A   (Witness perusing)
13  Q   Have you had a chance to reread Exhibit 4000-T,
14  Mr. Miragni?
15  A   Yes.
16  Q   Just to reorient everyone, can you remind us who
17  participated in this conversation?
18  A   It was me and Frank Guerra.
19  Q   Can you remind us the date of this conversation?
20  A   April 18, 2011.
21       MR. LIFSHITZ: I will place it on the Elmo as well so
22  people can follow along how they want. Is this appearing on
23  people's screens?  Good.
24  Q   Now, looking at the top, the very first line when Guerra
25  asks:

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - direct/ Lifshitz          1650

1          Did he get hit with unintelligible that guy Gene.
2          What was your understanding of what Guerra was
3   asking?
4 A   My understanding was did Anthony Russo get charged.
5          MR. McMAHON: I object to this interpretation.
6          MR. LIFSHITZ: Just his understanding.
7          THE COURT: Yes, I'll allow it. You can cross on it.
8 Q   What was your understanding of what that question meant?
9 A   That if Anthony Rousso got charged with Gene Lombardo.
10 Q   What incident are you referring to?
11 A   The extortion.
12 Q   Relating to the pizza places?
13 A   Relating to the pizza place.
14 Q   Directing your attention to the lines ten through 12
15 where you said:
16          Well, I don't know if that's one of the charges of
17 the extortion with Benjie, but it very well might be by the
18 time Anthony is done.
19          When you referred to Benjie, who did you mean?
20 A   Benjie Castellazzo.
21 Q   Who was he at the time?
22 A   The underboss.
23 Q   Of the Colombo Family?
24 A   Yes.
25 Q   When you referred to Anthony, who were you referring to?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - direct/ Lifshitz          1651

1 A   Anthony Rousso.
2 Q   At the time of this conversation what, if anything, had
3 you learned about Anthony Russo?
4 A   We heard Anthony Russo was cooperating.
5 Q   Directing your attention now to line 19 where Guerra
6 says: That was a personal fucking -- what did you understand
7 the word "that" to refer to?
8 A   The situation between he and Gene Lombardo.
9 Q   Relating to the pizza places?
10 A   Yes.
11 Q   At the time of that incident involving Gene Lombardo,
12 what was Anthony's Russo's position in the Colombo Family?
13 A   He was an acting captain.
14 Q   And what was Frankie Notch, what was Frankie Notch's
15 position?
16 A   Frankie Notch was an associate.
17 Q   Who, if anyone, was he around at that time?
18 A   He was around me.
19 Q   And directing your attention toward the bottom to line 24
20 to 25 where it says: Unintelligible it's not on tape so, no,
21 nothing ever hap-- you know.
22          What was your understanding of what the word "it"
23 referred to in that sentence?
24 A   I'm not sure.
25 Q   "It's not on tape"?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - direct/ Lifshitz          1652

1 A   It's not on tape as far as anything that happened at that
2 day at the pizzeria.
3 Q   Do you recall testifying on Thursday about a conversation
4 you had with the defendant in which you told him you saw his
5 name on the list?
6 A   Yes.
7 Q   Can you remind us what you said to him?
8 A   I told him, I says that I seen your name on a list, you
9 have a birthday coming, you'll be the same as the rest of your
10 friends.
11 Q   What does the word "birthday" mean in you're -- in that
12 context?
13 A   Birthday means you're gonna get inducted into the crime
14 family.
15 Q   How, if it all, did the defendant respond when you said
16 that?
17 A   He nodded his head and smiled.
18 Q   He nodded his head up and down?
19 A   Yes, nodded his head and smiled.
20 Q   Do you recall testifying earlier in 2010 you saw the
21 list that you just mentioned you discussed with the defendant?
22 A   Yes.
23 Q   Can you please remind the jury who was on that list?
24 A   Joe Pattella ^ and big Richie, Fat Larry, Philly, and
25 Frank Guerra.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1653

1 Q   You just mentioned a big Richie, who's big Richie?
2 A   That's what he goes by -- I'm sorry.  Not big Richie, big
3 Jerry.  I'm sorry.
4 Q
5          MR. LIFSHITZ: May I have one moment, Your Honor?
6          THE COURT: Yes.
7          MR. LIFSHITZ: No further questions at this time.
8          THE COURT: Did you say silly?
9          THE WITNESS: No. Philly.
10          THE COURT: Philly. Thank you.
11 CROSS-EXAMINATION
12 BY MR. McMAHON:
13 Q   Mr. Miragni, January 20th, 2011 has been referred to as
14 Mafia take-down day; is that correct, sir?
15 A   That's what they called it, yes.
16 Q   I believe that the FBI, the Attorney General, announced
17 the arrest of 127 people that they claimed were in the Mafia?
18 A   Yes.
19 Q   And of those 127 there were 39 that the FBI and the
20 prosecutors said were in the Colombo Family?
21 A   Yes, I believe that's correct.
22 Q   And you were arrested that day?
23 A   Yes, I was.
24 Q   And Anthony Russo was arrested that day?
25 A   Yes he was.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 9

Miragni - cross/ McMahon                    1654

1  Q    Frank, Guerra was not arrested that day?
2  A    No, he wasn't.
3  Q    Now, you have had a lengthy and some would say in the
4  crime world a distinguished career in comitting crimes?
5  A    That's correct.  I guess you could say that, yes.
6  Q    And I think you described starting at a very early age?
7  A    Yes.
8  Q    And amongst the crimes that you have committed are
9  assaults?
10 A    Yes.
11 Q    Extortion?
12 A    Yes.
13 Q    Loansharking?
14 A    Yes.
15 Q    Drugs?
16 A    Yes.
17 Q    Frauds?
18 A    Yes.
19 Q    All right. And with regard to some of the assaults, I
20 don't want to go into the details of all of them, you have
21 been known to put a baseball bat to somebody's head?
22 A    Yes.
23 Q    And I assume that that was not one of those foam baseball
24 bats that kids get at baseball games?
25 A    No, it wasn't.
                MARSHA DIAMOND, CSR, RPR
                OFFICIAL COURT REPORTER

Page 10

Miragni - cross/ McMahon                    1655

1  Q    And I assume it wasn't a whipple ball?
2  A    No, it was not.
3  Q    Was it wood or aluminum?
4  A    It was wood.
5  Q    A Louisville Slugger, so to speak?
6  A    I don't know the brand.
7  Q    You hit somebody on the side of the head with that
8  baseball bat?
9  A    Yes.
10 Q    And did their brains go flying out?
11 A    No.
12 Q    Did they get a message?
13 A    Yes.
14     THE COURT:  Did they?
15 Q    Get a message that Reynold Miragni meant business?
16 A    Yes.
17 Q    How many times did you hit him with the baseball bat?
18 A    Once.
19 Q    Now, how many assaults would you say you committed in
20 your criminal career?
21 A    I don't -- I couldn't put a number on them. I don't know.
22 Q    Something like your conversation with the Tori Persico,
23 more than ten and less than a thousand?
24 A    I'd say that.
25 Q    And how about your drug dealing, let's talk about that a
                MARSHA DIAMOND, CSR, RPR
                OFFICIAL COURT REPORTER

Page 11

Miragni - cross/ McMahon                    1656

1  little bit with the jury, you pled guilty to distributing or
2  conspiring to distribute more than 100 kilos of marijuana; is
3  that correct?
4  A    Yes.
5  Q    And what else -- what other drug activities have you been
6  involved in?
7  A    That's it that I recall.
8  Q    That's it that you can recall?
9  A    Yes.
10 Q    Well, are you saying there was no other drug criminality
11 or you just don't remember any other drug criminality?
12 A    I don't think there was any other drug criminality.
13 Q    But you are not sure?
14 A    I'm sure but with conspiracies and so on and so forth
15 point and conversations, I haven't engaged in any other drug
16 conspiracies that I know of -- that I'm aware of.
17 Q    That you can remember?
18 A    Yes.
19 Q    So they caught you on the 100 kilo transaction, so you're
20 admitting to that, but as to other drug things that they don't
21 know about, you're not admitting to that; is that correct,
22 sir?
23 A    I'm not admitting to it because I don't believe that I
24 did it.
25 Q    And on the drugs -- the 100 kilos that was -- of
                MARSHA DIAMOND, CSR, RPR
                OFFICIAL COURT REPORTER

Page 12

Miragni - cross/ McMahon                    1657

1  marijuana, that was to be imported from Canada?
2  A    Yes.
3  Q    With your contacts up there in Canada?
4  A    Yes.
5  Q    And loansharking. How long have you been doing
6  loansharking?
7  A    Since 1996.
8  Q    Okay.  Are you sure it wasn't earlier?
9  A    It my have been.
10 Q    And I think you also talked about frauds. You have in
11 your lifetime, sir, committed a lot of frauds; is that
12 correct, sir?
13 A    Yes.
14 Q    And fraud means that you are lying, cheating and
15 deceiving people; is that correct, sir?
16 A    Yes.
17 Q    And you have been known to virtually lie every single day
18 of your life; is that correct?
19 A    I wouldn't say every single day of my life.
20 Q    But close?
21 A    Well, when you say "close"?
22 Q    Well, you were even juggling a wife and a girlfriend at
23 the same time, weren't you?
24 A    Yes.
25 Q    So you were on supervised release and you're lying to the
                MARSHA DIAMOND, CSR, RPR
                OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1658

1 probation officer; is that correct, sir?
2 A    When was I lying to the probation officer?
3 Q    When you were on supervised release you were aware, I
4 assume, that you weren't supposed to go out and commit crimes?
5 A    Yes.
6 Q    And when you go in an report to the probation officer and
7 you have a discussion and he asks have you been good, have you
8 been straight, have you not been committing crimes, I assumed
9 you said no, of course not, I have not been doing any crimes?
10 A    You are correct.
11 Q    And you lied each and every time you said that?
12 A    Yes.
13 Q    And you lied to your best -- one of your best friends
14 when you cheated him out of $25,000?
15 A    That's correct. He wasn't one of my best friend but
16 that's correct.
17 Q    Was he a friend?
18 A    Yeah, he was a friend.
19 Q    One of the kind of friends you cheated out of $25,000?
20 A    Yes, he was the same friend that was recording me doing
21 it.
22 Q    But you didn't know it at the time?
23 A    No. He didn't know that I was cheating him either.
24 Q    At the time you cheated him you thought he was a friend
25 of yours?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1659

1 A    Yes.
2 Q    You thought that you were cheating your friend out of
3 $25,000?
4 A    Exactly.
5 Q    And you made up this whopping story about you had a
6 connection in the governor of Florida's office and you could
7 get a sentence reduction; is that correct, sir?
8 A    I could get his nephew's sentence reduced, yes?
9 Q    You told him the fee was 75,000 and you got a $25,000
10 down payment?
11 A    Yes. Actually I believe it was 80,000 and I got a
12 $25,000 dollar down payment.
13 Q    Which you put in your pocket?
14 A    Yes.
15 Q    Did you have a contact in the governor's office?
16 A    No, I don't.
17 Q    How many people did you sucker in on this kind of a scam?
18 A    Just one.
19 Q    Just the one?
20 A    Yes.
21 Q    Or just the one that you told the government about?
22 A    Just one.
23 Q    Who is that?
24 A    That was Tom.
25 Q    Your friend Tommy?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1660

1 A    Umm-humm.
2 Q    McLaughlin?
3 A    Yes.
4 Q    Your very good friend Tommy McLaughlin?
5 A    My friend Tommy McLaughlin.
6 Q    You spent a lot time with Tommy, didn't you?
7 A    He spent a lot of time with me. He came down to Florida
8 to see me.
9 Q    I guess you were friendly enough so that you spent time
10 together in New York and Florida; is that correct, sir?
11 A    We were friendly, yes.
12 Q    And is that how you treat your friends, you cheat them?
13 A    Well, if you recall I gave him back the 25,000.
14 Q    After you got caught?
15 A    After I got caught when?
16 Q    When did you give him back the 25,000?
17 A    Two days later.
18 Q    Why? Did you have a sudden change of heart?
19 A    He says he needed the money back.
20 Q    So basically he borrowed the money back?
21 A    No, he didn't borrow the money back. He said he needed
22 the money back, I gave him back his 25,000.
23 Q    And in that interim two days, did you hear anything about
24 him wearing a wire?
25 A    No.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1661

1 Q    Now, you also had some fraud going on with drivers
2 licenses?
3 A    Yes.
4 Q    That was in Florida also?
5 A    Yes.
6 Q    And you were telling people -- or actually you could
7 deliver phony drivers licenses; isn't that correct, sir?
8 A    I told people that they could obtain a phony driver's
9 license. The connection wasn't mine.
10 Q    But you knew where to steer them to?
11 A    Yes, I did.
12 Q    And for which you were duly compensated; is that correct,
13 sir?
14 A    Actually I didn't get any licenses for anybody.
15 Q    You didn't?
16 A    No.
17 Q    You didn't get any money?
18 A    No.
19 Q    But you admitted this quasi-criminality to the
20 government?
21 A    Yes, I did because I obtained a phony license for myself.
22 Q    Oh, did you get that on the cuff?
23 A    No. It cost me $800.
24 Q    Oh. Did you tell the government who the connection was?
25 A    The connection was arrested. It was part of my

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 17

Miragni - cross/ McMahon          1662

1 indictment in 2000.
2 Q    Did you cooperate in 2000?
3 A    I didn't cooperate on the case.
4 Q    Well, I didn't ask you that. Did you cooperate in 2000?
5 A    I helped.  I cooperated to the point where they wanted me
6 to inquire on police corruption.  They were asking me if I
7 could find out if there was any corrupt police or agents in
8 the South Florida area.  I told them I'd look into it.
9 Q    When you say "they" you mean law enforcement; is that
10 correct?
11 A    That's correct.
12 Q    So you have this sort of a long-standing odd relationship
13 with law enforcement, sometimes you're a rat, sometimes you're
14 a criminal, sometimes you're both; is that correct, sir?
15        MR. LIFSHITZ: Objection.
16        THE COURT: Yes, Sustained.
17 Q    Sometimes you help them out, sometimes you break the law
18 and sometimes you do both at the same time; is that correct,
19 sir?
20        MR. LIFSHITZ: Objection.
21        THE COURT:  No, I'll say allow the witness to
22 answer.
23 A    No, that's not the case.
24 Q    Were you committing crimes -- did you actually give them
25 any information about police corruption?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 18

Miragni - cross/ McMahon          1663

1 A    There was --
2 Q    Yes or no, sir?
3 A    No.
4 Q    And over what period of time did you ever discussions
5 with the Florida law enforcement about that subject?
6 A    That was in 2000.
7 Q    Over what period of time were you having conversations
8 with them about it?
9 A    Maybe three months.
10 Q    Three months.  And did you wear a wire?
11 A    No.
12 Q    Did you do any meeting?
13 A    No.
14 Q    Did you have regular meetings with the law enforcement
15 people and be debriefed?
16 A    No.
17 Q    How many times did you meet with them?
18 A    I met with them before I was released on bail, umm, once.
19 Q    Was that part of the reason why you got out on bail?
20 A    No.
21 Q    Was it a coincidence that you met with them, offered to
22 provide assistance and you got bail?
23 A    I didn't meet and offer to provide anything. They came to
24 meet me and wanted to speak to me about it.
25 Q    Is that the first time, sir, that you had ever talked

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 19

Miragni - cross/ McMahon          1664

1 with any law enforcement about providing assistance to them?
2 A    Yes.
3 Q    But not the last?
4 A    No.
5 Q    Now, among the other frauds that you participated in or
6 initiated were phony Walt Disney tickets?
7 A    They weren't phony tickets, no.
8 Q    What were they?
9 A    They were purchased with phony credit cards.
10 Q    Real tickets but funny money?
11 A    Exactly.
12 Q    So you were cheating on Walt Disney; is that correct,
13 sir?
14 A    Actually I was cheating the credit card company.
15 Q    How much did you make on that scam?
16 A    About 100,000.
17 Q    Now, I think you said that -- I think your testimony was
18 that you have committed crimes -- and this was on your direct
19 -- every week since 2006 until you were arrested January 2011;
20 is that correct, sir?
21 A    Yes.
22 Q    Are you aware, sir, that there are in the neighborhood of
23 250 to 300 weeks in that time period?
24 A    Yes, I am.
25 Q    So just for that five or six year period, you committed

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 20

Miragni - cross/ McMahon          1665

1 anywhere from 250 to 300 crimes; is that correct, sir?
2 A    Yes.
3 Q    And total number of crimes that you have pled guilty to
4 is what?
5 A    I don't know offhand.
6 Q    As you sit here now, you are awaiting sentence and you
7 don't know how many crimes you pled guilty to?
8 A    I believe it is eight.  I don't know exactly how many.
9 Q    It could be five?
10 A    It could be five, it could be ten, it could be six. I
11 don't know exactly how many.
12 Q    So your memory is not very good on the number of crimes
13 that you pled guilty to, but it is good about other things; is
14 that correct, sir?
15 A    I'm just unclear to how many crimes I've pled guilty to.
16 Q    They are contained in an information or indictment, are
17 they not?
18 A    Yes.
19 Q    You have seen those documents?
20 A    Yes.
21 Q    You don't remember?
22 A    I don't remember how many crimes, no, I don't.
23 Q    That doesn't counsel, that 250 to 300, that doesn't count
24 the crimes you committed before 2006?
25 A    Yes.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 21

Miragni - cross/ McMahon          1666

1  Q   So we could be talking about anywhere from 1500 to 2,000
2  crimes that Reynold Miragni has himself committed in his
3  criminal career; is that correct, sir?
4  A   I believe it's the crime; it's just an ongoing
5  conspiracy.
6  Q   Well, each time that you make a collection on a
7  loanshark, threatening to beat his head in with a baseball
8  bat, each one of those is a crime, are you aware of that, sir?
9  A   Yes, I am.
10 Q   So I'll go back to my question.  Maybe 1500 to 2000
11 crimes in your career would be a fair estimate; is that
12 correct, sir?
13 A   That's correct.
14 Q   How much money would you say that Reynold Miragni has
15 made over the course of committing 1500 to 2000 crimes?
16 A   I have no idea.
17 Q   Would ten million dollars be a nice number, a rough
18 estimate?
19 A   I think it would be a little too rough.
20 Q   A little too high perhaps or too low?
21 A   I think it would be too high.
22 Q   And I think that your agreement with the government says
23 that you are supposed to give them 500,000?
24 A   Yes.
25 Q   And how much have you given them so far?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 22

Miragni - cross/ McMahon          1667

1  A   Nothing.
2  Q   When did you make this agreement?
3  A   I made the agreement in February.
4  Q   This year?
5  A   Yes.
6  Q   And you've been negotiating the terms of that agreement
7  for some time, have you not, sir?
8  A   Yes.
9  Q   So you have not given them any dollars of the 500,000
10 that you promised to pay that's like an I owe you, sir?
11 A   Yes.
12 Q   Did you make any commitment to pay restitution to the
13 people that you've injured in your crimes?
14 A   No.
15 Q   The guy with the baseball bat?
16 A   No.
17 Q   No agreement to do that?
18 A   No.
19 Q   So did the government tell you they are just interested
20 in getting money for themselves and not the victims?
21      MR. LIFSHITZ: Objection, Your Honor.
22      THE COURT:  Yes. Sustained.  Judges determine
23 restitution.
24      MR. McMAHON:  Judges determine who gets the
25 restitution?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 23

Miragni - cross/ McMahon          1668

1       THE COURT:  Yes.
2  Q   Now, have you been asked to file tax returns or amend the
3  tax returns reflecting your income from criminal conduct?
4  A   No.
5  Q   And you certainly don't intend to file any amended tax
6  returns, do you?
7  A   I'm not sure what I'm going to have to do or what I'm
8  going to have to provide.
9  Q   And because you think being the cooperating witness gives
10 you, like,immunity, you don't have to pay any taxes; is that
11 true, sir?
12 A   That is not true.
13 Q   Isn't that what you just said, you are not sure what you
14 have to do?
15 A   I'm not sure how I have to proceed.  I will consult my
16 attorney and he will tell me how to proceed.
17 Q   As between February when you signed the agreement and
18 June 25th no such consultations have taken place?
19 A   That's correct.
20 Q   And the government has not been after you to file amended
21 tax returns?
22 A   I have not heard anything from my attorney yet, no.
23 Q   But you have been meeting with the prosecutors and
24 agents, have you not?
25 A   Yes.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 24

Miragni - cross/ McMahon          1669

1  Q   And have any of them in those many, many meetings asked
2  you about amended tax returns?
3  A   No.
4  Q   I think, if I am not mistaken, you said that you started
5  loansharking in the 1970s with Allie Persico; is that correct,
6  sir?
7  A   Yes.
8  Q   So it's not the 90s, it's not the 80s.  You've been
9  loansharking since the 70s; is that correct, sir?
10 A   Well, I loan-sharked for one year in the 70s.
11 Q   And what's the most amount of money, sir, that you ever
12 had out on the street at one time?
13 A   About 150,000.
14 Q   Now, about 150,000 at three points, that means that you
15 would get $4,500 per week just in the vig; is that correct?
16 A   Just --
17      THE COURT:  For what?
18      MR. McMAHON:  Vig.
19 Q   You know what the vig is?
20 A   You're talking to me?
21 Q   Yes.
22 A   Yes, I know what vig is.
23 Q   What is the vig?
24 A   The vig is the interest.
25 Q   Okay. So on $150,000 out on the street, you are getting

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1670

1 4,500 interest which does not, of course, reduce the debt?
2 A   That's correct.
3 Q   And if we talk about the 4,500, and my math is not great,
4 so 52 weeks a year, so we are talking like 250 to 300,000 a
5 year just on the loanshark money; is that correct, sir?
6 A   That's correct.  If it is 150,000 that is out there
7 constantly, yes, that would be correct.
8 Q   And then you if you times that times the 20 or so years
9 that you have been loansharking, or maybe even 30, you can
10 easily see how you could have accumulated ten million dollars
11 just in loanshark money?
12 A   Yes, if there was $150,000 out constantly at one time,
13 yes.
14 Q   By your testimony, I am going by your testimony.  So,
15 sir, so that would be ten million dollars that you might have
16 stashed away in a safe deposit box or multiple safe deposit
17 boxes; is that correct, sir?
18 A   That wouldn't be correct, no.
19 Q   You don't have a safety deposit box?
20 A   No, I don't.
21 Q   Did anyone from the government ask you if you have a safe
22 deposit box?
23 A   Yes.
24 Q   They asked you?
25 A   Yes.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1671

1 Q   And you said no?
2 A   I said no.
3 Q   And they believed you?
4 A   I guess they did, he didn't. I don't know.
5 Q   Did they -- did they go to your bank?
6      MR. LIFSHITZ:  Objection, Your Honor.
7 Q   If he knows?
8      THE COURT: Sustained.
9 Q   Did you tell them where you bank?
10 A   They know where I bank.
11 Q   That wasn't the question I asked.
12     Did you tell them where you bank?
13 A   Yes, I did.
14 Q   Had they executed search warrants on any of your banks or
15 bank accounts in connection with your crimes?
16     MR. LIFSHITZ: Objection.
17     THE COURT: Sustained.
18 Q   Did the federal government seize any money from your bank
19 accounts?
20     MR. LIFSHITZ: Objection.
21     THE COURT:  You can answer that so Mr. McMahon can
22 move on.
23 A   No.
24 Q   They didn't seize any money?
25 A   No.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1672

1 Q   Now, there came a point in time in connection with your
2 January 2011 arrest that you decided to cooperate; is that
3 correct, sir?
4 A   Yes.
5 Q   By the way, let me go back.
6      You got arrested in 2005 in Florida also; is that
7 right?
8 A   No.
9 Q   2000, rather, correct?
10 A   2000, yes.
11 Q   And this -- your first arrest was '95 was it?
12 A   My first arrest was in '85.
13 Q   Eighty-five.
14      So on the '85 arrest you got a sentence of five
15 years which you did a third; is that right, sir?
16 A   That's correct.
17 Q   In 2000 you get arrested again for racketeering?
18 A   Yes.
19 Q   And did you cooperate in connection with that arrest,
20 sir?
21 A   No, I didn't.
22 Q   Would you tell the jury how it was that you got a
23 sentence of two years on that arrest?
24      MR. LIFSHITZ: Objection.
25      THE COURT:  Mr. McMahon, he was sentenced by a

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1673

1 judge.  Objection is sustained.
2 Q   But you didn't cooperate?
3 A   No.
4 Q   So you get arrested in January 20th, 2011; is that
5 correct, sir?
6 A   Yes.
7 Q   And when did you decide that you were going to cooperate?
8 A   In March.
9 Q   Of 2011?
10 A   Yes.
11 Q   So you did not make a decision to cooperate from
12 January 20th until March; is that correct, sir?
13 A   Yes.
14 Q   Would you tell the jury why it is that you agreed to meet
15 privately with the agents and prosecutors on February 1st and
16 were debriefed by them?
17      MR. LIFSHITZ: Objection.  We would ask for a
18 side-bar.
19      THE COURT:  Yes.
20      (Continued on next page)
21
22
23
24
25

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 29

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

---

Page 30

Miragni - cross/ McMahon          1675

1   (The following took place in open court).
2   BY MR. McMAHON:
3   Q    Please tell the jury how it is that you ended up having a
4   debriefing session with the agents on February 1st, 2011?
5   A    I believe it was a meeting with the agents to see how I
6   was going to proceed.
7   Q    Okay. And this was what you would call a private
8   meeting?
9   A    Yes.
10  Q    And a private meeting on February 1st to meet with the
11  agents to see how you were going to proceed means that Reynold
12  certainly had in his mind cooperating; is that correct?
13  A    It was an option, yes.
14  Q    It was an option on February 1st, 2011 -- not the first
15  time it occurred was not March but actually February; is that
16  correct, sir?
17  A    That's correct.
18  Q    So you misspoke a few moments ago?
19  A    Yes, I miscalculated. I'm sorry.
20  Q    And you also miscalculated on your direct testimony; is
21  that correct?
22  A    I don't recall.
23  Q    Now, so you had the meeting on February 1st and then you
24  had -- how did that meeting go, sir?
25  A    How did it go?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

---

Page 31

Miragni - cross/ McMahon          1676

1   Q    Yes.
2   A    I sat down and I discussed with the government -- I
3   believe we proffered and we went over what would be expected
4   of me, and what I will expect in return.
5   Q    Okay. Now, I think the jury has heard about these proffer
6   sessions, but why don't you tell them again what is a proffer
7   session.
8   A    A proffer session is basically a debriefing.
9   Q    Is it correct, sir, that's a preliminary step to get a
10  cooperation agreement?
11  A    It's one of the long step, yes.
12  Q    Government wants to know what you have to offer and then
13  you tell them what you have to offer at these proffer
14  sessions; is that correct, sir?
15  A    Yes.
16  Q    And the same agents that were at the proffer sessions on
17  February 1st had been agents that you had previously had
18  private conversations with before; is that correct, sir?
19  A    Yes.
20  Q    Now, you were at this time trying to get bail on your
21  arrest from January 20th; is that correct, sir?
22  A    Yes.
23  Q    So this first meeting, this first proffer session, is
24  nine days after your arrest, sir?
25       Actually, my math is terrible.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

---

Page 32

Miragni - cross/ McMahon          1677

1   It's eleven or 12 days after, you're arrested on
2   January 20th, and this is February 1, just about 11 or
3   12 days?
4   A    I'm not sure. I'm not sure at all.
5   Q    But you had a bail hearing on February 4th, did you not?
6   A    Yes, I did.
7   Q    So you figured if you're going to get out on bail you're
8   not going to cooperate; is that correct, sir?
9   A    I don't recall having a proffer session February 1st.
10  Q    Well, you called it a proffer. You called it just a few
11  minutes ago.
12  A    I don't even remember meeting with the agents
13  February 1st or meeting with the government on February 1st.
14  Q    Are you now taking back your testimony --
15  A    I am trying to think. I know I had a bail hearing on the
16  4th. I was granted bail.
17  Q    Right. Then it was taken away?
18  A    Well, it was appealed. It was taken away at a later
19  date.
20  Q    And when was it taken away?
21  A    It was taken away when I went in front of Judge
22  Matsumoto.
23  Q    And that was on March 4th?
24  A    I believe so.
25  Q    So I want to just go back for a moment. We just had five

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

---

Page 33

Miragni - cross/ McMahon          1678

1  minutes of questioning about your session on February 1. You
2  described it as a proffer. You described the agents that you
3  had previously spoken to. Now, you're saying that you don't
4  remember such a session occurred on February 1.
5  A   That is correct, sir. I don't remember, it no.
6        MR. McMAHON: Can I have 3500-RM-26.
7        May I approach the witness, Your Honor?
8        THE COURT: Yes, you may. What's the --
9        MR. McMAHON: 3500-RN-26 eight pages.
10       THE COURT: Thank you.
11 Q   Take a look through those notes there and see if that
12 refreshes your recollection, both as to the date of that
13 meeting and as to the contents of your decisions with the
14 agents that day (handing to the witness).
15       Does that refresh your recollection, sir?
16 A   No, it doesn't.
17 Q   So as you sit here today you don't remember meeting with
18 the agents on February 1st, 2011?
19 A   No I don't (perusing).
20 Q   Do you recognize the handwriting on those notes?
21 A   No, I don't (perusing).
22 Q   Do you know whether or not the government refers to you
23 as RM?
24 A   I'm sure they do.
25 Q   Do you remember meeting with the government before your

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 34

Miragni - cross/ McMahon          1679

1  bail hearing on February 4th?
2  A   No.
3  Q   So you don't remember being taken out of MDC for a
4  private meeting?
5  A   I remember being taken out of the MDC for a private
6  meeting, I just don't know what date it was.
7  Q   So on March 4th -- take that back.
8        On February 4th the Magistrate Judge says you should
9  get bail, and the government appeals; is that correct, sir?
10 A   Yes.
11 Q   And on March 4th the District Court, Judge Matsumoto,
12 comes down with a decision and says no bail for Mr. Miragni;
13 is that correct, sir?
14 A   Yes.
15 Q   And as a result of Judge Matsumoto's decision did you
16 intensify efforts to cooperate, sir?
17 A   I didn't intensify because it was already in motion.
18 Q   Well, you weren't sure that you had this previous meeting
19 on February 1st, how could it be in motion?
20 A   I believe I met with the government before the March --
21 the March 4th date, but I'm not clear of the date at all. I
22 don't remember February 1st meeting. I don't remember it.
23 Q   You don't remember the day?
24 A   I don't remember the day I had the meeting, no.
25 Q   So you remember being in court and Judge Matsumoto denies

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 35

Miragni - cross/ McMahon          1680

1  you bail?
2  A   Yes, I do.
3  Q   And do you remember that approximately three weeks later
4  the government writes a letter to Judge Matsumoto asking her
5  to release you on bail; is that correct, sir?
6  A   I don't know when they wrote the letter.
7  Q   Was it about three weeks later?
8  A   I'm not sure when they wrote the letter.
9        MR. McMAHON: May I approach the witness,
10 Your Honor?
11       THE COURT: Yes, you may.
12       MR. McMAHON: Handing him Government
13 Exhibit 3500-RM-4B.
14 Q   Take a look at that document, sir, see if that refreshes
15 your recollection.
16 A   Yes.
17 Q   And that was on March 25th, I believe?
18 A   That's when it's dated, yes.
19       MR. McMAHON: Judge, I would offer that in evidence.
20       MR. LIFSHITZ: L.
21       THE COURT: L?
22       MR. McMAHON: L.
23       THE COURT: 3500-RM-4B.
24       MR. LIFSHITZ: No. We will object. We don't see
25 where under the rule it is admissible.

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Page 36

Miragni - cross/ McMahon          1681

1        THE COURT: Yes. Sustained.
2  Q   By March 25th, sir, you had come to an agreement, a
3  temporary or tentative agreement with the government that you
4  were going to be a cooperator; is that correct, sir?
5  A   Yes.
6  Q   And you understood that the government assured Judge
7  Matsumoto that you will be closely monitored if you were
8  released on bail; is that correct, sir?
9  A   Yes.
10 Q   And even with the government's assurances the Judge
11 denied the request and wanted even more assurances; is that
12 correct, sir?
13 A   Yes.
14 Q   And as a result of that, the government had to submit a
15 follow-up letter and that would be four days later, actually
16 on April 1st they resubmitted a bail request; is that correct,
17 sir?
18 A   I don't know.
19 Q   But a few days later they resubmitted a bail request
20 citing and indicating additional restrictions on your activity
21 while you had been out on bail; is that correct?
22 A   Yes.
23 Q   Because the, government when you were arrested in
24 January, had argued you should be detained because you were a
25 danger to the community; is that correct, sir?

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1682

1  A   Yes.
2  Q   And Judge Matsumoto wanted to know why were they now
3  saying you're not a danger to the community and they could put
4  you back on the street.
5       MR. LIFSHITZ:  Objection.
6       THE COURT:  Sustained.
7  Q   So it took two tries before Judge Matsumoto agreed to
8  release you on bail; is that correct?
9  A   Yes, twice, yes.
10 Q   And the government promised that you would be closely
11 monitored and supervised; is that correct, sir?
12 A   Yes.
13 Q   And as it turns out, the very first thing or one of the
14 first things you did was you went out and committed crimes
15 while on bail?
16 A   Yes.
17 Q   Numerous crimes?
18 A   I committed crimes that were made aware to the FBI.
19 Q   Long after the fact when you were committing the crimes
20 you were hiding it from these people who were closely
21 supervising you, weren't you?
22 A   I don't think so.
23 Q   You don't think so?
24 A   No.
25 Q   Are you telling this jury that the FBI knew you were

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Miragni - cross/ McMahon          1683

1  committing crimes when you were committing crimes on bail?
2  A   When I was out on bail I was talking to people and making
3  recordings.
4  Q   Is that responsive to any question that I asked?
5  A   Well, whatever crimes that I was committing the FBI were
6  aware of.
7  Q   Were they aware then when you were committing them?
8  A   I am sure.
9       THE COURT:  Crimes?  What crimes are we talking
10 about?
11      MR. McMAHON:  We are talking about the loan shark
12 collections that he made privately without the agents knowing.
13 Q   Remember testifying on direct Thursday that you hid
14 things from the FBI?
15 A   Yes, I did.
16
17
18
19
20
21
22
23
24
25

MARSHA DIAMOND, CSR, RPR
OFFICIAL COURT REPORTER

Maragni - cross - McMahon          1684

1  EXAMINATION CONTINUES
2  BY MR. McMAHON:
3  Q   And when you hid things it was about loanshark
4  collections, is that correct?
5  A   It was about my money, yes.
6  Q   Your money?
7  A   Yes.
8  Q   Your loanshark money?
9  A   Yes, my money.
10 Q   Your money.
11      And they didn't want you out there collecting your
12 loanshark money, did they, privately?
13 A   Well, they knew that there was money being collected.
14 Q   Yes.  But some money that was being collected was being
15 turned in.
16      That was under their supervision, is that correct?
17 A   That's correct.
18 Q   But what they didn't know was the private side dealings
19 that you were doing by like handing people notes so it didn't
20 turn up on the recorder?
21 A   That's correct.
22      That was the notes I was giving to my partner, yes.
23 Q   That would be your partner in the loanshark business?
24 A   Yes.
25 Q   So you are wearing a wire for the FBI.  You are meeting

GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1685

1  them in the morning.  You are meeting them at night.  You are
2  debriefing.
3       And you are cheating the FBI by writing notes to
4  your loanshark partner, don't say this and this because I'm
5  wearing a wire, is that correct, sir?
6  A   He didn't know.  He was unaware I was wearing a wire.
7  Q   But you wrote notes not to say this or not to say that,
8  is that correct, sir?
9  A   That's correct.
10 Q   You wrote notes so that the FBI agents who were closely
11 supervising you wouldn't know what you were doing, is that
12 correct, sir?
13 A   That's correct.
14 Q   Because if you had spoken it would have been on the
15 recorder, is that correct, sir?
16 A   That's correct.
17 Q   So you cheated the FBI, is that correct?
18 A   I guess I did.
19 Q   And you cheated the prosecutors that worked with the FBI,
20 that were supervising you, is that correct, sir?
21 A   That's correct.
22 Q   They still made a deal with you?
23 A   They made an arrangement with me.
24 Q   Now, in addition to leaving things off the recording by
25 virtue of passing notes, you also at certain select times

GR    OCR    CM    CRR    CSR

Page 41

Maragni - cross - McMahon          1686

1  turned off the recorder or didn't wear the recorder, is that
2  correct, sir?
3  A   There was times between appointments that I would turn
4  the recorder off, yes.
5  Q   Did you ever deliberately turn the recorder off so that
6  it wouldn't pick up certain things?
7  A   No.
8       (Continued on next page.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

         GR    OCR    CM    CRR    CSR

Page 42

Maragni - cross - McMahon          1687

1  Q   Now, this recording device, was in a watch?
2       MS. ARGENTIERI:  Objection.
3       MR. LIFSHITZ objection.
4       THE COURT:  I'm sorry?  Yes.  Come up, please.
5       (Side bar.)
6

Page 44

Maragni - cross - McMahon          1689

1       (In open court.)
2  EXAMINATION CONTINUES
3  BY MR. McMAHON:
4  Q   Was the recording device easily removable?
5  A   Yes.
6  Q   Now, I think you testified that after each recording that
7  you would talk to the agents, either telephonically or in
8  person, is that correct, sir?
9  A   Yes.
10  Q   You wore a wire or recording device from April of 2011 to
11  December of 2011?
12  A   Correct.
13  Q   And when you were debriefed by the agents that you
14  sometimes left out conversation with your partner, is that
15  correct, sir?
16  A   Yes.
17  Q   And you also left out telling them about the notes to the
18  partner, which you have described previously, is that correct,
19  sir?
20  A   Yes.
21  Q   Now, the notes that you would pass to your partner -- by
22  the way, who was your partner?
23  A   My partner Dennis.
24  Q   Dennis Cinn --
25  A   Dennis Cinnante.

         GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1690

1  Q    Cinnante.
2         At least one of the notes to the partner was don't
3  use names, is that correct, sir?
4  A    Yes.
5  Q    By the way, do you have copies of those notes?
6  A    No, I don't.
7  Q    Did the government arrest Dennis?
8  A    I don't know.
9  Q    Another note was, leave out your wife and brother?
10 A    Yes.
11 Q    Because they were involved in your loanshark business
12 also?
13 A    No; but I didn't want him to implicate them in anything.
14 Q    You mean, falsely implicate them?
15 A    I didn't want any conversation with their names in it.
16 Q    In connection with your loanshark business?
17 A    In connection with anything.
18 Q    Okay.  And you also -- one of your notes was, don't
19 mention shylock money?
20 A    Yes.
21 Q    I think that on direct examination you said that you
22 wanted to protect your family and your money and that's why
23 you did that, is that correct, sir?
24 A    That's correct.
25 Q    Even though you were actually lying to the government

          GR     OCR     CM     CRR     CSR

Maragni - cross - McMahon          1691

1  agents and prosecutors while you are doing it, you, Reynold
2  Maragni, chose to protect your money and your family over your
3  obligations to the government, is that correct, sir?
4  A    That's correct.
5  Q    And the jury should believe that you would forego those
6  obligations to tell the truth for that same government, is
7  that correct, sir?
8  A    I can't tell the jury what to believe or not to believe.
9  Q    True enough.
10        Now, there came a point in time early on in your
11 recording career here that there were some problems with the
12 recordings, is that correct, sir?
13 A    Yes.
14 Q    And basically, the government -- you handed over to the
15 agent at the end of the day the recording device and there was
16 nothing on it, is that correct, sir?
17 A    There was a time, yes, there was an instant, yes.
18 Q    They checked that device and they said there was nothing
19 wrong with the device.  What are you doing, Reynold?
20 A    They didn't say that.
21 Q    Was it something like that?
22 A    No.
23 Q    It wasn't like that?
24 A    No.
25 Q    You don't remember having a couple of conversations with

          GR     OCR     CM     CRR     CSR

Maragni - cross - McMahon          1692

1  them on May 17th about your obligations on the recording
2  device?
3  A    I remember a conversation.  I don't remember the date.
4  Q    Did they tell you that they thought that you were turning
5  the recording device on and off?
6  A    No.
7  Q    You had previously discussed the ability by a cooperator
8  to turn the recording device on and off, is that correct?
9  A    Yes.
10 Q    You and Tommy McLaughlin talked about that, is that
11 correct?
12 A    No.
13 Q    Or you talked about that in connection with Tommy
14 McLaughlin, is that right, sir?
15 A    I don't know what you're talking about.  I didn't talk to
16 Tommy McLaughlin about anything.
17 Q    Who did you talk to about the ability of cooperators to
18 turn the recording device on and off?
19 A    Who did I talk to?  About cooperators ability to turn the
20 recording on and off?  I don't believe I talked to anybody
21 about it.
22 Q    You did not talk to anybody about Tommy McLaughlin's
23 ability to turn that recording device on and off?
24        You never discussed that subject with anybody?
25 A    I don't think I did.

          GR     OCR     CM     CRR     CSR

Maragni - cross - McMahon          1693

1  Q    Okay.  We will come back to that.
2         Are you aware, sir, that -- did you have the ability
3  to turn it on and off?
4  A    Yes.
5  Q    And you had the ability to take it off and put it in the
6  trunk?
7  A    Yes.
8  Q    Which you did on numerous occasions?
9  A    I put the recording device -- I took the recording device
10 off and put it in the trunk when I didn't have any more
11 appointments.
12 Q    I know.  But I didn't ask you that question.
13        The question I asked you, sir, was, did you on
14 numerous occasions take the recording device off your person
15 and put it in the trunk of your car?
16 A    Yes, I did.
17 Q    What kind of car were you driving, by the way?
18 A    A BMW.
19 Q    What series?
20 A    Three.
21 Q    Was that a government provided car?
22 A    No.
23 Q    It is your own car?
24 A    Yes.
25 Q    Still have it?

          GR     OCR     CM     CRR     CSR

Page 49

Maragni - cross - McMahon          1694

1   A   No.

2   Q   Did you sell it?

3   A   No.

4        It was a leased car.

5   Q   Okay.  Do you own any cars?

6   A   No.

7   Q   Does your family own any cars?

8   A   Yes.

9   Q   Your wife?

10  A   Yes.

11  Q   Or your girlfriend or both?

12  A   My wife has a car.

13  Q   Your wife Kelly?

14  A   Yes.

15  Q   Kim put up bail for you when you were arrested?

16  A   Yes.

17  Q   Now, I think the prosecutor asked you on direct

18  examination on Thursday about the cooperation agreement and I

19  think he asked you whether or not lying to the government is a

20  breach of the agreement and you said yes.

21       Is that correct, sir?

22  A   Yes.

23  Q   You had previously lied to the government, is that right?

24  A   Correct.

25  Q   So that was okay.  But what did they say, do over, any

GR    OCR    CM    CRR    CSR

---

Page 50

Maragni - cross - McMahon          1695

1   new lies is a breach of the agreement?

2   A   When I signed the cooperation agreement, it was in the

3   agreement that I wouldn't lie to the government.  That was in

4   February of 2012.

5   Q   You knew that you weren't supposed to lie to them before

6   that, didn't you know that?

7   A   But I did.

8   Q   I know.

9        But you knew that you shouldn't have?

10  A   Yes.

11  Q   The earlier lies to the government were okay and the new

12  lies after you signed the agreement that is supposed to have

13  some meaning for you?

14  A   I don't know what new lies you are talking about.

15  Q   By the way, the monies that you were trying to collect

16  were monies that were owed to Kim?

17  A   Yes.

18       THE COURT:  What was the last thing you said?

19       MR. McMAHON:  Kim, monies that were owed to Kim.

20       THE COURT:  All right.

21  Q   That's your girlfriend?

22  A   Yes.

23  Q   She put up the house for you for bail?

24  A   No.

25  Q   She wasn't the surety on your bail?

GR    OCR    CM    CRR    CSR

---

Page 51

Maragni - cross - McMahon          1696

1   A   She put a signature on there.  It wasn't her house, no.

2   Q   Then she withdrew her signature?

3   A   Yes.

4   Q   Now, you have acknowledged, sir, that you lied to the

5   agents and prosecutors and that you committed crimes while you

6   were on bail release.

7        Is it not true, sir, that nobody from the government

8   ever told Judge Matsumoto that you did that?

9   A   I don't know.  I wouldn't know that.

10  Q   As we sit here today, in June 25th of 2012, you have not

11  been brought before Judge Matsumoto to account for the fact

12  that you committed crimes while on bail that she ordered, is

13  that correct, sir?

14  A   I haven't been back in front of Judge Matsumoto, no.

15  Q   Now, do you have a recollection, sir, on how many proffer

16  sessions you have had?

17  A   No, I don't.

18  Q   Do you have a recollection, sir, on how many times you

19  have met with government agents?

20  A   No.

21       It's been many times.  I don't know.  I don't have a

22  recollection of how many, no.

23  Q   Okay.  Let me read some dates to you, sir, and see if

24  this refreshes your recollection on the dates of proffer

25  sessions, which is to say, sessions where you actually signed

GR    OCR    CM    CRR    CSR

---

Page 52

Maragni - cross - McMahon          1697

1   a proffer agreement.

2   A   Okay.

3   Q   March 29, 2011, April 8, 2011, April 18, 2011,

4   April 28, 2011, May 10, 2011, June 30, 2011,

5   September 6, 2011, September 13, 2011, November 2, 2011,

6   November 21, 2011, December 2, 2011, January 11, 2012,

7   February 1, 2012.

8        Does that refresh your recollection, sir, that you

9   actually had 13 proffer sessions at which you signed proffer

10  agreements with the government before you were able to get

11  them to give you a cooperation agreement?

12  A   I remember meeting with the government, yes, and signing.

13  Q   And the proffer sessions were 13 in number.

14       You don't dispute that number, do you, sir?

15  A   No, I don't.

16  Q   Those dates seem to correspond with your recollection, is

17  that correct, sir?

18  A   Yes.

19  Q   All right.  In addition to those -- all those proffer

20  sessions, do you remember meeting with the government

21  on -- which is to say, agents, on the following dates:

22       April 22, 2011 -- these are dates other than proffer

23  sessions -- May 3, 2011, May 4, 2011, May 5, 2011,

24  May 11, 2011, May 13, 2011, May 15, 2011, May 17, 2011,

25  May 18, 2011, May 19, 2011, May 20, 2011, May 24, 2011,

GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1698

1 May 26, 2011, May 30, 2011, May 31, 2011, June 2, 2011,
2 June 3, 2011, June 8, 2011, June 9, 2011, June 14, 2011,
3 June 16, 2011, June 17, 2011, June 28, 2011, June 29, 2011,
4 July 8, 2011, July 12, 2011, July 14, 2011, July 15, July 19,
5 July 22, July 29.
6          Do you remember all of those meetings, sir?
7 A   Yes, I do.
8          Those were meetings made with the agents after the
9 day of working proactively, making recordings.  I was
10 debriefed on those days.
11 Q   So you had maybe, without boring the jury with continuing
12 to read dates, you had maybe 50 meetings with the government
13 agents before you were able to persuade them to give you a
14 cooperation agreement, is that correct, sir?
15 A   I don't know how many meetings there were.
16          MR. McMAHON:  May I have this deemed marked
17 Defendant's Exhibit L for identification?
18          I have a sticker, Mr. Mari.
19 Q   Just thumb through these dates, sir, and see if that
20 refreshes your recollection that the number of meetings is
21 close to 50.
22          MR. LIFSHITZ:  Your Honor, objection, to refreshing.
23 The witness answered previously.
24          THE COURT:  The witness said I don't remember.
25          MR. LIFSHITZ:  He answered yes to the list of dates
          GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1699

1 that were read.
2          MR. McMAHON:  I stopped reading.  I was getting
3 tired.  He can look at the list rather than me saying it.  He
4 can sort of make --
5          THE COURT:  What is your question?
6          MR. McMAHON:  My question is, is it close to 50
7 meetings before he got his cooperation agreement.  He could
8 thumb through the list.
9          THE COURT:  Yes.  He said he didn't remember.  So he
10 certainly can refresh his recollection.
11          (Pause.)
12 A   I am not sure.  It looks to be correct.  I am not sure,
13 though.
14 Q   Now, during each and every one of these meetings, you
15 were trying your best to get a cooperation agreement, is that
16 correct, sir?
17 A   During each and every one of these meetings, I was
18 debriefed on the day's activity.
19 Q   All right.  But I didn't ask you that question.
20          The question I asked you, during these 50 meetings
21 or so, were you trying to get a cooperation agreement?
22 A   No.
23          I was -- the whole conclusion of the work, the work
24 of being proactive, would result in a cooperation agreement.
25 Q   And that was your goal?
          GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1700

1 A   Yes; but not each and every meeting was -- was an aim to
2 gain a cooperation agreement.
3 Q   Well, you were out there being proactive on the street
4 means that you were gathering evidence to show what a good
5 government agent you'd be, is that correct, sir?
6 A   I was out there gathering evidence as part of my
7 agreement.
8 Q   As part of what agreement?
9 A   As part of the agreement I made with the government to
10 record various members of organized crime.
11 Q   And that's what got you out on bail, is that correct,
12 sir?
13 A   That's correct.
14 Q   Now, do you remember that you had -- that you were
15 claiming a recorder malfunction on April 28th, sir?
16 A   I don't remember the date.
17          MR. McMAHON:  May I approach the witness?
18          THE COURT:  Yes.
19          MR. McMAHON:  And show him 3500 RM 25 B, pages one
20 through three.
21 Q   Take a look at that document, particularly pages two and
22 three, and see if that refreshes your recollection about a
23 recorder malfunction on April 28th.
24          (Pause.)
25 A   Yes.
          GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1701

1 Q   Was that one of those days where you deliberately turned
2 it off or put it elsewhere?
3 A   No.
4 Q   All right.  Do you remember a similar malfunction -- by
5 the way, did the agents check the recorder at the end of the
6 day and find there was nothing wrong with it?
7 A   I don't know if they did or didn't.
8 Q   Take a look at the document.  See if that refreshes your
9 recollection, third page, sir.
10          MR. LIFSHITZ:  Objection, as to personal knowledge.
11          THE COURT:  Yes.
12          MR. McMAHON:  He was asked, Judge about --
13          THE COURT:  No.  He didn't say I don't remember.  He
14 said, I don't know whether they did.
15          MR. McMAHON:  This is to refresh his recollection as
16 to whether the agents tested the machine in front of him and
17 said there is nothing --
18          THE COURT:  You haven't asked that question.
19          MR. McMAHON:  That was prefatory to asking.
20          THE COURT:  You have to ask the question before you
21 can ask him to look for.
22          MR. McMAHON:  Very well.
23 Q   Do you remember handing the agents the recorder?
24 A   Yes, I do.
25 Q   It was working fine when they tested it?
          GR    OCR    CM    CRR    CSR

Page 57

Maragni - cross - McMahon          1702

1  A   No, I don't remember that.

2  Q   That you don't remember?

3  A   No.

4  Q   All right.  Do you remember that -- and the agents didn't

5  tell you, sir, that the recorder was working fine?

6  A   No, I don't remember them saying that either.  It says

7  over here, inspection of the device is ongoing.

8  Q   Okay.  And then on May 13th, the same thing happened, is

9  that correct, sir?

10  A   I am not sure of the date.

11       MR. McMAHON:  3500 RM 25-A, pages 60 through 61.

12       MS. ARGENTIERI:  Judge, can we just have a side bar

13  about this topic, please?

14       THE COURT:  Yes.

15       (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

          GR     OCR     CM     CRR     CSR

Page 58

Maragni - cross - McMahon          1703

1

Page 61

Page 63

Maragni - cross - McMahon          1708

1 Exhibit for identification M.

2       THE COURT:  M?

3       MR. McMAHON:  Yes, Your Honor.

4       THE COURT:  All right.

5       MR. McMAHON:  For identification.  This is a summary

6 based on 3500 RM 51.

7 Q    Take a look at the document, specifically, the

8 highlighted portion, sir, and see if that refreshes your

9 recollection about when you had the conversation with the

10 agent about the recorder being on and off?

11      (Pause.)

12 A   Yes.

13 Q   It was May 17th, sir?

14 A   Yes, it was.

15 Q   That was four days after the second supposed malfunction,

16 is that correct, sir?

17 A   Yes.

18 Q   Now, you are telling this jury under oath, sir, that you

19 weren't deliberately turning it off?

20 A   That's correct.

21 Q   You did not, however, get any cooperation agreement in

22 May 2011, did you?

23 A   No.

24 Q   And in fact, three days later, on May 20, 2011, you were

25 told, sir, that the government is not happy with you, is that

             GR    OCR    CM    CRR    CSR

Page 62

Maragni - cross - McMahon          1707

1     (In open court.)

2       MR. McMAHON:  May I approach the witness to get my

3 document?

4       THE COURT:  Yes.

5 EXAMINATION CONTINUES

6 BY  MR. McMAHON:

7 Q   Have you reviewed the document, sir?

8 A   Yes.

9 Q   Do you recall there was a second malfunction on May 13th?

10 A   Yes.

11 Q   Did the agents test the device in front of you and tell

12 you there was no malfunction?

13 A   I don't recall.

14 Q   Do you remember specifically having a telephone

15 conversation that day, rather, four days later, on May 17th,

16 with an agent, about the recorder when it should be on and

17 should be off?

18      Do you remember having a conversation four days

19 later?

20 A   I remember a conversation.  I don't remember if it was

21 four days later.

22      MR. McMAHON:  May I approach and show this document

23 to the witness?

24      THE COURT:  What document is that?

25      MR. McMAHON:  We will mark this as Defendant's

             GR    OCR    CM    CRR    CSR

Page 64

Maragni - cross - McMahon          1709

1 correct, sir?

2 A   I don't recall that.

3       MR. McMAHON:  May I approach and show the witness a

4 document, which would be marked as Defendant's Exhibit N for

5 identification?

6       THE COURT:  Yes.

7       MR. McMAHON:  Based on 3500 RM 55.

8       Approaching the witness, Your Honor, and handing him

9 a one-page document, 35 -- Defendant's Exhibit N for

10 identification.

11 Q   Does that refresh your recollection, sir, about the

12 question I just asked you?

13      (Pause.)

14 A   I remember having this conversation with my attorney,

15 yes.

16 Q   That the government was unhappy with you?

17 A   That's what he said they said.

18 Q   Right.

19      At this point they didn't even know about the notes,

20 is that correct, sir?

21 A   They didn't know about the notes at that point,  no, sir.

22 Q   They didn't know that, for sure, that you were

23 deliberately turning it on and off, the recorder?

24      They suspected that, is that correct, sir?

25      MR. LIFSHITZ:  Objection as to knowledge, what the

             GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1710

1 government knew.

2 Q   When you had that conversation with --

3       THE COURT:  Just a moment.  I haven't ruled yet.

4       Could you read that question back to me, please.

5       (Record read.)

6       THE COURT:  Well, if you are asking if that's what

7 somebody told him, I will allow it.

8       MR. McMAHON:  Or if he believed that to be the case.

9       MR. LIFSHITZ:  Also, misstates the testimony to the

10 extent that asks about deliberately turning something on and

11 off.

12       MR. McMAHON:  The question is, did he believe, the

13 witness, that the government agents suspected he was turning

14 it off.

15       THE COURT:  I will allow him to answer that

16 question.

17 A   I don't believe so.

18 Q   Oh, so when your attorney tells you the government is

19 unhappy with you, it was related to what, your diet?

20 A   I don't know what they were unhappy with.

21 Q   Just a few days before this conversation, you had the

22 May 13th second malfunction, is that correct, sir?

23 A   Yes.

24 Q   And then you had the April 18th malfunction, is that

25 correct, sir?

          GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1711

1 A   That's correct.

2 Q   And then you have a conversation with an agent about the

3 recorder, when it should be on and off, is that correct, sir?

4 A   Yes.

5 Q   And then a few days later your attorney says the

6 government is unhappy with you, is that correct, sir?

7 A   That's what the conversation --

8 Q   You didn't know what it was about?

9 A   I didn't know what it was about.

10       MR. McMAHON:  Your Honor, would this be the time for

11 a mid-morning recess?

12       THE COURT:  No.

13       MR. McMAHON:  Very well.

14       THE COURT:  11:30.

15 Q   Now, instead of getting a cooperation agreement, you got

16 a plea agreement, is that correct, sir?

17 A   Yes.

18 Q   And that was a straight plea agreement?

19 A   Yes, it was.

20 Q   No cooperation, no 5K letter, no nothing, is that right,

21 sir?

22 A   Correct.

23 Q   And you pled guilty to a crime that carried a maximum

24 term of imprisonment of 20 years, is that correct, sir?

25 A   I believe per the agreement, the guidelines of 97 months

          GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1712

1 was the maximum.

2 Q   Seventy-eight to 97?

3 A   Yes.

4 Q   But the crime that you were pleading guilty to carried a

5 statutory maximum of 20 years?

6 A   Yes.

7 Q   But the guidelines were 78 to 97?

8 A   Yes.

9 Q   As of August -- do you remember the date of that plea

10 agreement?

11 A   I believe it was August 4th.

12 Q   If I told you August 1st, would that refresh your

13 recollection?

14 A   It could be.

15 Q   All right.  You pled guilty before Judge Matsumoto, is

16 that correct, sir?

17 A   Yes.

18 Q   That was in an open courtroom?

19 A   Yes.

20 Q   No cooperation mentioned?

21 A   No.

22 Q   And the fact that you had been doing all this work from

23 April to August did, of course, not come up in the courtroom,

24 is that correct?

25 A   Correct.

          GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon          1713

1 Q   All the work that you had done from April to August did

2 not result in you getting a cooperation agreement, is that

3 correct, sir?

4 A   Correct.

5 Q   Now, at a certain point in time, this -- your partner in

6 loansharking, Dennis Cinnante, gave you $48,500, is that

7 correct, sir?

8 A   Yes.

9 Q   What was that for?

10 A   That was principal return.

11 Q   So one of your loanshark debtors returned the principal?

12 A   One or more.

13 Q   One or more.

14       And you were getting your money off the street?

15 A   I wanted to get my money off the street, yes.

16 Q   You knew at some point in time you -- hopefully, you were

17 going to have a cooperation agreement, you'd be in jail for a

18 little while and you wanted to get your money off the street,

19 is that correct, sir?

20 A   That's correct.

21 Q   Because you knew that when it became clear you were a

22 cooperating witness, there is nobody out there going to be

23 paying Reynold Maragni any loanshark money, is that correct,

24 sir?

25 A   I am not sure about that.

          GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon        1714

1  Q   You would what, go hit them with a baseball bat?
2  A   No.
3        I didn't hit anybody with a baseball bat over a
4  loanshark money.
5  Q   That was a straight out assault because you didn't like
6  the guy?
7  A   That was an assault because he robbed somebody's house
8  that was close to me.
9  Q   Okay.  So you were sort of the Sheriff of Nottingham?
10 A   No.  I sort of retrieved what he stole and I got it back.
11 Q   Okay.  You wanted to get your money off the street, is
12 that correct, sir?
13 A   That's correct.
14 Q   The 48,500 vig that you are collecting every week, you
15 felt would dry up.  Did you think that would dry up?
16 A   Sure.
17 Q   If you could get a little nest egg before you go into the
18 Wit Sec that wouldn't be too bad, would it?
19 A   I wanted to get my money off the street because I wanted
20 my money.
21 Q   Yes.  It is your money even though it is criminal
22 proceeds.  You viewed it as hey, it's my money, is that
23 correct, sir?
24 A   For whatever the reason, it was my money.
25 Q   It was your money.  The government takes a view that

GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon        1715

1  that's proceeds of crime, is that correct?
2        THE COURT:  Mr. McMahon --
3        MR. McMAHON:  I am just curious as to why he thinks
4  it is his money.
5        THE COURT:  No.  You are talking about the
6  government takes the view.  Ask your questions without --
7        MR. McMAHON:  Referring to the government?
8        THE COURT:  Or anyone, what anyone else thinks.
9        MR. McMAHON:  Okay.
10 Q   Now, you gave the government the 48,000.
11       How much did Dennis really give you?
12 A   He gave me $48,500.
13 Q   He didn't give you one hundred forty-eight, which would
14 be the principal you had out on the street?
15 A   No, he didn't.
16 Q   You didn't give them forty-eight and put one hundred in
17 your pocket?
18 A   No, I didn't.
19 Q   Do you still have one hundred on the street?
20 A   I am not sure what's on the street.  I have no control
21 over anything.  I don't know what's going on.
22 Q   I didn't ask you what you have control over.
23       Do you have one hundred on the street or did you
24 take all your money off the street?
25 A   I didn't take all my money off the street.  I got back

GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon        1716

1  48,500.
2  Q   That's all you got off the street?
3  A   That's what I got off.
4  Q   So there is one hundred out there?
5  A   I don't know what's out there.
6  Q   And between August 1st when you took a plea, what was the
7  next time that you know that you went to court?
8  A   I believe the next time I went to court was in February
9  2012.
10 Q   Well, was there a modification of your bail in December
11 of 2011?
12       Didn't the government go to Judge Matsumoto and say
13 that they wanted to relocate you in December of 2011?
14 A   Yes, but I don't -- I don't believe I was in court.
15 Q   But you are aware that the government wrote to the judge
16 and asked to relocate you?
17 A   I know I was being relocated.  I don't know the
18 procedures that they did.
19 Q   So you are -- if -- how much in contact with your lawyer
20 were you?
21 A   I was in contact with my lawyer constantly.
22 Q   So if the government was sending letters to the Court
23 with copies to him, he would tell you what's going on, is that
24 correct, sir?
25 A   Not all the time, no.

GR    OCR    CM    CRR    CSR

Maragni - cross - McMahon        1717

1  Q   So did your lawyer deliberately keep you out of the loop
2  or no?
3        MR. LIFSHITZ:  Objection, Your Honor.
4        THE COURT:  Sustained.
5        MR. McMAHON:  May I approach the witness and show
6  him 3500 RM 4 K, to see whether or not it refreshes his
7  recollection about his lawyer discussing it with him?
8        THE COURT:  Yes.
9        MS. ARGENTIERI:  Judge, he didn't say he didn't
10 recall.  The Court just sustained the objection to the
11 question as to what this would refresh his recollection to.
12       MR. McMAHON:  Judge --
13       THE COURT:  Come up.
14       (Side bar.)
15

Page 73

18
19
20
21
22
23
24
25

GR   OCR   CM   CRR   CSR

Page 76

Maragni - cross - McMahon          1721

1 EXAMINATION CONTINUES
2 BY MR. McMAHON:
3 Q   Mr. Maragni, you testified on Thursday about your
4 military service, is that correct, sir?
5 A   Yes.
6 Q   And you said that you enlisted, is that correct?
7 A   I boosted my draft, yes.
8        THE COURT:  You did what?
9        THE WITNESS:  I boosted up my draft.  I went three
10 months earlier.
11        THE COURT:  All right.
12        THE WITNESS:  Than I was scheduled.
13 Q   There is -- well, did you enlist, which would require a
14 three or four-year commitment, or did you accelerate the
15 draft, which required a two-year commitment?
16 A   I accelerated the draft.  It is called boosting the
17 draft.
18        (Continued on next page.)
19
20
21
22
23
24
25

GR   OCR   CM   CRR   CSR

Page 77

1722

1 BY MR. McMAHON: (Continued)
2 Q   Okay.  So, you only had a two-year commitment; is that
3 correct?
4 A   That's correct.
5 Q   And you went in, in November of 1970?
6 A   Yes.
7 Q   And you went through basic and AIT?
8 A   Yes.
9 Q   Where did you do that?
10 A   Fort Dix basic and Fort Gordon Georgia.
11 Q   Okay.  And then you went to 'Nam?
12 A   Yes.
13 Q   What was your MOS?
14 A   I was, I went to MP school and when I went to Vietnam I
15 was attached to a liaison unit on Hai Van Pass.
16      THE COURT:  On what.
17      THE WITNESS:  In a place called Hai Van Pass.  I
18 lived on the top of a mountain with four other Americans and
19 we were the only GIs between Da Nang and Phu Bai.
20      THE COURT:  All right, thank you.
21 Q   You know where Quang Tri is?
22 A   Yes, I do.
23 Q   How is it that you happened to get an MP MOS?
24 A   That's what they gave me.
25 Q   Now, the tour of duty in Vietnam at that time was

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 78

1723

1 365 days; is that correct, sir?
2 A   Twelve months, yes.
3 Q   And you told the jury you did nine-and-a-half months?
4 A   Approximately, yes.
5 Q   What did you do to have them short-circuit your tour of
6 duty?
7 A   They didn't short-circuit.  I came back on an R & R.
8 Q   Mr. Maragni.
9 A   Yes.
10 Q   It was a 365-day tour in Vietnam?
11 A   Yes.
12 Q   And you don't come back.  R and R was one week; is that
13 correct, sir?
14 A   Why.
15 Q   And explain to the jury what it is that you did that got
16 you kicked out of country?
17 A   That got me kicked out of country?
18 Q   Yes.  How is it that you served a nine-and-a-half year
19 [sic] tour when all the rest of us served a year, sir?
20      MR. LIFSHITZ:  Objection.
21      THE COURT:  Yes, sustained.
22 Q   You said the tour was a year; is that correct, sir?
23 A   Yes, it is.
24 Q   365 days.  Not nine-and-a-half months, 12 months?
25 A   That's correct.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 79

1724

1 Q   Okay.  Why was your tour different from all the other
2 thousands of draftees?
3 A   It wasn't.
4 Q   Oh, I see.  So, you did nine-and-a-half months when you
5 went for a week R & R and never went back?
6 A   That's correct.  It was 14-day R & R.
7 Q   Oh, you got a two-week R & R?
8 A   Yes.
9 Q   But it wasn't a two-and-a-half-month R & R; was it?
10 A   No.
11 Q   You didn't commit any crimes over there; did you?
12 A   No, I didn't.
13 Q   You didn't get kicked out of country?
14 A   No, I didn't.
15 Q   What was your rank when you left there, sir?
16 A   I was a PFC.
17 Q   Okay.  Now, they didn't do R & R in the United States;
18 did they?
19 A   Yes, they did.
20 Q   Are you sure?
21 A   Yes, I am.
22 Q   And did you come to the brig when you came back to the
23 United States?
24 A   Pardon me?
25 Q   Did you go to the brig?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 80

1725

1 A   What break?
2 Q   Brig.  Jail.  Army jail.
3 A   No.
4 Q   All right, you went AWOL?
5 A   Yes.
6 Q   Twice?
7 A   Yes.
8 Q   During the times that you went AWOL, did they ever put
9 you in jail?
10 A   No.  I was detained the first time that I went AWOL but I
11 wasn't in the brig.
12 Q   Okay.  And then you got a discharge?
13 A   Yes.
14 Q   A general discharge under less than honorable conditions;
15 is that correct, sir?
16 A   Yes.
17 Q   That's just short of a dishonorable discharge?
18 A   No, that's not.  It's just less than honorable
19 conditions.
20 Q   Well, there's only three discharges; aren't there, sir?
21 A   I'm not sure how many discharges there are.
22 Q   Well there's honorable, there's dishonorable, and in
23 between is a general discharge under less than honorable
24 conditions; isn't that correct, sir?
25 A   Yes.  And then there's general for honorable conditions.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

1726

1 And then there's general for conscientious objecting.  There's
2 many discharges.
3 Q   Are you making this up as you go along, sir?
4 A   No, I don't think so.
5 Q   And you're telling the jury that there's a general
6 discharge under honorable conditions?
7 A   Yes, there is.
8 Q   And that there's a general discharge for conscientious
9 objectors?
10 A   Yes, there is.
11 Q   And this is from your vast knowledge of military law?
12      MR. LIFSHITZ:  Objection.
13      THE COURT:  Sustained.
14 Q   But anyway, so, you went AWOL a couple times and you go
15 this general discharge under less than honorable conditions;
16 isn't that correct, sir?
17 A   Yes.
18 Q   Less than honorable to you?
19 A   Yes.
20 Q   And you did nine-and-a-half months in Vietnam?
21 A   Yes.
22 Q   Now, you have had discussions with a lot of people about
23 cooperation and cooperating witnesses; is that correct, sir?
24 A   I'm not sure of the question.  I'm not sure what you
25 mean.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

1727

1 Q   Well, you know what cooperation in the context of a
2 Federal cooperating witness is; do you not?
3 A   Yes.
4 Q   And you know what cooperating witnesses are?
5 A   Yes, I do.
6 Q   You are a cooperating witness?
7 A   Yes, I am.
8 Q   And the subject of cooperating witnesses is something
9 that is frequently discussed amongst organized crime people
10 who are in The Life; is that correct, sir?
11 A   Yes.
12 Q   And you, as a matter of course, would routinely follow
13 the cooperation efforts of famous cooperators such as
14 "Mikey Scars" DiLeonardo; is that correct, sir?
15 A   I'm not following anybody.
16 Q   Well, did you have discussions in person with Tommy
17 McLaughlin on September 19th -- actually, with individuals,
18 Mr. Truscello and Mr. Scarpati?
19      THE COURT:  Could you spell those names for the
20 reporter.
21      MR. McMAHON:  Yes.
22      Frank Scarpati -- S-C-A-R-P-A-T-I, and Dominick
23 Truscello -- T-R-U-S-C-E-L-L-O.
24      In which you discussed with those gentlemen, the
25 recent sentencing of Michael "Mikey Scars" DiLeonardo.
MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Side-Bar                    1728

1 THE COURT:  What was the last name?
2 MR. McMAHON:  Michael "Mikey Scars" DiLeonardo.
3 THE COURT:  Thank you.
4 MR. LIFSHITZ:  Objection, Your Honor.
5 THE COURT:  What is your objection?
6 MR. LIFSHITZ:  Sentencings.
7 THE COURT:  Come up.

R. Maragni - Cross / McMahon        1730

3
4        (In open court.)
5 Q      Without mentioning any names, Mr. Maragni --
6        THE COURT:  Mr. McMahon, ask your question.
7        MR. McMAHON:  Okay.
8 Q      Do you expect to get a sentence of time served for your
9 cooperation?
10 A     I'm not sure what sentence I'm going to get, that's up to
11 Judge Matsumoto.
12 Q     But you do follow in the newspapers and in Gangland --
13       THE COURT:  Mr. McMahon.
14       MR. McMAHON:  Judge, I can't even ask if he follows
15 it?
16       THE COURT:  No, I told you.  We talked about this up
17 here.
18       (Pause in the proceedings.)
19 Q     All right.  Now I think that you said you met "Allie Boy"
20 Persico in 1972?
21 A     No, I met "Allie Boy" Persico in 1969.
22 Q     Okay.  And did you say that you discussed with him a
23 situation involving your cousin?
24 A     That was --
25 Q     His cousin, rather, Carmine and your cousin Ricky?

R. Maragni - Cross / McMahon        1731

1 A     That was 1972.
2 Q     Okay.  And I assume that you were out of the Army at that
3 time?
4 A     Yes.  Well, I was still attached to the Army.  I wasn't
5 discharged until 1976, I believe it was.
6 Q     Even though theoretically --
7 A     I was AWOL at the time.
8 Q     Oh, I see.  So, they were looking for you, but you were
9 out talking to Allie Boy Persico.
10 A    Yes, in my own neighborhood, yeah.
11 Q    Now, there came a point in time, sir, that you relocated
12 from Florida to -- from New York to Florida; is that correct?
13 A    Yes.
14 Q    And this was when you got separated from your wife?
15 A    Yes.
16 Q    And were you -- what was her name, sir?
17 A    Barbara.
18 Q    Barbara what?
19 A    Barbara Maragni.
20 Q    What was her maiden name?
21 A    DeCicco.
22 Q    And did she have relatives that were organized crime?
23 A    Yes.
24 Q    And were you directed to relocate to Florida based on how
25 you treated her?

R. Maragni - Cross / McMahon        1732

1 A     No.
2 Q     Were you threatened to relocate to Florida?
3 A     No.
4 Q     I think you said that you've met Frank Guerra maybe six
5 times?
6 A     I met Frank Guerra much more than six times.
7 Q     So, when you said six times the other day, what were you
8 referring to?
9 A     I met Frank Guerra in the '90s, about six times.  And
10 then I met him between 2008 to 2011, about seven times.  Six,
11 seven times.
12 Q    Oh, so, maybe it's a total of 12?
13 A    Yes.
14 Q    And you didn't say on Thursday -- you were asked how many
15 times you have met Mr. Guerra and you said about six times?
16 A    That is correct.
17 Q    You did not say that on Thursday?
18 A    I did say that, but they asked me how many times I met
19 him in the '90s and then again how many times I met him before
20 my arrest.
21 Q    Okay.  Now, in the -- I think you said on a couple of
22 occasions you met him in the '90s or '70s, was it?
23 A    '90s.
24 Q    '90s, okay.  And that was with Alphonse Persico?
25 A    I met him once with Alphonse Persico in Key West and then

R. Maragni - Cross / McMahon        1733

1 I saw him in the neighborhood the rest of the times.
2 Q     And you, the ones you saw him in Key West, was he on
3 Alphonse Persico's boat?
4 A     I believe the boat was down there and they were down
5 there to get their SCUBA-diving certification.
6 Q     Okay.  Now, are you counting amongst the 12 times that
7 you say now you've seen him, the two times that the Government
8 sent you in wearing a wire?
9 A     No.
10 Q    You're not counting those two, okay.
11       And is it correct, sir, that Allie Boy Persico, in
12 your experience, was somebody that was quite secretive?
13 A    Somewhat.
14 Q    So, he was not somebody that would be telling his private
15 business to everybody that he ran into; is that correct, sir?
16 A    Yes.
17 Q    Now, I think you said that you were inducted in March of
18 2008 into the Colombo family?
19 A    Yes.
20 Q    And when did you become a capo?
21 A    In August of the same year.
22 Q    So, there was a three- or four-month difference between
23 becoming a soldier and a capo?
24 A    It was for me.
25 Q    Why?  Are you a special person?

R. Maragni - Cross / McMahon        1734

1 A   I don't know, maybe I am.  I don't know.
2 Q   Now, you said that at one time Frank Guerra drove you to
3 the airport?
4 A   Yes, that was in the '90s.
5 Q   In the 90s.
6       Can you give me a better handle on when that was?
7 A   It could have been '97.
8 Q   All right.  And where did he pick you up from, if he did
9 pick you up?
10 A   I was at Romantique Limousine.
11 Q   Okay.  And did he drive his car, or a limousine, or how
12 did he take you to the airport?
13 A   He drove his car.
14 Q   What kind of car did he have?
15 A   It was a Corvette.
16 Q   Is there some reason why somebody at Romantique
17 Limousine -- it's a limousine service?
18 A   Yes.
19 Q   Is there some reason they didn't take you?
20 A   I don't know.  I requested that one of the guys take me
21 and not to bother Frank.
22 Q   Okay.  Now, you said, testified earlier today on
23 continued direct, that when you had the, you had a
24 conversation with Frank about his proposal for induction in
25 2010.  I think you said that he could be with his friends; is

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

R. Maragni - Cross / McMahon        1735

1 that correct?
2 A   Yes.
3 Q   But then you referred to a number of different people
4 that are supposedly friends of his and they're all in jail; is
5 that correct?
6 A   I believe now they are.  I don't know if they're all in
7 jail, but some of them are.
8 Q   So, are you suggesting that he maybe could be friends
9 with them in jail?
10 A   No.
11 Q   Now, you have had -- during the course of your organized
12 crime affiliation, you have come to learn, have you not, sir,
13 that a lot of times people in The Life say things that aren't
14 necessarily true; is that correct?
15 A   Yes.
16 Q   A lot of times there's a lot of bragging going on?
17 A   Yes.
18 Q   And they make, they say I did X, Y, and Z making
19 themselves looking like big bad criminals when they may not
20 actually have done; is that correct?
21 A   That happens.
22 Q   And you, in fact, had discussed that very subject with
23 Tommy McLaughlin saying that Anthony Russo was telling storie
24 that make himself look like an important and powerful person?
25 A   I might have.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Side-Bar        1736

1 Q   Now you also; did you not, sir, when you came back to
2 New York in 2008, 2009, 2010, and 2011, you discussed with
3 various people what Frank Guerra was doing; is that correct,
4 sir?
5 A   I discussed with various people?  I don't know what
6 you're talking about.
7 Q   Well, in July of 2011, you know Carmine Baudanza?
8 A   Carmine Baudanza?  I never met him.
9 Q   All right.  How about Carmine Persico?
10 A   I know Carmine Persico.
11 Q   Okay.  And did you have a conversation on July 15th,
12 2011, with Carmine Persico in which he told you that Frank
13 Guerra hasn't been doing anything, he's just working?
14 A   I don't recall having a conversation with Carmine Persico
15 about Frank Guerra.
16       MR. McMAHON:  May I approach, show the witness,
17 Your Honor?
18       THE COURT:  Yes.
19       MR. McMAHON:  Disk number 36507, Section 2, at 5640.
20       (Pause in the proceedings.)
21       MR. LIFSHITZ:  Your Honor, can we have a brief
22 side-bar about this?

R

Page 93

---

Page 95

R. Maragni - Cross / McMahon          1740

1       Now, one of the conversations in which the
2   Government introduced -- there were two conversations, I think
3   they introduced through you, through your testimony.  They are
4   4001 and 4000.  The transcripts are in evidence as an aid to
5   the jury and recollection.
6   Q    Is that true, sir?
7   A    Yes.
8   Q    Now, the conversation, I think it was played on Thursday,
9   is a conversation with Mr. Guerra?
10  A    Yes.
11  Q    You went in to see Mr. Guerra on two occasions?
12  A    Yes.
13  Q    On April 15th, and May 10?
14  A    Sounds correct.
15  Q    And did the Government give you instructions on what you
16  should try to get from him?
17  A    They told me to have a conversation with him.
18  Q    Did they steer you as to subject --
19  A    They didn't get specific, no.
20  Q    They didn't get specific.
21       And how long was your meeting session before you
22  spoke to him on both occasions?
23  A    How long was my meeting session with who?
24  Q    With the agents, if you had any?
25  A    It was briefly.  It was over the telephone.
            MARSHA DIAMOND, CSR
            OFFICIAL COURT REPORTER

---

Page 94

R. Maragni - Cross / McMahon          1739

1       (In open court.)
2   BY MR. McMAHON:  (Continued)
3   Q    Mr. Maragni, is it correct, based on your familiarity
4   with Anthony Russo, that he was basically hanging around all
5   the time with Tommy McLaughlin and Peter Tagliava?
6   A    Yes.
7   Q    And you described then as three peas in a pod?
8   A    Yes.
9   Q    Do you remember -- do you know Artie Tarzia?
10  A    Yes.
11       THE COURT:  Can one of you spell that name.
12       MR. McMAHON:  T-A-R-Z-I-A, I believe it is.
13       THE COURT:  Thank you.
14  Q    Did you discuss with Artie Tarzia, on August 26th of
15  2011, the benefits that the Government would get from flipping
16  "BF?"
17  A    I'm not sure.  I'm not sure of the date.
18  Q    But you remember the conversation?
19  A    Yeah, I think something -- I recall something like that.
20  Q    Now, did you ever -- do you snort cocaine, sir?
21  A    No.
22  Q    Did you ever snort cocaine around the time that you were
23  making recordings?
24  A    I never snorted cocaine in my life.
25       MR. McMAHON:  Okay.  All right.
            MARSHA DIAMOND, CSR
            OFFICIAL COURT REPORTER

---

Page 96

Side-Bar          1741

1   Q    All right.  But you were there, basically, for the
2   purpose of trying to get incriminating information?
3   A    Yes.
4   Q    And on the two occasions that you interviewed Mr. Guerra
5   that you were recorded, do you recall how long the interviews
6   were?
7   A    They were brief.
8   Q    If I told you that the first interview on April 18th was
9   one hour and 19 minutes, would you call that brief?
10       MR. LIFSHITZ:  Objection, Your Honor.
11       THE COURT:  I don't know what you're talking about,
12  you have to come up.
13       (Side-bar conference held on the record out of the
14  hearing of the jury.)
15
16       (Side-bar.)

---

Page 105

10 CROSS-EXAMINATION
11 BY MR. McMAHON:  (Continued)
12 Q    Mr. Maragni, I stand corrected, the first conversation
13 with Mr. Guerra was 25 minutes in length.
14        Does that sound right to you, sir?
15 A    More or less.
16 Q    And that was on April 18th.  And the second conversation,
17 on May 10th, was about 40 minutes, sir?
18 A    Sound right.
19 Q    Now, and this Exhibit that's here that's been introduced
20 into evidence, it's from the April 18th, 25-minute
21 conversation; is that correct, sir?
22 A    Yes.
23 Q    Okay.  And it's one page of transcript; is that correct,
24 sir?
25 A    Yes.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Page 106

R. Maragni - Cross / McMahon          1751

1        MR. McMAHON:  All right.  Now, if the jurors could
2 take a look at that, I'll put it up on the ELMO.
3        (The above-referred to Exhibit was published to the
4 jury.)
5        MR. McMAHON:  Now, this is a conversation on
6 April 18th, which is three months, just about three months
7 after the indictment on Mafia take-down day.
8 Q    Is that correct, sir?
9 A    Yes.
10 Q    And the charges against all of the 39 Colombo and the
11 other 90 people were the subject of great publicity in the
12 newspapers; is that correct?
13 A    Yes.
14 Q    And also, the subject of great discussion amongst people
15 who are in the organized crime life; is that correct, sir?
16 A    Yes.
17 Q    And the indictments in the various cases were actually in
18 the newspapers.  I think you made reference to The Daily News;
19 is that correct?
20 A    Yes, there were.
21 Q    And you had asked Frank Guerra during these
22 conversations, didn't he read the things where said about
23 him in the Daily News and stuff; is that correct, sir?
24 A    Who was "he?"
25 Q    "He" being Frank Guerra.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Page 107

R. Maragni - Cross / McMahon          1752

1 A    Yes.
2 Q    So, there was detailed conversation of the allegations;
3 is that correct, sir?
4 A    Yes.
5 Q    And the detailed coverage also included excerpts of some
6 conversations.  Tapes were excerpted in the newspapers; is
7 that correct, sir?
8 A    I'm not sure if they were or not.
9 Q    Well, didn't you make reference to the Tommy McLaughlin
10 tapes the things that he was saying when he was recording
11 Anthony Russo?
12 A    I might --
13 Q    Don't you recall discussing that with other people?
14 A    I might have.
15 Q    And so, when Mr. Guerra asked you on April 18th:  Did he
16 get hit with that guy Gene, he's asking you about particular
17 charges being put on particular people; is that correct?
18 A    Yes.
19 Q    Nothing unusual about that?
20 A    No.
21 Q    Okay.  And when he asked you -- and you had said
22 Lombardo.
23        And he said yes.
24        And you said they brought that, I think they brought
25 something like that.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Page 108

R. Maragni - Cross / McMahon          1753

1        That was what you said to Mr. Guerra; is that
2 correct?
3 A    Yes.
4 Q    Now, Anthony Russo was actually a co-defendant of yours;
5 is that right?
6 A    Yes, he was.
7 Q    So, on that 39-defendant Colombo case in which Frank
8 Guerra was not listed, Maragni and Anthony Russo were; is that
9 correct?
10 A    Yes.
11 Q    So, you were familiar with the charges not only against
12 Maragni, but also against Anthony Russo; is that correct?
13 A    Yes?
14 Q    And since you knew Tommy McLaughlin well, you had an
15 interest not only on his recordings with Reynold Maragni, but
16 also his recordings with Anthony Russo; is that correct, sir?
17 A    Yes.  And many others.
18 Q    Right.  And during this process between January and
19 April, you were getting tape recordings and discovery.
20        You were getting stuff from the Government; is that
21 right?
22 A    I, until today, I haven't gotten the recordings.
23 Q    All right, but you got discovery?
24 A    Yes, I did.
25 Q    And your attorney got discovery?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

---

Page 109
R. Maragni - Cross / McMahon          1754

1 A   Yes, he did.
2 Q   He did.  And as a cooperating witness, you're not
3 entitled to discovery; are you?
4 A   I'm not sure about that.  I think I am.
5       THE COURT:  Yes, he is.
6       MR. McMAHON:  Well, Judge.
7       THE COURT:  He's entitled to discovery.
8       MR. McMAHON:  Okay.  That's not what the agreement
9 says, Your Honor.
10 Q   Going back to the transcript, you told Mr. Guerra:  I
11 don't know if that's one of the charges, the extortion with
12 Benji, but it very well might be by the time Anthony's done.
13      Now, were you referring to, sir, the fact that
14 Anthony makes up things in his tape recordings?
15 A   No.
16 Q   Were you referring to the fact that what -- well.
17      You said that you don't know if it's one of the
18 charges, but it might well be by the time Anthony's done.
19      What did you mean by that?
20 A   At the time I was having the conversation with Frankie
21 Guerra, Anthony Russo was already a cooperating witness.
22 Q   So, you knew?
23 A   Yes, I did know.
24 Q   Okay.  So, by -- in fact, his cooperation became, there
25 was a column in Gangland in early April?

Page 110
R. Maragni - Cross / McMahon          1755

1 A   His cooperation became apparent before I ever made bail.
2 Q   Okay.  And that was in early February?
3 A   Yes.
4 Q   That his cooperation was publicized?
5 A   Yes.
6 Q   Which made it all the more urgent for you to get in
7 there; is that correct, sir?
8 A   That had nothing to do with me.
9 Q   Okay.  Well, is it -- when you made that -- assuming you
10 made that debriefing session on February 1st, did you happen
11 to see Anthony Russo in the next room?
12 A   I saw Anthony Russo in the next room when I was meeting
13 with an attorney.  I was meeting with my attorney and Anthony
14 Russo was coming out of an attorney room.
15 Q   Do you know, sir, whether or not he met with agents on
16 the same day that you did?
17 A   No, I don't.
18 Q   Okay.  So, you were -- when you said during this
19 conversation that it may very well be by the time Anthony's
20 done, what you're telling Mr. Guerra is that, given that
21 Anthony's a cooperating witness, he is likely to make up all
22 sorts of stories and the extortion charge could very well come
23 as a result.
24      Is that what you meant to say, sir?
25 A   What I meant to say is that if the charge wasn't there on

Page 111
R. Maragni - Cross / McMahon          1756

1 the onset, it probably will be there by the time Anthony
2 Russo's done cooperating because Anthony could have made a
3 statement and said that, and told the story about Benji.
4 Q   Well, in terms of whether that's what you meant, did you
5 ever have conversations with other people -- in fact, I think
6 I just asked you a few minutes ago -- that Anthony Russo made
7 up things, made up stories?
8 A   Yes, he did.
9 Q   All right.
10 A   From time to time.
11 Q   And so, when you said it might very well be by the time
12 Anthony's done, you could very well be referring to him
13 telling them truthful information?  Or referring to him
14 telling the Government stories?
15      MR. LIFSHITZ:  Objection; asked and answered.
16      THE COURT:  No, overruled.
17      You're to answer.
18 A   Whether Anthony would be telling the truth or a lie, I
19 would have no way of knowing what he was telling the
20 Government.
21      But what I was getting across was if that extortion
22 wasn't one of the charges, it very well be by the time
23 Anthony was done.  That's what I meant.
24 Q   Well, you don't know if the extortion was one of the
25 charges; was it?

Page 112
R. Maragni - Cross / McMahon          1757

1 A   I don't know if it was one of the charges on Benji, I
2 didn't know.
3 Q   Okay.  Or on Anthony?
4 A   Or on Anthony.  I didn't know at that time.
5 Q   Okay.  And in this conversation in connection with the
6 extortion, Mr. Guerra told you that they're going to fucking
7 lie, pardon my French?
8 A   Yes.
9 Q   And that you then asked him what he meant was that you
10 went there and extorted this guy.
11      And he said we didn't?
12 A   Yes.
13 Q   And he said it was a personal thing?
14 A   Yes.
15 Q   Now, the guy that supposedly gave a slap to Gene Lombardo
16 was Frankie Notch; is that correct?
17 A   That's correct.
18 Q   And Frankie Notch reported to you?
19 A   Yes, he does.
20 Q   And Frankie Notch told you that he never got a penny from
21 the extortion; is that correct?
22 A   That's correct.
23 Q   Okay.  And Mr. Guerra is here denying to you that there
24 was ever any extortion.  That it was basically a personal
25 beef?

Page 113

R. Maragni - Cross / McMahon          1758

1 A   Yes.
2 Q   Now, he makes reference in the next line to:  It's not on
3 tape.
4       You were aware, sir, that he had a recording of Gene
5 Lombardo in which he denied he was extorted by Guerra; is that
6 correct, sir?
7       MR. LIFSHITZ:  Objection, Your Honor.
8       THE COURT:  Yes.  Sustained.
9 Q   Well, when you referred to a tape, are you referring to
10 the tape of Gene Lombardo?
11       THE COURT:  Did he refer to a tape?
12       MR. McMAHON:  Yes.  This is in a transcript that's
13 in evidence from the Government.
14       THE COURT:  Yes, I know.
15       MR. McMAHON:  And Guerra says it's not on tape.
16       And you were asked to provide an explanation for
17 what Guerra meant.
18       And I'm asking him if there's a different
19 explanations that is more correct.
20 Q   Wasn't Guerra talking about the tape that a private eye
21 made of Eugene Lombardo?
22 A   I have no idea a private eye made a tape of Gene
23 Lombardo.  Until right now.
24 Q   You didn't hear about it being played at the bail hearing
25 for Frank Guerra?

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

Page 114

Side-Bar                  1759

1 A   No.
2       THE COURT:  Look, come up here.
3       (Side-bar conference held on the record out of the
4 hearing of the jury.)
5
6

R. Maragni - Cross / McMahon          1762

1      (In open court.)
2 BY MR. McMAHON:  (Continued)
3 Q   Now, after Mr. Guerra says on this transcript it's not on
4 the tape, you say:  So, you have everything covered, is that
5 correct?  Leave it alone?
6 A   Yes.
7 Q   So, you are responding to his claim as if he told you
8 that he has a defense to that claim.
9 A   Yes.
10 Q   And that claim being the extortion of the Gene Lombardo;
11 is that correct, sir?
12 A   Yes.
13 Q   And it was your understanding that --
14      MR. McMAHON:  And then, if we could turn to the next
15 tape which they offer, the Government offered.
16      THE COURT:  The next transcript.
17      MR. McMAHON:  Transcript, excuse me 4001-T in the
18 books.  And it's on the ELMO.
19      (The above-referred to Exhibit was published to the
20 jury.)
21 Q   You're asking this guy that reports to you, this guy that
22 unquestionably slapped Gene Lombardo, whether he, the slapp
23 got any money as a result of this alleged incident; is that
24 correct, sir?
25 A   Yes.
              MARSHA DIAMOND, CSR
              OFFICIAL COURT REPORTER

R. Maragni - Cross / McMahon          1763

1 Q   And he told you that he did not?
2 A   That's correct.
3 Q   So, and you did not have any reason to disbelieve him,
4 did you, sir?
5 A   No, I didn't.
6 Q   So, if Anthony Russo got any money out of Gene Lombardo,
7 it certainly didn't go to Frankie Notch?
8 A   That's what I was made to understand.
9 Q   And if Anthony Russo got any money out of Gene Lombardo
10 Frank Guerra told you that he didn't get any of it; is that
11 correct, sir?
12 A   I didn't speak to Frank Guerra about any money.
13 Q   Well, when Frank Guerra said to you on the previous tape
14 that he had a complete defense to this, did you not get the
15 impression that he didn't get any money, sir?
16      THE COURT:  No, you don't have to answer this.
17      We don't discuss impressions here.  Facts.
18 Q   Now, did you, during that conversation on April 18th, did
19 you say -- not Mr. Guerra, did you say -- that Anthony Russo
20 was telling stories that he was in the back seat at Scopo, in
21 the car?
22      MR. LIFSHITZ:  Objection, Your Honor.
23 Q   Did you say that?
24      MR. LIFSHITZ:  Objection, Your Honor.
25      THE COURT:  Objection sustained.
              MARSHA DIAMOND, CSR
              OFFICIAL COURT REPORTER

Proceedings          1764

1      You don't have to answer.
2      MR. McMAHON:  Judge, I'm not --
3      THE COURT:  Objection sustained.
4      Go on.  Mr. McMahon, I have sustained the objection.
5      MR. McMAHON:  I can't even ask what he said?
6      THE COURT:  No.
7      (Pause in the proceedings.)
8      MR. McMAHON:  Your Honor, this Exhibit is marked as
9 Defendant's Exhibit O.
10      THE COURT:  I'm going to allow the jury to go to
11 lunch.  We'll come back at 2:00 o'clock.

Page 129

1774

19  CROSS-EXAMINATION CONTINUED
20  BY MR. McMAHON:
21  Q    Mr. Miragni, one of the individuals that you assaulted,
22  did you tell him that -- did you threaten that you were going
23  to come back and cripple him and roll him out like a fucking
24  paraplegic?
25  A    One of the people that I assaulted?
                    MARSHA DIAMOND, C.S.R.
                    Official Court Reporter

Page 132

Miragni - cross/ McMahon          1777

1   Q    Yes. Remember reading this transcript in the government's
2   bail -- initial bail application to keep you detained?
3   A    Yes.
4   Q    And did you actually use those words, did you actually
5   say that you would come back and cripple -- you are going to
6   roll him out like a fucking paraplegic, did you use those
7   words, sir?
8   A    Yes, but he was never assaulted.
9   Q    That is what you just threatened?
10  A    Yeah.
11  Q    And with respect to another individual, did you tell
12  Mr. McLaughlin that you wanted to take him off the street, you
13  want him stabbed, you want to fucking horrify him, did you
14  tell Mr. McLaughlin to convey those messages to one of your
15  loanshark debtors?
16  A    No.  He wasn't a loanshark debtor.  It was take him off
17  his feet; not take him off the street.  Not stab; scare.
18  Q    Again, in the transcript that the government provided to
19  Judge Matsumoto to deny you bail, that's what the government
20  said that you said?
21  A    That was in the transcript but that wasn't correct.
22  Q    Now, did you -- before you started cooperating with the
23  government, you had one of the agent's phone numbers; is that
24  correct, sir?
25  A    Yes.
                    MARSHA DIAMOND, C.S.R.
                    Official Court Reporter

Miragni - cross/ McMahon          1778

1 Q    And it would be fair to say that your level of interest
2 in trying to be a cooperator was pretty high?
3 A    What time are you talking about, what period?
4 Q    Right around the time of your arrest?
5 A    No, that wasn't true. The reason I got the agent's number
6 is because he knocked on my door, along with many other doors
7 that he knocked on, and he asked me if I would be interested
8 in cooperating.
9 Q    That was before your arrest?
10 A    Before my arrest.
11 Q    And you kept the card and you kept the number?
12 A    I kept the card, yes. Any agent that gives me a number,
13 I would keep the card so I would have it for my own future
14 reference.
15 Q    So after you got arrested you, in fact, called that
16 number?
17 A    Yes, yes. I did at some point, yes, I did.
18 Q    And did you testify at a previous proceeding in this
19 courthouse that your level of interest in trying to be a
20 cooperator was pretty high?
21 A    At a certain point, yeah.
22 Q    When was that point?
23 A    I don't recall exactly when.
24 Q    But it wasn't long after your arrest?
25 A    Within a few months, yeah.
                MARSHA DIAMOND, C.S.R.
                Official Court Reporter

Miragni - cross/ McMahon          1779

1 Q    Few Mondays or a weeks?
2 A    Few weeks, few months. I don't remember exactly when.
3 Q    How about a few days?
4 A    How about a few minutes. It was a couple of weeks.
5 Q    You don't like to be in jail?
6        THE COURT: Wait. First of all, you are talking
7 over each other and I don't need the smart remarks.
8        MR. McMAHON: Judge, is that from me or him?
9        THE COURT: It is from both of you.
10       MR. McMAHON: Okay.
11 Q    Now, you remember there came a time in December of 2011
12 that you met with an individual by the name of Pat Truglia?
13 A    Yes.
14 Q    And who is Pat Truglia?
15 A    Pat Truglia is an associate of the Colombo Family.
16 Q    And he was under you?
17 A    Yes.
18 Q    You were in Florida?
19 A    Yes.
20 Q    And he gave you a check for $7,000?
21 A    Yes.
22 Q    And did he give you anything else that day?
23 A    That day, no.
24       THE COURT: What day? I'm sorry. What day?
25       MR. McMAHON: Around December. Around December 13th,
                MARSHA DIAMOND, C.S.R.
                Official Court Reporter

Miragni - cross/ McMahon          1780

1 2011 in Florida.
2        THE COURT: Thank you.
3 A    Yes, he give me a check for $7,000.
4 Q    And that was some of your laundered shylock money?
5 A    Yes.
6 Q    And did he give you any cash?
7 A    No.
8 Q    Now, you gave the $7,000 check to the FBI; is that
9 correct?
10 A    Yes.
11 Q    But that turned out to be another one of those days when
12 the recorder didn't work?
13 A    No, I don't believe that's the case.
14 Q    All right. Take a look at this document which is
15 3500-RM-25 -- 3500 -- pages 178 and 179 (handing to
16 Ms. Argentieri).
17       THE COURT: RM?
18       MR. McMAHON: 25-A.
19       MR. LIFSHITZ: We object to the extent it is to
20 refresh.
21       MR. McMAHON: He says he doesn't think it happened
22 that day.
23       THE COURT: Do you recall?
24       THE WITNESS: I don't recall the recorder not
25 working that day. That was the last day that I was working
                MARSHA DIAMOND, C.S.R.
                Official Court Reporter

Miragni - cross/ McMahon          1781

1 proactive.
2 Q    Take a look at these two pages (handing).   See whether
3 that refreshes your recollection on the day of December 13th.
4 A    It says device wasn't working (perusing).
5 Q    That's at least the third time that we know that the
6 recorder malfunctioned?
7 A    Yes.
8 Q    For no apparent reason?
9 A    I don't know what the reason was, but yes.
10 Q    And that also happens to be the day just before you are
11 coming off the street; is that correct, sir?
12 A    That was the day.
13 Q    And you were scooping up all your loansharking money?
14 A    I was what?
15 Q    You were scooping all your loanshark money?
16 A    Not at this point.
17 Q    Well, the 7,000 was what?
18 A    The $7,000 was given to me by FBI. It was confiscated
19 money that they gave me, and I used that money, and gave it to
20 Pat Truglia to launder $7,000 for me.
21 Q    And then to return a check to you?
22 A    Yes.
23 Q    And in addition to returning the check to you, did he
24 hand you an envelope with some cash in it?
25 A    No.
                MARSHA DIAMOND, C.S.R.
                Official Court Reporter

Miragni - cross/ McMahon          1782

1 Q   You didn't get a little nest egg to go off the street
2 with?
3 A   No, I didn't.
4 Q   And did you turn off the recorder before that meeting
5 with Mr. Pat Truglia?
6 A   No, I didn't.
7 Q   Do you know why it malfunctioned?
8 A   I have no idea.  It could have turned off.  Sometimes
9 movement would turn it off, but I wouldn't know.
10 Q   Before you were saying that or -- withdrawn.
11       Did you say before that you didn't collect money
12 when the recorder was off, did you say that?
13 A   Did I say I didn't collect money when the recorder was
14 off?
15 Q   Right.
16 A   I didn't collect money the day that he was saying about
17 the $48,000 the recorder was off, no.
18 Q   All right.  Do you remember testifying under oath at a
19 previous proceeding at page 113 at lines nine through 18
20 (reading):
21       Question:  Did you always tell the agents everything
22 that happened during the meetings that you recorded?
23       Answer:  No.
24       Question:  What did you leave out?
25       Answer:  I left out some stuff from time to time.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Miragni - cross/ McMahon          1783

1       Question:  Like what?
2       Answer:  I left out when I collected money.
3       Question:  When you say, "collected money," what did
4 you mean?
5       Answer:  I collected shylock money that was due me.
6       Question:  You didn't tell the FBI about that?
7       Answer:  No, I didn't.
8       Do you remember giving those answers to those
9 questions under oath here in this courthouse two months ago?
10 A   Yes.
11       (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon          1784

1 EXAMINATION CONTINUES
2 BY MR. McMAHON:
3 Q   And that testimony was true, sir?
4 A   Yes.
5 Q   Among the people that you collected money from and didn't
6 tell the FBI about was Dennis Cinnante?
7 A   Yes.
8 Q   A fellow named DeSantis?
9 A   Yes.
10 Q   Now, you testified about having a conversation or
11 conversations with Mr. Guerra about a supposed induction, is
12 that correct, sir?
13 A   Yes.
14 Q   And how many conversations did you have with Mr. Guerra
15 on that subject?
16 A   Two.
17 Q   When were those conversations?
18 A   One was shortly after an induction ceremony in
19 February 2009, and another one was in September of 2011.
20 Q   In September of 2011?
21 A   I'm sorry.  September of 2010.
22 Q   So it wouldn't have been recorded?
23 A   No, it wouldn't have been.
24 Q   Okay.  Now, the first conversation, you had been told I
25 think by Benji that with regard to the 2009 class, shall we

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon          1785

1 say, that Mr. Guerra passed, he didn't want it?
2 A   Yes.
3 Q   And that's the one where Anthony Russo was inducted?
4 A   Yes.
5 Q   And you understood, did you not, sir, that Anthony Russo
6 was the one who kept pushing, pushing, pushing, to have Frank
7 Guerra proposed?
8 A   I wasn't aware of who was pushing to have him proposed.
9 Q   How many conversations have you had with Anthony Russo?
10 A   I've had many.
11 Q   Okay.  That subject didn't come up in your conversations
12 with Anthony Russo?
13 A   No.
14 Q   All right.  In the second conversation about Mr. Guerra
15 being inducted, is that the one where you testified here this
16 morning that he smiled or something like that?
17 A   Yes.
18 Q   And you -- by the way, did you discuss that testimony
19 over the weekend with the agents or prosecutors?
20 A   No.
21 Q   Is there some reason why you didn't say it last Thursday
22 but you said it this morning?
23 A   No.
24       I don't know if I was asked it last Thursday.
25 Q   I think you said last Thursday actually that you said

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Page 141

Maragni - cross - McMahon        1786

1 when you had this conversation with him about, you know, you
2 don't want to leave your friends and go on vacation, something
3 like that,  didn't you?
4 A   I made an analogy, yes.
5 Q   Analogy, yes.
6       All right.  And then you said that his response last
7 Thursday, you said his response was a little strange.  Those
8 were your words.
9       Do you remember using those words?
10 A   No.
11 Q   You don't remember that?
12 A   No.
13      What do you mean, a little strange?
14 Q   That's -- that's a good question, good question.
15      Today you came in and said, a little strange became
16 he smiled.
17 A   He smiled.  That was his facial expression.  He smiled
18 and he nodded his head up and down.  That's what he did.
19 Q   You didn't say that last Thursday.  You said it today.
20 A   I don't remember exactly what I said last Thursday.
21 Q   But you remember what he did?
22 A   Yes.
23 Q   Did he smile like a painful smile, like that's Anthony
24 again trying to get me inducted and I don't want it, one of
25 those smiles?

MARSHA DIAMOND, C.S.R.
Official Court Reporter

---

Page 142

Maragni - cross - McMahon        1787

1 A   He smiled.  I don't know how many different smiles
2 Frankie has.
3 Q   Okay.  But did you use the word, sir, it was a little
4 strange facial response?
5 A   I don't remember saying a little strange facial response,
6 no.
7 Q   Okay.  Did he look like he was jumping for joy at the
8 prospect of being inducted into the Colombo Crime Family, sir?
9 A   He showed very little emotion.
10 Q   Now, is it correct, sir, that for somebody who on
11 multiple occasions declines to accept somebody's invitation to
12 be a soldier, they could get killed?
13 A   That's not true.
14 Q   You don't think so?
15 A   No.
16 Q   Now, you had described this pizza extortion, the Lombardo
17 extortion, alleged extortion.  You said that they came -- they
18 came -- I think you said Mr. Russo and Mr. Guerra came to the
19 club, your club?
20 A   Yes.
21 Q   And it was -- where was the club located?
22 A   Staten Island.
23 Q   All right.  I think you have said that you had a
24 conversation with Mr. Guerra outside the club?
25 A   Yes.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

---

Page 143

Maragni - cross - McMahon        1788

1 Q   I think you said on Thursday on direct examination that
2 Anthony Russo was nearby but he was not part of that
3 conversation, is that correct, sir?
4 A   That's correct.
5 Q   Well, was that to suggest to the jury that this Lombardo
6 extortion was Guerra's idea as opposed to Russo's idea?
7 A   No.
8 Q   You didn't deliberately try and put Anthony Russo
9 somewhere else, did you, sir?
10 A   Anthony Russo was about five feet away from us.
11 Q   Okay.  But he was not part of this initial conversation?
12 A   I was talking to Frankie, not Anthony.
13 Q   Okay.  Do you remember, sir, why it is that you told the
14 agents that the conversation was involving Mr. Russo and
15 Mr. Guerra, not just Mr. Guerra?
16 A   Because at one point before the conversation was over
17 Anthony Russo walked over, when they were about -- when they
18 were about to get in the van and take a ride.
19 Q   I see.
20      Isn't it fact, sir, that what you told the agents in
21 terms of describing this incident was that Russo and Guerra
22 were present, describing the incident to you, at the whole
23 time, not -- no mention whatsoever of Russo being five feet
24 away?
25 A   Anthony Russo was close enough to hear every word of the

MARSHA DIAMOND, C.S.R.
Official Court Reporter

---

Page 144

Maragni - cross - McMahon        1789

1 conversation.  But he was no part of the conversation.
2 Q   Are you fudging a little bit?
3 A   I am not fudging anything.
4 Q   Was he five feet away or was he part of --
5      THE COURT:  Stop, Mr. McMahon.
6      MR. McMAHON:  Yes, Judge.
7      THE COURT:  Stop.
8      MR. McMAHON:  All right.
9      THE COURT:  I have a court reporter here.  When the
10 two of you are speaking at one time, she cannot take it.  I
11 have to have a record of these proceedings.
12      MR. McMAHON:  Okay.
13 Q   Was he five feet away?
14 A   Yes.
15 Q   Did he have his ear in the conversation?
16 A   He probably did.  I don't know.
17 Q   Okay.  But he was not standing next to Mr. Guerra part of
18 the conversation?
19 A   No, he wasn't.
20 Q   Take a look at 3500 RM 25-A, pages 16 and 17.
21      I direct your attention to highlighted portion on
22 the second page.  See if that refreshes your recollection
23 whether Russo was standing five feet away.
24      (Pause.)
25 A   This is referring to after the incident.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon      1790

1 Q   Oh.  After -- it doesn't -- doesn't it describe
2 there -- didn't you tell the agents there about how Russo and
3 Guerra told you about Lombardo when he was stealing the pizza
4 recipe and that they were going -- you know, that he was
5 angry?
6       Isn't that what you told the agents, the two of them
7 together told you that?
8 A   No, that's not in here.
9 Q   That's not in there?
10 A   No.
11 Q   May I have the document back?
12       Page one, did you look at the first page in the
13 highlighted portion?
14       (Pause.)
15 A   I still don't remember Russo standing and having a
16 conversation with me.
17 Q   Even though you told the agents that?
18 A   Even though I told the agents that.  I don't remember
19 Russo being present.
20 Q   You sure you weren't just trying to help out the
21 government a little bit, putting it on Guerra, not on Russo
22 who already is a rat?
23 A   No.  That's not what I was doing.
24 Q   You know what substantial assistance of course is?
25 A   Yes, I do.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon      1791

1 Q   Okay.  And you -- by trying to put that conversation all
2 on Guerra, you weren't trying to give them a little extra
3 substantial assistance, were you?
4 A   I wasn't trying to put the whole thing on Guerra.
5 Q   Okay.  Now, you did enter into a cooperation agreement,
6 sir?
7 A   Yes, I did.
8 Q   You read it?
9 A   Yes, I did.
10 Q   You understand that you have to provide information and
11 they decide if it is truthful or not, they being the
12 government?
13 A   I have to provide information.  What they determine is
14 out of my hands.
15 Q   Right.
16       But I am talking in terms if you want to get a 5K1
17 letter, is that correct, sir?
18 A   If I want to get a 5K1 letter I have to provide
19 information.  Whether the information is deemed -- is up to
20 the government, not me.
21 Q   Right.
22       It is not up to the jury.  It is not up to the
23 judge.
24 A   My cooperation agreement is with the government, not the
25 judge or the jury.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon      1792

1 Q   Who decides if you are being truthful?
2 A   I guess the government decides if I am being truthful.
3 Q   Who decides if you provided substantial assistance?
4 A   The government.
5 Q   Okay.  If they decide that you haven't provided
6 substantial assistance, you don't get a 5K letter, is that
7 correct, sir?
8 A   That's correct.
9 Q   If you don't get a 5K letter you are going to do a whole
10 lot more jail time, is that correct, sir?
11 A   I wouldn't know how much jail time.
12 Q   I didn't say how much.  But a whole lot more?
13 A   I would say I'd go to jail, yes.
14 Q   A whole lot more?
15 A   A whole lot more meaning what?  A whole lot more is not
16 telling me anything.
17 Q   I am just thinking about Reynold Maragni's state of mind.
18       Do you think you'd get less time if you get a 5K
19 letter?
20 A   It's possible.
21 Q   Possible?
22 A   Yes.
23 Q   Just possible?
24 A   Yes.
25       There is no guarantees here.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon      1793

1 Q   Now, isn't there a mandatory minimum attached to your
2 plea?
3 A   Yes, there is.
4 Q   If you don't get a 5K letter, you can't get less than the
5 mandatory minimum; is that correct?
6 A   That's correct.
7 Q   So we know if you get a 5K letter you don't even have to
8 get the mandatory minimum, is that correct, sir?
9 A   That's not true.  That's up to a judge.
10 Q   I understand that.
11       But you are not obligated to get the mandatory
12 minimum if you get a 5K letter?
13 A   I guess you are correct saying that.
14 Q   Right.
15       This -- this wouldn't come as news to you?
16       Do you have trouble saying it to the jury?
17 A   I have no trouble saying anything.
18 Q   So you could get time served, you could get probation,
19 you could walk out the door when you get sentenced, if you get
20 the 5K letter?
21 A   Correct.
22       I could also get 40 years with the 5K letter.
23 Q   Sure.
24       But you could get the time that Scars got and
25 Gravano got, right?

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon          1794

1  A   I can get whatever the judge wants to give me.
2      MR. LIFSHITZ:  Objection.
3      THE COURT:  Sustained.
4      You don't have to answer that.
5  Q   5K --
6      THE COURT:  The question and answer are stricken
7  from the record.
8  Q   You understand, sir, that some 5K letters are better than
9  others?
10 A   I have no idea.
11 Q   Well, do you know what pro forma means?
12 A   No.
13 Q   Do you know what gushing means?
14 A   What gushing means?
15 Q   Yes.
16 A   Spewing --
17 Q   If the government wrote a letter to the sentencing judge,
18 which would be Judge Matsumoto, and said that you were the
19 greatest cooperator since sliced bread, would you consider
20 that to be gushing praise of your efforts?
21 A   If that was what --
22     MR. LIFSHITZ:  Objection, Your Honor.
23     THE COURT:  Yes.
24     Sustained.
25 Q   Whereas if they wrote a letter to the judge and said, he

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon          1795

1  was okay, he did a little bit --
2      MR. LIFSHITZ:  Judge --
3      THE COURT:  Do you have an objection?
4      MR. LIFSHITZ:  The same objection.
5      THE COURT:  Sustained.
6      You can look at the agreement and question from
7  that.
8      MR. McMAHON:  Yes, Judge.
9  Q   Now, you also were able to recall at some point in time
10 this conversation about Frank being a wheelman?
11 A   Yes.
12 Q   Do you remember that?
13 A   Yes.
14 Q   And tells about that conversation.  Tell us when that
15 occurred?
16 A   That occurred the day that Frankie was driving me to the
17 airport.
18 Q   And who said that?
19 A   Allie Boy.
20 Q   This was 1997?
21 A   1997.  I believe it was '97.
22 Q   I thought -- wasn't Allie in jail?
23 A   No.
24 Q   1997, Allie said this, is that correct?
25 A   Yes.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon          1796

1  Q   Wasn't it Sally Fusco or somebody that said it?
2  A   No.
3  Q   Did you tell the -- how long did it take for you to think
4  up this incident or this sentence?
5      MR. LIFSHITZ:  Objection.
6  Q   How many -- how many meetings with the government did you
7  have before you suddenly remembered Frank Guerra, the
8  wheelman?
9      THE COURT:  Just forget the "suddenly."  Do you know
10 how long before you told the government?
11 A   How long before I told the government what?
12 Q   How many meetings did you have with the government before
13 you told them about Frank, the wheelman?
14 A   I told the government that Allie called Frank a good
15 wheelman when I was questioned about did I ever hear anything
16 about Frank Guerra.
17 Q   Right.
18     And do you recall, sir, that it was actually 51
19 meetings with the agents and/or prosecutors before you came up
20 with the recollection about Frank, the wheelman?
21     Do you recall that, sir?
22 A   Well, it was 51 meetings, you might be right.  But it
23 wasn't until I was asked that I answered that question.
24 Q   Well, that -- that, sir, can hardly be true, because your
25 statement about the wheelman was in September 6th of 2011, and

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - cross - McMahon          1797

1  you were wearing a wire on this guy twice before that.
2  A   So what did it have to do with --
3  Q   So that means that the subject of Frank Guerra was
4  obviously in the minds of the agents and prosecutors long
5  before you came up with this Frank, the wheelman?
6      MR. LIFSHITZ:  Objection.
7      THE COURT:  Sustained.
8      It is stricken.
9  Q   You just said it didn't come up before.
10     In other words, Frank Guerra's name didn't come up
11 even when you were wearing a wire on him?
12     MR. LIFSHITZ:  Objection; misstates the testimony.
13     THE COURT:  Yes.
14     MR. McMAHON:  I don't think it misstates his
15 testimony, Judge.
16     THE COURT:  Yes, it does.
17 Q   Did you just say, sir, that you answered the question
18 Frank, the wheelman when you were asked about Frank Guerra,
19 yes or no?
20     Did you just say that?
21 A   Yes, I did.
22 Q   Okay.  So did you mean to suggest that you weren't asked
23 about Frank before?
24 A   I wasn't asked about Frank before.
25 Q   Okay.  Despite the fact that you wore a wire on him

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - redirect - Lifshitz          1798

1 twice?
2 A   Exactly.
3 Q   You didn't discuss Frank and you are wearing a wire on
4 the guy?
5 A   I didn't discuss Frank in his capacity as to what anybody
6 ever told me about him.
7 Q   Fifty-one meetings it took you to come up with the
8 substantial assistance, is that correct, sir?
9 A   You're absolutely right.  If it would have been 151
10 meetings, it would be the same answer.
11       MR. McMAHON:  Nothing further, Judge.
12       THE COURT:  Any redirect?
13       MR. LIFSHITZ:  Brief moment, Your Honor, to confer?
14       (Pause.)
15       Very briefly, if I may, Your Honor.
16       THE COURT:  Yes.
17 REDIRECT EXAMINATION
18 BY MR. LIFSHITZ:
19 Q   Mr. Maragni, do you recall being shown reports by agents
20 during cross-examination here today?
21 A   No.
22 Q   Were you shown documents to refresh your recollection?
23 A   Yes.
24 Q   During your cross-examination?
25 A   Yes.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - redirect - Lifshitz          1799

1 Q   Had you ever seen those documents before?
2 A   No.
3 Q   Had you ever been asked by anyone to review them for
4 accuracy?
5 A   No.
6 Q   Do you recall testifying on Thursday?
7 A   Yes, I do.
8 Q   On direct -- do you recall testifying on direct
9 examination about a conversation you had with the defendant
10 after you learned that he had turned down being inducted into
11 the Colombo Family?
12 A   Yes.
13 Q   Do you recall being asked the following question and
14 giving the following answer?
15       Question:  What did you observe and what if anything
16 did the defendant say to you?
17       Answer:  I told Frank, I says, you're feeling funny,
18 that all your friends got straightened out.  You feel like
19 you've been sort of left behind.  He shook his head yeah, gave
20 me that little smile that he does.  I said, well, next time
21 this thing comes around and you're on there, don't pass on it.
22       Do you recall that?
23 A   Yes.
24       MR. LIFSHITZ:  Nothing further.
25

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - redirect - Lifshitz          1800

1 RECROSS-EXAMINATION
2 BY MR. McMAHON:
3 Q   I thought that conversation was the second one?  2010?
4       MR. McMAHON:  Can I see the page you are referring
5 to, by the way?
6 Q   Did you say this -- this a few minutes ago, that the
7 conversation where he supposedly smiled was the second
8 conversation about induction?
9 A   He smiled the second time too.
10 Q   Why didn't he just read you about the first time?
11       MR. LIFSHITZ:  Objection.
12 A   I have no idea.
13       THE COURT:  Objection sustained.
14       You don't have to answer that.
15       Mr. McMahon --
16       MR. McMAHON:  Judge, I have to get my glasses to see
17 what was said here.
18       THE COURT:  You don't ask him why a question was
19 asked of him by an attorney.
20       MR. McMAHON:  No.  But it was redirect, Your Honor.
21       THE COURT:  No.  I am not going to allow that.
22       MR. McMAHON:  Very well, judge.
23 Q   So you didn't tell us before that he smiled both times
24 but now you are saying he smiled both times?
25       MR. LIFSHITZ:  Objection; misstating the record.

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Maragni - redirect - Lifshitz          1801

1 Q   Did you just say he smiled both times?
2       THE COURT:  Overruled.
3 A   Yes.
4       MR. McMAHON:  This is laborious, Your Honor.
5 Q   He smiled both times.  Which one was the bit of a strange
6 smile?
7 A   I don't think he has a strange smile.
8 Q   When you said he gave me that little smile that he does,
9 what does that mean?
10       Does that mean like a grimace?
11 A   No.  Frankie smiles.
12 Q   It's a little smile?
13 A   It's a little smile.
14       There are people that sometimes they smile and then
15 somebody has a broad smile.  He smiled a little smile is what
16 he did.
17 Q   Okay.  Sometimes people smile when they are in pain?
18 A   Yeah.
19       Sometimes they smile when they are happy too.
20       MR. McMAHON:  Okay.  Judge, could we approach for
21 one second?
22       THE COURT:  Yes.
23       (Continued on next page.)
24
25

MARSHA DIAMOND, C.S.R.
Official Court Reporter

Page 157

1802

```
19      (Open court.)
20      MR. McMAHON:  Nothing further, Judge.
21      THE COURT:  You may be excused.
22      Thank you.
23      (Witness excused.)
```